UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

MARCUS MIAL )
)
    Plaintiff, )
)
v. ) Case #1:11-cv-921 (GBL/IDD)
)
JENNIFER A. SHERIN, )
NATHAN FERGUSON, )
BRIAN SAYRE, )
and )
NICHOLAS ALTON )
)
    Defendants. )

## AMENDED COMPLAINT

### Preliminary and Jurisdictional Statement

1. Marcus Mial called for assistance from the Loudoun Sheriff's Office when his wife, who was despondent, threatened to hurt herself with a kitchen knife. Even as he spoke with the sheriff's dispatcher, his wife, having calmed herself, relinquished the knife. He so advised the dispatcher, explaining that the emergency was over and no assistance was needed. This was expressly confirmed by the dispatcher. Five minutes later, the dispatcher called Mr. Mial's home and double-checked that all was well. Mr. Mial confirmed that it was, and that there was no need for anyone to come to the home. The dispatcher responded "Okay, thanks." Shortly thereafter, a sheriff's deputy arrived and demanded entry to Mr. Mial's home notwithstanding that she had already been briefed by the dispatcher that things were under control and it was evident that nothing was amiss.

Disinclined to grant entry and cause further upset to his wife, Mr. Mial initially refused. Thereafter, having consulted with a friend, he agreed to let the deputies in and reopened the door. Without waiting, the deputies violently pushed their way through the door that Mr. Mial was holding open, assaulted and tased Mr. Mial, and then charged him with assault on two deputies and obstruction of justice. Mr. Mial was acquitted of all charges on the court's finding that the deputies' forcible entry into his home was unconstitutional. Mr. Mial now sues the deputies for having unconstitutionally entered his home, assaulted him and arrested him. This case arises under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983. This court has jurisdiction under 28 U.S.C. §1331.

## Parties

2. Plaintiff Marcus Mial is an adult resident of Loudoun County, Virginia.

3. Defendants Jennifer A. Sherin, Nathan Ferguson, Brian Sayre, and Nicholas Alton were, at all times relevant hereto, Loudoun County deputy sheriffs. They are the deputies who made the forcible entry and assault here at issue. They are sued in their individual capacities for damages.

## Claim for Relief

### The Calls For Assistance

4. On or about February 14, 2010, Mr. Mial was in his home in a gated community in Loudoun County with his wife and two young children.

5. At about 4:15 p.m., Mr. Mial's wife, who was depressed over a variety of personal

and family issues, picked up a kitchen knife and threatened injury to herself. Ms. Mial was not under the influence of drugs or alcohol, and was responding to extreme personal distress.

6. Unable to convince his wife to release the knife, Mr. Mial called 911 and spoke to the sheriff's dispatcher. Mr. Mial had hardly requested assistance before his wife relinquished the knife.

7. The recorded 911 call was as follows, in pertinent part:

Dispatcher: Sheriff's office, what's your emergency?

Mr. Mial: I just need assistance in sending someone to assist in taking a knife from an individual.

Dispatcher: Okay. This is 911. Tell me where I need to send the police to.

Mr. Mial: The address is 20010 Palmer Classic Parkway.

Dispatcher: Okay. And what is going on?

Mr. Mial: Never mind. They just gave it up.

Dispatcher: Okay.

Mr. Mial: Thank you.

8. About five minutes after this call ended, Mr. Mial received a call from the sheriff's office. This call, which was also recorded, went as follows:

Mr. Mial: Hello?

Dispatcher: Hello. This is the Loudoun County Sheriff's office calling back to the 911 phone call that you placed.

Mr. Mial: Yes.

Dispatcher: Is the subject that you were calling about, they no longer have a knife or anything like that?

-3-

| | |
|---|---|
| Mr. Mial: | That's correct. |
| Dispatcher: | All right. Did they use it on anybody? |
| Mr. Mial: | No. |
| Dispatcher: | Okay. Is this somebody who resides at this address, a family member or ... |
| Mr. Mial: | Yes. This is a residence. The situation is under control. No need to send anyone out. |
| Dispatcher: | Okay. Thanks. |

9. The sheriff's general order #534, governing these matters, required the dispatcher to "provide the responding deputies with as much information as possible to identify any potential risk at the scene." In the case at hand, the dispatcher was charged to tell any responding deputies that the matter had been peacefully resolved according to the person who had first sought emergency aid. On information and belief, this is exactly what the dispatcher conveyed to the responding deputies, defendants herein.

The Deputies Respond

10. Shortly thereafter, deputy Sherin arrived at Mr. Mial's house. She had been informed of both telephone calls set forth above.

11. In response to deputy Sherin's knock, Mr. Mial came to the door with his two young children. He confirmed that everything was fine and that there was no need for law enforcement activity in the home. Deputy Sherin understood that he was the person who had placed the 911 call.

12. There are glass panels on both sides of the front door to Mr. Mial's home. Through them, and through the front door that Mr. Mial held wide open, at no time did deputy Sherin see

anything amiss in the home, and indeed, there was nothing amiss.

13. Deputy Sherin nevertheless demanded entry into Mr. Mial's home.

14. Mr. Mial was extremely sensitive to his wife's precarious emotional state. Desirous of not embarrassing and distressing her further, and believing that her interrogation by the police threatened to upset the calm that had been restored, Mr. Mial initially declined to permit deputy Sherin to enter his home.

15. At no time during his encounters with Deputy Sherin or any other deputy was Mr. Mial under the influence of drugs or alcohol, nor did any of the deputies believe that he was. He was appropriately dressed, not disheveled, had no blood on his clothing, nor did he vent any anger at anyone at home or say that he had been in an argument with anyone at home. The children in the house, who were visible, appeared normal and healthy.

16. Deputy Ferguson then joined deputy Sherin at the doorway of Mr. Mial's home. He too had been informed of both telephone conversations set forth above. He too could see, through the glass panels on the sides of the door and through the door that Mr. Mial was holding open, that nothing seemed amiss. Deputy Ferguson also understood that Mr. Mial was the person who had placed the 911 call.

17. Mr. Mial repeated his refusal to permit the deputies to enter his home.

18. Deputies Sherin and Ferguson thereupon left Mr. Mial's home and walked back to their cars. They made no attempt to force entry into the house.

19. About five minutes later, deputies Sherin and Ferguson returned to Mr. Mial's home and knocked at the door. Mr. Mial, who was in the kitchen preparing dinner, walked to the door, where through the glass panes he saw deputies Sherin and Ferguson and they saw him. He then returned to the kitchen and to preparing dinner.

20. Deputies Sherin and Ferguson knocked more insistently, and Mr. Mial determined to seek advice from a friend and mentor as to what he should do. He walked from the kitchen, past the door and glass panels through which he saw the deputies looking at him, to a land line on the other side of the house. He called his friend and spoke with him for about fifteen minutes.

21. Throughout the time that Mr. Mial spoke on the telephone, the deputies remained at the door, waiting for it to be opened. They made no attempt to force an entry into the house.

22. After hearing Mr. Mial's explanation of what had happened and was happening, the person with whom Mr. Mial was speaking advised him to let the deputies enter his home as they had requested. Mr. Mial determined to follow this advice.

23. Mr. Mial put down the phone, went to the door, and opened it partially, preparatory to letting the deputies enter as he had been convinced to do. Having seen numerous police cars outside his house, immediately upon opening the door he told deputies Sherin and Ferguson, who were at the door, that he was surprised at such a large show of force.

24. Deputies Sherin and Ferguson considered Mr. Mial's behavior to amount to "contempt of cop." Without warning Mr. Mial that he was risking arrest for obstruction of justice or otherwise allegedly breaking the law, and without giving Mr. Mial the opportunity to go through with his plan of letting them enter his home, as he had been counseled to do and as he was in fact doing, having re-opened the door, deputies Sherin and Ferguson proceeded abruptly and violently to force their way into Mr. Mial's home. Mr. Mial, who had been holding the front door partially open with his hand and one foot, was pushed violently out of the way. Staggering back, flabbergasted and distressed at this unanticipated and gratuitous violent invasion, he yelled "you are not authorized to come into my house" even as he was being assaulted by deputies Sherin and Ferguson on his sides, followed by deputy Alton in front of him. Thereafter he was

tased by Deputy Sayre for "resisting" the deputies Sherin and Ferguson who had rushed violently into his home even as he was inviting them in.

25. Deputies Sherin and Ferguson used excessive and unreasonable force in assaulting Mr. Mial even as he was opening the door to let them in. By unreasonably entering into a wholly avoidable physical confrontation with him, they needlessly provoked deputy Alton into compounding the excessive and unreasonable assault upon Mr. Mial. Deputy Sherin further aggravated the situation by calling upon defendant Sayre to tase Mr. Mial, notwithstanding that all the latter was doing was trying to keep his balance having been rushed by two and then three deputy sheriffs who had assaulted him on all sides. For his part, deputy Sayre knew or should have known that it was wholly unnecessary, unreasonable and outrageous to tase Mr. Mial even as he was being assaulted by three other deputies.

26. The deputies found nothing amiss in Mr. Mial's home. However, Deputies Sherin and Ferguson arrested Mr. Mial for allegedly having assaulted them and obstructed justice. These charges were fabricated and intended to justify the defendants' misconduct. Mr. Mial had assaulted no one, and the extent of his "obstruction" was the temporary placement of his foot behind the front door of his home as he addressed the deputies the second time, only to be violently shoved backwards within seconds thereafter even as he was opening the door to let them in, as set forth above.

27. The criminal charges against Mr. Mial were *nolle prossequied* in the Loudoun County Circuit Court following a finding that the deputies' entry into Mr. Mial's home was unconstitutional.

28. The deputies' entry into Mr. Mial's home was accomplished with neither probable cause nor reasonable suspicion that criminal activity was afoot therein, nor that the life or safety

of anyone herein was in jeopardy, and was a violation of the Fourth Amendment.

29. At all relevant times, the sheriff had a written policy, in the form of general order #534, that permitted forced entry "**only** if deputies have a reasonable suspicion that the safety of people inside **may** be in jeopardy." (Emphasis in original.)

30. The sheriff's written policy required deputies to evaluate the following elements in making any decision to force entry:

* Degree of urgency involved and time required to obtain warrant,
* Possibility of danger to others, including deputies guarding site,
* Whether the "suspected offense" involved violence, and
* Whether the deputies reasonably believed that "persons may be armed."

31. In the case at hand, none of the mandated factors counseled forcible entry, and each counseled the contrary. There was no urgency to the matter, since the emergency was known to have abated before the deputies first arrived, and the deputies acted accordingly in not immediately forcing their way into the house to check on other residents. There was no reason to believe that anyone was in danger, as the person who had requested assistance had confirmed that all was well, and all other persons visibly present were acting normally. There had been no suspected offense, violent or non-violent. The deputies had no reasonable belief that anyone was armed; indeed, they had good cause to believe, from what the dispatcher had told them, that no one was.

32. The deputies' actions were intentional, willful, malicious and in knowing disregard of Mr. Mial's right to be safe and secure in his own home.

33. Mr. Mial suffered physical pain, humiliation and situational emotional distress at what had happened to him, including but not limited to hearing one of his children scream, after

he had been tased, "You killed my daddy!" He also incurred expenses for medical and legal assistance arising directly out of defendants' assault upon him.

### Causes of Action

Count I (Alternate A): <u>Excessive Force: All Deputies</u>

34. By using excessive and unreasonable force in gratuitously assaulting, overpowering and tasering Mr. Mial in his home, thereby causing him physical injury and emotional distress that could and should have been avoided, all as set forth above, the deputy defendants violated his rights, secured by the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable seizure of his person.

Count I (Alternate B): <u>Excessive Force: Deputies Sherin and Ferguson</u>

35. Alternatively, should it be found that the actions of deputies Alton and Sayre, or either of them, were justified by their finding deputies Sherin and Ferguson struggling with Mr. Mial whom they had assaulted, then the emergency entry of deputies Alton and Sayre into the Mial home, and their respective physical and taser assaults upon Mr. Mial, were the result of the unreasonable and unnecessary state-created danger brought into existence by the unreasonable actions of deputies Sherin and Ferguson in violently forcing their way into the home and assaulting Mr. Mial in the first place, as set forth above, in violation of his rights under the Fourth and Fourteenth Amendments of the Constitution.

Count II: <u>Unreasonable Violent Entry Into Home: Deputies Sherin and Ferguson</u>

36. In acting as set forth above, defendants Sherin and Ferguson knowingly, willfully and maliciously violated clearly established law to the effect that under the Fourth and Fourteenth Amendments of the United States Constitution, it was impermissible for them to

-9-

force their way violently into a citizen's home when he was in the process of letting them enter peacefully.

Count III: <u>Unreasonable Entry Into Home Without Sufficient Cause: Deputies Sherin and Ferguson</u>

37. In acting as set forth above, defendants Sherin and Ferguson knowingly, willfully and maliciously violated not merely their own general orders but also clearly established law to the effect that it was impermissible under the Fourth and Fourteenth Amendments of the United States Constitution for them to force their way into a citizen's home without a warrant and lacking probable cause or reasonable suspicion that the safety of people inside might be in jeopardy.

## Relief Requested

Wherefore, Mr. Mial seeks the following relief:

* An award of his actual damages, and of punitive damages, against the defendant deputies appropriate to the proof at trial,

* An award of his costs, including reasonable attorney's fees, and

* Such other relief as is just.

Mr. Mial requests trial by jury.

Respectfully submitted,

*[signature]*

MARCUS MIAL