UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| MARCUS MIAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case #1:11-cv -921 (GBL/IDD) | |
| | ) | |
| JENNIFER A. SHERIN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment should be denied, as it is premised on hotly

contested facts and a disregard for long established law that severely limits warrantless entries

into citizens' homes. The Plaintiff and the Defendants tell diametrically opposed stories. The

facts taken in the light most favorable to Mr. Mial present a real claim for unconstitutional entry

and excessive use of force; the Defendants ignore these facts in seeking to present their dramatic

version, that nevertheless does not justify their unlawful and tortious actions. The disputed facts

of this case are ripe for examination by a jury, and cannot at this time justify judgment on the

pleadings and discovery alone.

### I.  Standard of Review

Material facts must be undisputed for summary judgment to be granted, *Fed.R.Civ.P.*

56(c), and "the court must draw any inferences in the light most favorable to the non-movant."

*Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir.1991). Defendants present

selected allegations and arguments, but ignore the disputed facts contained in the sworn

testimony. The question presented is whether a reasonable jury could find that the actions of the

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 2*

Defendants in forcing a warrantless entry into Mr. Mial's home, as well as battering and seizing him, constituted a violation of his Fourth Amendment rights, based on the evidence presented by Mr. Mial. For a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.   Material Facts Ignored by Defendants

### A.   Information Known to Deputies Upon Arrival

The following information was known to the Defendants when they arrived at Mr. Mial's home:

1.   A male caller who had called 911 requesting assistance in getting a knife from someone had immediately thereafter reported that the knife had been put down and that assistance was no longer necessary. (See Exhibit 1: Sherin Deposition p. 181; Exhibit 4: Ferguson Deposition p. 32.)

2.   The dispatcher called back a few minutes later, and the original caller (Mr. Mial) confirmed that the knife had been put down, the situation was under control, and assistance was not needed. (Sherin Deposition p. 184.) The dispatcher provided no information to the effect that the knife had been used on anyone. (Sherin Deposition p. 182.)

3.   The incident qualified as "nonviolent" according to deputy Sherin, who initially took the lead in the matter. (Sherin Deposition p. 125.)

4.   Deputy Sherin had no knowledge of any prior incidents or domestic problems at Mr. Mial's home. (Sherin Deposition p. 166.)

5.   There was no noise or yelling at the home when Deputy Sherin arrived at the house. (Sherin Deposition p. 167.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 3*

## B.  Information Known to Deputies Prior to Forced Entry

The following was known by the Defendants after they arrived at Mr. Mial's home and before they chose to forcibly enter it:

6.  There was nothing noteworthy at the Mial residence when observing the home from the front. (Sayre Deposition p. 35.)

7.  The front door of Mr. Mial's home has glass panels on either side of the door, giving a view of the inside of Mr. Mial's home. (Ferguson Deposition p. 50).

8.  When Deputy Sherin walked up to the front of Mr. Mail's house and looked in she did not see anything going on inside. (Sherin Deposition p. 185.)

9.  When Deputy Sherin knocked on the door, Mr. Mial answered it quickly, his children at his sides. (Sherin Deposition pp. 187, 194; Exhibit 8: Mial Deposition p. 36.)

10. Mr. Mial spoke to Sherin in a normal tone of voice. He did not display anger or aggression and did not yell. (Mial Deposition pp. 42, 44.) Mr. Mial did not appear injured or disheveled in any way. (Exhibit 2: Motion Hearing, August 2, 2010, p. 37-38.) Mr. Mial was making eye contact with Sherin. (Motion Hearing, August 2, 2010, p. 37.)

11. During the time that Mr. Mial was talking to the deputies, his children were neither crying, nor appeared upset. (Sherin Deposition p. 275.) Mr. Mial's children did not appear to be injured in any way. (Motion Hearing, August 2, 2010, p. 51.)

12. At some point during Mr. Mial's conversation with Deputy Sherin, Deputy Ferguson joined Deputy Sherin at Mr. Mial's front door. (Sherin Deposition p. 192.)

13. At no time during Mr. Mial's interaction with the deputies did Mr. Mial display any anger towards anyone living in his home or say that any argument had occurred in his home. (See Exhibit 3: Defendant Sherin's Response to Plaintiff's Requests for Admission, Number 18.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 4*

14. Sherin asked Mr. Mial if he had placed the 911 call, to which Mr. Mial responded, "yes." (Mial Deposition p. 35.) It was clear to Sherin and Ferguson that Mr. Mial was the person who had made the 911 call. (Sherin Testimony, Motion Hearing, August 2, 2010, p. 54; Ferguson Testimony, Motion Hearing, August 2, 2010, p. 79; Ferguson Deposition p. 127.)

15. In response to Sherin's inquiry, Mr. Mial stated that he, his two children and his wife lived in the home. He explained that he owned the house. (Sherin Deposition p. 35.)

16. Sherin asked Mr. Mial if she could come in to make sure that everyone was safe, and Mr. Mial said no, since – as he had already informed the dispatcher twice – everything was under control. (Mial Deposition p. 36.)

17. Sherin did not ask Mr. Mial to bring his wife (or anyone) to the door. She asked to enter the home. (Mial Deposition p. 36-37.)

18. Sherin voluntarily walked away from Mr. Mial's front door. (Mial Deposition p. 40.)

19. As Sherin stepped off the door stoop, and turned to walk away, she reprimanded Mr. Mial regarding the accumulation of ice on the stoop. (Sherin Deposition p. 190-191.)

20. At no point before leaving Mr. Mial's front door did either Sherin or Ferguson advise Mr. Mial that they considered the matter an emergency, that he was required to let them into his home, that they possessed the right to enter without his consent or might do so, or that his refusal was unlawful in any manner. (Defendant Sherin's Response to Plaintiff's Requests for Admission, Numbers 20 and 21.)

21. At no time did Mr. Mial ever ask the deputies to get off of his property, or tell them that they had no right be on the property. (Mial Testimony, Motion Hearing, August 2, 2010, p. 110.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 5*

22. Deputies Sherin and Ferguson were law enforcement officers trained in subduing subjects and in making entry into homes by force. They both had their service weapons on their person. (Ferguson Deposition p. 102.)

23. Notwithstanding their training and their weapons, they did not proceed into Mr. Mial's house. Rather, they walked away to the street to consider how to proceed (Sherin Deposition p. 201.)

24. Sherin and Ferguson took no steps to enter the house until Sergeant Holway arrived, approximately ten minutes later. (Sherin Deposition p. 202.) Sergeant Holway, who was familiar with the 911 call, knew that the knife had been relinquished and that there was no indication of its having been used. (See Exhibit 6: Holway Deposition p. 173.)

25. Sergeant Holway, and Defendant Deputies Sherin, Ferguson and Altom met and agreed that the three deputies would force entry into Mr. Mial's home. (See Exhibit 7: Altom Deposition p. 70.)

26. Approximately ten to fifteen minutes after Holway's arrival, Sherin and Ferguson went to the door and knocked or rang (Mial Deposition p. 75; Sherin Deposition pp. 202, 204.)

27. Through the glass panels on each side of the front door, the deputies saw Mr. Mial approach the door, look at them, and walk away. (Mial Deposition p. 76, Sherin Deposition p. 205.)

28. Deputy Sherin continued to knock at the door in a persistent manner for approximately ten minutes. (Sherin Deposition p. 206.)

29. During the time that the deputies were knocking at the door, Mr. Mial walked to his home office to use the phone. He was visible to the deputies as did so, and as he sat talking on a phone. (Sherin Deposition p. 212-213.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 6*

30. Mr. Mial spoke on the phone for perhaps 10-15 minutes with his friend and mentor Bud Kirkland. (Mial Deposition p. 78.)

## C.  Facts Concerning Forcible Entry and Excessive Force by the Defendants

31.  Bud Kirkland advised Mr. Mial to open the door for the police and allow them in the home and Mr. Mial agreed to do so. (See Exhibit 9: Kirkland Deposition p. 18.)

32. Mr. Kirkland asked Mr. Mial to leave the phone open, so that he (Kirkland) could hear what happened. Mr. Mial set the phone down without hanging it up. (Kirkland Deposition p. 18.)

33. Mr. Mial opened the front door. (Kirkland Deposition p. 19.) At that point, there were six or seven sheriff's cars around Mr. Mial's home. (Holway Deposition pp. 94, 104-105.)

34. When Mr. Mial opened the door he commented on the officers' "show of force" at his home. He opened the door such that most of his body was visible to the deputies. He was not yelling or angry, but had a concerned demeanor. (Mial Deposition 85-85, 87.)

35. Before Mr. Mial could make another comment, or open the door fully for the officers as he intended to do, Deputies Sherin, Ferguson and Altom forced their way into his home, and pushed and seized Mr. Mial. (Mial Deposition pp. 86, 98; Altom Deposition p. 42-43.)

36. Within seconds of hearing the front door open, Mr. Kirkland heard, "boom [...] like a SWAT team hit the door, followed by loud voices." (Kirkland Deposition p. 19-20.)

37. Between the time that Deputy Sherin had first spoken to Mr. Mial at his fully opened door until the time that she and her colleagues forcibly entered his home, at least 30 minutes had passed (at least 20 minutes until the deputies returned to the door, and at least 10 more minutes as Mr. Mial spoke to Mr. Kirkland before coming to open the door). (Sherin Deposition pp. 202, 204.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 7*

38. The deputies at the door made no request of or statement to Mr. Mial before forcing their way into his home, pushing, seizing and tasing him. (Mial Deposition p. 86.)

39. As Mr. Mial was pushed by the three deputies, he heard deputy Sherin yell, "Grab his arms, grab his legs!" At that point, Sherin was on his right leg, Altom was pushing his torso, and Ferguson was grabbing his arms. Mr. Mial then yelled, "You are not authorized to come in my home." (Mial Deposition p. 98.)

40. Mr. Mial did not have time to react to the deputies. There was no struggle between Mr. Mial and the deputies, only Mr. Mial being pushed, seized and then tased. Mr. Mial did not strike at or strike any of the deputies. (Mial Deposition pp. 99-100, 104.)

41. Deputy Sayre entered Mr. Mial's home a few seconds after the other deputies. (See Exhibit 5: Sayre Deposition p. 45-46.)

42. When Sayre entered the home, he saw the three deputies engaged with Mr. Mial. (Sayre Deposition p. 54.)

43. Upon seeing the three deputies engaged with Mr. Mial, Sayre determined that "nobody was in immediate peril." (Sayre Deposition p. 55.)

44. Sayre then turned his back to the three deputies and Mr. Mial and addressed Mr. Mial's children, who were nearby. (Sayre Deposition p. 54.)

45. Sayre instructed the children to go elsewhere and made a comforting statement to them. (Sayre Deposition p. 56.)

46. After having dealt with the Mial children, Sayre turned back around and faced the deputies and Mr. Mial's back. (Sayre Deposition p. 58.)

47. Deputy Sherin shouted "tase him," whereupon Deputy Sayre shot Mr. Mial in the back with his taser. (Mial Deposition pp. 99, 105; Sayre Deposition p. 68.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 8*

48. Within a few seconds of hearing the front door open, Mr. Kirkland heard a child yell, "You killed my daddy!" Shortly thereafter, the phone went dead. (Kirkland Deposition pp. 9, 20.)

## II.  Facts Contested By The Plaintiff

The Plaintiff contests many of the facts listed by the Defendants as uncontested material facts.  The Plaintiff responds to the "facts" listed by the Defendants in their Memorandum of Law, according to the paragraph numbers used therein:

21, 22, 39. Mr. Mial categorically denies that Sherin told him that she simply "needed to make sure that everyone in the home was OK." Mr. Mial has testified and states here that Sherin demanded entry into his home: no more and no less. Mr. Mial did not "decline" any request "to make sure that everyone in the house was OK" because he never received such a request. (Mial Deposition pp. 36-37, 86, 94.)

32, 44. While it may allegedly have "appeared to Sherin that the front door began to close," all Ferguson saw was Mr. Mial "moving back" from the door. Ferguson did not see the door "swinging shut." (Ferguson Deposition p. 79-80.)

34, 52. Mr. Mial has testified and states here that he was rushed by three deputies, later identified as Deputies Sherin, Ferguson and Altom. (Mial Deposition at 88-96.)

43. Mr. Mial has testified and states here that on the occasion of his second encounter with the Loudoun deputies at his door, he did not begin "arguing with the deputies about past experiences with the Loudoun County Sheriff's Office," and that all he said was that he was surprised at such a large show of force and "disappointed" in the sheriff's office. Before he could say anything else, he was pushed back by the deputies. (Mial Deposition p. 85-86.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 9*

51. Mr. Mial has testified and states here that he was "getting the better" of no one, and that it was he who was assaulted and battered by three deputies and tased by a fourth when they burst into his home. (Mial Deposition p. 96-99.)

63. According to Sayre, he saw Sherin's eyes, "big as dinner plates," over Mr. Mial's shoulder. Yet when asked to describe how Mr. Mial was allegedly holding both Sherin and Ferguson in headlocks, Sayre testified that their heads "were drawn in close to [Mr. Mial's] chest ...in a separation between the pectoral muscle and the shoulder muscle." (Sayre Deposition p. 116.) It will be for the jury to determine whether Sherin's eyes could have been visible given the location of her head as described, or whether this description is, as Mr. Mial contends, an after-the-fact contrivance intended to justify deployment of Sayre's taser. Mr. Mial testified that he never had his arm around Sherin. (Mial Deposition p. 16-18.)

### III.  Non-Factual Assumptions Underlying Defendants' Motion

Defendants' motion states as follows at page 27:

> There is no dispute that some type of scuffle or physical contact occurred between Ferguson, Sherin and Mial. Altom observed this event and honed in the scuffle with an attempt to assist Ferguson and Sherin...From Altom's view, Mial was getting the better of Sherin and Ferguson during the struggle...[T]here is no evidence that Altom ... did anything else other than grab, push, or pull on Mial during the course of the scuffle. In fact, the force Altom used was so ineffective and limited that along with Sherin and Ferguson they were not able to gain control of Mial, which ultimately precipitated the need for him to be tased by Sayre...

The Defendants' arguments hinge on the assumption that a prolonged struggle ensued at the door.  However, the facts as viewed in the light most favorable to the Plaintiff show the Defendants entering Mr. Mial's home swiftly, and that in a few brief moments Sherin, Ferguson

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 10*

and Altom had grabbed Mial, immediately after which he was tased by Sayre. (Mial Deposition, p. 100.)

The Defendants argue that "accepting Mial's version as being true does not change the analysis" with regard to the alleged Fourth Amendment violation and the proffered qualified immunity defense. (Defendants' Memorandum of Law in Support of Motion for Summary Judgment, p. 18.) However, the facts presented by Mr. Mial are diametrically opposed to the argument asserted by the Defendants in regard to the alleged "struggle."

If Mr. Mial's statement that he was attacked even as he was calmly opening the door to let the deputies into his home is accepted, then serious questions of material fact are raised for a jury. What justifies the forcible entry into Mial's home, where on their own account the deputies did not force entry into his home in the first place, and took no action for half an hour or more thereafter, notwithstanding their alleged concern for the welfare and safety of unknown persons inside? What justifies their physical assault on Mr. Mial, and indeed, his seizure at all? What was the reason for which they had to "gain control over him" and he had to be "taken to the ground?"

The Defendants do not provide undisputed facts to answer these questions. Instead, the Defendants rely upon unarticulated assumptions below the surface of their arguments: that they were justified in doing what they did because of the aggression that Mr. Mial allegedly displayed towards them. But the latter contention is the fundamental issue in dispute in this case. By means of their summary judgment motion, defendants are inviting – requiring, actually – the court to make credibility decisions: something it may not do at this stage. The court must "apply the summary judgment standard of review, not view the evidence much as it would during a bench trial." *Rosetta Stone, Ltd. V. Google, Inc.,* #10-2007 (4th Cir. Apr. 9, 2012) Slip Op. at 16.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 11*

## IV.  Defendants Not Entitled to Immunity

### A. Sherin, Ferguson and Altom Violated Fourth Amendment

It has already been determined that the deputies who forced their way into Mr. Mial's

home on the occasion violated his Fourth Amendment rights. *Commonwealth v Mial*, Case #

21965, Loudoun County Circuit Court, December 17, 2010 (Attached as Exhibit 10).

Recognizing that this judicial finding does not bind these defendants, who were witnesses, not

parties, to the criminal case, Mr. Mial briefs the matter as though it had not already been decided

in his favor. However, the Memorandum Opinion of the Court in the criminal case provides a

comprehensive review of many of the Fourth Amendment principals at issue in the present case.

Basic Fourth Amendment principals at issue in this case were also summarized by the

Eastern District of Virginia in the case of Guerrero v. Deane:

> The Fourth Amendment forbids unreasonable searches and
> seizures. "It is a 'basic principle of Fourth Amendment law' that
> searches and seizures inside a home without a warrant are
> presumptively unreasonable."*Payton v. New York,* 445 U.S. 573,
> 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Thus, "[i]n terms that
> apply equally to seizures of property and to seizures of persons, the
> Fourth Amendment has drawn a firm line at the entrance to the
> house." *Id.* at 590, 100 S.Ct. 1371. "That line ... must be not only
> firm but also bright." *Kyllo v. United States,* 533 U.S. 27, 40, 121
> S.Ct. 2038, 150 L.Ed.2d 94 (2001). The Supreme Court has "made
> clear that any physical invasion of the structure of the home, 'by
> even a fraction of an inch,' [is] too much, and there is certainly no
> exception to the warrant requirement for the officer who barely
> cracks open the front door." *Id.* at 37, 121 S.Ct. 2038 (internal
> citations omitted). Thus, searches and seizures conduct in absence
> of a valid warrant "are per se unreasonable under the Fourth
> Amendment—subject only to a few specifically established and
> well-delineated exceptions." *Katz v. United States,* 389 U.S. 347,
> 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

*Guerrero v. Deane,* 750 F.Supp.2d 631,644 (E.D.Va.2010).

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 12*

It is settled law that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct., 407 U.S. 297*, 313 (1972). Thus, "it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The presumptive unreasonableness of warrantless entry can be overcome only under certain exceptions. A warrantless entry into a person's home will be deemed unreasonable unless it falls into such an exception. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

In the instant case, the defendants rely up upon the exception for exigent circumstances, also called the emergency aid exception, to justify their warrantless entry into Mr. Mial's home. Under this exception, "law enforcement may enter a home without a warrant to render emergency assistance on an injured occupant to protect an occupant from imminent injury." *Id.* The undisputed facts of the instant case do not show, however, that the entry into Mr. Mial's home is justifiable on this basis. Much the opposite is true.

1. **"Exigent Circumstance" Requires Emergency**

   **Or Realistic Possibility of Imminent Danger**

Warrantless entry into a home is reasonable under the emergency aid exception when an officer has concrete background information, or makes firsthand observations, that demonstrate someone has been hurt or is about to be hurt. *Michigan v. Fisher*, 130 S.Ct. 546, 547-549 (4th Cir. 2009) (warrantless entry reasonable where an officer responding to report of home disturbance observed, before entry, considerable damage in front of home, blood, and a man with cuts on his body screaming and throwing things); *Seremeth v. Board of County Com'rs Frederick County*, 2012 WL 764469 (W.D.Va. March 12, 2012) (officers investigating child abuse case had report by eye witness and had responded to prior reports of domestic disturbances at the

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 13*

home; entry reasonable); *Trull v. Smolka*, 411 F. App'x 651 (4th Cir. 2011), (officers reasonably suspected man locked in bathroom after dispute with his wife had a gun and was an immediate danger to himself and others); *United States. v. Schaffer,* 286 Fed.Appx. 81, 88 (4th Cir. 2008)(unpublished)(possibly armed man, who had earlier threatened his girlfriend with a gun, was "lurking around and may have already returned to his home;" entry authorized); *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006)(officers observed ongoing violence involving juveniles and adults fighting in home; entry authorized).

Fourth Circuit case law confirms that even if there is the potential for danger, entry is not reasonable if neither the background information known to the officer, nor the facts observable to him, demonstrate that the risk of danger is immediate. *United States v. Hill*, 649 F.3d 258 (4th Cir. 2011) (warrantless entry not reasonable where occupant refused to answer door, which looked as though it might have been kicked in); *United States v. Shea*, No. 99–4723, 2000 WL 870492 (4th Cir. June 30, 2000) (unpublished)(officers impermissibly entered adult suspect's hotel room in response to report that he was engaged in intercourse with a young girl, when the police found the defendant outside of his hotel room without her); *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992) (no emergency where officer *thought* that cabin was being occupied illegally or that occupants were hurt or in danger, because there was no indication of any illegal occupant or danger, or that the officer's entry would prevent damage to the dwelling).

The common thread in this line of cases is that it takes more than the speculation of a law enforcement agent to establish an emergency sufficient to justify passing bypassing of the warrant procedure in cases of home entry (forcible or not). The courts look to the facts on the ground to assess the merits of the claimed right to bypass what the Fourth Amendment requires.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 14*

Virginia case law is, like federal case law, replete with adjudications of Fourth Amendment cases that stand for the proposition that warrantless entry is not justified where neither background information known to an officer, nor firsthand observations of the officer, demonstrate an immediate risk of danger. *Commonwealth v. Barnett*, 2010 WL 3540057, Virginia Court of Appeals, Record No. 0664-10-3, September 10, 2010 (unpublished)(warrantless entry not within the emergency aid exception, where police responded to 911 call regarding domestic disturbance, child answered the door, and there was no evidence apparent to the officer that any occupant was in need of immediate assistance); *Kyer v. Commonwealth*, 45 Va. App. 473 (2005)(despite officer's suspicion that burglar had returned to his family home, officers could not enter the home under the emergency aid doctrine where facts did not demonstrate that health or physical safety of occupants was threatened, there being no evidence of emergency at the home); *Commonwealth v. Martinez*, 1999 WL 1129678, Virginia Court of Appeals Record No. 0467-99-4, July 20, 1999 (unpublished) (entry unreasonable in the face of evidence of potentially violent domestic situation and an apparent domestic battery prior to police arrival, where officers found the suspect calm and not a threat to anyone).

Defendants focus on several cases in which warrantless entry has been deemed permissible. But it is necessary to parse the facts supporting these holdings more carefully than has been done by the Defendants, and when that is done, the results in these cases are neither surprising nor in conflict with the basic rule discussed above.

The defense first relies on *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009). In *Hunsberger*, however, the officers faced a decidedly ominous state of affairs involving potential vandalism and abuse of a minor. In this case, officers were dispatched to the Hunsberger home after midnight when a neighbor reported suspicious activity late at night. Mistakenly believing

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 15*

that the Hunsbergers were out of town, the neighbor was concerned about vandalism. The officers were aware that two weeks prior, a vacant home nearby was burned down. Prior to entering the home, the officers made significant first-hand observations bearing on their ultimate entry. The lights inside the home turned off as they approached. They rang the doorbell twenty-five to thirty times with no response. While walking back to their cars, a side door to the garage, that had been closed when they approached the home, had been opened, suggesting that someone might have run away while they were ringing the doorbell. When the deputies contacted the owners of the cars parked in front of the home, a worried father of a sixteen year old girl came to the scene, advising that his daughter was supposed to be sleeping over at different friend's house, and that his daughter was not answering her phone. When one of the deputies heard something fall over in the garage and the sounds of a door locking, he and the worried parent called out for the child, and knocked on the door inside the garage and the basement door. Finding one of the doors to be unlocked, the deputy entered the home to investigate for vandalism and find the missing minor. *Id.* at 549-551.

The Hunsbergers, who turned out to be asleep in their home while their teenage children entertained friends, challenged the warrantless entry into their home. The Fourth Circuit determined that the actions of the officers were justified by the emergency exception. "A reasonable officer could conclude that prompt entry was necessary in order to protect the Hunsberger home from potential damage and to locate a missing girl who might be in harm's way. ... When a child goes missing, time is of the essence." *Id.* At 555.

In *Pleasants v. Town of Louisa*, 2012 WL 844355 (W.D. Va. March 12, 2012), relied upon by the defendants, the safety of a child in immediate danger was also central to the court's analysis. In *Pleasants,* Officer Rigsby arrived to conduct a welfare check on a minor living in a

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 16*

home he had visited only six weeks before, in order to assist the minor's father in picking up his

daughter. On the earlier occasion, Officer Rigsby had learned from the dispatcher that Ms.

Pleasants was "very violent" and "possibly intoxicated." Six weeks later, Officer Rigsby was

notified by the dispatcher that the daughter was crying and screaming in the background, and

again, that Ms. Pleasants "drinks." The welfare check at issue was done to make sure that the

child was not in distress or injured. Ms. Pleasants, who answered the door, was upset and hostile.

She attempted to close the door after telling the officer to leave. Officer Rigsby, who had gotten

a glimpse of the child, came through the door in order to question the child. *Id.* at 2-3. As in

*Hunsberger*, the conclusion was foreordained by the known facts, including Ms. Pleasants'

disposition and behavior, and the crying and screaming child.

The defense also relies on *Cloaninger v. McDevitt,* 555 F. 3d 324 (4th Cir. 2009). But their

superficial treatment of *Cloaninger* ignores the court's focus on a host of steps taken by the

officers in that case before their warrantless entry. In fact, *Cloaninger* exemplifies the judiciary's

insistence that officers make sufficient efforts to determine that a given situation actually

presents an emergency before making a warrantless entry into a home.

In *Cloaninger,* officers responded to a situation in which a man was in the midst of an

apparent mental breakdown and threatening suicide. *Id.* at 328. They knew that officers had

previously found firearms in his home. *Id.* at 328. The officers did not commence with a forcible

entry, but with an attempt to have a reasoned discussion with Cloaninger, who demanded,

however, that they get off his property and closed the door. A sergeant at the scene contacted a

nurse familiar with Cloaninger to gather additional information about his mental health history.

*Id.* at 328-9. Only after confirming with the nurse and a magistrate that the matter was indeed an

emergency did the sergeant authorize forced entry into Cloaninger's home. Cloaninger was

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 17*

immediately brought before the magistrate, who issued an emergency commitment order. *Id.* at 329. The Fourth Circuit held the warrantless entry was reasonable given the information available to the officers and the recommendation and approval of both a health professional and a magistrate. Mr. Mial would be pleased to have been the recipient of parallel inquiries in his own case, which did not involve a gun.

These cases, relied on by Defendants, demonstrate that the Fourth Circuit requires the risk of danger to be demonstrable and immediate in order for the emergency aid exception to apply. The mere possibility of a speculative harm or danger, without more, will not suffice. The facts known to the deputies must create "an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to person or property within." *Moss*, 963 F.2d at 678.

## 2. Facts Do Not Support The Emergency Aid Exception

Neither the background information available to the deputies prior to their arrival, nor their observations upon arriving at the house, justified their entry under the emergency exception to the warrant requirement. On arriving to the house, the deputies had no information of prior disputes, weapons use or ownership, domestic violence or other misbehavior at the Mial home. (Sherin Deposition p. 166.) They had information regarding a brief incident, aptly viewed as "nonviolent" by deputy Sherin, in which a knife had been held by one person, who relinquished it during the very 911 call made about it. (Sherin Deposition p. 181.) There is no contention that the knife was thought or claimed to have been brandished at any one. The dispatcher had learned from Mr. Mial that no one had used the knife. (Mial Deposition p. 56.) They knew that the dispatcher had promptly called the male caller, understood by the deputies to be Mr. Mial, back

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 18*

and confirmed that the incident was over and that the assistance of law enforcement agents was no longer needed. (Sherin Deposition p. 182.)

Courts should consider "the appearance of the scene of the search in the circumstances presented as it would appear to a reasonable and prudent men standing in the shoes of the officers." *United States v. Reed*, 935 F.2d 641, 643 (4th Cir.1991). The deputies' firsthand information after arriving on the scene was equally benign. There was nothing visibly amiss from outside the Mial home. (Sayre Deposition p. 35.) They could see into the house through the glass panels along both sides of the front door, and had an unobscured view into Mr. Mial's home. (Ferguson Deposition p. 50.) There were no signs or sounds of violence, struggle, or fighting. (Sherin Deposition p. 167.)

When Deputy Sherin knocked on Mr. Mial's front door, he came to and opened the door quickly, making no effort to conceal anyone or anything from her. (Sherin Deposition p. 187.) He opened the door fully, not undertaking to block anyone or anyone's line of sight, (Sherin Deposition p. 194.)

The deputies saw and heard nothing signaling an emergency in the home. The deputies knew that they were speaking with the person who had made the 911 call, *i.e.*, the ostensible "victim" rather than the perpetrator of the actions giving rise to the call. (Mial Deposition p. 35-36.) Mr. Mial was speaking in a calm, normal tone and not displaying anger or hostility towards Sherin and Ferguson. (Mial Deposition p. 42-44.) Mr. Mial answered the door with his two young children at his sides. (Mial Deposition p. 70.) The children did not appear to be in distress. (Sherin Deposition p. 275.) Mr. Mial explained to the deputies that he, his wife and the two children with him lived in the home. (Mial Deposition p. 36.) While defendants claim otherwise, Mr. Mial has testified and states here that he answered Deputy Sherin's questions normally,

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 19*

without yelling or aggression. (Mial Deposition p. 44.) He did not refuse to answer any questions.

It was the deputies who ended the first conversation with Mr. Mial and stepped away from the door. There is no evidence that Mr. Mial asked them to leave or ended the conversation abruptly or otherwise. (It is only after Deputy Sherin made what he perceived as a snide comment to him about the ice on his front stoop as she walked away from the door that Mr. Mial, displeased with what he perceived as an uncalled for insult, closed the door.)

Neither Sherin nor Ferguson, the two defendants at the door with Mr. Mial during this first encounter, asked Mr. Mial to bring his wife out, or to otherwise make her available for an interview. Their only request was to be allowed to enter Mr. Mial's home. (Mial Deposition p. 36-37.)

Up to this point, it is clear that the deputies perceived no emergency or risk of danger of the sort described in case law where the emergency aid exception has been applied by the federal or state courts. Given the totality of the circumstances known to the deputies when they arrived and, and the calm scene found at the Mial home upon arrival, the officers *voluntarily walked away, not to return for over half an hour upon being chastised by their supervisor.*[1] Under these facts, they cannot in good faith claim the existence of an "emergency."

---

[1]   Defendants' presentation of the "following orders" defense is woefully wrongheaded. To the limited extent that any courts indulge this universally disfavored "defense," they put it in the context of all the facts known to the accused officer; it is never an outright defense to civil rights liability. In *Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012), the Supreme Court examined the reasonableness of an officer's executing a search *notwithstanding* that he was acting pursuant to a warrant. While the Fourth Circuit has not directly addressed the defense, at least two district courts reject it outright. *Gonzalez v. Cecil County, Maryland*, 221 F.Supp.2d 611 (D.Md., 2002)(jail medical case; "Not surprisingly, the Nurse Defendants point to no authority for the proposition that an individual is entitled to qualified immunity where they are 'just following orders.'"); *Tasker v. Moore*, 738 F.Supp. 1005 (S.D.W.Va.,1990)(Prison officials under a duty to

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 20*

The reactions of deputies Sherin and Ferguson, both in terms of what they did *not* do –

force entry into the Mial home at the outset – and in terms of what they *did* do – retire to

consider their options for half an hour if not more – cannot be meshed with any conviction on

their part that there was an emergency in the Mial home demanding their immediate ingress.

Defendants contend that they voluntarily walked away from an open door when they thought an

injured person was inside needing their help. Whether their contentions to this effect have merit

is a matter for a jury to decide.

Throughout the period of at least half an hour during which the deputies stood watch

outside the Mial home, they received no information that assistance was needed in the home.

Indeed, they received the opposite information. They observed nothing that suggested that an

emergency was underway. While the initial call to 911 justified the belief that there had been a

problem at the home, it did not make reasonable any belief that at the time that the deputies

forced entry a current emergency existed, requiring them to act immediately to prevent injury.

---

release plaintiffs "chose instead, at their own peril, to follow orders of their superior."). The
defense represents that the Sixth and the Eleventh Circuits "recognize the 'following orders'
defense." Memorandum at 22. In fact, however, just the opposite is true. "[S]ince World War II,
the 'just following orders' defense has not occupied a respected position in our jurisprudence."
*O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004). "Following orders does not immunize
government agents from civil rights liability." *Brent v. Ashley*, 247 F.3d 1294 (11th Cir. 2001).
The Sixth Circuit find the defense at odds with a "respected position in our jurisprudence" that
an officer is not "'relieve[d] ... of his responsibility to decide for himself whether to violate
clearly established constitutional rights[.]" *Id.* at 337 (quoting *O'Rourke*, 378 F.3d at 1210);
*Kennedy v. City of Cincinnati*, 595 F. 3d 327, 337 (6th Cir. 2010)(officer not "relieve[d] ... of his
responsibility to decide for himself whether to violate clearly established constitutional rights[.]".
The defense cites *Hare v. City of Corinth, Miss*, 36 F.3d 412 (5th Cir. 1994) as also "recognizing
the defense." Memorandum at 22. But *Hare* relies on pre-*Harlow v. Fitzgerald*, 457 U.S. 800
(1982) case law addressing an officer's subjective intent – something inconsequential for thirty
years. Even *Hare* holds that an officer "'may not hide behind the cloak of institutional loyalty.'"
*Id.* at 417. The rule is no different in the Third Circuit, where what is critical is the information
the officer had, regardless of "orders." *Harvey v. Plains Tp. Police Dept.*,421 F.3d 185 (3rd Cir.
2005). Defendants' appeal to "following orders" as a defense should be disregarded outright as a
regrettable distortion of the law.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 21*

Much to the contrary, the "appearance of the scene," *Reed*, 935 F.2d at 643, including the calmness at the home, the absence of signs of injury and the demeanor of Mr. Mial and the children, contradicted any such belief.

While defendants rely on *Code of Va.* §19.2-81.3 and General Order, No. 534 of the Loudoun County Sheriff's Office on Domestic Violence (Exhibit 11) to justify their forced entry, the fact is that these legal provisions establish just the opposite. Armed with them (and with their guns), Sherin and Ferguson walked away from an open door. They changed course only later, after being chastised by a supervisor for having let Mr. Mial close his door. In fact, Mr. Mial closed his door only after Sherin and Ferguson, *seeing no reason to do so, failed to demand and secure entry to his home.* These actions speak volumes about their perception of the "emergency" they now urge upon this court, in an effort to get through the back door of "following orders" what they chose not to get through the front door of acting appropriately under the governing law and orders.

It should also be noted that while §19.2-81.3 sets guidelines for a deputy's response to a domestic violence situation, it "does not address entry into private residences," nor, "abrogate the Constitution by dispensing with the exigency requirement for warrantless searches." *Pleasants*, 2012 WL 844355 at 9. As for General Order No. 534, it simply tracks the guidelines set by §19.2-81.3, while incorporating Fourth Amendment-based restrictions on warrantless entries. General Order, No. 534, at 6. The order provides that a deputy may make a warrantless entry under "emergency situations," or if deputies "have a reasonable suspicion that the safety of people inside may be in jeopardy." Both the statute and the rule remain governed by the Fourth Amendment.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 22*

To the extent that the deputies needed to interview all the members of the family to satisfy themselves that all was well, this could have been done within the confines of the Fourth Amendment. Mr. Mial would not have objected to asking his wife to come to the door, had he been asked to produce her. She was upstairs taking a shower, and would presumably have come without difficulty at his request. But this was never asked of him (although defendants now say it was), and the next thing he knew, he was being charged and tased.

The facts at issue here are not simply those alleged by the defense, but those proffered by Mr. Mial. Defendants have not shown, and on this record cannot show, that they were entitled as a matter of law to force entry into Mr. Mial's home. Their doing so violated his rights under the Fourth Amendment, and a jury should be permitted so to find, just as the court did in the antecedent criminal case.

**3.  Deputies Sherin, Ferguson and Altom Violated Clearly Established Law by Forcibly Entering Mr. Mial's Home**

The Defendants argue, in the alternative, that at the time that they made their unconstitutional entry into Mr. Mial's home, the unlawfulness of their conduct was not clearly established. The case law outlined above demonstrates otherwise, however. By February 14, 2010, the date of entry, their conduct was clearly established as being in violation of the Fourth Amendment by both federal and state courts adjudicating the Fourth Amendment.

One starts with what was "clearly established" beyond doubt: that police entry into a home is impermissible without a warrant, absent emergency circumstances authorizing such entry. Here, the deputies' default position had to be, *and in fact initially was,* that they could not enter based on mere inchoate concern, and had to get a warrant, hence their initial walking away.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 23*

The Defendants present *Pleasants* in support of their argument. Defendants' Memorandum at 20. This is to no avail for two reasons. First, *Pleasants,* which was not decided until 2012, could not have informed the deputies' decision to enter. Second, *Pleasants* forms part of a line of authority stating that warrantless entries do not run afoul of the Fourth Amendment when they are based on concrete, significant indices of immediate danger or injury. (In *Pleasants*, the officer entered to speak to a crying and screaming child over the objections of a mother with a reputation for violence and intoxication.

Again, in *Cloaninger*, at issue was a man having a mental health crisis, understood to be suicidal, and in possession of a gun. In *Schaffer*, at issue was a man accused of aggravated assault with a gun, who was apparently lurking in the area and had terrified his girlfriend. In *Hunsberger*, the officer faced an actively worried parent searching for his missing minor daughter, along with signs of possible vandalism of a home. In *Trull*, at issue was a gun-owner locked in a bathroom as officers, inside his home, accompanied his wife with whom he had just been in a severe marital spat.

Compare Mr. Mial's case: no gun, no intoxication, no aggression, no problem with children, no sign of violence, no family disputes, no history of problems, no shouting, no disorderly conduct – *nothing* other than the affirmative assurance from a calm homeowner, standing in a wide-open door with his children at his sides, that all was well, as had been reported and reconfirmed to the dispatcher earlier, and with no reason for anyone to conclude otherwise. Whatever event might have happened in the recent past, it was now plainly over, with no reason for anyone to think otherwise. And indeed, Sherin and Ferguson simply walked away, having no reason to force their way into the home.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 24*

The state court decisions available to the Defendants clarify the federal constitutional limits upon them. For example in *Barnett*, which was ultimately relied upon by the court in Mr. Mial's criminal case to determine that the deputies' entry was unconstitutional, the Virginia Court of Appeals made clear that where no signs of ongoing violence are present at the home, the deputies could not enter on the basis of a domestic assault report that did not indicate that a victim was in present danger. What was critical to the *Barnett* court, and should have been critical to the defendants, was the lack of facts demonstrating ongoing or recent violence, or "that a person within [the home] is in need of immediate aid." *Commonwealth v. Barnett*, 2010 WL 3540057,Virginia Court of Appeals, Record No. 0664-10-3, September 10, 2010 (unpublished). In *Barnett,* unlike the instant case, the police had information that someone had in fact been assaulted. The mere possibility, not demonstrated by any facts someone *could have been* hurt, or be in need of aid did not and here does not suffice as grounds to enter forcibly into a home. The Fourth Amendment has long required more. This requirement, initially grasped intuitively by Sherin and Ferguson, was ignored here. The deputies who forced their way into Mr. Mial's home knew or should have known that what they were doing was constitutionally impermissible. They are not protected by qualified immunity.

## B. Defendants Used Unreasonable Force In Seizing Mr. Mial

Assessing the reasonableness of the deputies' actions in seizing Mr. Mial as they did requires assessment of whether he "pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner*, 490 U.S. 386, 396 (1989). On Mr. Mial's proffered facts, no reasonable jury could so find. Whether Mr. Mial's assertions will be accepted remains for another day – but on this motion, those facts must be assumed, with inferences therefrom drawn in Mr. Mial's favor.

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 25*

## 1.   The Initial Seizure of Mr. Mial

Mr. Mial has presented facts from which a jury might conclude that deputies Sherin, Ferguson and Altom jointly determined to force entry into Mr. Mial's home, and then did so, including taking him to the floor, ultimately with a taser, following which he has handcuffed, arrested, and charged with multiple crimes. The facts proffered by Mr. Mial demonstrate that there was no reason for him to have been seized at all, let alone being assaulted as he has described and ultimately tased. His evidence, supported by timing attested to by the "ear-witness" Bud Kirkland, is that he had no time to offer resistance had he sought to do so. (Mial Deposition p. 100; Kirkland Deposition p. 19.) It is for a jury to decide if he posed a threat to the deputies at any time, something he stoutly denies, and whether he should have been assaulted or seized in the first place, let alone being tased. On Mr. Mial's facts, these actions, following his opening the door of his own home preparatory to letting the deputies in, was the height of unreasonableness.

The defense argues that the force applied to Mr. Mial was reasonable under circumstances since "by all accounts, [Mr. Mial] had his arms around the Deputies, or was pushing back against the Deputies, and not going to the ground." Defendants' Memorandum at 25. However, these are not "all [the] accounts." Rather, these are the accounts of the deputies. Mr. Mial's account is markedly different. Mr. Mial claims that as he was at the door speaking to the deputies he was suddenly pushed back by the deputies' forcible entry. (Mial Deposition p. 88.) Mr. Mial testified: "The door was pushed initially. I got pushed after the door." (Mial Deposition p. 96.) Mr. Mial went on to specify that "Officer Sherin was on my right leg. The heavy officer was pushing up on my torso. There was another officer that tried to grab my arms." (Mial Deposition p. 98.)

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 26*

The defense proposes to have a jury believe that a moment after Sayre found that "nobody was in immediate peril," (Sayre Deposition p. 55), turning his back to his colleagues and speaking to the Mial children, he then turned back around to find Mr. Mial flinging three trained and armed sheriff's deputies around and holding two of them in headlocks to his chest, from which he could nevertheless see, over Mr. Mial's shoulder, the eyes of one of them "as big as dinner plates." Sayre admits to having been told to tase Mr. Mial, and to having done what he was told. (Sayre Deposition pp. 59-62, 116.)

When asked whether he had his arms around the larger officer or Deputy Sherin, he responded, "No." (Mial Deposition p. 98.) Mr. Mial explained, "There was no struggle. I was pushed back." (Mial Deposition p.100.) In other words, the officers simply attacked Mr. Mial without warning or instruction, and Mr. Mial did nothing to resist the attack. The officers used excessive force in battering and seizing Mr. Mial, where he did not attempt to stop them from entering, did not assault or batter them, and did not resist their efforts to seize him.

Doubtless, if an officer "reasonably but mistakenly believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 121 S.Ct. 2151, 2158 (2001). However, this is a question for a jury, not to be decided on a summary judgment motion. *Cf., Rosetta Stone Ltd. v. Google, Inc.* When contested assertions are disregarded and the facts are considered in the light most favorable to the Plaintiff, nothing about Mr. Mial's demeanor suggested that he was going to resist the officers' entry into his home. *Saucier* is a not a talisman whereby law enforcement officers are freed to invent whatever is useful to escape liability for their constitutional torts. The most Mr. Mial did that might have displeased the deputies was express annoyance at the Sheriff's Office's past responses to requests for assistance from Mr. Mial, and slam the front door at displeasure over at

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 27*

Deputy Sherin's catty reprimand about the ice on his porch. The deputies had no indication, either from background information or on firsthand interaction with him, that Mr. Mial was physically defiant or aggressive. He had simply denied them consent to enter his home the first time that he came to the door. Even if the deputies could have reasonably believed that Mr. Mial would have been displeased at the deputies' entry, they could not have reasonably believed that it was necessary to seize and physically subdue him to ensure his cooperation. In so doing, they violated his rights.

## 2. The Liability of Defendant Sayre for Tasing Mr. Mial

In support of Deputy Sayre, brief at 28, the defense cites *Geurrero v. Deane,* 750 F. Supp.2d 631 (E.D. Va. 2010). In this case, Ms. Guerrero told an officer at her door that the person he sought was not there, following which she shut the door on the officer's foot or leg. *Id.* at 639. Seeing their colleague in visible distress with his foot or leg caught in the door, the defendant officers forcibly entered the home and knocked Ms. Guerrero down. *Id.* at 640. Mr. Geurrero then appeared from another room in the house and walked rapidly towards the officers, coming close to them with his hands out in front of him. *Id.* at 653. Believing themselves to be under attack by an incensed husband, the officers pepper-sprayed Mr. Guerrero. In the subsequent civil suit, the court found that the defendants could reasonably have believed that Ms. Guerrero had committed a battery by closing the door on his leg or foot and that Mr. Guerrero posed an immediate threat to them. *Id.* at 640, 654-5.

Defendants like *Geurrero* because they claim that "by all accounts, [Mr. Mial] had his arms around the Deputies, or was pushing back against the Deputies, and not going to the ground." Memorandum at 25. But as noted above, these are not the facts "by all accounts" – they are the Defendants' facts, with which Mr. Mial takes issue. On Mr. Mial's facts, with inferences drawn

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 28*

in his favor, Deputy Sayre entered the home to find three deputies grabbing and pushing Mr. Mial, with Mr. Mial not striking or placing his arms around any officer. Indeed, Sayre admits that he "made acknowledgment of the fact that nobody was in immediate peril" and turned his back on his colleagues. (Sayre Deposition, p. 55.) He then tased Mr. Mial at the request of Dep. Sherin. On Mr. Mial's facts, this tasing was gratuitous, outrageous – and unconstitutional. A jury could so find, and should be permitted so to find.

### 3.  The Deputies Use of Force Violated Clearly Established Constitutional Law

The defendant deputies pushed, grabbed, and tased Mr. Mial in his own home notwithstanding that he had done nothing to warrant such abuse. He was not resisting, assaulting, battering nor disobeying any deputy. He had merely opened the door (a second time) and commented on the "show of force" by the deputies, decidedly not a comment to suggest resistance.

The defense proposes to have a jury believe that a moment after Sayre found that "nobody was in immediate peril," (Sayre Deposition p. 55), turning his back to his colleagues and speaking to the Mial children, he then turned back around to find Mr. Mial flinging three trained and armed sheriff's deputies around and holding two of them in headlocks to his chest, from which he could nevertheless see, over Mr. Mial's shoulder, the eyes of one of them "as big as dinner plates." Sayre admits to having been told to tase Mr. Mial, and to having done what he was told. (Sayre Deposition pp. 59-62, 116.)

### V.  Conclusion

Under the factual scenario before the court, there is no exigent circumstance that required the entry into the Mial home, and there the force used by the Defendants after the unlawful entry was excessive. At no time had Mr. Mial resisted, threatened to resist, or appeared to resist an officer,

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 29*

nor acted in a way to suggest that he posed a threat to the officer. Under these circumstances the

force used against this man in his own home was manifestly excessive, even without regard to

the fact that their entry itself was constitutionally impermissible in the first instance. There is no

case law supporting the use of a taser on a party doing nothing impermissible, threatening, or

dangerous. The wrongful and needless creation of the chaotic situation which ended in Sherin's

calling upon Sayre to tase Mr. Mial, and Sayre's doing so, is sanctioned by no law, and entitles

the defendants to no qualified immunity. To the contrary, it has long been clearly established that

individuals have a right to be free from excessive force during the course of a seizure. *Turmon v.*

*Jordan*, 405 F.3d 202, 207 (4th Cir.2005) (finding the "general right to be free from

unreasonable seizures is as old as the Fourth Amendment"). For these reasons, defendants'

motion for summary judgment should be denied.

MARCUS MIAL
By Counsel

_____ /s/ _____
Steven David Stone, Esq., VSB #16996
Luke Young, Esq., VSB#71581
STEVEN DAVID STONE, P.C.
Alexandria, Virginia 22314
Tel: 703-684-0200; Fax: 703-684-1521
Email: stone@stevendavidstonepc.com
Counsel for Plaintiff

*Mial v. Sherin, et. al.*
*Memorandum in Opposition to*
*Defendants' Motion for Summary Judgment*
*Page 30*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing Memorandum in

Opposition to Defendants' Motion for Summary Judgment, via ECF transmission and

first class mail, postage pre-paid, this, 17th day of April, 2012 to:

      Alexander Francuzenko, Esquire
      Cook, Craig & Francuzenko, PLLC
      3050 Chain Bridge Road, Suite 200
      Fairfax, Virginia  22030
      (703) 865-7480 (office)
      (703) 434-3510 (fax)
      alex@cookcraig.com
      Counsel for Defendants


_____/s/_____
Steven David Stone, Esq., VSB #16996
Luke Young, Esq., VSB#71581
STEVEN DAVID STONE, P.C.
Alexandria, Virginia 22314
Tel: 703-684-0200; Fax: 703-684-1521
Email: stone@stevendavidstonepc.com
Counsel for Plaintiff