IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MARCUS MIAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:11cv921 (GBL/IDD) |
| v. | ) | |
| | ) | |
| | ) | |
| JENNIFER SHERIN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Jennifer Sherin, Nathan Ferguson, Nicholas Altom, and Brian Sayre's Motion for Summary Judgment. Plaintiff Marcus Mial brought this civil action under 42 U.S.C. § 1983 against four police officers for alleged forcible and warrantless entry into his home and use of excessive force. In their Motion for Summary Judgment, Defendants assert the defense of qualified immunity from suit, arguing that the warrantless entry and the use of force against Plaintiff were justified by Plaintiff's conduct and the circumstances.

There are two issues before the Court. The first issue is whether Defendants are entitled to immunity from suit based on a warrantless entry into Plaintiff's home after Plaintiff placed a 9-1-1 call for emergency assistance but then withdrew his request for assistance and refused to admit into his home police officers responding to the call. The second issue is whether Defendants are entitled to immunity from suit based on the use of force against Plaintiff, which

included the use of a Taser, where there remain factual disputes regarding the physical contact between the parties inside Plaintiff's home prior to the use of the Taser.

The Court holds that Defendants are not entitled to qualified immunity in this case because genuine issues of material fact remain regarding whether Defendants violated Plaintiff's clearly established Fourth Amendment rights against unreasonable search and seizure by their warrantless entry into Plaintiff's home. With respect to Plaintiff's unlawful entry claims, factual disputes remain regarding whether, at the time of Defendants' warrantless forcible entry into Plaintiff's home, a reasonable officer in Defendants' positions would have believed that such entry was immediately necessary to render assistance or prevent harm. With respect to Plaintiff's excessive force claim, factual disputes remain regarding whether Plaintiff posed an immediate threat to Defendants' safety or actively resisted arrest when Plaintiff was pushed and a Taser was used on him by Defendants. For these reasons, the Court denies Defendants' Motion for Summary Judgment.

## I.      FACTUAL BACKGROUND

On February 14, 2010, Mr. Marcus Mial called 9-1-1 to request assistance from the Loudoun County Sheriff's Office because his wife had grabbed a knife and threatened to harm herself with it. Mial Dep., at 48-49. Mr. Mial told the dispatcher that he needed assistance "in taking a knife from an individual" but, after providing his address, stated, "Never mind. They just gave it up." Pl.'s Ex. 3, at 1-2. The Sheriff's Office called back a few minutes later to confirm that assistance was no longer needed, and Mr. Mial confirmed that the person no longer had the knife and had not harmed anyone. Pl.'s Ex. 3, at 2.

Deputy Jennifer Sherin of the Loudoun County Sheriff's Office arrived at the Mial home shortly after the 9-1-1 call was placed. Mial Dep., at 34-35. Deputy Sherin learned from the dispatcher at the Sheriff's Office that the 9-1-1 caller cancelled his request for assistance and "confirmed that . . . the situation [was] under control." Sherin Dep., at 181-82. Mr. Mial answered when Deputy Sherin arrived and knocked at the door, opening the door fully with his two children behind him. Sherin Dep., at 185,194; Mial Dep., at 35-36. Mr. Mial told Deputy Sherin that he was the 9-1-1 caller but cancelled the request for assistance, and that he owned the house and lived in it with his wife and children. Sherin Dep., at 187-88; Mial Dep., at 35-36. Deputy Sherin asked to "[c]ome in and make sure [that] everyone was safe" twice and made another request to enter the home after being joined at the door by another Loudoun County deputy, Nathan Ferguson. Sherin Dep., at 189; Mial Dep., at 36-37. Mr. Mial refused Deputy Sherin's requests, stating that assistance was not needed and that the situation was under control. Mial Dep., at 36-37.

The parties dispute Mr. Mial's demeanor during his exchange with Deputy Sherin. Mr. Mial stated in his deposition that he maintained a "normal" tone of voice and was not angry during his conversation with Deputy Sherin. Mial Dep., at 42. Deputy Sherin testified that Mr. Mial "became extremely irate," and Deputy Ferguson testified that Mr. Mial "appeared to be very upset" when Deputy Sherin asked to check on the welfare of the people inside the house. Sherin Dep., at 189; Ferguson Dep., at 52.

Mr. Mial stated that he was surprised by how quickly the deputies had arrived and began to complain to the deputies about the Sheriff's Office's response to previous calls for assistance. Mial Dep., at 38-40; Sherin Dep., at 189-90. After Deputy Sherin made a comment warning Mr.

3

Mial about ice on his porch, which Mr. Mial took as a slight or reprimand, Mr. Mial slammed his front door. Mial Dep., at 40-41; Sherin Dep., at 192.

Deputies Ferguson and Sherin walked down the driveway, and Deputy Ferguson called their supervisor, Sergeant Kim Holway. Sherin Dep., at 198-199; Ferguson Dep., at 61. Deputy Ferguson briefly told Sergeant Holway what had transpired, including the facts that Mr. Mial would not let the officers inside, that Mr. Mial was angry, and that the children did not appear to be distressed. Sherin Dep., at 201; Ferguson Dep., at 61; Holway Dep. at 77. Sergeant Holway testified that the deputies called her "because they didn't know whether they could just leave or not[,]" and that she thought the deputies wanted to leave. Holway Dep., at 78. Sergeant Holway told Deputy Ferguson that the deputies should stay there and that she was en route. Sherin Dep., at 201; Holway Dep., at 78. Sergeant Holway also told Deputy Ferguson that the deputies would need to check the welfare of the other persons involved and that, if Mr. Mial was to open the door, the deputies should not allow the door to be shut again. Ferguson Dep., at 61-62; Holway Dep., at 78.

Deputies Ferguson and Sherin returned to the front door and rang the doorbell. Mial Dep., at 75; Sherin Dep., 204-05. Mr. Mial was in the kitchen cooking for his children when he heard the doorbell, and walked out to see who was at the door. Mial Dep., at 75-76. He could see through the window next to the front door that Deputies Sherin and Ferguson had returned. *Id.* After observing deputies at the door, Mr. Mial returned to the kitchen to continue cooking. *Id.* The deputies could see that Mr. Mial was moving through the house but would not answer the door. Sherin Dep., at 204-05. After she arrived, Sergeant Holway joined the deputies at the front door, and the deputies told her that no one was answering the door. Sherin Dep., at 205; Ferguson Dep., at 62; Holway Dep., at 84-85. The facts that someone called 9-1-1 reporting that

4

a knife needed to be taken away from someone else and that Mr. Mial was "immediately irate" at the door, according to Deputies Sherin and Ferguson, made Sergeant Holway suspicious and concerned that someone might be injured inside the house. Holway Dep., at 95-96. Sergeant Holway was aware, however, that Mr. Mial was the person who placed the 9-1-1 call and then cancelled his request for assistance. Holway Dep., at 96.

As the deputies continued knocking loudly and persistently, Mr. Mial decided to call his friend and mentor Mr. Golden "Bud" Kirkland for advice. Mial Dep., at 77-78. Mr. Mial left the kitchen and went to his office, picked up the phone, and called Mr. Kirkland. *Id.* The deputies at the door observed Mr. Mial leaving the kitchen, going into his office and speaking on the phone in his office. Mial Dep., at 82; Ferguson Dep., at 65; Sherin Dep., at 205-206; Holway Dep., at 89-90. Sergeant Holway called the dispatcher to retrieve the phone number to the Mial residence and then called that number. Ferguson Dep., at 62; Holway Dep., at 89-90. She left a voice message indicating that the police needed to do a welfare check and asking Mr. Mial to answer the door. Holway Dep., at 89-90.

Deputy Brian Sayre arrived to offer assistance after monitoring the radio traffic about events at the Mial residence, and Deputy Nicholas Altom arrived after Deputy Sayre. Sayre Dep., at 32; Holway Dep., at 92-93. Sergeant Holway briefed Deputies Sayre and Altom on the facts that Mr. Mial had placed a 9-1-1 call for assistance in taking a knife from someone but then cancelled his request, confirmed that he did not need assistance when the dispatcher called him back, answered the door for Deputies Sherin and Ferguson, "was extremely irate" in complaining about the police presence, shut the door on the deputies, and refused to answer the door again. Sayre Dep., at 34-35; Holway Dep., at 93. Sergeant Holway had Deputy Sayre check the perimeter of the house to look for signs of forced entry and asked Deputy Altom to try to contact

neighbors to seek information about the Mial residence and the people living there. Altom Dep., at 32; Holway Dep., at 94.

Mr. Mial was on the phone with Mr. Kirkland for approximately 10 minutes while Deputies Sherin and Ferguson continued knocking at the front door. Mial Dep., at 79-81; Ferguson Dep., at 65; Sherin Dep., at 206. Mr. Kirkland advised Mr. Mial to let the deputies inside to conduct their welfare check, and Mr. Mial agreed to open the door. Kirkland Dep., at 18. Mr. Kirkland also asked Mr. Mial to leave the phone open so that Mr. Kirkland could hear what was going to happen in the home, and Mr. Mial set the phone down without hanging up. Kirkland Dep., at 18.

Deputy Ferguson notified the other deputies over the radio that someone was coming to the door. Sayre Dep., at 42; Altom Dep., at 33. Mr. Mial opened the door and placed his right foot behind the door to serve as a "doorstop." Mial Dep., at 87. Mr. Mial made a comment about the show of force and started to comment about his disappointment with the Sheriff's Office when the deputies pushed open the door, pushing back his right foot. Mial Dep., at 85-87. It appeared to the deputies that Mr. Mial had begun to shut the door before they pushed the door open and pushed him back. Sherin Dep. at 216; Ferguson Dep., at 77; Altom Dep., at 36. The deputies had not asked to come inside or that Mr. Mial bring the occupants of the house to the door. Sherin Dep., at 215; Ferguson Dep., at 75. Deputy Ferguson testified that he had told Mr. Mial that Sergeant Holway wanted to speak with him and that Mr. Mial declined to speak with her. Ferguson Dep., at 75. Deputy Ferguson also testified that he attempted to tell Mr. Mial that the deputies could not leave without ensuring that everyone in the house was okay but Mr. Mial continued complaining. *Id.* Deputy Sherin testified that the deputies did not say anything in response to Mr. Mial's complaints. Sherin Dep., at 215.

6

Many of the facts about what occurred after Deputies Sherin and Ferguson forced entry are disputed between the parties. According to Mr. Mial's testimony, Deputy Ferguson pushed Mr. Mial from the door backward, specifically on his upper torso, and Deputy Sherin yelled, "Grab his arms, grab his legs." Mial Dep., 96-98. Mr. Mial yelled, "You are not authorized to come into my home," twice, and saw at least one other deputy enter the home before one of the deputies used a Taser on him. Mial Dep., at 98-101.

The deputies testified to a physical struggle between them and Mr. Mial before the Taser was used on Mr. Mial. According to Deputies Sherin and Ferguson, Mr. Mial grabbed both of them, held them to his chest after they pushed their way inside the house, and attempted to push them out. Sherin Dep., at 226; Ferguson Dep., at 97-100. Deputy Altom testified that he ran into the house when he saw Deputies Sherin and Ferguson push their way in and engage in a physical struggle with Mr. Mial. Altom Dep., at 36. According to Deputy Altom, Mr. Mial "was getting the better of [Deputies Sherin and Ferguson]," pushing them forward, and Deputy Altom responded by shoving back against Mr. Mial, in his chest, without much effect. *Id.*, at 41-43. Deputy Sayre testified that he ran into the house after Deputy Altom where he found Mr. Mial and the three deputies engaged in a physical struggle. Sayre Dep., at 50-52. Deputy Sayre testified that, when he saw Mr. Mial's children moving toward the struggle, he told them to stop or to stay where they were. *Id.*, at 58. According to Deputy Sayre, Mr. Mial had an arm around Deputy Sherin's neck and an arm around Deputy Ferguson's neck and was swinging them around, while Deputy Altom pushed against Mr. Mial near his waist. *Id.* at 58-59. Deputy Sayre could see Deputy Sherin's face and saw that she looked "concerned about her safety." *Id.* at 58-60. Deputy Sayre had his Taser in hand, and Deputy Sherin told him to use it on Mr. Mial. *Id.* at

59-60. Without giving a warning, Deputy Sayre used the Taser on Mr. Mial, and Mr. Mial was physically incapacitated. Mial Dep., at 105-06.

Mr. Mial testified that the time between the forcible entry and the use of the Taser was too fast for him to engage in any physical struggle with the officers. Mial Dep., at 104. Mr. Kirkland testified that he heard everything, including the forcible entry and Mr. Mial's child shouting after Mr. Mial was tased, occur in a matter of seconds. Kirkland Dep., at 19.

## II.   PROCEDURAL HISTORY

Mr. Mial filed the present action in this Court under 42 U.S.C. § 1983 on August 31, 2011, against Loudoun County Sheriff Stephen O. Simpson, the four deputies who entered his home on February 14, 2010, and several unnamed employees of the Sheriff's Office. Mr. Mial filed an Amended Complaint on December 13, 2011, against only the four deputies Sherin, Ferguson, Altom, and Sayre. The Amended Complaint lists three counts and one alternative count: (1) Excessive Force against all Defendants, or alternatively Excessive Force against Deputies Sherin and Ferguson; (2) Unreasonable Violent Entry Into Home against Deputies Sherin and Ferguson; and (3) Unreasonable Entry Into Home Without Sufficient Cause against Deputies Sherin and Ferguson. On March 30, 2012, Defendants filed a Motion for Summary Judgment seeking qualified immunity from suit. This matter has been fully briefed and argued by the parties.

8

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247-48.

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 248. Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

9

specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986).


IV.   **ANALYSIS**

The Court denies Defendants' Motion for Summary Judgment and request for qualified

immunity because genuine issues of material fact remain regarding whether Defendants are

liable for violating Plaintiff's constitutional rights in forcibly entering his home without a

warrant and using force against him while seizing him inside the home.

A civil suit for damages may be brought under 42 U.S.C. § 1983 against persons acting

"under color of state law" who violate civil rights secured by the federal law. *Gregg v. Ham*, 678

F.3d 333, 339 (4th Cir. 2012). However, "[t]he doctrine of qualified immunity protects

government officials from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted).

"Qualified immunity balances two important interests—the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555

U.S. at 231 (2009). Whether a public official "may be held personally liable for an allegedly

unlawful official action generally turns on the 'objective legal reasonableness' of the action,

assessed in light of the legal rules that were 'clearly established' at the time it was taken."

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818, 819 (1982)) (internal citations omitted). The qualified immunity doctrine protects

government officials from ambiguity or haziness in the state of the law, and ensures that they are "on notice their conduct is unlawful" before they are subjected to suit. *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled in part by Pearson*, 555 U.S. at 239-40.

The resolution of a qualified immunity defense is a two-pronged inquiry, requiring the court to determine: (1) whether the facts established by the plaintiff make out a violation of a federal right; and, once the violation is established, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. With respect to the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640 (1987) (internal citations omitted). When deciding whether a reasonable officer would have been aware of the federal right, the court does not require the official "to sort out conflicting decisions or to resolve subtle or open issues." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (quoting *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). The unlawfulness of the action must be apparent "in the light of pre-existing law" in order for a reasonable officer to have been aware that the action violated a federal right. *Creighton*, 483 U.S. at 640. However, the specific official action need not to have previously been held unlawful in order for the officer to be held liable for violating the right. *Id.*

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). The doctrine offers immunity "from the burdens of litigation," not merely a defense to liability. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992). This immunity "is effectively lost if a case is erroneously permitted to go to trial.'" *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 330 (4th Cir. 2009) (quoting *Mitchell v. Forsynth*, 472 U.S. 511, 526 (1985)). The issue of "whether

a right allegedly violated was clearly established . . . at the time of the challenged conduct is always a matter of law for the court [and therefore] always capable of decision at the summary judgment stage." *Pritchett*, 973 F.2d at 313; *see also Saucier*, 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."). However, the doctrine of qualified immunity "does not . . . override the ordinary rules applicable to summary judgment proceedings." *Willingham*, 412 F.3d at 559. "[A] genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Id.* (quoting *Pritchett*, 973 F.2d at 313).

Based on the evidence in the record in the present case, the Court holds that Defendants are not entitled to qualified immunity and denies Defendants' Motion for Summary Judgment for two reasons. First, the constitutional rights at issue are clearly established, and a reasonable officer would have been aware of these rights at the time the conduct challenged by Plaintiff occurred. With respect to the counts for unreasonable entry, the Fourth and Fourteenth Amendments forbade Defendants from forcibly entering Plaintiff's home in the absence of exigent circumstances requiring immediate entry into the home to render assistance or prevent harm. With respect to the count for excessive force, the Fourth and Fourteenth Amendments forbade Defendants using force against Plaintiff without any immediate threat to the safety of the officers or resistance from Plaintiff.

Second, there remain genuine questions of material fact regarding whether Defendants' conduct violated Plaintiff's Fourth Amendment rights to be secure in his person and in his house, which must be reserved for trial. *See* U.S. Const. amend. IV. Facts regarding Plaintiff's demeanor during his interactions with Defendants at his front door, whether a struggle ensued

12

between Plaintiff and Defendants, and the nature of any struggle that occurred are material to the question of whether Defendants violated clearly established Fourth Amendment law. Plaintiff has offered deposition testimony showing that genuine disputes remain as to these material facts, meeting his burden in opposition to Defendants' Motion for Summary Judgment. Because the Fourth Amendment rights at issue in this case are clearly established and those rights would have been violated on the facts presented by Plaintiff, the Court holds that Defendants are not entitled to qualified immunity or otherwise entitled to judgment as a matter of law on Plaintiff's unlawful entry and excessive force claims. The Court will treat the Amended Complaint as stating only these two causes of action for clarity of analysis.

### A. Unlawful Entry

Defendants are not entitled to qualified immunity as to Plaintiff's unlawful entry claims because Plaintiff has shown that genuine disputes remain regarding whether Defendants were presented with exigent circumstances justifying their forcible, warrantless entry into Plaintiff's home.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

> "At the very core" of this guarantee "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. U.S.*, 365 U.S. 505, 511 (1961). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *U.S. v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972). Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).

*Hunsberger v. Wood*, 570 F.3d 546, 552-53 (4th Cir. 2009). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" its prohibition against warrantless

13

entry and search "is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

A police officer may make forcible entry into a home without a warrant if such action is supported by probable cause and exigent circumstances. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (citing *Payton*, 445 U.S. 573); *see also U.S. v. Hill*, 649 F.3d 258, 265 (4th Cir. 2011) (requiring "substantial evidence of wrongdoing or imminent danger."). "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2639 (2009) (internal quotations and citations omitted).

In the absence of probable cause, a warrantless entry is justified by a compelling need to render assistance or prevent harm without time to secure a warrant. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *see also Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002). This "emergency exception" to the warrant requirement calls for "an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed." *Hunsberger*, 570 F.3d at 554. Such "[e]xigent circumstances vary from case to case, and a determination of the issue is of necessity fact-specific." *Osabutey v. Welch*, 857 F.2d 220, 224 (4th Cir. 1988). "The existence of exigent circumstances must be determined as of the moment of the warrantless entry of the officers onto the premises[.]" *U.S. v. Reed*, 935 F.2d 641, 643 (4th Cir. 1991) (citing *Arkansas v. Sanders*, 442 U.S. 753, 763 (1979)). The court must determine "whether the circumstances known to [the officer at the time of the warrantless entry] would create an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons

or property within.'" *Hunsberger*, 570 F.3d at 555 (quoting *U.S. v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). Generally, "an action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,*' support the action." *Hunsberger*, 570 F.3d at 554 (quoting *Stuart*, 547 U.S. at 404) (emphasis in original).

In this case, Defendants are not entitled to qualified immunity or otherwise entitled to summary judgment with respect to Plaintiff's unlawful entry claim for two reasons. First, Plaintiff's constitutional right to be secure in his home against warrantless and forcible intrusion in the absence of exigent circumstances is clearly established. The Court has cited numerous cases from the U.S. Supreme Court and the Court of Appeals for the Fourth Circuit that stand for this basic principle of Fourth Amendment law and do not conflict on this point. As the Supreme Court stated in *Payton v. New York*, 445 U.S. 573, 590 (1980), "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."

Second, Plaintiff's Fourth Amendment right to security in his home would have been violated on the facts he has presented in opposition to Defendants' summary judgment motion. *See Anderson,* 477 U.S. at 255 (facts viewed in a light most favorable to the non-moving party in assessing motion for summary judgment). While warrantless entry into a home may be justified by an emergency or Defendants' "objectively reasonable belief that an emergency existed that required immediate entry," *Moss*, 963 F.2d at 678, the record before the Court does not establish the objective reasonableness of any belief Deputies Sherin and Ferguson might have had that such an emergency existed, or that they even had any such belief at all.

Indeed, the record reflects several facts that suggest that Defendants were not presented with any emergency that would require them to forcibly enter Plaintiff's home to render

15

assistance or prevent harm "as of the moment" of their entry. *Reed*, 935 F.2d at 643. The only undisputed fact in this case indicating an emergency at the Mial residence is Plaintiff's original 9-1-1 call requesting assistance in taking a knife from another person. On the same call, however, Plaintiff stated that the person gave up the knife and emergency assistance was no longer needed. The dispatcher at the Loudoun County Sheriff's Office even called back to the Mial residence to confirm that the emergency had abated. Plaintiff confirmed that there was no emergency, stating that the person who had the knife no longer had the knife "or anything like that," that the knife was not used on anyone, and that "[t]he situation [was] under control." Pl.'s Ex. 3, at 1-2. Before they arrived at the residence, Deputies Sherin and Ferguson were told that the person who made the 9-1-1 call had stated that the person who had the knife had given it up and that the caller withdrew his request for assistance.

After they arrived at the home, Deputies Sherin and Ferguson did not observe anything suspicious or otherwise noteworthy about the house. Plaintiff answered the door promptly after Deputy Sherin arrived and knocked. Deputies Sherin and Ferguson could see Plaintiff's children during their first encounter with Plaintiff, and they did not appear hurt, upset, or distressed. The deputies could see inside the home, but they saw no indication of any physical struggle. There was no broken or out-of-place furniture or other objects within view of the deputies. Moreover, Deputies Sherin and Ferguson left their initial interaction with Plaintiff without forcing their way inside, which suggests that at least *they* did not perceive an emergency requiring forcible entry. Sergeant Holway testified that she thought Deputies Sherin and Ferguson wanted to leave when they reported their first encounter with Plaintiff to her via radio. Indeed, there were no signs of distress or injury such as yelling, crying, or any other indication that emergency assistance or intervention inside the house was necessary.

There are factual disputes between the parties as to Plaintiff's demeanor during his interactions at the front door with Deputies Sherin and Ferguson. Defendants testified to Plaintiff presenting as "extremely irate," Sherin Dep., at 189, while Plaintiff testified that he was not angry and spoke in a normal tone of voice, Mial Dep., at 42-44. The question of how Plaintiff presented himself to Defendants is material to the issue of whether a reasonable police officer in their position would have perceived an emergency at that time. It is undisputed that, during Deputies Sherin and Ferguson's first encounter with him, Plaintiff refused to admit the deputies into his home when they requested entry, as was his Fourth Amendment right. Plaintiff's cancelled request for emergency assistance and refusal to voluntarily admit the deputies into his home, without more, are not enough to raise an objectively reasonable suspicion of exigent circumstances. *Cf. Bailey v. Kennedy*, 349 F.3d 731, 740 (4th Cir. 2003) (third-party 9-1-1 report that plaintiff was attempting suicide "[w]ithout more" could not support probable cause sufficient to justify warrantless entry). These facts in combination with an "extremely irate" display by Plaintiff may have supported a reasonable suspicion of exigent circumstances, but the fact of Plaintiff's demeanor is disputed. The Court cannot resolve these disputes in Defendants' favor on their summary judgment motion.

The Court cannot accept Defendants' "just following orders" argument, as set forth on page 23 of their Memorandum, as either grounds for qualified immunity.[1] First, with respect to

---

[1] *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order.") (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004)); *Brent v. Ashley*, 247 F.3d 1294, 1305 (11th Cir. 2001) (agreeing that "following orders does not immunize government agents from civil rights liability"); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981) ("[I]f [defendant government agents] knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty.") (quoting *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3d Cir. 1979), *cert. denied*, 101 S. Ct. 3147 (1981)), *cited in Tasker v. Moore*, 738 F. Supp. 1005, 1011 (S.D.W.Va. 1990); *Thaddeus-X v. Blatter*,

the qualified immunity doctrine, the fact that Sergeant Holway instructed Deputies Sherin and Ferguson to force entry before Plaintiff could close the front door again cannot be heard to render unclear the state of Fourth Amendment law and clearly established right to security in one's home it protects. Deputies Sherin and Ferguson knew or should have known that a forcible entry without a warrant in the absence of probable cause or circumstances indicating an exigency that would justify such warrantless entry would violate Plaintiff's Fourth Amendment rights regardless of whether they were ordered to make such an entry by a supervisor. Deputies Sherin and Ferguson were responsible for deciding for themselves whether forcible entry into Plaintiff's home without a warrant was lawful and whether there was a legal reason to question the validity of Sergeant Holway's order.

Second, with respect to the emergency doctrine, the fact that Sergeant Holway instructed Deputies Sherin and Ferguson to force entry before Plaintiff could close the front door again cannot be heard to create an emergency where, otherwise, there was no such emergency. Defendants argue on page 17 their Memorandum that, regardless of the circumstances presented to Deputies Sherin and Ferguson, forcible entry into Plaintiff's home was reasonable under the circumstances presented to *Sergeant Holway*, who, based on those circumstances, ordered Deputies Sherin and Ferguson to make forcible entry. Sergeant Holway has testified that the facts that someone called 9-1-1 reporting that a knife needed to be taken away from someone else, that Deputies Sherin and Ferguson had not been able to gain any more information about the incident from Plaintiff, and that Plaintiff was "immediately irate" at the door, according to the officers, made her suspicious that someone might be injured inside the house. Holway Dep. at 95-96. Defendants' argument that the circumstances presented to Sergeant Holway were

175 F.3d 378, 393 (6th Cir. 1999) ("Reliance on a superior's orders does not in itself dissipate all liability."); *Gonzalez v. Cecil Cnty., Md.*, 221 F.Supp.2d 611, 617 (D.Md. 2002) (rejecting defendants' argument that they are entitled to qualified immunity because they were "just following orders").

exigent strongly implies that Sergeant Holway had a substantially different understanding of the situation in the Mial home than Deputies Sherin and Ferguson, who were more directly involved and had first-hand encounters with Plaintiff. Thus, Defendants' argument suggests that Sergeant Holway had an incomplete understanding of the situation in the home. The fact that Deputies Sherin and Ferguson knew better than Sergeant Holway gave them reason to question the validity of her order.

The Court is not persuaded to grant Defendants' motion based on the cases cited in their Memorandum. In *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009), the issue was "whether the circumstances known to [the defendant police officer] would create an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" 570 F.3d at 555 (quoting *Moss*, 963 F.2d at 678). The Fourth Circuit answered in the affirmative and held that the defendant did not violate the Fourth Amendment by entering the plaintiff's home under "circumstances indicat[ing] the strong possibility of an unauthorized intruder in the home." *Hunsberger*, 570 F.3d at 555. These circumstances included the following facts: "a vacant home in the neighborhood had recently burned down as the apparent result of unauthorized use"; "there was evidence that a minor girl was in the home, given that her car was parked in front of the house" but her "stepfather said that she was not supposed to be at the home and was exceedingly concerned for her welfare"; "the girl was not answering her cellphone"; and "it was the middle of the night." *Id.*

The present case does not present the "numerous indications" that justified a belief that an emergency existed as were present in *Hunsberger*. *Id.* It is true that Plaintiff failed to answer the knocks at his door and telephone calls as the police officers attempted to make contact with him after his initial encounter with Deputies Sherin and Ferguson. However, Plaintiff did make

that initial contact and, in fact, answered the door quickly when Deputy Sherin first arrived. Plaintiff explained that there was no need for emergency assistance, and Defendants did not receive any information indicating that this fact had changed at some point prior to their forcible entry into his home.

In the recent Western District of Virginia case *Pleasants v. Town of Louisa*, 2012 WL 844355 (W.D. Va. Mar. 12, 2012), the issue of qualified immunity required a determination of whether, at the time of the defendant police officer's warrantless entry into the plaintiff's apartment, "it was clearly established that a police officer . . . may not enter without a warrant in order to ensure the safety of a hysterical minor whose mother was potentially intoxicated and allegedly violent." 2012 WL 844355 at *7. Clearly, the facts in *Pleasants* are far more dramatic than those presented in the present case. In *Pleasants*, the defendant had been exposed to a "contentious dispute" between the plaintiff and her husband "over the parenting of their daughter." *Id.* On that previous occasion, the defendant learned that the plaintiff had plans to "throw [the] daughter out of the house[,]" was informed by a dispatcher that the plaintiff was violent and possibly intoxicated, and encountered "a decidedly tense situation" when he arrived at the home. *Id.* The defendant, on that previous occasion, observed the plaintiff slamming the door on her husband and the daughter crying and asking to leave with the husband. *Id.* Before the incident at issue in the case, the plaintiff's husband asked the defendant to check on the welfare of his daughter and told the defendant that he heard his daughter screaming and crying in the background during a telephone conversation with the plaintiff and that the plaintiff was "upset and hostile." *Id.* at *8. The court found all of this information possessed by the defendant relevant in determining that the defendant reasonably made entry to the apartment without a warrant. *Id.* at *11.

20

In the present case, no one requested the welfare check sought by the deputies, and there was no indication that such a welfare check was necessary. None of the defendants in this case have testified to any prior knowledge of Plaintiff or his family that would suggest the sort of domestic strife that was present in *Pleasants*, or to having observed anything that would suggest that sort of domestic strife.

In *Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2009), the issue was whether the defendant officers' conduct was objectively reasonable in seizing the plaintiff and pulling him out of his home where the defendants had received a report that the plaintiff threatened suicide through a 9-1-1 call from a doctor. 555 F.3d at 328. The defendants were informed that the plaintiff had made previous threats of suicide. *Id.* The defendants attempted to communicate with the plaintiff, but the plaintiff refused, telling the officers to get off his property. *Id.* When one of the officers contacted a local hospital, he learned that the plaintiff "had a history of calling the hospital and threatening suicide." *Id.* When the plaintiff opened his front door and stuck his arm out, the defendants seized him, which required them to enter his house, and pulled him out. *Id.* at 329. The Fourth Circuit held that the defendants' conduct was objectively reasonable and that they were entitled to qualified immunity, regardless of factual disputes over whether the plaintiff was belligerent and threatened the defendants. *Id.* at 334.

Again, in the present case, Defendants possessed far less information that would suggest or support a reasonable suspicion of an exigency requiring forcible entry into Plaintiff's home. Defendants received no information of an ongoing pattern of domestic violence at the Mial residence. Plaintiff himself was the person who placed the 9-1-1 call—not a third party concerned about Plaintiff's welfare or the welfare of anyone else in the home. Deputies Sherin

21

and Ferguson knew that Plaintiff was the caller and that he cancelled his request for assistance, stating that emergency assistance was no longer needed.

In at least one crucial way, the present case is more like *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003), a case discussed at length in the *Cloaninger* opinion. In *Bailey*, the defendant police officers, seeking qualified immunity from an excessive force claim brought under § 1983, argued that they had probable cause to seize the plaintiff for an emergency mental evaluation based on a neighbor's 9-1-1 report that the plaintiff had threatened suicide. 349 F.3d at 740. The Fourth Circuit rejected this argument, stating that "*[w]ithout more, the 911 report cannot bear the weight that the officers would place on it.*" *Id.* (emphasis added). The Fourth Circuit affirmed the district court's decision denying the defendants qualified immunity. *Id.* at 745. In the present case, Defendants also rely on Plaintiff's 9-1-1 call as justification for their suspicion of exigent circumstances. Here, as the court held in *Bailey,* Plaintiff's cancelled request for assistance cannot, without more, render objectively reasonable any suspicion of exigent circumstances held by Defendants.

In the Fourth Circuit decision in *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992), the issue was whether the emergency doctrine justified a Forest Service law enforcement officer's warrantless entry into a cabin while he searched for the owner of an illegally parked car. 963 F.2d at 678. The car blocked access to a road and was left there for a number of days. *Id.* at 675. The cabin in question was the first stop in the officer's search. *Id.* When he arrived, he noticed, "first, that there was no lock on the door and, second, that there were 'fresh bike tracks' in the vicinity of the cabin," which "relieved his concern for the 'safety' of the car's owner." *Id.* Despite his relief, the officer decided to enter the cabin and testified to three reasons for doing so: (1) "under the mistaken impression that no one reserved the cabin, he thought it had been

illegally broken into"; (2) "he wanted to locate the owner of the illegally parked car in order to have it moved"; and (3) he was still concerned about the welfare of "persons connected with the car[.]" *Id.*

The Fourth Circuit concluded that "there was no objectively reasonable basis upon which [the officer] could have determined that he confronted an emergency requiring immediate entry into the cabin[.]" *Id.* at 678. The court stated further that "there was nothing about the circumstances then confronting [the officer] (including his erroneous information) that warranted any perception of an emergency requiring immediate entry to attend to [his legitimate duties]." *Id.* at 679. The court noted that "there was no indication that any illegal occupant was inside [and] no immediate danger that the cabin itself would be damaged, or that entry into it would prevent that." *Id.* "Neither was there anything in the circumstances confronting [the officer] that warranted any objectively reasonable perception of an emergency that required immediate identification of the occupants in order to give them assistance—or indeed that assistance was needed." *Id.*

Similarly, in the present case, there was no objectively reasonable basis for any suspicion that anyone in the Mial home was injured and required immediate assistance at the moment that Deputies Sherin and Ferguson forced their way inside. Additionally, there was no indication that Deputies Sherin and Ferguson even held such a suspicion after their first encounter with Plaintiff at the front door because they decided not to force entry at that time. After hearing their report about the first encounter, Sergeant Holway believed Deputies Sherin and Ferguson wanted to leave. There is no evidence in the record that shows that Deputies Sherin and Ferguson received any information suggesting that there was an emergency inside the house between their first and second encounters with Plaintiff. An order to make forcible entry from a supervisor who had no

23

more information about what was occurring in the house than Deputies Sherin and Ferguson is

not information that indicates an emergency. Finally, viewing the evidence in the light most

favorable to Plaintiff as the non-moving party, whether there was anything about the second

encounter with Plaintiff that suggested an emergency requiring the officers' forcible entry is, at

best, disputed. Again, the undisputed facts before the Court do not establish any objectively

reasonable basis for the perception of an emergency in the Mial home when Deputies Sherin and

Ferguson made their entry.

In the Virginia Court of Appeals decision in *Kyer v. Commonwealth*, 612 S.E.2d 213 (Va.

App. 2005), the issue was whether police officers violated the Fourth Amendment when they

walked into the criminal defendant's apartment through a door that had been left open after

knocking and receiving no answer. 612 S.E.2d at 215. The officers had caught one of two

suspects that fled the scene of a burglar alarm, and the detained suspect directed the officers to

the defendant's apartment. *Id.* The court held that an objectively reasonable officer would not

think that the emergency exception to the warrant requirement applied in this situation. *Id.* at

217. The court noted that, although the door to the apartment was open, "[t]here were no signs of

forced entry[, n]o one called out for help[,]" there were "[n]o sounds or observations [that]

suggested panic or danger within the apartment[,]" and there were no reports from neighbors of

"any suspicious circumstances suggesting foul play." *Id.* at 217-18. "The mere discovery of an

'open door' of a residence—absent some other reason for concern—is not, *in and of itself,* a

circumstance that could give rise to a reasonable belief that entry is necessary to prevent harm to

persons or property." *Id.* at 218 (quoting *State v. Christenson*, 181 Or. App. 345 (2002)) (internal

quotation marks omitted). Similarly, with respect to the present case, the Court finds that

Plaintiff's cancelled request for assistance was not, "*in and of itself,* a circumstance that could

give rise to a reasonable belief that entry [was] necessary to prevent harm to persons or property." *Kyer*, 612 S.E.2d at 218.

The present case is also similar to the Virginia Court of Appeals case *Commonwealth v. Barnett*, 2010 WL 3540057 (Va. App. Sept. 10, 2010),[2] where the issue was whether the emergency doctrine justified a warrantless entry into a house by a police officer responding to a 9-1-1 call placed by the criminal defendant's wife in which she reported a domestic assault. 2010 WL 3540057 at *1-2. After the police officer knocked on the door, it was answered by a child who told the officer that the defendant's wife was inside. *Id.* at *1. The officer announced his presence and entered the residence. *Id.* The defendant's wife told the officer that she no longer required assistance. *Id.* at *2. After a second officer arrived, the defendant's wife provided details of an assault on her by the defendant. *Id.* The court held that "the record contain[ed] no objective facts to support [the first officer's] warrantless entry" and affirmed the trial court's ruling that the warrantless entry was not justified by the emergency doctrine. *Id.* at *4.

The *Barnett* court distinguished the U.S. Supreme Court case *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), where the Court held that warrantless entry was justified where, in responding to complaints of a loud party at 3:00 a.m., the police officers heard and could eventually see a "loud" and "tumultuous" altercation inside the house. 547 U.S. at 406. The noises the officers heard when they arrived included "thumping and crashing" as well as "people

---

[2] Defendants aver that they lacked the benefit of the *Barnett* decision at the time of the warrantless entry into Plaintiff's home, supporting their argument that the constitutional right at issue in this case was not clearly established—or at least not as clearly established as it is post-*Barnett*. While the fact that *Barnett* involved a cancelled request for emergency assistance makes this case more closely analogous to the present case and therefore the constitutional right at issue in this case more clearly established than otherwise, the case law available to Defendants at the time of their warrantless entry put them on notice of the Fourth Amendment right at issue in this case. The bottom line is that, based on the facts in the record viewed in the light most favorable to Plaintiff, no reasonable officer would have perceived an emergency at the Mial home requiring immediate and forcible entry at the time Plaintiff opened his door and complained to Deputies Sherin and Ferguson about the Sheriff's Office.

yelling 'stop, stop' and 'get off me.'" *Id.* When the officers proceeded around the house to the back, "they could see that a fracas was taking place inside the kitchen" and that persons involved were injured. *Id.* "In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* Given the circumstances, the Court held that the Fourth Amendment did not require the officers to wait outside for consent to enter the residence. *Id.* The Supreme Court also discussed *Stuart* in the *per curiam* opinion in *Michigan v. Fisher*, 130 S. Ct. 546 (2009), where the Court found exigent circumstances justifying warrantless entry into a home based on the "tumultuous situation" in the house encountered by the police officers in that case. 130 S. Ct. at 548. The Court noted that "the officers could see violent behavior inside," including the criminal defendant "screaming and throwing things." *Id.* at 549.

Viewed in the light most favorable to Plaintiff, the record before the Court in the present case more closely resembles the facts in *Moss, Fisher, Bailey, Barnett*, and *Kyer* than those in *Stuart, Fisher, Cloaninger, Pleasants*, and *Hunsberger*. The evidence shows that the situation with which Deputies Sherin and Ferguson were faced was not tumultuous or tense. The circumstances, based on Plaintiff's facts, could not have created an objectively reasonable suspicion or belief that forcible entry into the Mial home was necessary to render assistance or to prevent harm. There were no loud noises, no signs of violence or distress, and no information about Plaintiff or his family from third-party sources or from experience suggesting any risk of harm to person or property inside the home. Plaintiff's cancelled request for assistance, Plaintiff's refusal to let Deputy Sherin into the home when she requested entry, Plaintiff's complaints about the Sheriff's Office, and Sergeant Holway's orders to force entry would not have been sufficient to support an objectively reasonable belief that there was any injury or risk

26

of injury inside the house that required official action. Indeed, as noted *supra*, Deputies Sherin and Ferguson's conduct up until the point of their forcible entry suggests that not even they perceived an emergency inside the home that justified forcible entry.

The Fourth Amendment law is clear that an objectively reasonable belief or suspicion about the existence of such an emergency is required to justify forcible entry without a warrant or probable cause. For these reasons, the Court cannot grant Defendants qualified immunity and must deny their summary judgment motion as to Plaintiff's unlawful entry claims.

### B. Excessive Force

Defendants are not entitled to qualified immunity or summary judgment as to Plaintiff's excessive force claims because Plaintiff has shown that genuine disputes remain regarding whether Defendants used objectively unreasonable force against Plaintiff in violation of Plaintiff's clearly established Fourth Amendment rights.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person may bring a claim under § 1983 against police officers in their individual capacity alleging excessive force where the officers' conduct constitutes an unreasonable search or seizure in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "When reviewing [an] excessive force claim against an officer effecting a seizure, the Court uses an 'objective reasonableness' standard in analyzing the officer's action." *Guerrero v. Deane*, 750 F. Supp. 2d 631, 654 (E.D. Va. 2010) (citing *Graham*, 490 U.S. at 388). The court must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "To gauge objective reasonableness, a court examines only the actions

27

at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citing *Graham*, 490 U.S. at 397). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Assessing the reasonableness of the use of force in a particular case "requires careful attention to the facts and circumstances of [that] case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

In the present case, based on the evidence in the record, the Court holds that Defendants are not entitled to qualified immunity or otherwise entitled to summary judgment with respect to Plaintiff's excessive force claim for two reasons. First, Plaintiff's constitutional right to be secure in his person against the unreasonable use of force by police officers in the absence of any crime, any threats to the safety of the officers or others, or any active resistance to or evasion from arrest is clearly established by the Supreme Court decision in *Graham v. Connor*, 490 U.S. 386 (1989), and subsequent decisions by various courts relying on that case. Second, Plaintiff's Fourth Amendment right to security in his person in his home would have been violated on the facts he has presented in opposition to Defendants' summary judgment motion. Plaintiff testified in his deposition that Deputies Sherin and Ferguson pushed him back as he was standing at the door to his home and complaining about the Loudoun County Sheriff's Office. Plaintiff was also

28

pushed by another officer, Deputy Altom, and tased by a fourth officer, Deputy Sayre, both of whom had quickly entered his home after he was initially pushed back by Deputies Sherin and Ferguson. According to Plaintiff's testimony, there was only enough time for him to say "You are not authorized to enter my home" twice before Deputy Sayre used the Taser on him. According to Mr. Kirkland's testimony, the forcible entry and Deputy Sayre's use of the Taser all happened in a matter of seconds.

Virtually all of the facts concerning the physical altercation between Plaintiff and Defendants remain in dispute. Perhaps the only relevant facts not in dispute are the facts that Deputies Sherin and Ferguson forced their way into Plaintiff's home and that Deputies Altom and Sayre quickly followed them into the house. According to Defendants, a physical struggle ensued between Plaintiff, Deputy Sherin, and Deputy Ferguson where Plaintiff had his arms around Deputies Sherin and Ferguson, the officers struggled to gain control, Deputy Altom joined this struggle but failed to gain control over Plaintiff, and then, at Deputy Sherin's behest, Deputy Sayre tased Plaintiff. Under the set of facts presented by Defendants, the use of force against Plaintiff would have been reasonable, as Plaintiff posed "an immediate threat to the safety of the officers" and actively resisted their use of force. *Graham*, 490 U.S. at 396. Thus, the disputed facts regarding the physical engagement between Plaintiff and Defendants are material to the question of whether Defendants violated Plaintiff's Fourth Amendment rights. The genuine factual disputes about the events that occurred between the forcible entry and the use of the Taser against Plaintiff render unclear the merits of Defendants' argument that the use of force against Plaintiff by Deputies Sherin and Ferguson was not excessive or unreasonable. Given the contesting accounts of what occurred in the Mial home, it is not clear exactly what force was used against Plaintiff by Deputies Sherin, Ferguson, and Altom. All that is clear about their use

of force against Plaintiff is that force was used, including some bodily force and the use of a Taser.

On a motion for summary judgment, the Court cannot resolve the factual disputes presented in the parties' conflicting testimony but, rather, must view the facts in the light most favorable to Plaintiff, as the non-movant. Provided the genuine issues of material fact in the record, Defendants' Motion for Summary Judgment as to Plaintiff's excessive force claim must be denied.

## V.   CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment because genuine issues of material fact remain regarding whether Defendants violated Plaintiff's constitutional rights in forcibly entering his home without a warrant and using excessive force against him once inside. Defendants are not entitled to qualified immunity from Plaintiff's unlawful entry claims because: (1) Plaintiff's constitutional right to be secure in his home against warrantless and forcible intrusion in the absence of exigent circumstances or probable cause is clearly established; (2) Plaintiff's constitutional right to be secure in his person against the unreasonable use of force by police officers in the absence of any crime, threats to anyone's safety, or active resistance to or evasion from arrest is clearly established; and (3) evidence in the record supports a finding that these rights were violated when Defendants forcibly entered Plaintiff's home and then used force to incapacitate Plaintiff once inside. Defendants are not entitled to summary judgment as to the unlawful entry claims because the record does not present undisputed facts that would have led a reasonable officer in Defendants' positions to believe that immediate entry into Plaintiff's home was necessary to render assistance or prevent harm at the time Defendants made their entry.

Defendants are not entitled to summary judgment as to the excessive force claim because the record does not present undisputed facts that would have led a reasonable officer in Defendants' positions to believe that the force used against Plaintiff, including the use of a Taser, was necessary under the circumstances. Indeed, virtually all material facts about the physical contact between the parties after Defendants entered Plaintiff's home remain in dispute. The significant factual disputes presented in the record cannot be resolved on Defendants' Motion for Summary Judgment and must be reserved for trial.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel.

ENTERED this _____ day of July, 2012.

Alexandria, Virginia
7 /9 / 12

_____ /s/ _____
Gerald Bruce Lee
United States District Judge

31