IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARCUS MIAL,                          )
                                      )
            Plaintiff,                )      Civil No. 11-cv-921
                                      )
     VS.                              )      March 23, 2015
                                      )
STEPHEN O. SIMPSON, et al.            )
                                      )
            Defendants.               )
_____ )


TESTIMONY OF WITNESSES


BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

  FOR THE PLAINTIFF: WESTLAKE LEGAL GROUP
                     BY: THOMAS K. PLOFCHAN, JR.


  FOR THE DEFENDANT: COOK CRAIG & FRANCUZENKO PLLC
                     BY: ALEXANDER FRANCUZENKO


                      ---


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR, CRR
                         U.S. District Court
                         401 Courthouse Square, 5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT |
|---------|--------|-------|----------|
| J. Forsch | 3 | | |

```
 1                    (Thereupon, the following was heard in open

 2    court at 2:43 p.m.)

 3                    THE COURT:  Your first witness.

 4                    MR. PLOFCHAN:  Thank you, Your Honor.  We

 5    call Ms. Forsch.

 6                    MR. FRANCUZENKO:  Your Honor, may I have a

 7    moment before --

 8                    THE COURT:  Yes.

 9                    THEREUPON, JENNIFER FORSCH, having been duly

10    sworn, testified as follows:

11                    THE WITNESS:  Yes, ma'am.

12                    THE COURT:  You may proceed.

13                    MR. PLOFCHAN:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15    BY MR. PLOFCHAN:

16      Q.  Ma'am, can you state your name for the judge and

17    the jury, please.

18      A.  It's Jennifer Forsch.

19      Q.  Okay.  And, how are you employed?

20      A.  With the Loudoun County Sheriff's Office.

21      Q.  And, how long have you been employed there?

22      A.  For eight years.

23      Q.  Okay.  So, that begins in 2007?

24      A.  Yes, sir.

25      Q.  And that would have been 3 years prior to this
```

1  incident?

2      A.  Yes, sir.

3      Q.  Okay.  And did you work prior to -- did you work

4  in law enforcement prior to coming to Loudoun County?

5      A.  Yes, sir.

6      Q.  Okay.  Where did you work?

7      A.  In Gwinnett County, Georgia, Oceanside,

8  California.

9      Q.  And, so you worked in two different locations in

10  law enforcement?

11      A.  Yes.

12      Q.  Okay.  And where -- did you go to an academy?

13      A.  Yes, sir.

14      Q.  Okay.  What academy did you go to?

15      A.  To San Diego Regional Academy in California and to

16  Gwinnett County Police Academy, Georgia.

17      Q.  Is that G-W-I-N-N-E-T-T?

18      A.  Correct.

19      Q.  Okay.  Now, I take it that when you went to those

20  academies, you had some training; is that correct?

21      A.  Yes, sir.

22      Q.  And you had training in the use of force; is that

23  correct?

24      A.  Yes, sir.

25      Q.  Okay.  And, you had training in the Constitution,

1    correct?

2        A.   Yes, sir.

3        Q.   And, you had training in compliance with orders;

4    is that correct?

5        A.   Yes, sir.

6        Q.   Okay.  And, would you agree that Loudoun County

7    Sheriff's Office has a series of orders that govern the

8    conduct of the deputies?

9        A.   Yes, sir.

10       Q.   Okay.  And are those called the General Orders?

11       A.   Correct.

12       Q.   And they also have regulations; is that correct?

13       A.   I'm not understanding.

14       Q.   Do they have anything else that governs the

15   conduct of deputies other than the General Orders?

16       A.   They have policies and procedures.

17       Q.   Okay.

18            MR. PLOFCHAN:  Court's indulgence, Your

19   Honor.

20   BY MR. PLOFCHAN:

21       Q.   Now, when you -- what is the function of a General

22   Order?

23       A.   For the Sheriff's Office?

24       Q.   Yes.

25       A.   It is a guideline to help us on the calls and the

1    type of calls that we respond to.

2        Q.   Are officers trained on them or just given them to

3    read?

4        A.   It depends on the General Order.

5        Q.   Okay.  Have you been given General Order 534 on

6    domestic violence?

7        A.   Yes, sir.

8        Q.   Okay.  Is that a guideline or is it -- is it --

9    let me rephrase that.  Were you trained on that or were

10   you just given it to read?

11       A.   I was trained on it, sir.

12       Q.   Okay.  And so what does that mean that you were

13   trained on it?

14       A.   Meaning that I was given instruction on it.  We

15   went over the General Order.

16       Q.   Okay.  And, when did you get this instruction?

17       A.   I couldn't tell you a specific date.

18       Q.   Okay.  But this was a mandatory instruction,

19   correct?

20       A.   Correct.

21       Q.   All right.  And, you had received that by

22   February 14th, 2010, correct?

23       A.   Yes, sir.

24       Q.   And, as a matter of fact, did you also get tested

25   on it after you received the training?

1    A.   No, sir.

2    Q.   There wasn't any follow up after that training

3  where they made -- orally asked you questions?

4    A.   No, sir.

5    Q.   Okay.  Now, have you ever testified under oath in

6  this case before?

7    A.   Yes, sir.

8    Q.   Okay.  And, do you recall being asked whether you

9  received instruction relative to this General Order in

10  the past?

11    A.   Yes, sir.

12    Q.   Do you recall what your answer was?

13    A.   Yes, sir.

14    Q.   Okay.  And, did you -- have you ever recalled

15  whether or not that occurred on -- if you were asked --

16  whether that was asked on one occasion or more?

17    A.   I could not tell you, sir.

18    Q.   Okay.

19         MR. PLOFCHAN:  Your Honor, if I -- Court's

20  indulgence.  It's possible with the screen just to show

21  the officer or if not may I approach the officer?

22         THE COURT:  You can show on the screen if

23  you'd like to use the deposition, just tell opposing

24  counsel page and line number.

25         MR. PLOFCHAN:  Your Honor, I'm sorry.  This

1    is just for refreshing the recollection.  I didn't want

2    it to come up on the screen in front of the jury.  That

3    was my --

4              THE COURT:  All right.  Well then why don't

5    you hand them the page if that's what you want to do.

6    Ask her to read the page and ask the question you want to

7    ask.

8    BY MR. PLOFCHAN:

9        Q.   And, Deputy, I'm asking you to look at page 17.

10       A.   Yes.

11       Q.   And in that do you recall being asked if it was on

12   more than one occasion and you said you couldn't be

13   positive?

14       A.   Correct.

15       Q.   Okay.

16             MR. PLOFCHAN:  And I'm sorry.  I'm sorry,

17   Marshal.  May I have that sheet.  I apologize.  Thank

18   you.

19       Q.   Now, I'm going to ask you, what did you do to

20   prepare for your testimony today?

21             MR. FRANCUZENKO:  Your Honor, I'm going to

22   object.

23             THE COURT:  What's the objection?

24             MR. FRANCUZENKO:  Attorney-client privilege.

25             MR. PLOFCHAN:  I'm not asking what was said

1    to anyone.  I'm just asking what she did.  Did she talk

2    to her attorney?  Did she read anything?

3              THE COURT:  As long as she understands the

4    question was very precise.  What did she do to prepare,

5    not what her lawyer told her to do or say.

6    BY MR. PLOFCHAN:

7        Q.   What did you do to prepare?

8        A.   I met with Mr. Francuzenko.

9        Q.   Okay.  Did you read any of your previous

10   statements with regard to this case?

11       A.   Yes, I did.

12       Q.   Okay.  And, did you do anything else?

13       A.   No, sir.

14       Q.   Okay.  Would you agree that when this -- when you

15   were deposed, it was actually on November 10th, 2011,

16   over 3 years ago, correct?

17       A.   I would have to look at the date, but that sounds

18   familiar.

19       Q.   This is page one of that deposition.  Does that

20   refresh your recollection?

21       A.   Yes, sir.

22       Q.   Okay.  And when was the date of that deposition?

23       A.   November 10th, 2011.

24       Q.   Okay.  And now, would you agree November 10th,

25   2011, is about 20 months after the incident?

1    A.   Correct.

2    Q.   Okay.  And, yet it's been 3 years and 4 months

3    since that deposition, correct?

4    A.   Yes, sir.

5    Q.   Okay.  And would you agree that your memory was

6    better then than it is today with respect to this

7    incident?

8    A.   It depends on the facts in the case, sir.

9    Q.   So, can you just tell me why in 2011 you couldn't

10   tell and didn't know whether or not you'd been trained

11   more than once and today you're emphatic that you had not

12   been?

13        MR. FRANCUZENKO:  Object, Your Honor.  I

14   don't think that was her testimony.

15        THE COURT:  I'll give you a chance to ask

16   questions when it's your turn.

17        Objection overruled.

18        THE WITNESS:  Would you be able to repeat the

19   question for me.

20   BY MR. PLOFCHAN:

21   Q.   Sure.  I asked you very specifically whether you

22   had been trained more than once on the General Orders.

23   In 2011, you said you couldn't be positive and didn't

24   know and yet when I asked you that today, you said no, I

25   had not been.

1          And I want to know can you explain why supposedly

2     your memory is now better 5 years after the incident than

3     it was a year and 9 or 10 months after the incident?

4        A.   I never said today I was not trained on the

5     General Orders.

6        Q.   I asked you if you had been trained more than once

7     and you said no.

8        A.   If you had read further in the deposition, there

9     are other times where I said one or more times possibly.

10       Q.   I understand that, ma'am.  So, why can you say

11    definitively no today 5 years after the incident, but a

12    year and a half after the incident, you were unsure?

13         What did you do that made your memory so good

14    5 years after the incident rather than when it wasn't so

15    good a year and 10 months after the incident?

16       A.   I've been trained on the General Orders, yes.  I

17    could not tell you exactly how many times.

18       Q.   Can you --

19            THE COURT:  Next question.

20            MR. PLOFCHAN:  Yeah, I'll move on.  I think I

21    made the point.  Thank you.

22    BY MR. PLOFCHAN:

23       Q.   Now, how long did your training last?

24       A.   That I could not tell you, sir.

25            MR. FRANCUZENKO:  Your Honor, I'm going to

1    object on relevance at this point.

2              MR. PLOFCHAN:  Your Honor, one of the things

3    I think we have to -- that we want to establish is --

4              THE COURT:  If you --

5              MR. PLOFCHAN:  -- this is a highly-trained

6    officer.

7              THE COURT:  If you want to focus in on this

8    case as opposed to general knowledge, that would be

9    helpful.

10             MR. PLOFCHAN:  I'm sorry.  Let me see if I

11   can ask it this way, Your Honor.

12             MR. FRANCUZENKO:  Your Honor, and just if I

13   may, one more objection.  I renew the objection that was

14   the subject of our motion in limine with regard to the

15   orders and I just ask that be part of the record.

16             THE COURT:  All right.

17   BY MR. PLOFCHAN:

18     Q.  Would you agree that the General Order with how to

19   handle a call to a home in an alleged domestic violence

20   case is General Order 534?

21     A.  I would have to see it, sir.

22     Q.  Okay.

23     A.  Yes, it is, sir.

24     Q.  Okay.  And that's the -- if you can let --

25   Marshal, I'm going to ask her one follow-up question.

1          That is a copy of the document that was produced

2     at your deposition.  Do you agree that that is the

3     five -- the General Order 534 that you previously

4     identified as a copy of Loudoun County Sheriff's Office

5     General Order 534?

6     A.   It appears that it is, yes.

7               MR. PLOFCHAN:  Your Honor, I'd like to move

8     that exhibit in.  It's our Exhibit Number 36.

9               MR. FRANCUZENKO:  Your Honor, objection.

10              THE COURT:  All right.  I think the objection

11    is one we made previously outside the hearing of the

12    jury.

13              MR. FRANCUZENKO:  Yes, Your Honor.

14              THE COURT:  All right.  That objection is

15    overruled.

16              MR. PLOFCHAN:  Thank you, Marshal.

17    BY MR. PLOFCHAN:

18    Q.   Now, with regard to this General Order only, do

19    you agree that you had received at least 30 to 45 minutes

20    of training?

21    A.   Yes.

22    Q.   And, that at your sessions, written material was

23    distributed?

24    A.   Yes.

25    Q.   Okay.  And, legal issues were discussed?

1    A.   Yes, sir.

2    Q.   Okay.  And that if there were any questions that

3    affected the training in question or any court rulings

4    that affected the General Order that you would ordinarily

5    be trained with respect to any order that would have come

6    into place?

7    A.   Yes, sir.

8    Q.   Okay.

9         MR. PLOFCHAN:  Court's indulgence.

10   Q.   Now, are you free to violate a General Order as a

11   matter of your own discretion?

12   A.   No, sir.

13   Q.   Okay.

14        MR. PLOFCHAN:  Now -- Your Honor, with the

15   Court's permission, since it has been admitted, I'd like

16   to put parts of the General Order on the screen.

17        THE COURT:  All right.

18        MR. PLOFCHAN:  Thank you.

19   BY MR. PLOFCHAN:

20   Q.   Now, Deputy, can you see this on your screen?

21   A.   Kind of, yes, sir.

22   Q.   Okay.  Now, would you agree that this is a General

23   Order that's been issued by the Loudoun County Sheriff's

24   Office with regard to domestic violence and related

25   offenses, correct?

1    A.   Yes, sir.

2    Q.   Okay.  How is domestic -- how is it determined

3 whether or not something is a domestic violence case?

4    A.   It all depends, sir.

5    Q.   Pardon?

6    A.   It all depends.

7    Q.   Well, who makes that determination?

8    A.   Ultimately, I do, sir.

9    Q.   Okay.  So, when did you make the determination

10 that this was a domestic violence case or an alleged

11 domestic violence case?

12   A.   I never made that 100 percent determination.

13   Q.   Okay.  Now, in order to be bound or in order to

14 use these rules for action, wouldn't you have had to make

15 a determination that it was a domestic violence case?

16   A.   I was there to investigative if it was a domestic

17 violence situation.

18   Q.   That's not my question.  In order to use this

19 General Order as a justification for your action,

20 wouldn't you have had to have determined first that this

21 was a domestic violence case?

22   A.   No.

23   Q.   Okay.  What other types of cases are there?

24   A.   There's larceny.  There's numerous cases.

25   Q.   Okay.  So, wouldn't you have had to determine

 1   before you -- well, let me ask you this.  Are there

 2   General Orders for larceny?

 3       A.  Yes, sir.

 4       Q.  And are there --

 5           THE COURT:  Excuse me.  If we could focus on

 6   this case, that would be very helpful to us.

 7           MR. PLOFCHAN:  I think -- I didn't mean to go

 8   astray.

 9           THE COURT:  I don't think you hear what I'm

10   saying.  I want you to focus on this case, what you pled

11   in your complaint.

12           MR. PLOFCHAN:  Yes, sir.

13   BY MR. PLOFCHAN:

14       Q.  Now, in terms of when you arrived -- let me ask

15   this.  What was the first information you received with

16   regard to Mr. Mial?

17       A.  I received a call for service.

18       Q.  Okay.  And who did that come from?

19       A.  From our dispatch.

20       Q.  Okay.  What did you -- did you receive it in

21   written or oral format?

22       A.  In oral format.

23       Q.  Okay.  And that came from the dispatcher?

24       A.  Yes, sir.

25       Q.  And, what did she say?

1    A.   She had stated that there was an address that I

2    needed to respond to and that a complainant had called

3    and stated somebody was armed with a knife.

4    Q.   Was that all that she said?

5    A.   No, sir.

6    Q.   What else did she say?

7    A.   She had stated that the complainant while on the

8    phone, said, never mind, they dropped the knife.  And

9    then the complainant hung up.

10   Q.   Okay.  So, the -- I want to be clear.  The very

11   first communication you had was that there was a call

12   saying they needed -- I'm sorry, what was the actual

13   phrasing?  Did so and so say they needed assistance with

14   a knife or there was someone with a knife?

15   A.   Dispatch had stated there was a complainant that

16   had called stated they needed help getting a knife away

17   from somebody.

18   Q.   Okay.  And without hanging up in that same call,

19   they said never mind, they've given it up and then hung

20   up?

21   A.   Yes, sir.

22   Q.   Okay.  So, if that's the case, would you agree

23   that based on that information, you have no existing

24   allegation that there is a crime or assault currently

25   being committed?

1     A.   I would not agree with that, sir.

2     Q.   If a complainant -- would you agree the

3  complainant is the victim?

4     A.   I do not know that, sir.

5     Q.   Well, what you were told -- because I want to

6  focus on what you knew.  You were told that someone

7  called and said someone else has a knife and that they

8  wanted to get that away from them, correct?

9     A.   Correct.

10    Q.   Okay.  What part of that information would suggest

11 to you that the person calling was not the victim?

12    A.   I don't know who the person calling was until I

13 further investigate.

14    Q.   Ma'am, I didn't ask who the person was.  I want to

15 know based on that information that you had, what part of

16 that information suggests that the person calling is not

17 the victim?

18    A.   I don't know who the complainant is and/or the

19 person calling.

20    Q.   All --

21         THE COURT:  Mr. Plofchan, we're going to take

22 the afternoon recess now for 15 minutes.

23         MR. PLOFCHAN:  Yes, sir.  Thank you.

24         (Court recessed at 3:01 p.m. and reconvened

25         at 3:18 p.m.).

1       THE COURT:  You can bring our jury out,

2  Mr. Toliver.  Thank you.

3       You may be seated.  You may continue,

4  counsel.

5       MR. PLOFCHAN:  May it please the Court.

6  BY MR. PLOFCHAN:

7    Q.  Ma'am, just before we took the break, I asked --

8  one of the questions I asked, you said you were the one

9  who determined whether or not it's a domestic relations

10 call, correct?

11   A.  I believe I stated not in every instance.

12   Q.  Well, in this, were you the one who determined it

13 was a domestic relations call or domestic disturbance

14 call in this case?

15   A.  I didn't classify it when it originally came out.

16   Q.  Okay.  When did you classify it?

17   A.  When I wrote my report.

18   Q.  So after everything was done?

19   A.  Yes, sir.

20   Q.  Okay.  So, if you didn't classify it, how did you

21 know to apply the rules for domestic violence,

22 specifically General Order 534 when you went there?

23   A.  I'm not understanding.

24   Q.  Well, would you agree what it says is that -- rule

25 number 534 applies to domestic violence, correct?

1    A.    Correct.

2    Q.    And, you agree that you applied -- in your mind,

3    you answered and said that you applied the rules of

4    General Order 534 to this case, correct?

5    A.    Correct.

6    Q.    So, if this only applies to domestic violence

7    cases and you didn't classify it as a domestic violence

8    case until after you wrote your report, how did you know

9    to apply the rules of 534 when this case was actually

10   happening?

11   A.    Our dispatch labeled it as a domestic violence

12   call.

13   Q.    Okay.  So, then it had been classified by someone

14   else?

15   A.    Yes, sir.

16   Q.    Okay.  Can you explain why when I asked you who

17   classifies it as a domestic violence case, you told me

18   you do, if somebody else has already classified it as a

19   domestic case?

20   A.    Because in the course of an investigation, things

21   can change.  And just because dispatch classified it as

22   one thing I am able to classify it as something else.

23   Q.    But it was classified when you were making -- when

24   you first went up to the house, correct?

25   A.    Yes, sir.

1    Q.   Would you agree that 534 actually talks about

2    three different types of people.  It talks about

3    complainants, victims, and disputants, correct?

4    A.   I would have to look it up.  I believe they were

5    covered, yes, sir.

6    Q.   Okay.  And, would you agree that if we look at

7    534 -- do you see that, ma'am?

8    A.   Yes, sir.

9    Q.   If you look at page 4 where it talks about --

10   Section 4, it talks about procedures.  One of the first

11   things that dispatch is supposed to say is who is

12   complaining and to locate the name of the caller if

13   different from the complainant.  Correct?

14   A.   That is what it says, yes, sir.

15   Q.   Okay.  Who were you identifying as -- who was

16   identified as the complainant to you?

17   A.   Dispatch just stated a complainant.

18   Q.   Okay.  Didn't it also identify it as a male?

19   A.   No, sir.

20   Q.   Now, did you get cad reports with respect to

21   handwritten notes that were received over the radio or

22   received over a system into your cruiser?

23   A.   Handwritten notes?

24   Q.   Computer-generated records that were received in

25   your cruiser.

1    A.  Yes, sir.

2    Q.  Okay.  And, did not that cruiser identify the

3 caller as -- or didn't those reports identify the caller

4 as a male?

5    A.  I did not look at those reports.

6    Q.  Okay.  Did you ever look at those reports?

7    A.  Yes, sir, I did.

8    Q.  When did you first look at those reports?

9    A.  After the call, sir.

10    Q.  Okay.  And, would you also agree that -- was an

11 ambulance ever sent to the -- prior to you going up to

12 the house, was an ambulance ever sent by dispatch?

13    A.  That I do not know.

14    Q.  Okay.  Did you see one when you went there?

15    A.  No, sir.

16    Q.  Okay.  And when you came down from the house after

17 the first time Mr. Mial closed the door, did you see any

18 ambulance?

19    A.  No, sir.

20    Q.  Okay.  Now, would you agree that the General

21 Orders specifically say that if there's any evidence of

22 injury or a -- I'm sorry, it's right here in the

23 paragraph, where someone has threatened violence, a

24 dispatch -- a deputy shall be dispatched immediately

25 along with an ambulance, if needed, correct?

1      A.   Correct, sir.

2      Q.   And no ambulance was ever dispatched?

3      A.   I do not know if it was dispatched.

4      Q.   You certainly didn't see one or hear of one being

5  dispatched, correct?

6      A.   Correct.

7      Q.   Okay.  Now, since you were familiar with the

8  General Orders, wouldn't that have indicated to you that

9  this was -- there was no evidence of injury or a weapon

10  existing?

11     A.   That I did not know, sir.

12     Q.   Well, I'm asking if you didn't see or hear of an

13  ambulance, with your training, wouldn't it have been

14  appropriate for you to conclude that there was no injury

15  or weapon existing?

16     A.   No, sir.

17     Q.   Do you assume that dispatch follows the General

18  Orders?

19     A.   They're supposed to, sir.

20     Q.   Okay.  And can you rely on dispatch following the

21  General Orders?

22     A.   Not in every instance, sir.

23     Q.   How do you determine when to rely on dispatch and

24  not when to rely on dispatch?

25     A.   That's why I am sent to the residence.

1    Q.   When do you make your determination whether to

2    rely on dispatch or not rely on dispatch?

3    A.   I'm not understanding.  I'm sorry, I apologize.

4    Q.   Well, you just said that you don't rely on

5    dispatch in every instance.  And I want to know how do

6    you make a determination as to when to rely on dispatch

7    or not rely on dispatch?

8             MR. FRANCUZENKO:  Your Honor, I'm going to

9    object at this point on relevance.  We're talking about

10   whether dispatch followed an order or not.  I object.

11            MR. PLOFCHAN:  May I respond, Your Honor?

12            THE COURT:  I'm listening.

13            MR. PLOFCHAN:  We're actually talking about

14   what information the officer had and what was -- what

15   were the inferences she should draw from that information

16   based on the General Order.

17            THE COURT:  All right.  If you have a

18   question about what her knowledge was on the day and

19   relevant to this case, that would be fine.

20            MR. PLOFCHAN:  That's what I'm referring to.

21            THE COURT:  Her general knowledge --

22   objection sustained.

23   BY MR. PLOFCHAN:

24   Q.   So that day when you were there and didn't see an

25   ambulance and didn't hear an ambulance or hear of an

1    ambulance over the radio, wouldn't you be able to have

2    inferred that the dispatch determined that there was no

3    evidence of injury or weapon existing?

4             MR. FRANCUZENKO:  Your Honor, I object, calls

5    for speculation.

6             THE COURT:  Sustain.

7    BY MR. PLOFCHAN:

8    Q.  Now, you indicated as well -- how did dispatch

9    communicate to you that this was a domestic violence

10   case?

11   A.  They stated over the radio.

12   Q.  Did they say it or did they actually put it in the

13   notes that were typed into the computer?

14   A.  When the original screen pops up, it states it on

15   the top along with the address.

16   Q.  Okay.  I thought you just said that you hadn't

17   looked at the screen to determine whether or not dispatch

18   had classified this as anything --

19   A.  I did not.

20   Q.  -- until after the incident was over?

21   A.  I did not look at the notes of the call, sir.

22   Q.  Okay.  Now, would you agree that when you got

23   there -- I'm going to back up.

24             I apologize, Your Honor.

25             Now, before you got to Mr. Mial's house, would you

1     agree that you were also informed by dispatch that there

2     was a second call, that dispatch had called back?

3         A.   Yes, sir.

4         Q.   Okay.  And, dispatch had called back and had a

5     conversation with Mr. Mial and they confirmed that the

6     person he was complaining about no longer had a knife and

7     that he told them the situation was under control, no

8     need to send anyone out.

9         A.   Yes, sir.

10        Q.   Okay.  So, before you got to the house, you knew

11    that there was a call that, before that call even ended,

12    he said he didn't need anybody and that they had called

13    back and confirmed they didn't need anybody, correct?

14        A.   Correct.

15        Q.   And when you got to the house, you didn't leave

16    your channel open, did you?  You didn't leave your

17    communication channel open, did you?

18        A.   Any time my radio is on, the channel is open, sir.

19        Q.   Isn't there a procedure that if you believe that

20    it's -- there's a dangerous situation, you leave it open

21    in a dedicated way so dispatch can always reach you?

22        A.   Yes, sir.

23        Q.   And isn't it a fact you did not leave it in a

24    dedicated way when you first approached the house?

25        A.   Yes, sir.

1   Q.  Okay.  So, is it fair to say that when you

2   approached the house, you did not deem this to be a

3   dangerous situation?

4   A.  I can't say that for sure, sir.

5   Q.  Well, if it was dangerous and the rules require

6   you to leave the channel open for dangerous situations

7   and you didn't leave the channel open, why can't we

8   conclude that you didn't think it was a dangerous

9   situation.

10   A.  Because I had not made contact yet with anyone at

11   the residence.

12   Q.  So, if you didn't know if it was dangerous or not,

13   why wouldn't you have left the channel open that day?

14   A.  I decided not to.

15   Q.  But we -- you decided not to and you are saying

16   that we can't infer that that decision was not -- that

17   decision reflects your decision it was not a dangerous

18   situation?

19   A.  I'm sorry.  There was too many different --

20   Q.  Okay.  I'll move on.

21       Now, I asked you about complainants, victims and

22   disputants.  In accordance with the General Orders, what

23   is the difference between a complainant, a victim and a

24   disputant as it apply to this situation that day?

25   A.  The complainant was identified as somebody that

1   had called.

2       Q.   Okay.  And what is a victim?

3       A.   A victim is some -- a victim of a crime.

4       Q.   Okay.  And what is a disputant?

5       A.   Could be a party to that crime.

6       Q.   Now, you were told that that second call, that the

7   person who had called was a male, correct?

8       A.   No, sir.

9       Q.   Okay.  And, when you got to the door, you knocked

10  on the door, correct?

11      A.   Yes.

12      Q.   And, Mr. Mial came and arrived in about 10,

13  15 seconds, correct?

14      A.   Yes, sir.

15      Q.   And, when he arrived, he opened the door

16  completely, correct?

17      A.   Correct.

18      Q.   All right.  And he was wearing socks and a

19  T-shirt, correct?

20      A.   Correct.

21      Q.   Okay.  And, you did not see any wounds or marks or

22  anything on Mr. Mial, correct?

23      A.   Correct.

24      Q.   You did not see any broken furniture?

25      A.   Correct.

1    Q.   You didn't hear anybody crying or yelling or

2  whaling?

3    A.   Correct.

4    Q.   You actually -- when you came up, you had looked

5  in the window and saw some children, correct?

6    A.   Incorrect.

7    Q.   You didn't see children?

8    A.   No, sir.

9    Q.   Okay.  Did you ever see children?

10   A.   Yes.

11   Q.   When did you see children?

12   A.   After I had already made contact with Mr. Mial.

13   Q.   Okay.  So, Mr. Mial opens the door and then you

14  see children?

15   A.   Eventually, yes, sir.

16   Q.   And they were not crying or appeared distressed in

17  any way, shape or form, correct?

18   A.   Correct.

19   Q.   So they were actually very peaceful and seemed not

20  unhappy?

21   A.   Correct.

22   Q.   So, there was nothing to indicate to you that

23  there was any type of emergency or disturbance going on,

24  correct?

25   A.   Incorrect.

1    Q.   What was it that indicated to you that there was

2    an emergency or disturbance going on?

3    A.   A call had been placed to that residence stating

4    that somebody had been armed with a knife.

5    Q.   Somebody had what?

6    A.   Been armed with a knife.

7    Q.   Now, you said a call had been placed to that

8    residence.  What about -- what about some call that was

9    placed to that residence that would indicate that someone

10   in the residence had a knife?

11   A.   That's what I was there to investigate.

12   Q.   So, someone from some other place called the

13   residents and said there's a knife and you went to the

14   residence to see if there's a knife?

15   A.   That was the address that I was dispatched to.

16   Q.   So, it was your understanding that no one at the

17   residence indicated there was a knife?

18   A.   It state in the complainant -- stated somebody was

19   armed with a knife.  It never said in the residence.

20   That was not communicated to us.

21   Q.   So, when you got to the door, you didn't even know

22   if the person that this caller was talking about was even

23   in the house when the call was made?

24   A.   Correct.

25   Q.   And, you had no -- other than he identified an

1    address of where the caller lived, you had no indication

2    that there was anyone at all in the house with a knife,

3    correct?

4        A.   Correct.

5        Q.   So, I want to be clear, when Mr. Mial came to the

6    door, you did not know if there was anyone in the house

7    with a knife or if there had ever been anyone in the

8    house with the knife?

9        A.   He just stated somebody had been armed and did not

10   say where.

11       Q.   Okay.  So you didn't know it was in the house,

12   correct?

13       A.   Correct.

14       Q.   And, now, you just told me you didn't know if it

15   was a male, but you now just told me that he said that

16   someone had been armed, but he didn't say where.

17           If you didn't know it was a male, why would you

18   use the pronoun "he" said that when you're talking about

19   the caller?

20       A.   I apologize, you had used it.  It was just the

21   complainant.

22       Q.   So, you don't know -- so, this could have been

23   someone armed with a knife two houses down, correct?

24       A.   Correct.

25       Q.   And, someone -- if someone was armed with a knife

1    on the street, you didn't know?

2       A.   Correct.

3       Q.   And, you had no reason to believe that there was

4    anyone in the house who had been armed, correct?

5       A.   That I did not know.

6       Q.   Well, did you have any reason to believe it?

7       A.   No, sir.

8       Q.   And, you didn't see any signs when you opened --

9    when Mr. Mial opened the door and you eventually saw the

10   children, you didn't see any signs from -- from your

11   ability to observe that gave you any indication that

12   someone had ever been in the house with a knife?

13      A.   That's correct.

14      Q.   Okay.  So then if you didn't have any -- well, did

15   you ask Mr. Mial to come into the house?

16      A.   No, sir.

17      Q.   Okay.  So, you didn't ask to go into the house at

18   that point in time?

19      A.   No, sir.

20      Q.   Did you ask him to bring anyone to the door?

21      A.   Yes, sir.

22      Q.   Who did you want him to bring to the door?

23      A.   Anyone that was at that residence.

24      Q.   Okay.  Now, if you have no reason to believe

25   anyone was ever in the house with a knife, why would you

1    want everyone to come -- who was in that house to come to

2    the door?

3         A.   The gentleman that answered the door had stated he

4    had made the phone call.

5         Q.   Okay.  So -- but he didn't say that the -- you

6    didn't ask him if that person was in the house, did you?

7         A.   I asked who had the knife.

8         Q.   And what did he say?

9         A.   It was none of my business.

10        Q.   Okay.  And he never said that that person was in

11   the house, correct?

12        A.   Correct.

13        Q.   So, you still have no reason to believe that

14   anyone in the house had a knife?

15        A.   Correct.

16        Q.   So, if you had no reason to believe anyone in the

17   house had a knife, why did you ask everyone to come to

18   the door?

19        A.   Because he had stated he had called, and he would

20   not tell me who had the knife.

21        Q.   Okay.  He also said that never mind, they got rid

22   of it, correct?

23        A.   Correct.

24        Q.   And he also said that the situation is resolved,

25   and you don't need to come, correct?

1    A.  Correct.

2    Q.  Okay.  So, I'm trying to figure out if you knew

3  all that and you had no reason to believe that anybody in

4  the house had a knife, why did you care who was in the

5  house?

6    A.  I was there to investigate that, sir.

7    Q.  And, if someone doesn't cooperate or doesn't want

8  to give you information, what's your response to that?

9    A.  You're not legally required to.

10   Q.  So they don't have to cooperate or give you

11  information?

12   A.  They do not.

13   Q.  Okay.  As a matter of fact they're within their

14  constitutional rights not to cooperate or give you

15  information?

16   A.  Right.

17   Q.  And they're within their rights to say I already

18  told you it's not a problem; I don't need you any more?

19   A.  Correct.

20   Q.  Okay.  So, I want to be clear.  At that first time

21  you did not ask to enter the house?

22   A.  No, sir.

23   Q.  Okay.  So, there was no refusal of entry to the

24  house?

25   A.  Correct.

1    Q.   So, there would have been no reason for a forced

2    entrance into the house at that point in time?

3    A.   I was trying to determine the facts.

4    Q.   Okay.

5    A.   So, I can't say that.

6    Q.   Do you see this section in front of you from

7    General Order 534?

8    A.   Yes, sir.

9    Q.   Okay.  If entry is refused, deputies must explain

10   that they need to make sure there are no injured persons

11   inside.  Correct?

12   A.   Correct.

13   Q.   Entry wasn't refused at this point in time because

14   you didn't ask for entry, correct?

15   A.   Correct.

16   Q.   Okay.  Refusal of entry or no response to a knock

17   at the door may require a forced entry, only if certain

18   requirements are met, correct?

19   A.   Correct.

20   Q.   Now, I just asked you if there was -- you had no

21   reason to have a forced entry and you said you didn't

22   know, correct?

23   A.   Correct.

24   Q.   Well, would you agree that under your General

25   Orders, you can only have a forced entry if there is a

1  refusal of entry or no response to a knock at the door?

2  Those are the first prerequisites, correct?

3      A.   There are other requirements as well.

4      Q.   These are the first prerequisites, correct?

5      A.   Those, yes.

6      Q.   And you didn't have a refusal because you never

7  asked to enter, correct?

8      A.   Correct.

9      Q.   And, he did respond to a knock on the door,

10 correct?

11     A.   Correct.

12     Q.   So, based on this paragraph, would you agree that

13 you had no authority to seek a forced entry of the -- at

14 that point in time?

15     A.   I was there trying to gather information.

16     Q.   I didn't ask that, ma'am.

17          Would you agree that you had no authority under

18 your General Orders to seek a forced entry at this point

19 in time?

20     A.   I don't fully agree with that.

21     Q.   Okay.  Can you point anywhere in the General

22 Orders that said at that point in time you would have had

23 authority to make a forced entry?

24     A.   There are other circumstances.  On those two, no.

25     Q.   You know what those other circumstances are?

1    A.   Degree of urgency, the possibility of danger to

2    others, the bottom four underneath that, sir.

3    Q.   So, let's go down to the bottom of the list.  Now,

4    would you agree that you didn't have authority to conduct

5    a search of the house at that point in time?

6    A.   To search it, no.

7    Q.   You did not have authority, correct?

8    A.   I do have -- I'm still trying to investigate where

9    that is.

10    Q.   Well, if you look at this order, it says,

11    "deputies may conduct a search of the premises if consent

12    has been given and no one who resides at the premises and

13    is present at the scene objects to the search".

14         You didn't ask for a consent, correct?

15    A.   Correct.

16    Q.   You didn't obtain consent, correct?

17    A.   Correct.

18    Q.   Mr. Mial didn't volunteer consent, correct?

19    A.   Correct.

20    Q.   So then at that point in time, you had no

21    authority to search, regardless of your intent to gather

22    information, correct?

23    A.   Correct.

24    Q.   Okay.  Now let's go to Section E.  Section E,

25    would you agree, also says "deputies may also make a

1    warrantless entry to conduct a search if an emergency

2    exists", correct?

3        A.   Correct.

4        Q.   "The deputies must have a reasonable belief that

5    such an emergency does exist; i.e., deputies believe that

6    someone, perhaps children, are in distress or immediate

7    danger and in need of assistance", correct?

8        A.   Correct.

9        Q.   Now, let's go through this.  Are you asserting

10   that at that point in time you have authority to make a

11   warrantless entry into that house to conduct a search

12   because an emergency exist?

13       A.   I was investigating that to try to determine it.

14       Q.   So was that a no?  You were not asserting that you

15   had the authority to go into the house because you didn't

16   have information to establish that an emergency existed,

17   correct?

18       A.   Correct.

19       Q.   And, there is nothing in the General Orders that

20   says that you have authority to make a warrantless entry

21   into a house to investigate, does it?

22       A.   Correct.

23       Q.   Okay.  So you would have had to have some

24   articulated observable fact that you could rely on,

25   correct?

1    A.   Correct.

2    Q.   Okay.   Now, it also says that "deputies must have

3  a reason to believe that such emergency exists.   Deputies

4  believe that someone, perhaps children, are in distress".

5        The only people you saw in that house were

6  Mr. Mial and his children, correct?

7    A.   Correct.

8    Q.   And they were not in distress, correct?

9    A.   They did not appear in distress.

10    Q.   You had no reason to believe they were in

11  distress, did you?

12    A.   That was the address provided by the complainant

13  of where somebody was armed with a knife.

14    Q.   Well, actually they weren't armed with a knife,

15  were they?   They had been armed with a knife, correct?

16    A.   Correct.   They had been.

17    Q.   Okay.   So, would you agree that there was not an

18  immediate danger based on your knowledge because no --

19  based on your knowledge nobody had a knife?

20    A.   That I did not know for sure, sir.

21    Q.   I'm asking based on what you did know.   You knew

22  that no one had a knife because the last thing you were

23  told was they've given it up.   I don't need your help,

24  correct?

25    A.   They had been -- dispatch had been told that.   I

1  was there to verify it.

2      Q.  But, what you knew was that somebody had given up

3  the knife, correct?

4      A.  Dispatch had been told that, yes, sir.

5      Q.  Now, so at that point in time, where is -- is

6  there anybody else there at the door with you?

7      A.  I can't say what moment another deputy walked up.

8      Q.  Or at any point in time while you're talking with

9  Mr. Mial and the door is wide open and he's standing

10 there in his socks, and you can see his kids in the back,

11 was there any other deputy with you?

12     A.  Yes, sir.

13     Q.  Who?

14     A.  Deputy Ferguson.

15     Q.  Okay.  And you don't know when he got there?

16     A.  Correct.

17     Q.  Okay.  Did he say anything to Mr. Mial?

18     A.  No, sir.

19     Q.  Did you say anything to him while Mr. Mial was

20 present?

21     A.  Deputy Ferguson?

22     Q.  Uh-huh.

23     A.  No, sir.

24     Q.  Okay.  And then Mr. Mial told you that he didn't

25 need you anymore and that he was telling you that he

1  thought it was crazy that you were there so quickly when

2  he's called in the past and no one ever showed up.

3  Correct?

4      A.  Correct.

5      Q.  And then he eventually closed the door, correct?

6      A.  Correct.

7      Q.  Okay.  And in the past you've testified under oath

8  that he slammed the door, correct?

9      A.  Correct.

10     Q.  But you don't know if he slammed the door or not,

11 correct?

12     A.  He slammed the door, yes, sir.

13     Q.  Okay.  Do you know if other people had testified

14 that he didn't slam the door or they had no memory of

15 slamming the door?

16          MR. FRANCUZENKO:  Objection, Your Honor.

17 She's asked about what she recall --

18          MR. PLOFCHAN:  I'll withdraw the question,

19 Your Honor.  I'll withdraw the question.

20          THE COURT:  All right.

21 BY MR. PLOFCHAN:

22     Q.  Have you ever had -- you actually have a protocol,

23 don't you, that if someone doesn't want to talk or

24 doesn't invite you in, you have a protocol under your

25 orders on what to do, correct?

1    A.   Correct.

2    Q.   And what does that involve?

3    A.   I would have to look at the exact order.

4    Q.   So, you don't know what's involved at this point

5  in time without looking at it?

6    A.   Someone does not invite us in, we have to try to

7  verify the information that was already provided by

8  dispatch through an investigation and confirm what had

9  been told to us or to dispatch.

10   Q.   Okay.  Well, was that requirement triggered at

11 this point in time?

12   A.   Yes.

13   Q.   Well, you just told me that if someone doesn't

14 invite you in that that would trigger an investigation.

15 You never asked to go in, correct?

16   A.   Correct.

17   Q.   So why would that trigger a further investigation?

18   A.   Because I need to verify information.

19   Q.   You didn't tell anybody that you needed to come

20 in, right?

21   A.   Right.

22   Q.   So if you didn't tell anyone you needed to come

23 in, they couldn't have denied you the ability to come in,

24 correct?

25   A.   Correct.

1    Q.   So -- and if nobody denied you the ability to come

2    in, then you don't have any other reason to do any

3    further investigation because you didn't do what you were

4    supposed to do at the door, right?

5    A.   Incorrect.

6    Q.   So, let me get this.  Is it your position that

7    someone is supposed to voluntarily invite you in without

8    you asking?

9    A.   No, sir.

10   Q.   And, you agreed that someone not letting you in

11   upon your request is what triggers the need to

12   investigate with neighbors, correct?

13   A.   Lack of service is what leads me to have to

14   investigate further.

15   Q.   I didn't ask you what lead you to investigate

16   further, because apparently this visit to the door is

17   investigating further.

18        You're at the door and someone doesn't let you in

19   upon your request.  That's what triggers your requirement

20   to go to neighbors, right?

21   A.   The requirement to go to the neighbors, I'm sorry.

22   Q.   Or to make further investigation.

23   A.   Further investigation is when I got there, I have

24   to investigate further.  I --

25   Q.   Ma'am, I asked you what happens if somebody

1    doesn't invite you in, and you said that requires us to

2    do a further investigation, perhaps go to neighbors,

3    correct?

4        A.   Correct.

5        Q.   If you didn't ask -- and then you said it doesn't

6    happen when -- let me rephrase it.

7             You said they do not have to spontaneously ask you

8    in.  You have to ask, correct?

9        A.   If he wanted to invite me in, he could have.  I

10   don't have to ask.

11       Q.   Does the -- where -- do you know where in the

12   General Orders it says that you are -- that someone -- if

13   someone does not unilaterally invite you in, you're

14   supposed to go to the neighbors?

15       A.   No.

16       Q.   Doesn't it, as a matter of fact -- we're back

17   again on page five and I'll put a highlight in there.

18   "If entry is refused and refusal of entry may require

19   certain further action".  Correct?

20       A.   I'm trying to see where you're pointing out, sir.

21       Q.   I'm pointing right here, "if entry is refused" and

22   then right here, "refusal of entry", correct?

23       A.   I see that, yes, sir.

24       Q.   So, in order to trigger any further response on

25   your part, you have to seek entry and be refused,

1    correct?

2        A.   For that part of the General Orders.

3        Q.   And, you did not seek entry or were refused,

4    correct?

5        A.   Right.

6        Q.   And then, for search if an emergency exists, it

7    says you have to have a reasonable belief that such

8    emergency does exist, that someone, perhaps children, are

9    in distress or immediate danger and in need of

10   assistance, correct?

11       A.   Right.

12       Q.   Where does it tell you that you're supposed to go

13   to the neighbors?

14       A.   It doesn't state right in there.

15       Q.   Okay.  Now -- so, you're -- I want to be clear.

16   You're saying there are two different factual scenarios,

17   one case where I asked to come in and I'm refused, and

18   another case where I think an emergency exists, correct?

19       A.   I'm not understanding what the question would be,

20   sir.  I apologize.

21       Q.   Under the rules, the General Orders, you have two

22   instances where you can have a warrantless entry.  One

23   upon refusal to your request to enter plus some other

24   factors.  The other is if you believe an emergency exists

25   and there are other factors, correct?

1    A.  Yes, sir.

2    Q.  Okay.  And we've already established that at that

3  time after your first visit, there was no refusal,

4  correct?

5    A.  Correct.

6    Q.  All right.  So -- and you said you still believed

7  that you had the right to make a forced entry into

8  Mr. Mial's house at that time, correct?

9    A.  I was gathering facts to see if that existed.

10   Q.  Yes or no, did you have a right at that point in

11  time to enter his house with a forced entry?

12   A.  I'm going to say no.

13   Q.  And that's because you didn't know if there was an

14  emergency, correct?

15   A.  Correct.

16   Q.  So then you and Ferguson leave and the door is

17  closed, correct?

18   A.  Correct.

19   Q.  And, you walk down to the driveway and down to the

20  street, correct?

21   A.  Correct.

22   Q.  Now, what time did you get there?

23   A.  I couldn't be positive, sir.

24   Q.  Okay.  Would you agree it was approximately 10

25  after 5.

1      A.    It could be.

2      Q.    Okay.  And, would you agree that this whole

3    encounter with Mr. Mial took less than 3 minutes?

4      A.    Yes, sir.

5      Q.    Okay.  So we're talking somewhere between 10 after

6    5 or 5:15, that you are now down the driveway walking at

7    that point in time, correct?

8      A.    Yes, sir.

9      Q.    And did Ferguson make a comment to you that he was

10   surprised, never seen you -- never -- used so few words

11   or not say anything like that?

12     A.    Yes, sir.

13     Q.    Okay.  And, what was in your thought process at

14   that point in time?

15     A.    The reason I didn't say anything was I did not

16   want to agitate Mr. Mial any more than he already was.

17     Q.    Okay.  But, I'm not asking -- I said what is your

18   thought process.  You just admitted you didn't have any

19   evidence of an emergency.  And you didn't ask to enter

20   the house in that case.

21         So, at this point, you have no thought of forceful

22   entry?

23     A.    At this point, our thought was to contact -- or my

24   thought was to contact the supervisor and explain what we

25   had.

 1    Q.   Okay.  Now, you were familiar with the General

 2  Orders, correct?

 3    A.   Correct.

 4    Q.   So, did you contact the supervisor?

 5    A.   No, sir.

 6    Q.   And is that Sergeant Holloway?

 7    A.   Yes, sir.

 8    Q.   Okay.  Who contacted the supervisor?

 9    A.   Deputy Ferguson.

10    Q.   And were you there when he was on the phone with

11  her?

12    A.   Yes, sir.

13    Q.   And did you hear his conversation?

14    A.   Yes, sir.

15    Q.   Okay.  Do you know what was related to her?

16    A.   I do not, sir.

17    Q.   Okay.  And what did Deputy Ferguson tell you when

18  he got off the phone with Sergeant Holloway?

19    A.   Stay put; she would be there shortly.

20    Q.   And that's it?

21    A.   Yes, sir.

22    Q.   So this is about 5:13, 5:15.  How long did it take

23  for her to get there?

24    A.   I couldn't tell you exact minutes, but it wasn't

25  long.

1    Q.   Okay.  Did you take any other steps?

2    A.   No, sir.

3    Q.   You didn't try to write up anything to seek a

4    search warrant or anything with regard to the house?

5    A.   No, sir.

6    Q.   You didn't go back up to the house and look in any

7    windows?

8    A.   No, sir.

9    Q.   Were there any other deputies present at that

10   time?

11   A.   No, sir.

12   Q.   So, it's just you and Ferguson at the bottom of

13   the driveway to the house waiting for Holloway?

14   A.   Right.

15   Q.   And then she shows up, correct?

16   A.   Correct.

17   Q.   And what does she tell you about going into the

18   house?

19   A.   She had stated to make contact again with the

20   homeowner and this time to check the welfare of all the

21   residents in the residence.

22   Q.   What did she tell you about whether or not you

23   should let the door close?

24   A.   She stated not to let it close.

25   Q.   And, did she tell you you shouldn't have let it

1    close on the first encounter?

2       A.  I can't remember the exact words.

3       Q.  Okay.  Did you ever tell her or make any question

4    to her about the General Orders and say we can't go the

5    house unless there's an emergency?

6       A.  No, sir.

7       Q.  Did you ever tell her that we can't go in the

8    house unless we're refused entry and the four factors

9    exist?

10      A.  No, sir.

11      Q.  So, she -- but you knew that those were the rules,

12   right?

13      A.  I knew the General Orders existed, yes, sir.

14      Q.  And you knew you were bound by the General Orders?

15      A.  Yes, sir.

16      Q.  Okay.  So when she told you that you needed to go

17   back up and make entry into the house, and you knew that

18   you didn't have a reason or a justification to make entry

19   into the house, what did you tell her?

20      A.  We walked back up to the house.  I didn't speak

21   with her again.

22      Q.  So you just blindly said, even though you knew

23   that the rules and the General Orders didn't permit you

24   to go back into the house with the information you had,

25   you said you -- you went back up to that house in an

1    effort to gain a forceful entry, correct?

2        A.   An effort to make contact.

3        Q.   And, if he opened the door, you were to enter the

4    house, correct?

5        A.   Not let the door shut.

6        Q.   How were you going to accomplish that without

7    entering the house?

8        A.   That would be as the situation unfolded.

9        Q.   No, I'm just physically -- how are you going to

10   accomplish not letting the door shut without entering the

11   house?

12       A.   Some part of the body would have to enter the

13   house.

14       Q.   Okay.  So when I asked you were going up there to

15   make contact and enter the house, that's what you were

16   intending to do, right?

17       A.   Yes, sir.

18       Q.   Even though you knew you did not have authority to

19   do that at that time, correct?

20       A.   Per the General Orders, yes, sir.

21       Q.   Okay.  Now, you're also familiar with the

22   Constitution, correct?

23       A.   Yes, sir.

24       Q.   Okay.  And you agree that the Constitution and the

25   Fourth Amendment forbids entry into a house without a

1  warrant, correct?

2      A.   Correct.

3      Q.   And, you didn't have a warrant?

4      A.   Correct.

5      Q.   Didn't have an arrest warrant or a search warrant,

6  correct?

7      A.   Correct.

8      Q.   And you hadn't applied for either?

9      A.   Correct.

10     Q.   So, the only reason that you would have been able

11  to get into this house is if you had an exception to the

12  warrant requirement, correct?

13     A.   Correct.

14     Q.   And yet, you knew at the time that you were going

15  up to that house to enter that house that you did not

16  have the criteria to meet an exception to enter the

17  house, correct?

18     A.   We were developing it, correct.

19     Q.   But you had already formed the opinion that you

20  were entering the house, correct?  That's what Holloway

21  told you to do, and that's what you were doing, correct?

22     A.   Correct.

23     Q.   Okay.  So, you were intending to enter the house

24  regardless of whether or not there was legal

25  justification, correct?

1          MR. FRANCUZENKO:  No objection, Your Honor.

2          THE WITNESS:  We were trying to investigate

3     further.

4     BY MR. PLOFCHAN:

5     Q.  Ma'am, I didn't ask that.  When you left -- you

6     said yes, ma'am, or yes, sergeant to Deputy Holloway and

7     you turn to go back up to the house.  It was your intent

8     to enter into the house whether or not there was legal

9     justification, yes or no?

10    A.  She stated not to let the door shut.  That was our

11    intent.

12    Q.  And the only way to do that was to enter the

13    house, some part of the body entering the house and you

14    were going to do that without legal justification,

15    correct?  Correct, yes?

16    A.  I don't agree with that, sir.

17    Q.  Well, when you told me that -- how were you going

18    to -- let me rephrase.

19         Court's indulgence, Your Honor.

20         If you were determined to go up, make contact and

21    not let the door closed, which required some part of

22    somebody's body entering the house and you knew at that

23    time that you did not have a refusal and that at that

24    time, you not have an emergency, what legal justification

25    did you have to attempt to enter the house?

1       A.   We were trying to ascertain that information.

2       Q.   Where in the General Order does it say that you

3   can make a warrantless forced entry into a house to

4   obtain information?

5       A.   It does not.

6       Q.   Where in any order, statute, law, case, any -- any

7   authority that you can put your hand on, does it say that

8   you have the authority to enter a home without a warrant

9   and make a forceful entry in order to investigate whether

10  there's an emergency?

11      A.   It does not.

12      Q.   So, since you went there, you cannot provide this

13  jury with any legal basis for your intent to enter that

14  house to further an investigation, correct?

15      A.   It was based on first encounter and the steps that

16  were taken in between the first and second encounter.

17      Q.   Well, now, let's talk about that answer.  You've

18  just told us that when you left the first encounter and

19  walked down to the bottom of the driveway, you did not

20  have any evidence of an emergency that would have allowed

21  you to enter the house, correct?

22      A.   I stated I didn't feel we had enough.

23      Q.   So then you didn't have it to enter the house,

24  correct?

25      A.   Correct.

1    Q.   Okay.  And so what, based on the first encounter,

2    allows you on your way back up to say now I can enter the

3    house?  If you didn't have it when you were leaving the

4    house; you didn't talk to Mr. Mial in the meantime, and

5    now you're going back up to the house, what happened

6    there that now all of a sudden gives you a legal

7    justification to enter the house based on the first

8    encounter?

9    A.   There were steps taken in between that time.

10   Q.   What steps?

11   A.   Phone calls made to the residence, knocking on the

12   residence door.

13   Q.   I'm asking about the final leave to the house.  No

14   phone calls were made until you were actually at the

15   door, right?

16   A.   I believe so, yes.

17   Q.   Okay.  So, no phone calls were taken in the -- in

18   between the time when you had already formed the idea

19   that you were entering the house.  And you had said --

20   and what was the second one after phone calls?

21   A.   Phone calls and knocking on the doors.

22   Q.   And knocking on the door hadn't happened before

23   you went back up.  Somebody else hadn't gone up to knock

24   on the door, right?

25   A.   Right.

1    Q.  So there was nothing intervening that would have

2    justified you when you left, see a sarge, when you turned

3    around, there was nothing to justify to have an intent to

4    enter that house at that point, correct?

5    A.  She had stated not to let the door shut.  But we

6    had not entered the house at that time.  We were still

7    developing our investigation.

8    Q.  If the sergeant gives you an illegal order, do you

9    follow it?

10   A.  No, sir.

11   Q.  So, whether she said to enter it or not is

12   irrelevant, isn't it?  You knew you didn't have any legal

13   basis when you turned up the driveway to go into that

14   house, correct?

15   A.  We were trying to make contact.

16   Q.  I understand what you're trying to do.  But, you

17   already said you had the intent to enter and you knew you

18   did not have a legal basis to enter, correct?

19   A.  That's what she instructed us to do.

20   Q.  And you just told me because you knew you did not

21   have a legal basis you're actually obligated to ignore an

22   illegal order, right?

23   A.  I didn't feel it was an illegal order.

24   Q.  So what make it legal?

25   A.  The notes of the call, the encounter with Mr. Mial

1   the first time, all of that was circumstance that played

2   into it.

3      Q.  So, if -- but none of those changed from the time

4   you left the house until after you talked to the sergeant

5   and you went back up, correct?  You didn't have any more

6   information from the house, right?

7      A.  Right.

8      Q.  So, if you didn't have legal basis when you left

9   the house the first time, and you got no more

10  information, how did you now form the opinion that it was

11  legal for you to go in and investigation?

12     A.  Sergeant Holloway had formed that opinion and had

13  stated it based on -- you would have to ask her what her

14  opinion was based on.

15     Q.  Well, I'm not asking about Sergeant Holloway's

16  actions.  She's not a defendant.  You just told me you

17  can't obey an illegal order.  And you told me you're

18  familiar with the General Orders, statutes, law,

19  Constitution.

20         Regardless of Sergeant Holloway, what authority

21  are you relying on that says that when you turned around

22  and you had the intent to enter that house regardless,

23  that you were justified in doing so?

24     A.  Based on the phone call and the totality of what

25  went on.

J. Forsch - Direct                                              58

1     Q.   So what changed and this is the last time I'm

2   going to ask because we're going in circles.  What

3   changed between the time you came -- you left the house

4   to the time you turned around that those phone calls and

5   the circumstances all of a sudden now gave you a

6   justification to enter a house to investigate?

7     A.   The time lapse, the knocking on the door, the

8   phone calls, all that played into it.

9     Q.   Ma'am, there was no knocking on the door.  There

10  was no phone call because you hadn't gotten to the door

11  yet.  You created the time lapse, correct?

12    A.   Correct.

13    Q.   So, I want to be clear then.  Since you hadn't

14  gotten to the door yet to knock and nobody -- and nobody

15  had made a phone call, you're saying, I've created a time

16  lapse and now this justifies me to make a forceful entry

17  into a house and investigate even though I don't have any

18  evidence of an emergency?

19    A.   That is not what I'm saying, sir.

20    Q.   Tell me what you are saying then, because I

21  thought I just did exactly -- I identified everything you

22  said.

23    A.   I'm saying based on the first encounter with Mr.

24  Mial, that did create some sort of urgency to myself.  I

25  did not feel it was enough at that point to enter the

1    home because I wanted him to calm down, to not create

2    further issues.

3            The second time, we were told after we had walked

4    away from the residence, you should have not let the door

5    shut.  This time don't let it shut.  We are required to

6    check the welfare of all the residents in that house.

7    Q.    Now, with all due respect -- I'm not going to

8    comment on your testimony.  I'll save it for argument.

9            Nothing -- you had no additional information other

10   than Sergeant Holloway telling you to go into the house

11   and you knew that that was an illegal order, correct?

12   A.    I didn't think it was an illegal order, sir.

13   Q.    And then I asked you to tell me what statute,

14   rule, order or anything you relied on that would make it

15   a legal order and you can't do that, can you?

16   A.    Based on the initial phone call and the behavior

17   at the door.

18   Q.    Well, if there was an initial phone call and

19   behavior at the door, that behavior would have had to

20   create a sense of emergency in order for you to make a

21   forceless entry, correct?

22   A.    Correct.

23   Q.    And you already admitted it didn't create a sense

24   of emergency, correct?

25   A.    I stated I did not want to make the situation any

1   worse than it already was.

2      Q.   You also stated there was no emergency, did you

3   not, within the last half hour?

4      A.   The phone call itself is a lead that there is an

5   emergency.

6      Q.   Well, what about the phone call that says, "never

7   mind.  They've given up the knife".  And then you call

8   back.  "The situation's under control.  Don't come out."

9           Doesn't that give you a lot of evidence that

10  there's not an emergency?

11     A.   No, sir.

12     Q.   So, I want to be clear.  You as an officer are

13  free to disregard any citizen's statement that there is

14  not an emergency just because you don't want to listen to

15  it?

16     A.   I have to investigate it, sir.

17     Q.   Where in the General Orders does it says that you

18  have to investigate it?

19     A.   It does state.

20     Q.   Does it?  And where does it say --

21     A.   You're required to investigative any calls for

22  service.

23     Q.   Where do they define investigation?

24     A.   Gather information, gather facts.

25     Q.   Okay.  And where does it say in your General

1    Orders that an investigation requires you to enter a

2    house?

3        A.   It does not say to enter a house, sir.

4        Q.   Okay.  So now we're back in this big circle.  I'm

5    trying to distinguish -- you're investigating.  I have no

6    issue with your investigating, but you entered somebody's

7    house.

8            So, where was the authority when you turned

9    around, yes, sergeant, when you turned around for you to

10   form the intent that you were entering that house to

11   investigate?  Where's the authority to do that?  There

12   isn't any, is there?

13       A.   Based on the original phone call to check the

14   welfare of all the residents in the house.

15       Q.   If it didn't create an emergency then, what

16   changed that allowed it to create an emergency

17   afterwards?

18       A.   First time I tried not to make the situation any

19   worse.  The emergency was still there.

20       Q.   Well, so you walked away from an emergency.  Is

21   that what your testimony is?

22       A.   Not make the situation worse, yes.

23       Q.   So you walked away from the emergency.  What -- I

24   want to be clear.

25           As an officer, you're supposed to apply reason,

1    logic and common sense, correct?

2        A.   Correct.

3        Q.   And, you have a phone call that says, I need some

4    help getting a knife away from someone.  Never mind,

5    they've given it up.

6            Five minutes later, they -- dispatch calls back

7    and they say, yeah, problem solved, everything's done.

8    You show up, nothing -- somebody comes to the door right

9    away.  His socks, T-shirt.  You look around.  You see

10   kids in the back.  There is no evidence of violence.

11   Reason, logic and common sense dictate that there's no

12   emergency, doesn't it?

13       A.   Not necessarily, sir.

14       Q.   Especially since you didn't know if the person had

15   a knife in the house or outside of the house.  Doesn't

16   that dictate that there's no emergency?

17       A.   That was the residence that was given as to where

18   the knife was.  I have to verify that's where it was

19   occurring.

20       Q.   Now, this is -- and now, Deputy, it seems your

21   story is changing.

22           Does -- where in the report that you got said that

23   that's the residence where the knife was?

24       A.   That was the residence that was provided by

25   dispatch.

J. Forsch - Direct                                                63

1    Q.   So, that was the residence of the caller, correct?

2    A.   Of the complainant.

3    Q.   Right.  And you testified not more than 40 minutes

4    ago, half hour, that you didn't know if the knife was

5    outside, across the street, or in the neighbor's yard,

6    correct?

7    A.   I did, yes.

8    Q.   Okay, so then how can you now sit there and

9    testify that that's where the knife was when you just

10   testified you didn't know where the knife was?

11   A.   Because the complainant stated that is why they

12   needed the police to try to help.

13   Q.   And then the complainant said "I don't need help",

14   correct?

15   A.   Right.

16   Q.   Now, when we go to -- you now claim that there's

17   an emergency, right, right?

18   A.   Right.

19   Q.   All right.  What was the emergency?

20   A.   Possibly somebody armed with a knife.

21   Q.   What evidence did you have that -- what time is

22   this that you go back up?

23   A.   I couldn't tell you.

24   Q.   5:30?

25   A.   I couldn't tell you what time.

1    Q.   What evidence did you have that at 5 -- between

2    5:15 and 5:45, anyone had a knife?

3    A.   Are you talking from when the initial call was

4    placed or are you talking -- you have to specify.

5    Q.   You got to the house at -- you said by 5:10.  You

6    were done with Mr. Mial by 5:13.  What evidence from the

7    time you got there until 5:45 did you have that anyone

8    had a knife?

9    A.   I didn't know if anyone had the knife at that

10   point still.

11   Q.   And, you didn't know if Santa Clause was in the

12   closet, right?

13   A.   Right.

14   Q.   So, you -- so you're allowed to assume that even

15   though you're told no one has a knife, you believe it's

16   within your purview to assume that everybody's lying and

17   they must still have a knife and therefore you can make a

18   forceful entry?

19   A.   I'm not assuming anything.  I need to verify

20   information how that knife was taken away, was anyone

21   injured in taking that knife away.

22   Q.   Do you agree you can't make any -- take any action

23   until you verify that information?

24   A.   That's what I was attempting to do.

25   Q.   That's not my question.  Do you agree that you

1   cannot take any action until you verify that information?

2            MR. FRANCUZENKO:  I'm going to object, Your

3   Honor.  The term "action" is vague.

4            MR. PLOFCHAN:  I'll rephrase, Your Honor.

5            THE COURT:  Thank you.

6   BY MR. PLOFCHAN:

7       Q.  Do you agree you cannot make a forceful entry into

8   the home until you verify that information?

9       A.  I don't.

10      Q.  So, you believe that you can make a forceful entry

11  into a home to investigate something?

12      A.  Dependent upon what a call for service would be.

13  Not --

14      Q.  Okay.  Is there ever any number of calls that

15  could ever be made that said I don't need your help that

16  would allow you to say, okay, we don't have to make a

17  forceful entry?

18      A.  You have to go over specifics.  I don't --

19      Q.  Have you ever had a call where someone said I

20  don't need your help and then you said okay.  I'm not

21  making a forceful entry?

22      A.  When they've answered the door and I've spoken

23  with them, yes.

24      Q.  And Mr. Mial answered the door and you spoke with

25  him, correct?

1    A.   No, sir.

2    Q.   I thought you said he answered the door the first

3    time and you spoke with him?

4    A.   We didn't have a conversation.

5    Q.   You told us before that he told you he didn't need

6    your help and that you had a conversation about him

7    saying that you guys came right away.  When I've asked

8    you to come before, you didn't come.  How is that not a

9    conversation?

10   A.   I wasn't speaking, sir.  He was screaming at me.

11   Q.   Now, he's screaming at you.  You didn't mention

12   that before.  What about the screaming -- now that this

13   is something new.  What about the screaming at you -- let

14   me rephrase it.  I'll withdraw and rephrase.

15          MR. FRANCUZENKO:  Your Honor, I'll object.

16   It's argumentative.

17          MR. PLOFCHAN:  That's why I'm rephrasing it,

18   Your Honor.

19          THE COURT:  All right.

20   BY MR. PLOFCHAN:

21   Q.   You agree, though, that even though you allegedly

22   now say that he was screaming at you, you still didn't

23   have a basis for an emergency when you left the first

24   time?

25   A.   He was yelling, and I was trying to have a

1    conversation with him, yes.

2      Q.  Ma'am, my questions are very simple.  And I know

3    you want to get Mr. Francuzenko to help you tell what you

4    want to say.

5              MR. FRANCUZENKO:  Objection, Your Honor.

6    That's gratuitous.

7              MR. PLOFCHAN:  I think -- I'll withdraw that

8    comment.  I'm strike that argument, Your Honor, or that

9    statement.

10             MR. FRANCUZENKO:  -- be permitted --

11             MR. PLOFCHAN:  And I apologize to the jury to

12   the extent that was wrong.

13             THE COURT:  The court reporter can only take

14   down one person speaking at a time.

15             MR. PLOFCHAN:  Yes, sir.

16             THE COURT:  And the objection is sustained.

17             MR. FRANCUZENKO:  Thank you.

18   BY MR. PLOFCHAN:

19     Q.  Now, when you previously said that when you left

20   the house after the first time, you did not have a basis

21   for an emergency.  It is now your position that he was

22   screaming at that time, correct?

23     A.  Right.

24     Q.  And, yet you still didn't have a basis for an

25   emergency, correct?

J. Forsch - Direct

1     A.  I didn't want to aggravate the situation any more

2  which is why I did not force entry.  The entire call was

3  an emergency based on what the complainant had said.

4     Q.  Now, I'm trying to get as to what is your filter

5  that -- what if a complainant says two times, there's --

6  I need help, I need help, and then says I don't need

7  help, do you assume they need help?

8     A.  Yes.

9     Q.  If they say I need help but then say 25 times I

10  don't need help, do you assume they need help?

11     A.  Yes.

12     Q.  Why?

13     A.  Because they had stated originally that they

14  needed help.

15     Q.  So why do you believe them the first time and not

16  the 25 times afterwards?

17     A.  Because I need to understand why it changed.  What

18  has changed.

19     Q.  Where is your authority to insist that someone

20  explain why it has changed?

21     A.  I need to verify information.

22     Q.  I didn't ask that question, ma'am.

23     Where is your authority to insist that someone

24  explain why it has changed?

25     A.  People do not have to speak with me if they do not

1  want to.

2     Q.  Okay.  And where is your authority that says that

3  if you don't have verification of an emergency, you can

4  still go into a house to look for more evidence?  There

5  isn't any, is there?

6     A.  I'm going to say based off the General Orders it

7  says right here, degree of urgency involved at that

8  point.

9     Q.  Let's go over that.  I just came over to look at

10  this.  It says "deputy believes that someone is in

11  distress and in an immediate danger and in need of

12  assistance".

13        The only people you saw were not in distress,

14  correct?

15     A.  Correct.

16     Q.  And the only people you saw were not in immediate

17  danger and in need of assistance, correct?

18     A.  Correct.

19     Q.  And, you had no information that anyone else was

20  in the house, correct?

21     A.  No.

22     Q.  What information did you have that anyone else was

23  in the house?

24     A.  Mr. Mial had stated that it was none of my

25  business who was in the house.  So I did not know who was

1    there.

2       Q.  So, you had no information that anyone else was in

3    the house.  He didn't say my wife, my friend, my dog,

4    whatever.  You just had no information, correct?

5       A.  Correct.

6       Q.  Okay.  So then -- if you had no information, you

7    had no information to assume someone was in the house or

8    there was -- or that there were 40 people in the house?

9    You just didn't have any information, correct?

10              THE COURT:  That's about four question.

11   Could you ask just one question.

12              MR. PLOFCHAN:  Yes, sir, I apologize.

13   BY MR. PLOFCHAN:

14      Q.  You didn't know if there was no one else in the

15   house, correct?

16      A.  Correct.

17      Q.  And you didn't know if they're 40 people in the

18   house, correct?

19      A.  Correct.

20      Q.  Is there any authority you have that allows you to

21   assume there are 40 people in the house that you can go

22   in and investigate?

23      A.  Based off of the phone call and the armed with a

24   knife, that --

25      Q.  The phone call said -- would you agree?  Can we

1    disagree on this that when the phone call ended, you had

2    no one saying anyone was armed with a knife?

3         A.   But I didn't know that for a fact.

4         Q.   You didn't know for a fact that there was a knife

5    in the first place, did you?

6         A.   Based on the call, that is what the --

7         Q.   So you're going to believe the first half of phone

8    call and not the second half of the phone call?

9         A.   I'm there to investigative the phone call.

10        Q.   And therefore you didn't have any real knowledge

11   and yet you acted anyway, correct?

12        A.   Correct.

13        Q.   Okay.  Now, let's draw your attention to the rest

14   of this.  If you claim there's an emergency, okay, you

15   must have a reasonable belief that an emergency exists

16   and that deputies shall evaluate the following elements

17   when considering a warrantless entry, correct?

18        A.   Correct.

19        Q.   Shall says it's mandatory, right?

20        A.   Correct.

21        Q.   Which means that you have to make these

22   evaluations before you would make a warrantless entry,

23   correct?

24        A.   Correct.

25        Q.   You never evaluated the time required to obtain a

J. Forsch - Direct                                                    72

1    search warrant, did you?

2        A.   No, sir.

3        Q.   So, you didn't follow the General Order, didn't

4    you?

5        A.   Step number A, I did not follow.

6        Q.   Now, let's ask the other half of step number A,

7    the degree of urgency involved.  You just testified that

8    you created the urgency, correct?

9        A.   When the door shut, contact was done.  We did step

10   back.

11       Q.   Up to 35 minutes, correct?

12       A.   No, sir.

13       Q.   Well, let me ask you this.  Would you agree that

14   based on all the reports and the evidence you provided in

15   discovery that the Taser was at 5:48 and some seconds?

16       A.   That I don't know.

17       Q.   When was the Taser deployed?

18       A.   That I don't know.

19       Q.   Would you agree it was after 5:30?

20       A.   It would be after the second time we made contact.

21       Q.   And would you agree that the Taser's deployed

22   within 30 seconds, no more than a minute of being in the

23   house?

24       A.   Correct.

25       Q.   Okay.  So, if it is established that the Taser was

1    fired at 5:48, that means you entered the house about

2    5:47 and some seconds, correct?

3        A.   It could be, yes, sir.

4        Q.   Okay.  So, if you left the house between 5:10 and

5    5:13 and you went in again at 5:47, you were about

6    35 minutes before one -- before going at the door and

7    then entering a second time, correct?

8        A.   We were at the door prior to that.

9        Q.   I understand, but prior to entering, you had

10   35 minutes, correct?

11       A.   Right.

12       Q.   All right.  And, you -- and you created that

13   delay, correct?

14       A.   No.

15       Q.   Well, who forced you, if you felt there was an

16   emergency, who forced you to walk away at 5:13?

17       A.   I chose to walk away.

18       Q.   Okay.  And then there was a delay because you

19   chose to walk away, correct?

20       A.   Yes.

21       Q.   So, is it fair to say you created the delay?

22       A.   When I arrived back the second time, a delay was

23   not answering the door as well.

24       Q.   Okay.  But, when did you arrive back?

25       A.   I couldn't tell you the --

1    Q.   Was it any more than 10 minutes?

2    A.   Prior to the door being opened, yes, sir.

3    Q.   It was more than 10 minutes.  You're sure about

4    that?

5    A.   I would say approximately 10 to 15 minutes of

6    knocking on the door.

7    Q.   Could it have been 5 to 10 minutes?

8    A.   I would say longer, but I couldn't give you an

9    exact minute.

10   Q.   Do you recall having testified about that before?

11   A.   Yes, sir.

12   Q.   And do you recall saying 5 to 10 minutes?

13   A.   Ten to 15, I believe.

14   Q.   That's what you think.  We'll get to that in a

15   second.

16        Marshal, can I ask --

17        Deputy, I'm going to ask you to look at the last

18   line on the document and see if that refreshes your

19   recollection when the Taser went off.

20             MR. FRANCUZENKO:  What document is that, Your

21   Honor?

22             MR. PLOFCHAN:  It's your record, just to

23   refresh --

24             THE COURT:  Show things to the opposing

25   counsel.

1      MR. PLOFCHAN:  Marshal, I will show

2  Mr. Francuzenko, first.

3      MR. FRANCUZENKO:  Your Honor, I object on a

4  lot of different grounds at this point.  She didn't

5  prepare this document, so I'm not sure it's appropriate

6  for my client to --

7      THE COURT:  Is there any limitation what can

8  be used to refresh recollection, Mr. Francuzenko?

9      MR. FRANCUZENKO:  I'm sorry.

10      THE COURT:  Is there any limitation on what

11  can be used to refresh recollection?

12      MR. FRANCUZENKO:  No, but there needs to be

13  some foundation to be made that this document can refresh

14  recollection before being used.

15      THE COURT:  Objection overruled.  You can use

16  it.  There's no limitation what can be used to refresh

17  recollection.

18      MR. PLOFCHAN:  Thank you.

19  BY MR. PLOFCHAN:

20    Q.  Does that refresh your recollection, the last

21  line?  Does that refresh your recollection what time the

22  Taser was employed?

23    A.  Dispatch entered it at that time.

24    Q.  What time was that?

25    A.  17:48.

1    Q.   Is that 5:48 and some seconds?

2    A.   Yes.

3    Q.   How many?

4    A.   Forty-five, sir.

5    Q.   So, almost 5:49, correct?

6    A.   Correct.

7         MR. PLOFCHAN:  Thank you.  Marshal, next time

8    when you get up, I'll take it back.  Thank you.  I thank

9    you, sir.

10   BY MR. PLOFCHAN:

11   Q.   Now, let's go to the second basis for an

12   emergency.  "The possibility of danger to others,

13   including deputies left to guard the site".

14        What are you leaving deputies to guard the site

15   for?  Is that to go get a warrant?

16   A.   It could be.

17   Q.   But, you can now do a warrant through dispatch,

18   right?

19   A.   I don't know that.

20   Q.   Okay.  Were you trained in how to do a warrant?

21   A.   At that -- I did take a class, yes, sir.

22   Q.   Okay.  And, you're aware through your training

23   that you had the ability to send a Teletype message to

24   the adult detention center and they can walk it down to

25   the magistrate, correct?

J. Forsch - Direct                                              77

1    A.   No, sir.

2    Q.   Okay.  Let me ask you this.  Did you leave any

3    deputies to guard the site?

4    A.   No, sir.

5    Q.   Were there any deputies to leave to guard the

6    site?

7    A.   There was deputies there, yes, sir.

8    Q.   Okay.  What evidence did you have that if you left

9    deputies there to guard the site that they would be in

10   danger?

11   A.   None.

12   Q.   Okay.  What was the suspected offense that you

13   were going -- that you had reason to believe was

14   occurring at that moment?

15   A.   Somebody was possibly armed with a knife.

16   Q.   Okay.  Now, the call came in at 5:03, right?  And,

17   that's the last time there was any evidence that somebody

18   had a knife, correct?

19   A.   Per the complaint, yes, sir.

20   Q.   Okay.  And through your observation you didn't

21   have any other information, right?

22   A.   Right.

23   Q.   So, and we know that no one had a knife according

24   to the complainant at 5:04, correct, by the time they

25   hung up, right?

1      A.   With the complaint yes, sir.

2      Q.   So, no one to your knowledge had a knife after

3   5:04, correct?

4      A.   To my knowledge, no, sir.

5      Q.   Okay.  So, what was the suspected offense that was

6   currently ongoing at that time?

7      A.   I didn't know for a fact --

8      Q.   So you didn't know of any offense that was

9   currently ongoing at that time, correct?

10     A.   I did not know for a fact if somebody was injured

11  in disarming the person with the knife.

12     Q.   And you didn't know if there were Martians in the

13  living room, didn't you?

14     A.   Correct.

15     Q.   And you had no suspected offense that was

16  occurring at this time, correct?

17     A.   I did not know.

18     Q.   So, if you did not know, you had no suspected

19  offense that was occurring, correct?

20     A.   Suspected -- I did not know if a person had been

21  injured in disarming of the knife, anything.

22     Q.   Well, what suspected offense do you claim that you

23  had?

24     A.   Possibly somebody armed with a knife.

25     Q.   Is it illegal to be armed with a knife?

1   A.  To be armed with a knife to attempt to hurt

2   somebody, yes, it is.

3   Q.  No, I didn't ask you that question.  Is it illegal

4   to be armed with a knife?

5   A.  You have to tell me what your definition of

6   armed --

7   Q.  Well, if I have a knife in my hand, is it illegal?

8   A.  No.

9   Q.  As a matter of fact, people have knives in the

10  kitchen drawers all the time, correct?

11  A.  Correct.

12  Q.  That's not illegal, correct?  All right.  So, is

13  an offense to stand in the living room with a knife in

14  your hand?

15  A.  To stand with it in your hand, no, sir.

16  Q.  Okay.  And, if there's no evidence of somebody

17  actually being struck by a knife, is there offense if

18  somebody threatens or uses it at somebody but doesn't

19  strike?

20  A.  Yes, sir.

21  Q.  Okay.  Is there -- what evidence did you have

22  between 5:04 and 5:49, that there was anybody in that

23  house threatening to use a knife on themselves or someone

24  else?

25  A.  I did not know.

1    Q.   Okay.  So you had no evidence, correct?

2    A.   Correct.

3    Q.   Okay.  So then we didn't have a suspected offense,

4    and we didn't have any indication that there was anything

5    involving violence, did we?

6    A.   The notes of the call indicated there was some

7    sort of violence.  Somebody armed with a knife.

8    Q.   But you just told me it's not illegal to the armed

9    with a knife?

10   A.   Somebody's calling 911 --

11   Q.   And they -- well --

12   A.   -- and stating someone is armed with a knife.

13   Q.   Isn't it a fact that they said, I need some

14   assistance in -- sending someone to assist in taking a

15   knife from an individual.  That's all they said.

16   Correct?

17   A.   Per those notes, yes, sir.

18   Q.   Okay.  There was never any communication that

19   someone was armed with a knife, was there?

20   A.   Our dispatch had stated that somebody had a knife.

21   The word armed was not --

22   Q.   Did you produced a video -- a tape recording of

23   this conversation, that somebody had a knife?

24   A.   Dispatch had stated --

25   Q.   I'm asking did you produce a recording of that?

1    A.   No, sir.

2    Q.   Okay.  Now, let me ask you this.  Wouldn't it, in

3  order to be a crime of violence, have to be -- go beyond

4  merely saying someone had a knife and they would have had

5  to say had a knife and threatened to harm one person or

6  another in order for it to be a crime?

7    A.   I'm not understanding.

8    Q.   Just by saying someone has a knife does not state

9  a crime, correct?

10   A.   Correct.

11   Q.   You actually would have had to say has a knife and

12  is threatening to hurt themselves, or has a knife and has

13  threatened to hurt someone in order to be a crime,

14  correct?

15   A.   Correct.

16   Q.   And you never got that from dispatch, did you?

17   A.   I would say the 911 call just calling for

18  assistance in that type of situation would be enough

19  because if they were cutting in the kitchen, they're not

20  going to call asking to ask somebody to come and help

21  take the knife away.

22   Q.   How do you know.  What if -- are you trying to say

23  what if there was somebody who --

24              THE COURT:  Excuse me.

25              MR. PLOFCHAN:  Hypothetical.  I'll keep to

1    this case.

2                THE COURT:  I'd rather you focus on this case

3    as opposed to hypotheticals.

4                MR. PLOFCHAN:  Thank you, Your Honor.

5    BY MR. PLOFCHAN:

6        Q.   No caller or dispatch ever identified to you that

7    someone was threatening to use a knife against themselves

8    or any other person, did they?

9        A.   No, sir.

10       Q.   Okay.  What knowledge did you have about any guns

11   in the house?

12       A.   None.

13               MR. FRANCUZENKO:  Your Honor, I'm going to

14   object.  Now we're getting really beyond.  There was

15   never any discussion of a gun.

16               MR. PLOFCHAN:  Your Honor, the General Order

17   says whether deputies reasonably believe that any person

18   may be armed and I'm just going through the first guns

19   and I was going to ask about knives and anything else

20   that was armed.

21               MR. FRANCUZENKO:  Your Honor, at this point,

22   maybe we can take a break.  I'd like to be heard on this

23   point and some additional points.

24               THE COURT:  All right.  I'm going to let the

25   jury step out for a few minutes and take a matter outside

1    your presence for a few moments.

2                   (Jury excused from courtroom at 4:33 p.m.)

3                   THE COURT:  You can have a seat.

4                   MR. FRANCUZENKO:  Your Honor, we're going

5    well beyond the scope of the facts in this case.  There

6    is questions about guns.

7                   You know, this is a problem that I have with

8    the Orders, Your Honor, and quite frankly, although I

9    don't want to do this, these General Orders are now the

10   focus of this case and not the United States

11   Constitution.  And there's case law that makes it clear

12   that these folks are not supposed to be judged on the

13   orders.  This has become -- this whole area of testimony

14   is a quiz about the orders and that's simply not what

15   this is about.

16                  I quite frankly think that I'm entitled to a

17   mistrial at this point because there's been so much

18   that's gone on in the last hour and a half about the

19   orders, whether certain parts of it are complied or not

20   complied.  That's not what the standard is.  It's not

21   even the standard of care if this were a negligence case.

22                  So, Your Honor, I object to the line of

23   questioning about the guns.  I object to the line of

24   questioning about the orders.  I think at this point,

25   this jury and this case has been tainted by this whole

1    line of questioning.

2              MR. PLOFCHAN:   In response, Your Honor, the

3    General Order articulates the standards of exceptions to

4    the Fourth Amendment that were originally identified in

5    *Peyton* and it's progeny in that the sanctity of the home

6    without a warrant cannot be passed unless there's an

7    exception.

8              The federal cases have identified some rules

9    and that's where we put the *Vera v. Commonwealth* case on

10   that one slide I was thinking about because they

11   summarized a series of them.  I didn't include all the

12   federal citations in that case.

13             One of the citations on an emergency is --

14   they're a whole series of them, whether you're in hot

15   pursuit, whether you think contraband will be destroyed.

16   These four elements in the General Order are whether

17   there is an emergency.  And this officer has now said

18   that she believes she's justified on an emergency and

19   I've gone through these things and I'm asking her do you

20   have any evidence that anyone was armed and the first

21   question I asked was about armed with guns.  I was going

22   to ask about armed with knife or any other weapons and

23   that's it.

24             THE COURT:   Let's focus if you would.  Do you

25   have any facts to suggest that there is anything more

1    involved here than a 911 call with reference to a knife?

2    There's no fact at basis for bombs, flame throwers, guns,

3    anything else; is that right?

4              MR. PLOFCHAN:  That's correct, and I just

5    want that admission.

6              THE COURT:  Well, it would be different if it

7    was brought up on cross-examination by her counsel that

8    she had that in her mind.  But right now, you're going

9    well beyond what the --

10             MR. PLOFCHAN:  Okay.

11             THE COURT:  -- what the facts are.

12             Now, I want to focus on the question raised

13   by Mr. Francuzenko and that is the General Orders.  Is

14   your case based on the General Orders or is your case

15   based on the Fourth Amendment to the United States?

16             MR. PLOFCHAN:  Fourth Amendment to the United

17   States, Your Honor.

18             THE COURT:  Well, you are spending an

19   inordinate amount of time on the General Orders.  I let

20   you go on again for the reason I stated previously.  Some

21   evidence are what the officer knew or should have known

22   about the Fourth Amendment in general and their

23   obligation to adhere to the law.

24             But I intend to instruct the jury that

25   deviation in any material respect from the General Order

1    does not mean that the deputies are liable.  It's only

2    that they violate the Fourth Amendment as that

3    instruction I'll give them.

4              So, how much more do you have with this

5    General Order?  Are you going to go --

6              MR. PLOFCHAN:  Actually, Your Honor --

7              THE COURT:  There are three or four more

8    other General Orders.  You want to go through each one of

9    them, too?

10             MR. PLOFCHAN:  Only tangentially, Your Honor.

11   There was just that last point and then I'm going to have

12   some discussion about the second entry and what happened

13   factually, and that's it.

14             MR. FRANCUZENKO:  Your Honor, I don't think

15   an instruction is going to cure it.  I formally make my

16   motion at this point.  And I don't want to waste any more

17   of this Court's time.

18             I think the horse is out.  We made our

19   objections initially.  The last hour plus has been a quiz

20   about these orders, whether she knows them, how

21   they're -- how she's violated them in terms of -- in

22   terms of the facts of this case.  And I don't think the

23   instruction's going to cure it.

24             MR. PLOFCHAN:  Your Honor, if I may respond.

25   The last hour has been a discussion of what facts she

J. Forsch - Direct                                           87

1    could possibly rely on to be an emergency which is an

2    exception to the warrant requirement under the Fourth

3    Amendment.  And I was trying to define what is the

4    emergency and what facts had changed.  That's where we're

5    getting at.  You left.  You turn around with an intent to

6    go.  No facts had changed.  What is the basis for the

7    exception to the Fourth Amendment?  That's what we were

8    exploring the entire time.

9            And I don't think there's any basis for a

10   mistrial just because he hasn't liked the answers he

11   gotten in the testimony.

12           This is the whole issue.  Was there a basis

13   under an exception to the Fourth Amendment to go into the

14   house and when they can't identify any facts that have

15   changed or facts to establish an emergency, that helps --

16   that's part of Mr. Mial's case.  I don't think there's

17   any basis for a mistrial in this matter.

18           THE COURT:  Let the record reflect this

19   matter is before the Court on the defendant's motion for

20   mistrial based upon the defendant's argument that

21   plaintiff has spent time questioning the officer on the

22   stand, Ms. Jennifer Forsch, about her knowledge of the

23   General Orders of the Loudoun County Sheriff's Office.

24           And the question presented is whether

25   reference to the General Orders and testimony about the

1    General Orders along with factual information what she

2    knew or did not know at the time of this incident was

3    relevant and somehow prejudiced the defendant in some way

4    that would prevent the jury from considering the case

5    under Fourth Amendment.

6            My judgment is this.  In order for the jury

7    to ascertain whether or not there's been a violation of

8    the Fourth Amendment, they must have some knowledge from

9    the Court instruction of what the Fourth Amendment is.

10           And in *Graham versus O'Connor*, the Court will

11   instruct the jury that the jury must consider what was

12   objectionably reasonable and whether or not the force

13   used was necessary under the circumstances.

14           One of the factors that bears in this case's

15   consideration is what the officers knew about the Fourth

16   Amendment parameters in terms of entry of a home without

17   a warrant when the Fourth Amendment clearly states you

18   may not enter a home without a warrant.  And also the

19   issue here is, it seems to me, whether or not the officer

20   had some reasonably cause, based upon their observation

21   of the facts, to enter the home.

22           That is a question of fact for the jury.  The

23   jury cannot be unguided as to what the officer knew or

24   had reason to know.  And the General Orders in my view

25   support what an officer employed -- and this officer's

1    been employed for several years with the Loudoun County

2    Sheriff's Office, knows or ought to know about the Fourth

3    Amendment.

4              A moment ago she was asked about getting a

5    warrant and whether or not she can get a warrant.  And I

6    don't know if she knows or not, but I have the impression

7    that's something you expect an officer to know.

8              Can you get a warrant over the phone or do

9    you have to go down to the magistrate judge's office in

10   every instance?  That's a very basic matter.  I don't

11   know if she knows or not.

12             But it seems to me in order to ascertain what

13   the jury can weigh in terms of reasonableness of the

14   action, they must have some standard.

15             I have decided that one of the things they

16   may consider along with other information that the

17   defendant will offer about their training and their

18   background, all those things bear on the issue of

19   objective reasonableness under *Graham versus O'Connor*.

20   So the motion for mistrial will be denied.

21             You can bring our jury back.  Thank you.

22             (Jury brought into the courtroom at 4:41

23   p.m.)

24             THE COURT:  You may be seated.

25             All right, counsel, you may proceed.

1          MR. PLOFCHAN:  May it please the Court.

2    BY MR. PLOFCHAN:

3      Q.   Now, Officer Forsch, what I was -- I'm going to

4    ask you, was there anything within your knowledge other

5    than this initial phone call that you had that would have

6    indicated that there was any weapon or threatened

7    violence towards anyone?

8      A.   No.

9      Q.   Okay.  Can you explain your understanding of the

10   Fourth -- the exceptions to a requirement for a warrant

11   to enter a house -- to enter a house?

12     A.   Are you looking for exigent circumstances?

13     Q.   What is it your understanding is?  When are you

14   allowed to enter a house when you don't have a warrant?

15     A.   It would be either invited in.  It would be if

16   there is a possibility of danger to some -- to occupants

17   of that house, to preserve life, to help if anyone is

18   injured inside the residence.

19     Q.   Okay.  What are the limits to your determination

20   of the possibility of danger?

21     A.   What do you mean, sir?

22     Q.   Well, you would agree that it could be dangerous

23   for someone to use too hot water in a bath tub.

24          THE COURT:  I want you to focus in this case.

25          MR. PLOFCHAN:  I'm trying to figure -- yes,

1    sir.

2    BY MR. PLOFCHAN:

3        Q.   What are your limits in terms of -- what, let me

4    rephrase it.

5            Thank you, Your Honor.  Withdraw that question.

6            What do you need to know in order to make a

7    determination that there is a danger -- a possibility of

8    danger that would allow you to enter -- forcibly enter a

9    house without a warrant?

10           MR. FRANCUZENKO:  Your Honor, I'm going to

11   object.  That's a general question.  Again, do you want

12   to go back to the case and what her thought process was?

13   In this case, I understand -- I'm going to object.

14           THE COURT:  Sustained.

15           MR. PLOFCHAN:  Okay.  Let me see if I can

16   rephrase it this way.

17   BY MR. PLOFCHAN:

18       Q.   Other than the phone call, what did you know when

19   you decided to go back up to the house that gave you an

20   indication of a possibility of danger that would have

21   justified a warrantless entry into Mr. Mial's house?

22           MR. FRANCUZENKO:  I'm going to object to the

23   form.  That's compound, possibly triple compound.

24           THE COURT:  All right.  Asked and answered.

25   Let's move on to something else if you have additional

```
 1   questions.
 2              MR. PLOFCHAN:  I do.
 3   BY MR. PLOFCHAN:
 4       Q.  Did you go up to the house secondly -- the second
 5   time by yourself?
 6       A.  No, sir.
 7       Q.  Who went with you?
 8       A.  Sergeant Holloway and Deputy Ferguson.
 9       Q.  Okay.  Did you all three go to the door?
10       A.  Yes, sir.
11       Q.  Okay.  When did you do that?
12       A.  When we walked back up to the residence.
13       Q.  Okay, and how far away was it?  When you were at
14   the bottom of the driveway, how far away was that from
15   the front door?
16       A.  Maybe 50 feet.
17       Q.  Okay.  And, what happened when all three of you
18   got back up to the porch?
19       A.  Sergeant Holloway knocked on the door.
20       Q.  Okay.  And, did anyone come and answer?
21       A.  No, sir.
22       Q.  Ever?
23       A.  Eventually, yes, sir.
24       Q.  Okay.  But not right away.  Okay.  Are there
25   windows on the side of the door?
```

1    A.  Yes, sir.

2    Q.  Did you look in the windows?

3    A.  Yes, sir.

4    Q.  Did you see any calamity, any violence, anything

5  going on?

6    A.  No, sir.

7    Q.  Okay.  Did you see anybody?

8    A.  Yes.

9    Q.  What did you see?

10   A.  I saw a male subject sitting in an office.

11   Q.  Was that Mr. Mial?

12   A.  Later determined, yes, sir.

13   Q.  Okay.  Well, how far were you away was his office?

14   A.  Maybe 20, 25 feet.

15   Q.  Okay -- how could you tell it was a male but not

16  tell it was Mr. Mial?

17   A.  I did not know his name.

18   Q.  Okay.  But it was the same man who had come to the

19  door?

20   A.  Correct.

21   Q.  So you saw the person who had identified himself

22  as the complainant come to the door?  Who -- I'm sorry.

23  You saw the person who had identified himself as the

24  complainant when he came to the door.  He was sitting in

25  an office, correct?

J. Forsch - Direct                                                94

1    A.   Correct.

2    Q.   And you would agree he doesn't have to answer his

3    door?

4    A.   Correct.

5    Q.   Did you see any other physical sign of trauma or

6    distress or an emergency?

7    A.   No, sir.

8    Q.   Did you see any other physical sign of anything

9    that indicated that there was any danger within the

10   residence?

11   A.   No, sir.

12   Q.   Okay.  Did you speak to any neighbors to see

13   whether or not they had heard anything?

14   A.   I did not.

15   Q.   Okay.  Were you aware if anyone had spoken to any

16   neighbors?

17   A.   I do not know.

18   Q.   Okay.  When you were there with Sergeant Holloway

19   and Deputy Ferguson, when there was no response, what did

20   you do?

21   A.   I continued to knock on the door.

22   Q.   Okay.  So, did the Sergeant knocked the first time

23   and you continued it or you continued all the time?

24   A.   The Sergeant knocked the first time.

25   Q.   Okay, and how often were you knocking?

1    A.   It was continuous.

2    Q.   So you just, (indicating) without stopping until

3    somebody came?

4    A.   If there was a break, it was a short break.

5    Q.   Okay.  Now, after the first minute, why didn't you

6    realize he didn't want you -- he didn't want to answer

7    the door?

8    A.   I needed to make contact with him.

9    Q.   Is it you needed or you wanted to?

10   A.   Needed to.

11   Q.   What was -- was your need to make contact or enter

12   the house to investigate?

13   A.   Yes.

14   Q.   Okay.  So you -- it's not that you needed to make

15   contact.  It's your position you needed to enter the

16   house to investigate, correct?

17   A.   No, sir.

18   Q.   Okay.  You had the intent if he opened the door to

19   enter the house.  Is that correct?

20   A.   To investigate, sir.

21   Q.   But to enter the house, correct?

22   A.   Yes, sir.

23   Q.   What information at that point in time were you

24   relying on to say that you did not have to abide by the

25   Fourth Amendment's requirement to have a warrant to enter

1     that house?

2        A.   Are you speaking before he opened the door or

3     after he opened the door?  Can you clarify timeframe for

4     me?

5        Q.   When you went back up and you're knocking and you

6     have the intent to enter the house, what information are

7     you relying on at that point in time that would justify

8     an exception to the Fourth Amendment's requirement for a

9     warrant?

10       A.   He would not answer the door.  We knew based on

11    his statement somebody else was in the residence.  They

12    were not answering the door as well.  Unknown if they

13    were injured.

14       Q.   I thought you told me a few minutes ago that when

15    you went back up to the house, you didn't know if there

16    were one person or 40 other people.  You didn't know if

17    there was someone else in the residence, correct?

18       A.   Correct.

19       Q.   Okay.  So, what fact are you relying on that

20    provides an exception to the warrant requirement of the

21    Fourth Amendment?

22       A.   That possibly somebody could be injured.

23       Q.   Would you agree that a possibility is not a fact?

24       A.   Yes.

25       Q.   Okay.  So, I'm asking you, what fact are you

1    relying on that would justify an exception to the warrant

2    requirement of the Fourth Amendment?

3        A.   Him not answering the door, unknown call.  We do

4    know other people in the residence and no one answering

5    the phone.

6        Q.   What part -- when -- you said you could see him.

7    Did you see the kids?

8        A.   Yes, sir.

9        Q.   Okay.  Did you have any indication that anything

10   had happened to the kids?

11            MR. FRANCUZENKO:  Objection, asked and

12   answered, Your Honor.

13            MR. PLOFCHAN:  This was a very specific

14   question.  I don't think --

15            THE COURT:  Overruled.

16   BY MR. PLOFCHAN:

17       Q.   Okay.  And he was not engaged in any violent

18   behavior or doing anything but sitting in an office,

19   correct?

20       A.   Correct.

21       Q.   He was actually on the phone, correct?

22       A.   Correct.

23       Q.   So if he's on the phone with someone else,

24   wouldn't that have provided an explanation as to why he

25   didn't answer the phone when you were trying to call?

1      A.    For him, yes, sir.

2      Q.    Okay.  And you knew that.  You knew he was on the

3  phone with someone else while you were trying to call,

4  correct?

5      A.    On the phone, yes, sir.

6      Q.    So him not answering the phone, would you agree,

7  is not a fact that could justify your violating the

8  Fourth Amendment's warrant requirement?

9      A.    For him not answering the phone?

10     Q.    For him not answering the door.

11     A.    You had asked for him not answering the phone

12  because he was on it?

13     Q.    Right.  Well, if he's on the phone, would it even

14  be ringing in the house?  If -- would another number

15  be -- would the phone be ringing if somebody's on it?

16     A.    That I don't know.

17     Q.    Were you calling or somebody else calling?

18     A.    I was not calling.

19     Q.    Do you know if it was ringing or there was a busy

20  signal?

21     A.    I do not know.

22     Q.    Okay.  So then based on your observations and your

23  current -- and your knowledge at that moment in time,

24  him -- your observations of him did not provide a factual

25  basis that there was an emergency or some other exception

1   to the warrant requirement under the Fourth Amendment,

2   correct?

3       A.   For him, correct.

4       Q.   Okay.  And you had no knowledge of anyone else

5   other than the children being in the house, correct?

6       A.   Correct.

7       Q.   And, you don't know if the children had gone out

8   the back door at that time, do you?

9       A.   Correct.

10      Q.   So, then you don't know if anyone's in the house

11  at that point in time, correct?

12      A.   Well, I could see --

13      Q.   Other than Mr. Mial, correct?

14      A.   Correct.

15      Q.   So, you do not have any facts that you could rely

16  on that would suggest that anyone was in danger or there

17  was any emergency that would justify an exception to the

18  requirement of the Fourth Amendment that you have a

19  warrant, correct?

20      A.   Facts no.

21      Q.   Okay.  Now, you had some guessing or some

22  speculation, correct?

23      A.   Correct.

24      Q.   Okay.  Are you aware of any authority that says

25  that you -- your guessing or speculation can justify a

1    violation of the Fourth Amendment?

2        A.   No.

3        Q.   Okay.  Now, eventually, you were actually -- let

4    me rephrase it.  You're standing at the door and the door

5    knob is at the right?

6        A.   Correct.

7        Q.   And you're standing there knocking and have your

8    hand on the door knob?

9        A.   No.

10       Q.   Where was your hand?

11       A.   I could not tell you, but it was not on the door

12   knob.

13       Q.   Were you close to the door jam?  Where were you

14   standing?

15       A.   Probably 2 to 3 feet from the door.

16       Q.   Two to 3 feet out from the door?

17       A.   Correct.

18       Q.   And where was Deputy Ferguson?

19       A.   To my left.

20       Q.   Was he immediately, or was he closer back, closer

21   to the door?

22       A.   You have to ask him exactly where he was standing.

23   I know he was to my left.

24       Q.   Okay.  And after some period of time, you saw

25   Mr. Mial approach the door, correct?

1    A.   Correct.

2    Q.   And did you announce over the radio that he's

3    coming to the door?

4    A.   I don't know.

5    Q.   Okay.  Did someone announce that he's coming to

6    the door?

7    A.   I don't know.

8    Q.   Okay.  Do you know if Deputy Ferguson announced

9    that?

10   A.   I don't know.

11   Q.   And he comes to the door.  And how was he

12   positioned when he comes to the door?

13   A.   He opened the door and stood halfway behind it.

14   Q.   Okay.  So, if this is the door in front of me, and

15   if from his side it would open on the left -- the left

16   and open to the right, correct?

17   A.   Correct.

18   Q.   All right.  And he has his hand on the door knob

19   and he stands -- and how far does he open it?

20   A.   Enough that I could see half of his body.

21   Q.   Okay.  So, if this was the door right here, he --

22   and this is the front of the door, he kind of opens it

23   and stands like this so you can see half of his body,

24   correct?

25   A.   Correct.

1    Q.   Where are his hands?

2    A.   That I don't know.

3    Q.   Okay.  Did you watch him come to the door?

4    A.   Yes, sir.

5    Q.   You didn't see any weapons or anything on him, did

6    you?

7    A.   Not in his hands, no, sir.

8    Q.   Okay.  So, did he have one hand up on the -- the

9    door frame?

10   A.   I don't know.

11   Q.   Okay.  Were you looking at where his hands are?

12   A.   I was.

13   Q.   Okay.  Did you engage in any conversation?

14   A.   I did not speak, no, sir.

15   Q.   Okay.  Who spoke?

16   A.   Deputy Ferguson and Mr. Mial.

17   Q.   And how long did you engage in conversation?

18   A.   Maybe 30 seconds.

19   Q.   Okay.  Did Deputy Ferguson ever ask to enter the

20   house?

21   A.   No, sir.

22   Q.   So, again, nobody has asked to enter the house

23   yet, right?

24   A.   Right.

25   Q.   Did you ever tell him that you're going to enter

1    the house if he doesn't let you in the house?

2        A.    No, sir.

3        Q.    Okay.  Did he -- did Deputy Ferguson ask him to

4    bring anyone in the house to the door?

5        A.    I don't know his exact words, sir.

6        Q.    Okay.  So, to your knowledge at this point in

7    time, you don't have -- anyone asking him to bring people

8    in the house to help you investigate or to allow you in,

9    correct?

10       A.    I had asked that on the first contact.

11       Q.    You had asked him to bring people to the door but

12   not to go in, correct?

13       A.    Correct.

14       Q.    And to your knowledge, nobody re-asked it at this

15   new encounter possibly a half hour later, correct?

16       A.    Right.

17       Q.    So, he's having a conversation and is Mial telling

18   him leave me alone; go away?  What is he saying?

19       A.    He's stating that he doesn't need us and that he

20   started screaming about the Sheriff's Office.

21       Q.    Okay.  He's not happy with the Sheriff's Office,

22   right?

23       A.    Right.

24       Q.    And, how long -- you say this conversation last

25   about 30 seconds?

J. Forsch - Direct                                          104

1    A.    Possibly.

2    Q.    Okay.  Does he make any other move?

3    A.    He does.

4    Q.    What does he do?

5    A.    To shut the door.

6    Q.    So, if you can't see his hands, how do you know

7    he's trying to shut the door?

8    A.    Because the door moved towards us.

9    Q.    So the door moves towards you.  What facts are you

10   in possession of right now at that instant that would

11   justify an exception to the Fourth Amendment's

12   requirement of having a warrant before you enter that

13   house?

14   A.    Trying to verify facts.

15   Q.    Well, so you don't have any facts, correct?

16   You're just trying to verify facts.  Is that a fair

17   statement?

18   A.    Correct.

19   Q.    So, then you had nothing but potential speculation

20   that you want to explore, correct?

21   A.    Correct.

22   Q.    And yet, you don't know of any authority that you

23   can rely on that says, having potential speculation that

24   you want to explore is a basis under one of the

25   exceptions to the Fourth Amendment warrant requirement,

1    correct?

2        A.   Correct.

3        Q.   All right.  And he starts to close the door and

4    what do you do?

5        A.   I pushed against the door.

6        Q.   Did you cross the threshold?

7        A.   Yes.

8        Q.   So you entered the house at that moment?

9        A.   Yes, sir.

10       Q.   Okay.  And you had been trained in the Fourth

11   Amendment, correct?

12       A.   Yes, sir.

13       Q.   And, you knew at that moment you entered the

14   house, that you needed a warrant or an exception to the

15   warrant requirement in order -- or to be invited in,

16   right?

17       A.   Right.

18       Q.   Okay.  And, you didn't have a warrant, correct?

19       A.   Correct.

20       Q.   And you had no facts that established an exception

21   to the warrant requirement, correct?

22       A.   Facts.

23       Q.   No facts?

24       A.   To be verified, no.

25       Q.   And you had -- you were not invited in?

1    A.   Correct.

2    Q.   Okay.  Did Deputy Ferguson enter?

3    A.   Yes.

4    Q.   Okay.  To your knowledge, did he have any facts

5    different than what you possessed?

6    A.   To my knowledge, no.

7    Q.   Okay.  So then, he would not have had any facts

8    that he could rely on as an exception to the Fourth

9    Amendment requirement to have a warrant to go into that

10   house, correct?

11   A.   That I don't know if he had different facts.

12   Q.   But assume -- let me rephrase it.  To your

13   knowledge, since you don't believe he had any other facts

14   than what you had, would you agree that he did not have

15   any facts that would have justified an exception to the

16   Fourth Amendment requirement?

17   A.   Right.

18   Q.   Okay.  Now, was there somebody else there at the

19   door who crossed the threshold?

20   A.   At that time, no.

21   Q.   Well, how much time passed before there was

22   somebody?

23   A.   That I don't know.

24   Q.   Okay.  Where was Deputy Altom?

25   A.   I do not know.

J. Forsch - Direct                                                    107

1    Q.   Did you ever see him?

2    A.   Eventually.

3    Q.   Okay.  Now when you and -- where was Deputy Sayre?

4    A.   I did not see him.

5    Q.   At all?

6    A.   At that point, no.

7    Q.   Okay.

8              THE COURT:  Counsel, what we're going to do,

9    we're going to stop right here and resume tomorrow

10   morning at 10 o'clock.

11             Ladies and gentlemen, please do not discuss

12   the case nor permit the case to be discussed in your

13   presence.  Leave your notes in the jury deliberation room

14   and don't do any research on the case.

15             We will resume tomorrow at 10 o'clock.

16   You're free to leave.

17             THE COURT:  We're in recess.

18             (Proceedings concluded at 5:01 p.m.)

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF REPORTER

3

4           I, Renecia Wilson, an official court

5    reporter for the United State District Court of Virginia,

6    Alexandria Division, do hereby certify that I reported by

7    machine shorthand, in my official capacity, the

8    proceedings had upon the testimony in the case of Marcus

9    Mial vs. Stephen O. Simpson, et al.

10          I further certify that I was authorized and

11   did report by stenotype the proceedings and evidence in

12   said testimony, and that the foregoing pages, numbered 1

13   to 107, inclusive, constitute the official transcript of

14   said proceedings as taken from my shorthand notes.

15          IN WITNESS WHEREOF, I have hereto subscribed

16   my name this _6th_ day of _August_, 2015.

17

18                              _____/s/_____
                                Renecia Wilson, RMR, CRR
19                              Official Court Reporter

20

21

22

23

24

25