IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MARCUS MIAL, | ) |
| Plaintiff, | ) Civil No. 11-cv-921 |
| VS. | ) March 24, 2015 |
| STEPHEN O. SIMPSON, et al. | ) |
| Defendants. | ) |

TESTIMONY OF WITNESSES

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

 FOR THE PLAINTIFF: WESTLAKE LEGAL GROUP
                    BY: THOMAS K. PLOFCHAN, JR.


 FOR THE DEFENDANT: COOK CRAIG & FRANCUZENKO PLLC
                    BY: ALEXANDER FRANCUZENKO


---


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR, CRR
                         U.S. District Court
                         401 Courthouse Square, 5th Floor
                         Alexandria, VA  22314
                         (703)501-1580

INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J. Forsch | 3 | 89 | 123 | |
| N. Ferguson | 133 | 199 | | |

```
 1              (Thereupon, the following was heard in open
 2   court at 10:04 a.m.)
 3              THE CLERK:  1:11 civil 921, Mial versus
 4   Forsch.
 5              THE COURT:  Good morning, Mr. Mial.
 6              Good morning, Ms. Forsch.
 7              THE WITNESS:  Good morning.
 8              THE COURT:  Good morning, Mr. Ferguson,
 9   Mr. Sayre, and Mr. Altom.
10              Good morning, counsel.
11              Ready to proceed?
12              MR. FRANCUZENKO:  Yes.
13              THE COURT:  You can bring our jury out,
14   Mr. Toliver.  Thank you.
15              You may be seated.
16              Good morning, ladies and gentlemen.
17              Good morning, Mr. Mial.
18              Good morning, Ms. Forsch, Mr. Sayre,
19   Mr. Ferguson, Mr. Altom.
20              Good morning, counsel.
21              Ready to proceed?
22              MR. FRANCUZENKO:  We are, Your Honor.
23              THE COURT:  You may proceed.
24              MR. PLOFCHAN:  Thank you, Your Honor.
25              DIRECT EXAMINATION CONTINUED
```

1    BY MR. PLOFCHAN:

2        Q.   Ms. Forsch, after yesterday, other than speak to

3    counsel, did you do anything to prepare for your further

4    testimony today?

5        A.   No, I did not.

6        Q.   Okay.  Did you speak to the other defendants?

7        A.   No, I did not.

8        Q.   Okay.  Now, isn't it true that prior to this

9    incident, that you had -- had been investigated by

10   Loudoun County Sheriff's Office because of an allegation

11   of taking action based on someone's race?

12       A.   I am not aware --

13            MR. FRANCUZENKO:  Your Honor, I'm going to

14   object.  Can we --

15            THE COURT:  Yes.

16            MR. FRANCUZENKO:  -- approach.

17            (Thereupon, the following side-bar conference

18   was had.)

19            MR. FRANCUZENKO:  Your Honor, first of all,

20   there is absolutely no facts, even in the complaint,

21   alleging that race is an issue in this case.

22            This -- I would ask that the Court, before

23   this actually goes down this line of questioning, that

24   the plaintiff's counsel give a proffer as to what

25   information he's trying to elicit here and the Court

1    determine whether or not it's appropriate at this stage

2    of the litigation.  Because I'm afraid if he goes down

3    this road and it's inappropriate, it's going to taint

4    this jury.

5              MR. PLOFCHAN:  Your Honor, I'm happy to

6    proffer.

7              In the criminal defense trial of Mr. Mial,

8    the Commonwealth provided Brady material indicating -- at

9    the request of the defense attorney as a matter of fact,

10   indicating that the then Deputy Sherin had been

11   investigated for -- and there was an internal affairs

12   investigation with regard to race, and that someone had

13   made a complaint that she was treated improperly, with

14   excessive force and was -- and that the motivation for

15   that treatment was that she was Hispanic.

16             There was never any trial with regard to

17   that.  But she does have it in her history.

18             In addition, when -- the next question I was

19   going to ask was that she indicated that she has had over

20   300 visits a year to people's houses, and that this was

21   the only person that she ever -- when they told them

22   everything was fine, this is the only person she ever

23   questioned.

24             And the question is, was this the only -- and

25   it is our belief the answer would be, this was the only

1  large black man or African American man that she had

2  encountered in that situation in over 300 visitors per

3  year for over 3 years.  That's the -- this is the only

4  one she ever questioned his -- his sincerity or whether

5  he was telling the truth that this situation had been

6  revolved.

7          MR. FRANCUZENKO:  If he wants to do that

8  second part, that's up to him to do the second part but

9  to bring up something about a Hispanic that -- Your

10 Honor, it doesn't even put the context of when that --

11 when that investigation was or when that complaint was.

12 Was it before or after?

13          Your Honor, I think it's extremely

14 prejudicial.  It's not an African American that the

15 complaint is about.  You know --

16          THE COURT:  Well, you made mention of that in

17 opening statement.  And --

18          MR. FRANCUZENKO:  That's his problem.

19          THE COURT:  I had thought that meant that was

20 something you all had explored in discovery.  I don't

21 know anything about this, okay.

22          MR. FRANCUZENKO:  I don't know anything about

23 it, either.  This is the first time I've heard about it

24 was in opening statement.

25          THE COURT:  Okay.  What happened with the

1   internal affairs investigation?

2           MR. PLOFCHAN:  They took no action.  The

3   internal affairs investigation and then the question that

4   was then asked at depositions is, had anyone else -- did

5   the person make any formal complaint in the case and she

6   said no.

7           THE COURT:  Okay.  Well then, since you've

8   opened up this issue -- it's not in the complaint, right?

9   Is race mentioned in the complaint?

10          MR. PLOFCHAN:  Not specifically.

11          THE COURT:  You've raised it in opening

12  statement.  I don't -- I don't have any problem with you

13  raising it if you want to go there.  But, you will be

14  stuck with whatever the answers may be.

15          MR. PLOFCHAN:  I understand, Your Honor.

16          THE COURT:  So here's what I'm going to do.

17  I can't tell them disregard that comment.  If you don't

18  bring out what you just told me about that it was a

19  Hispanic person and that the complaint resulted in no

20  action, then, Mr. Francuzenko can bring it out on his

21  cross-examination.

22          MR. PLOFCHAN:  That's correct.

23          THE COURT:  As it relates to the issue of the

24  300 or whatever contacts with individuals based on 911

25  calls and not entering the home, you still are able to do

1    that if there's a factual basis for it and it sounds like

2    there is.

3                MR. FRANCUZENKO:  Your Honor, let me raise

4    the issue that this was never identified -- any of this

5    information was ever identified in discovery either with

6    regard to any kind of complaint or anything like that.

7                So, again, the first I've heard of a

8    complaint and, you know, he doesn't -- he doesn't have

9    any documents to support this complaint.  I mean, it's

10   like me coming into -- you know, I don't know what he

11   has, but you have to have some kind of factual foundation

12   to go down this path.

13               I mean, it's a pretty serious allegation to

14   start claiming that somebody's had a complaint about

15   racism, just throwing that out, and if you don't have

16   anything substantial to back it up, the questioning

17   itself ends up tainting the jury.

18               So, I would ask the Court to not permit it

19   unless there's more of a proffer given at this point

20   because I think the question itself is going to have an

21   impact regardless of what I can do to remedy it in terms

22   of identifying Hispanic or whatever.  It's not even --

23   it's not even the same -- we're not even in the same

24   league here as far as race and everything else.  So --

25               THE COURT:  Well, that certainly can be a

1    part of your closing argument to the jury.  I'm not going

2    to further highlight this matter than it's already been

3    done.

4                Whether or not he has documents to produce,

5    it doesn't seem like -- if he hasn't produced any

6    documents, he's stuck with whatever her answers are with

7    respect to that.  And if there's some document that you

8    have in response to that that would be rebuttal, he would

9    have to produce it.

10               But it's connected to the criminal case.  He

11   tells me there's a factual basis for it, so I'm not going

12   to ask him to stop.  He's stuck with the answers.

13               MR. FRANCUZENKO:  Can I see the factual basis

14   if he has a document?

15               MR. PLOFCHAN:  Sure, this is --

16               THE COURT:  No, he's stuck with the answer

17   for right now.  If you want to let him see it, you can.

18   I'm not trying to create new issue about the document

19   because the document is not the evidence.  The evidence

20   will be her testimony, not the document.

21               MR. PLOFCHAN:  That's correct.

22               (THEREUPON, side-bar conference was

23   concluded.)

24               MR. PLOFCHAN:  May I proceed?

25               THE COURT:  You may proceed.

1   BY MR. PLOFCHAN:

2       Q.   Now, Ms. Forsch, do you recall that as a result of

3   this incident that there were criminal charges brought

4   against Mr. Mial?

5       A.   Yes.

6       Q.   Okay.  And as part of the disclosures in that

7   criminal -- that was criminal charges, they were -- it

8   was asked as to whether or not you were or any of the

9   other deputies ever had any complaints made against them

10  based on race.  Do you recall that?

11      A.   I do not, no.

12      Q.   Okay.  Do you recall that the Commonwealth

13  provided information to Mr. Mial that there were no

14  complaints against Deputy Ferguson and that there had

15  been a complaint against you by a Hispanic woman who made

16  an allegation of excessive force and racial motivation in

17  an encounter and that they had -- internal affairs

18  investigation had investigated it and they had found that

19  to be unfounded.  Is that correct?

20      A.   That's untrue, sir.

21      Q.   That's untrue.

22      A.   Yes, sir.

23      Q.   Okay.  So -- all right.  Are you also aware that

24  this was subject of a hearing in Loudoun County in front

25  of the Honorable Burke McCahill in which he considered

1    whether to grant an emergency continuance in Mr. Mial's

2    case so they could further investigate the allegations of

3    a racial bias with respect to this witness -- this

4    potential complainant?

5        A.   I was not aware of that, no.

6        Q.   Okay, all right, thank you.

7             Now, isn't it also true that you have testified

8    that you are not -- testified under oath, but you stated

9    under oath that at the time of this encounter with

10   Mr. Mial, that you had approximately 300 home visits a

11   year every year for the last several years in which you

12   had to encounter a person -- a citizen at their home?

13       A.   That's an incorrect statement.

14       Q.   Okay.

15            MR. PLOFCHAN:   Court's indulgence.   Okay.

16       Marshal, may I ask your assistance?   And just --

17   page 31 and 38.   Okay.

18   BY MR. PLOFCHAN:

19       Q.   Now, Ms. Forsch, I'm going to ask you to look at

20   page 31 in the highlighted area.

21            Would you agreed that you were specifically asked

22   whether or not over the last -- how many home visits and

23   encounters you would have had and you said it would be a

24   fair estimate that there were over 300 per year?

25       A.   Yes, sir.

1    Q.  Okay.  And then if you look at page 38, I'm going

2  to -- before you look at that, let me ask you a question.

3         Isn't it a fact that prior to Mr. Mial, with all

4  those 300 home visits per year, this was the only -- the

5  first time that you determined that you ever had any

6  reason to doubt when someone told you that a case had

7  been resolved or an issue had been resolved, this was the

8  first time that you had ever had any reason to doubt that

9  it had been revolved?

10   A.  Yes, because I had never encountered behavior like

11  his on that day.

12   Q.  Okay.  And isn't it a fact that you had not

13  previously encountered a black man at a door who weighed

14  approximately 280 pounds?

15   A.  I can't recall every call I've gone to.

16   Q.  Okay.  Can you recall ever singly encountering a

17  black man who weighs 280 pounds at the door when they

18  answered the door?

19   A.  I'm sure if I've been on over 300 calls, yes, sir.

20   Q.  But you can't recall any specifically, can you?

21   A.  No, sir.

22   Q.  Okay.  Thank you.

23         Now, yesterday, you also -- I'm sorry, Marshal,

24  may I ask for those sheets back?  Thank you.

25         Yesterday you also testified that -- you recall

1    your testimony that you had not seen the cad notes or the

2    notes from the computer until after the incident had

3    concluded.

4        A.   There was two statements based on the cad notes

5    yesterday.

6        Q.   Okay.  I'm aware there are two statements.  I'm

7    going to ask you the first one is, you remember asking

8    me -- me asking about the cad notes and have you -- had

9    you reviewed the cad notes when you arrived at the house

10   and you testified that you had not reviewed the cad notes

11   until after the incident.  Correct?

12       A.   Correct.

13       Q.   Okay.  Now, I'm going to ask you to take -- did

14   you testify under oath at a preliminary hearing in the

15   General District Court of Loudoun County on or about

16   April 22, 2010?

17       A.   I couldn't be specific, but, probably yes.

18       Q.   Okay.  And, do you recall any testimony there

19   where you were specifically asked do you remember what

20   came over the cad computer printout that's in your car,

21   and you indicated that you had.  And that what did you

22   remember about that printout, and it said somebody had

23   called asking how to disarm a person with a knife and

24   then in the notes of the call, it also said that the

25   person said, disregard, I got the knife away, and then

1   they had hung up.

2          And then the question was, did it also say they

3   called them back and he said for a second time I don't

4   need your help and your answer was yes.

5          And then the question was so, you -- you knew both

6   of those things before you got to the residence, correct?

7   And you said yes, I did.

8          Do you recall that conversation under oath in the

9   General District Court?

10   A.   I don't recall the conversation.

11   Q.   May I --

12          MR. FRANCUZENKO:  What page?

13          MR. PLOFCHAN:  This is page 16 and 17.

14          Marshal, may I show 16 and 17.

15          THE WITNESS:  What page am I looking at, sir?

16          MR. PLOFCHAN:  Sixteen and 17, ma'am.

17          MR. FRANCUZENKO:  Your Honor, I'd ask that

18   counsel provide a copy of what he's referencing.  I don't

19   have a copy of it.

20          THE COURT:  Okay, all right.  Can you produce

21   a copy of it?

22          MR. FRANCUZENKO:  Your Honor, can I ask

23   counsel to read the entire page or --

24          THE COURT:  Well, you'll have a chance to

25   redirect if he doesn't ask your questions.

1     MR. FRANCUZENKO:  Okay.  And I object to the

2  way this question is being phrased.

3     THE COURT:  I understand.  You'll have a

4  chance to do your questioning.

5     MR. FRANCUZENKO:  Very good.

6     THE COURT:  Objection overruled.

7  BY MR. PLOFCHAN:

8     Q.  Now, Deputy, do you agree that under the -- that

9  on April 22, 2010, when you were under oath in General

10  District Court that you made those statements in response

11  to questions?

12     MR. FRANCUZENKO:  Your Honor, can the witness

13  look at the transcript again, please.

14     MR. PLOFCHAN:  I'm sorry.  If she still needs

15  it, I'm happy to.

16     THE COURT:  Let her read the statement.  That

17  might save us all a lot of time.

18  BY MR. PLOFCHAN:

19     Q.  Okay.  If you would read from lines 16 on page 16

20  through 12 on page 17.

21     THE COURT:  Out loud.

22     THE WITNESS:  Yes, sir.

23     "Okay, do you remember what came over the

24  cad -- the computer printout that's in your car?

25     "Answer:  Yes.

1            "Question:  When I say printout, the computer

2   screen.

3            "Answer:  Yes.

4            "Question:  All right, do you remember what

5   this -- what that -- excuse me.

6            "All right.  Do you remember what that said

7   about this call?

8            "Answer:  It had said somebody called asking

9   how to disarm a person with a knife.  And then in the

10  notes of the call, it also said that the person said

11  disregard; I got the knife away, and then they had hung

12  up.

13           "Question:  Okay.  Did it also say they

14  called him back and said for a second time he didn't need

15  your help?

16           "Answer:  Yes.

17           "Question:  Okay.  So, you knew both of those

18  things before you got to the residence, correct?

19           "Answer:  Yes, I did."

20  BY MR. PLOFCHAN:

21    Q.  So, based on your testimony in the General

22  District Court, 2 months or so after this incident, you

23  indicated that you had read a cad printout prior to

24  arriving at the house, correct?

25    A.  That does not say prior to arriving at the house,

1    sir.  It asked if I had known both of those facts prior

2    to, which yes, I did.  The cad notes were not read until

3    after the call for service.

4        Q.  Did you make that distinction in the General

5    District Court?

6        A.  That question wasn't asked of me.

7        Q.  Well, the predicate would you agree in the General

8    District Court was that you had read this material and

9    that was the reason why you knew this.  Correct?

10            MR. FRANCUZENKO:  Objection, Your Honor.  If

11   he wants to read the predicate, he can read the two

12   questions before.  It's not the predicate that's an

13   improper representation in that question.

14            MR. PLOFCHAN:  I don't know how to respond to

15   that objection, Your Honor.

16            THE COURT:  I'm not sure what the objection

17   was.  The objection's overruled.

18            MR. PLOFCHAN:  Thank you.

19   BY MR. PLOFCHAN:

20       Q.  Would you agree that when he asked you about what

21   the cad printout said and then he says, so, because of

22   that you knew both of these things before you got to this

23   residence, you answered yes, I did.

24       A.  The last question was do you know both of these

25   things before I responded to that residence.  I said yes,

1    I did know both of those things.

2        Q.  Ma'am, I'm going to ask one more time.  Would you

3    agree the question says, "Okay.  So, you know both of

4    these things after he had asked you a series of questions

5    about what the cad printout said?"

6        A.  But it did not ask when I read the cad message.

7        Q.  All right.  Now, you also indicated yesterday that

8    you had no idea or knowledge as to whether or not the

9    caller was a male, correct?

10       A.  Correct.

11       Q.  Okay.  Do you recall being deposed in this case on

12   November 10th, 2011.

13       A.  Yes.

14       Q.  Okay.  And, who is Jacquelyn Huntley?

15       A.  She was a dispatcher with the Sheriff's Office.

16       Q.  Okay.  And, did you have communication with

17   Ms. Huntley at the time that you were going over to this

18   house?

19       A.  I don't know if she was the one dispatching.

20       Q.  Okay.  Now, I'm going to take you to -- there were

21   a series of communications, is that correct, with

22   Ms. Huntley, or whoever the dispatcher was?

23       A.  I -- I couldn't be -- I don't know.

24       Q.  Okay.  I'm now going to ask you to take a look at

25   page 156 of your deposition transcript, and I'd like you

1    to read lines 5 through 11.

2           Could you read those out loud, please.

3    A.    On page 156?

4    Q.    Yes.

5    A.    "Question:  The next entry is per male, the

6    individual is under control and our assistance is not

7    needed.

8           "Was that information communicated to you by

9    Ms. Huntley?

10          "Yes.

11          "Question:  Before you arrived?

12          "Answer:  Yes."

13          Then it says --

14   Q.    That's where I want you to --

15   A.    Sorry.

16   Q.    So, yesterday when you testified that you didn't

17   have any knowledge that the person had called was a male

18   before -- before you got to the door, that's inconsistent

19   with what you said in November of 2011, correct?

20   A.    I just knew it was a complainant.

21   Q.    Well, ma'am, it says -- the question that you just

22   read is "per male, the situation is under control and our

23   assistance is not needed.  Was that information

24   communicated to you by Ms. Huntley?"  And you answered

25   yes.  "Before you arrived at the home?"  And you again

1  answered yes.

2       So, you knew before you got to the home that the

3  person who had called was a male, correct?

4    A.  No.

5    Q.  Is there some reason why then you were not

6  truthful in November of 2011?

7    A.  A complainant -- I knew it was a complainant that

8  had called.  I did not know if it was a male or a female

9  at the time.

10   Q.  Is there anything confusing about you looking at

11 an entry and it says the next entry is, "per male, the

12 situation is under control and our assistance is not

13 needed.  Was that information communicated to you by

14 Ms. Huntley?"  And you said yes.

15      So, you acknowledged that Ms. Huntley communicated

16 to you that a male informed her that the situation is

17 under control and that the assistance is not needed.

18 Correct?

19   A.  She informed me that the situation was under

20 control; that it was a complainant.  I was unaware that

21 it was a male.  So, I answered yes, I knew that it was --

22 the complainant had stated the situation was under

23 control.

24   Q.  You nowhere in December of 2011 or November of

25 2011, ever provided any caveat that it was merely a

1    complainant or that you didn't know the gender, did you?

2        A.   Was it asked, sir?

3        Q.   Yes.  It specifically said were you told per male,

4    per a male, that this situation was under control, and

5    you said yes.

6        A.   I knew it was a complainant.

7        Q.   Okay.  Can you think of any reason why anyone

8    should disregard your sworn statements from April of 2010

9    and November of 2010 and accept your testimony today?

10       A.   Because I'm telling the truth.

11       Q.   And, were you not telling the truth then?

12       A.   It's a two-part question that you're asking in the

13   deposition.  Did I know those facts ahead of time?  Yes,

14   I'm not disputing that.  I did not know it was a male

15   that had placed the call for service.

16       Q.   And, that -- well, I'll move on.  I understand

17   that that's your position today.

18            Okay.  Now, let me ask you this.  And I want to go

19   back to the context of the Fourth Amendment.  When you

20   left the house after the first time with Mr. -- with

21   Deputy Ferguson, did you do any research or look at any

22   notes with regard to any actions you can take that would

23   respect Mr. Mial's Fourth Amendment rights?

24       A.   No, sir.

25       Q.   Okay.  Did you talk to anyone about what actions

1  you could take that would respect Mr. Mial's Fourth

2  Amendment rights?

3      A.   No, sir.

4      Q.   Okay.  Did you even consider the situation in the

5  context of Mr. Mial's Fourth Amendment rights?

6      A.   Yes, sir.

7      Q.   Okay.  When did you have -- when did you make that

8  consideration?

9      A.   The first encounter, sir.

10     Q.   Okay.  And how did you make that consideration?

11     A.   By asking him just to bring people to the door,

12  which he refused to do.

13     Q.   Okay.  And so then you were aware of your

14  obligations to him under the Fourth Amendment?

15     A.   Yes, sir.

16     Q.   And you were aware at that time, correct?

17     A.   Yes, sir.

18     Q.   Okay.  Then, in -- you were also aware -- Court's

19  indulgence, Your Honor.

20         You were also aware that the Fourth Amendment

21  required you, if you wanted to go into the house, and if

22  there wasn't an emergency, required you to obtain a

23  warrant, correct?

24     A.   For nonemergency, yes.

25     Q.   Okay.  And, you took no steps to obtain a warrant,

1    correct?

2        A.   No, sir.

3        Q.   Okay.  And, would you agree that even if you had

4    taken steps to obtain a warrant, that a warrant would not

5    have been granted?

6        A.   I didn't take steps to obtain one.  I couldn't

7    tell you that.

8        Q.   Well, let me ask you this.  Do you agree that it

9    says, the Fourth Amendment says that no warrant shall

10   issue but upon probable cause supported by oath or

11   affirmation, correct?

12       A.   Correct.

13       Q.   And you were -- and you have been trained as to

14   what probable cause means, correct?

15       A.   Correct.

16       Q.   Okay.  And as a matter of fact, you were trained

17   in that in your General Orders, correct?

18       A.   Correct.

19       Q.   Okay.  And, I'm going to show you General Order

20   610 and ask you -- and on page 1 of that and Section 3B,

21   it's a definition of probable cause.  I'm going to ask if

22   that's your understanding of the definition of probable

23   cause.

24            MR. FRANCUZENKO:  Your Honor -- I'm sorry,

25   Your Honor.  I just renew my objection with regard to the

1   order.

2             THE COURT:  All right.  Objection is

3   overruled for reasons previously stated.

4             MR. FRANCUZENKO:  Just so the record's clear,

5   I'm not going to object to each question.

6             THE COURT:  That's fine.  I think going

7   forward, since I made a judgment that they're admissible,

8   I think your issue is preserved.

9             MR. FRANCUZENKO:  Thank you.

10            THE COURT:  Uh-huh.

11  BY MR. PLOFCHAN:

12     Q.  Is that the General Order?

13     A.  Yes, it is.

14            MR. PLOFCHAN:  Your Honor, that's Exhibit 41.

15  I'd like to move that in.

16            THE COURT:  Plaintiff's 41 will be preserved.

17  Objection's preserved.

18            MR. PLOFCHAN:  Now, Marshal, may I have that

19  back now that it's admitted --

20            THE WITNESS:  No, he's going to ask me --

21  hang on one second.

22            MR. PLOFCHAN:  I'm going to put it on the

23  screen for you, Deputy.

24            THE WITNESS:  Okay.

25            MR. FRANCUZENKO:  Which number is that?

1          MR. PLOFCHAN:   Forty-one.

2     BY MR. PLOFCHAN:

3          Q.   Now, do you agree that the General Orders indicate

4     that -- they tell you that probable cause, which is a

5     prerequisite for a warrant is where facts and

6     circumstances are such at -- so as to cause a person of

7     reasonable caution to believe that an offense is being or

8     has been committed and that the person to be arrested has

9     committed the offense.   Correct?

10         A.   Correct.

11         Q.   All right.   So, I asked you before whether you

12    had -- it was useless for you to ask for a warrant

13    because no warrant would have been granted because there

14    was no probable cause.   Would you agree with that?

15         MR. FRANCUZENKO:   Your Honor, I'm going to

16    object.   I think that calls for speculation.   I also want

17    to point out to the Court that the order that's being

18    referenced here is for arrest procedures.   There's no

19    allegations or anything that a warrant would have been

20    obtained for an arrest at that point.   We're talking

21    about a different type of warrant, so I don't even think

22    that this General Order is applicable.   So, I move to

23    strike this exhibit.

24         MR. PLOFCHAN:   Your Honor, this is only being

25    offered for the definition of probable cause which is

1    part of the Fourth Amendment.

2              THE COURT:  All right.  The objection is

3    overruled.  The issue here is one of probable cause and

4    that is being -- definition is being presented, and I

5    note that the plaintiff was arrested.

6              Go ahead.

7              MR. PLOFCHAN:  Thank you, Your Honor.

8    BY MR. PLOFCHAN:

9    Q.   Now, would you agree that in order for you to have

10   gotten a warrant, even if you would have taken steps, you

11   would have had to have probable cause, correct?

12   A.   Correct.

13   Q.   And you would have had to swear under oath as to

14   the basis for probable cause, correct?

15   A.   Correct.

16   Q.   Which means you would have had to have sworn under

17   oath that an offense was being committed or had been

18   committed by someone, correct?

19   A.   Correct.

20   Q.   And, you admitted yesterday that you had no facts

21   that would have supported -- you had no facts.  You had

22   just had a hunch or suspicions and so forth, but you

23   would have had no facts in which to make an oath for a

24   warrant, correct?

25   A.   Based on the totality of the circumstances, cause

1   a reasonable person to believe that offense has been

2   committed, that would be met.

3       Q.   Really?  What offense was being committed when you

4   didn't have any facts?

5       A.   A totality of the circumstances.

6       Q.   Ma'am?

7       A.   So the circumstances involved with the first

8   encounter, all the circumstances with -- involved with

9   the call, all the circumstances when we got there.

10      Q.   I'm not asking your justification.  I just asked

11  you what offense is being committed based on the facts?

12      A.   That's what I'm there to investigate.

13      Q.   So, you wouldn't have had knowledge to ask for a

14  warrant of a particular offense, correct?

15      A.   Based on the totality of the circumstances, I

16  would have a reasonable -- reason to believe that

17  somebody could possibly be armed or an offense has been

18  committed.

19      Q.   What offense?

20      A.   That's what I was there to investigate.

21           THE COURT:  I'm sorry.  Can you answer his

22  question.  He is asking a specific question.  What crime

23  was committed in your presence?

24           THE WITNESS:  In my presence, none in my

25  presence.

BY MR. PLOFCHAN:

Q.  Okay.  And you had no facts to specifically support any specific crime at that point in time, correct?

A.  Fact of the phone call had been placed.

Q.  Okay.  And, yet we talked yesterday where you said that you had no facts to say that that -- that any phone call regarding a knife indicated that anyone had committed a crime.  Correct?

A.  You asked if I had personal knowledge of the facts.  I did not have personal knowledge.

Q.  You didn't have any facts that anyone had committed a crime, correct?

A.  Correct.

Q.  All right.  So, if that's the case, then you -- and you didn't have any facts that a crime had previously been committed, correct?

A.  Correct.

Q.  All right.  And, you didn't have any facts to assert that Mr. Mial or his two children, the only people you knew in the house, had committed any crimes, correct?

A.  Facts, no.

Q.  Okay.  So, then would you agree that even if you had followed the procedures for a warrant, you would not have been able to make a sworn affidavit of probable

1    cause to even get a warrant?

2       A.   That I don't agree.

3       Q.   Okay.  And I want to be clear.  You -- at no time,

4    did you ever inform Mr. Mial or anyone else that he had,

5    in your mind, committed a crime?

6       A.   No, sir.

7       Q.   Okay.  All right.  So, when you went to the door

8    the second time, there -- you had no facts to support

9    that Mr. Mial had committed or was committing a crime

10   then, correct?

11      A.   Correct.

12      Q.   Okay.  And, there was no immediate threat to any

13   officers at that time, correct?

14      A.   Officers, no.

15      Q.   Okay.  And, there was no immediate threat to

16   anyone that you knew of, correct?

17      A.   That I had personal knowledge of, not at the time.

18      Q.   Okay.  And, there was no immediate threat of harm

19   to any officer before you crossed the threshold, correct?

20      A.   Correct.

21      Q.   As a matter of fact, there was not any harm to any

22   officer when you crossed the threshold, correct?

23      A.   Incorrect.

24      Q.   Well, did you cause the harm to an officer?

25      A.   I did not.

1    Q.   Well, isn't it a fact that you struck Mr. Mial?

2    A.   I did not.

3    Q.   Court's indulgence.

4         Isn't it a fact you and Ferguson went in the door

5    and you ran smack into Mr. Mial?

6    A.   Correct.

7    Q.   So you initiated the contact with Mr. Mial?

8    A.   When I came to the door.

9    Q.   Right, you initiated it, correct?

10   A.   When he came to the door, yes.

11   Q.   He did not initiate it?

12   A.   I did not reach out to touch him at all coming

13   through the door.

14   Q.   But you ran smack into him?

15   A.   Correct.

16   Q.   So he didn't initiate any contact with you

17   whatsoever?

18   A.   I disagree.

19   Q.   If you were the first person to have contact and

20   it was -- and the contact was made by you running smack

21   into him, how did he initiate that contact?

22   A.   He reached out to grab me first.

23   Q.   Now, do you recall testifying about the incident

24   in the General District Court on April 22nd --

25   April 22nd, 2010?  And I'm going to ask you if would --

1    if you would read line -- on page 28 and 29, I'd like you

2    to read lines 12 through -- through the rest of 28 and

3    lines 1 through 3 on page 29.

4                MR. FRANCUZENKO:  Can I see it first?

5                MR. PLOFCHAN:  Yes, sir.

6                MR. FRANCUZENKO:  Which --

7                MR. PLOFCHAN:  April 22nd, again.

8                MR. FRANCUZENKO:  Which page?

9                MR. PLOFCHAN:  Lines 12 through the end and

10   the first three lines on the next page.

11               THE WITNESS:  Starting on line 12?

12   BY MR. PLOFCHAN:

13     Q.  Yes.

14     A.  "Question:  Okay.  Before there was any physical

15   touching between you, I understand you had to push the

16   door to get in.

17               "Answer:  Correct.

18               "Question:  And he would have been then pretty

19   close to you, because he's holding the door to keep you

20   out barely, correct?

21               "Answer:  Correct.

22               "Question:  Once you came in, isn't it fair to say

23   he put his out stretched arms out.  He put his out

24   stretch arms like I have them here, almost like a cross

25   (indicating).

1      "Answer:  Honestly, I couldn't tell you.  I know

2  once we entered the house, we ran right smack into him.

3  So once I was up against him, I could not see what his

4  hands were doing until I felt them on me."

5      Q.  Okay.  Now, so how -- do you agree you made that

6  statement under oath?

7      A.  Yes.

8      Q.  And, in that statement, you say "I honestly

9  couldn't see where his hands were.  And -- I couldn't

10  tell you.  I know once we entered the house, we ran smack

11  into him.  And so, once I was up against him, I could not

12  see what his hands were doing until I felt them on me".

13      Would you agree that you couldn't see his hands

14  until you had already initiated contact?

15      A.  By walking in, yes.

16      Q.  And, walking in to him?

17      A.  Yes.

18      Q.  And that you didn't feel any hands on you until

19  after you had already initiated contact?

20      A.  Until I walked into him and there was contact

21  made, yes.

22      Q.  Okay.  So, if you agree you made that statement

23  and you agree with this, why had you just 2 minutes ago

24  said you did not initiate contact with Mr. Mial?

25      A.  When I came through the door, we were face to face

1    and I walked into him.

2        Q.   So, you created contact with him, correct?

3        A.   Correct.

4        Q.   Okay.  Now, would you agree that if your contact

5    with him or entry into the house was illegal, that he

6    would have had the right to use reasonable force to

7    remove you?

8        A.   If the entry was illegal.

9        Q.   Okay.  And, that he would have had the right to

10   defend himself in his property, correct?

11       A.   To a point, yes.

12       Q.   Okay.  And so, at this point in time, you have you

13   deciding to go in and you initiating contact and him

14   resisting after you initiate it, correct?

15       A.   Correct.

16       Q.   Okay.

17            MR. PLOFCHAN:  Court's indulgence.

18       Q.   And would you agree if you have no right to enter

19   a house, you would be a trespasser?

20            MR. FRANCUZENKO:  Your Honor, I would object

21   at this point.  I mean, he's asking for legal opinion.

22   This is the --

23            THE COURT:  Sustained.

24   BY MR. PLOFCHAN:

25       Q.   Now, you also agree as you came in that Ferguson

1    was right behind you, correct?

2        A.   Correct.

3        Q.   Okay.  And, where was Altom?

4        A.   I do not know.

5        Q.   Okay.  When did you know that Altom was present?

6        A.   I couldn't tell you the exact moment.

7        Q.   Okay.  Well, did you notice he was present when

8    everything was over?

9        A.   I did, yes.

10       Q.   Okay.  And, did you notice him pushing behind you?

11       A.   I did not.

12       Q.   Okay.  As a matter of fact, when you got there, in

13   response to you running smack into him, Mr. -- were you

14   on Mr. Mial's right or his left?

15       A.   On his right.

16       Q.   Okay.  And, Ferguson was on his left, correct?

17       A.   Correct.

18       Q.   All right.  And, he had grabbed his arms around

19   your shoulders and he was actually holding the back of

20   your shirt, wasn't he?

21       A.   Correct.

22       Q.   And he was saying, you can't come into my house,

23   correct?

24       A.   I don't know what he was saying.

25       Q.   Okay.  And, he was trying to move you back through

1    the door, correct?

2       A.   Correct.

3       Q.   All right.  And, you were trying to sweep out his

4    legs, correct, to get him on the ground?

5       A.   I had lifted up my legs to do so, but I did not.

6       Q.   So you were trying to get him to the ground?

7       A.   Correct.

8       Q.   Now, what was your justification to seize Mr. Mial

9    at this point in time?

10      A.   It was all based on the totality of the

11   circumstances and the exigent circumstances, the

12   reasonable person to enter the house to check the welfare

13   of the residence due to his apprehension.

14      Q.   If you -- what authority says if you enter a home

15   that you have the right to seize the persons if they have

16   not -- if you have no evidence that they've committed a

17   crime?

18      A.   We're investigating for that crime.  He is at that

19   point obstructing the investigation.

20      Q.   Now, did you inform him he was -- wait.  The

21   investigation of what crime?

22      A.   The phone call placed, if people are injured.

23      Q.   You just told me and the jury not more than

24   10 minutes ago that you had no facts to support that

25   there was any crime being committed by Mr. Mial at that

1    time.

2       A.   And I had no reason to believe there wasn't,

3    either.

4       Q.   So, what was the basis, if you didn't think he --

5    and had no reason to believe he was committing a crime,

6    what was your authority to seize his person?

7       A.   At that point, when we were intending to check the

8    welfare of all the residents in the house, he was

9    obstructing that investigation.

10      Q.   How did he have time to obstruct if you burst

11   through the door and ran smack into him?

12      A.   By preventing us from being allowed to have anyone

13   to come to the door.

14      Q.   How did you have any ability to allow anyone to

15   come to the door if you didn't even know if anyone was in

16   the house?

17      A.   Because I asked him, made repeated attempts asking

18   him.

19      Q.   And, what says -- what is -- what would have been

20   your ability to have someone come to the door?

21      A.   I'm not understanding.

22      Q.   Well, you said he prevented you from exercising

23   your ability to have someone come to the door.  You don't

24   have any ability to have someone come to the door in a

25   private house, do you?

1      A.   I can ask them to bring them to the door to

2   investigate.

3      Q.   What if he walked in and said, everyone -- anyone

4   want to go talk to his deputy?  And no one answered.  Is

5   he then allegedly obstructing you?

6      A.   People do not have to speak with me if they don't

7   want to speak.

8      Q.   And they don't have to come to the door?

9      A.   To check the welfare, we are required to check the

10  welfare of everyone.

11     Q.   Ma'am, answer my question.  They don't have to

12  come to the door, correct?

13     A.   I disagree with you.

14     Q.   So, if a deputy shows up at a house, you're saying

15  that if a deputy shows up at the house and I want to talk

16  to somebody, somebody has to come to the door?

17     A.   I didn't show up at a random house.  I called.

18     Q.   I didn't ask that, ma'am.

19     A.   That is what we're discussing.

20     Q.   Somebody -- you're saying that somebody in the

21  house, when you don't have a warrant and you don't have

22  probable cause that there's a crime having been committed

23  or is being committed that they have to come to the door

24  and talk to you because you're a deputy, and if they

25  don't do that, you're going to forcibly enter into their

1    home?

2              MR. FRANCUZENKO:  Your Honor, I'm going to

3    object to form.

4              THE COURT:  Compound question.

5              MR. PLOFCHAN:  I'll rephrase.

6    BY MR. PLOFCHAN:

7      Q.  So, you agree that if -- because you're a deputy

8    that if you show up, and you say, I need someone to come

9    to the door, they have to come to the door?

10             MR. FRANCUZENKO:  Your Honor, hypothetical.

11             MR. PLOFCHAN:  I'm clarifying her statement,

12   Your Honor.

13             THE COURT:  It is a hypothetical.  If you

14   want to ask about this case, ask about this case.

15             Next question.

16   BY MR. PLOFCHAN:

17     Q.  So, it's your statement that because you said to

18   Mr. Mial, I want anyone in the house to come to the door,

19   if -- that they had to come to the door.

20     A.  Correct.

21     Q.  Okay.  What authority can you say that governs

22   Mr. Mial that says he has to comply with that request

23   when you do not have probable cause of a crime or that he

24   is involved or has been involved in a crime?

25     A.  Because we were there to investigate the crime.

1    And if he would not allow those people to come to the

2    door, we need to make sure they're not injured.  So the

3    only other way to do so would be to enter the residence.

4        Q.   You agree that you are not aware of any

5    investigation exception to the Fourth Amendment, correct?

6        A.   It's all based on the totality of the

7    circumstances.

8        Q.   Ma'am, you can answer my question.  You are not

9    aware of any investigation exception to the Fourth

10   Amendment, correct?

11       A.   Investigation, no.

12       Q.   Okay.  So, if there's no investigation exception,

13   and would you -- let me -- to put that back.  Would you

14   also agree that there is no crime associated with not

15   helping an officer in his investigation?

16       A.   There's obstruction of justice.

17       Q.   I'm not asking about that.  I'm asking there is no

18   crime of not helping an officer in his investigation or

19   her investigation, correct?

20       A.   You are not required to answer my questions.

21       Q.   And they're not required to help, correct, you're

22   investigation, correct?

23       A.   Help my investigation.

24       Q.   They're not required to, correct?

25       A.   Correct.

1    Q.  So, if there's no crime and they're not required

2    to help you, not required to answer you, what gives you

3    the authority to say that if they don't do that, they're

4    now obstructing you?  If there they're not required to do

5    it, how could they have been obstructing you?

6    A.  Because we were trying to check the welfare of all

7    the residents in the house.

8    Q.  Officer, you understand that your activities are

9    governed by the law, correct?

10   A.  Correct.

11   Q.  And, what your intentions are are irrelevant.

12   They have to be governed by the law, correct?

13   A.  Correct.

14   Q.  So, whether you had good intentions or bad

15   intentions, your conduct is still governed by the law,

16   correct?

17   A.  Correct.

18   Q.  And, even though --

19          THE COURT:  Can you take that document off

20   the screen, please.

21          MR. PLOFCHAN:  Take it off, Your Honor?

22          THE COURT:  Yes.

23          MR. PLOFCHAN:  Okay, yes.

24          THE COURT:  Unless you're asking a question

25   about it, take it off.

BY MR. PLOFCHAN:

Q.   So, you agree that regardless of what your intent was to investigate, if there's no law, that allows you to go in or -- then, you can't go in, correct?

A.   Depends on the circumstances.

Q.   I've already asked you if there is no law that says you can go in, you can't go in?

A.   There's exceptions to the law.

Q.   Okay.  And, if Mr. Mial has no obligation to answer your questions, and Mr. Mial has no obligations to go and talk to anybody in the house, then he is not committing a crime, correct?

A.   Obligations to talk, no.  He doesn't want to talk, that's fine.

Q.   And he doesn't have to go and get anybody in the house for you either, does he?

A.   When we have the circumstances that we had, yes, we have to check the welfare of everyone inside.

Q.   I understand you wanted to do that, but where is the law that says that Mr. Mial has to do something in his house because you ask him to?

A.   Under exigent circumstances with anyone that could possibly be armed or injured.

Q.   Where is the law that says Mr. Mial has to do anything, not what your intent is or what you want to

 1  accomplish.  Where is the law that Mr. Mial has to do

 2  something so that if he doesn't do it, it's a crime?

 3      A.  He didn't have to speak with me.

 4      Q.  Okay.  So, he didn't commit a crime.  And he

 5  didn't obstruct you because he didn't have to cooperate

 6  with you, right?

 7      A.  He did obstruct.

 8      Q.  Okay.  Now, isn't it also that obstruction under

 9  the law means that one has to physically impede your

10  lawful activity, correct?

11      A.  Correct.

12      Q.  And, so if you illegally entered into his house,

13  then there's no obstruction, correct?

14      A.  If it's an illegal entry.

15      Q.  Okay.  And, if you caused the conduct, there's no

16  obstruction, correct?

17      A.  If it's an illegal entry.

18      Q.  Now, where is the authority that says when you

19  enter a house that you can physically restrain any person

20  who has not committed a crime in your presence?

21      A.  If that person is actively fighting with me, then

22  I'm going to have to restrain them.

23      Q.  Were you wearing a weapon?

24      A.  I was.

25      Q.  Did you draw your weapon and say, Mr. -- Mr. Mial,

1   open the door?

2       A.   No.

3       Q.   Were you -- did you withdraw your weapon at all?

4       A.   No, sir.

5       Q.   Would that have perhaps caused him to restrain

6   from any activity?

7       A.   I don't know.  You'd have to ask.

8       Q.   Okay.  You didn't even look at that, correct?  You

9   and Ferguson just jumped on him and Altom jumped on him

10  as well, correct?

11      A.   I don't know what the other deputies did.

12      Q.   You don't know what Ferguson did.  He was standing

13  right next to you?

14      A.   He was standing beside me, but I could not tell

15  you what he was doing.

16      Q.   Now, I want to be clear.  You did not ask Sayre to

17  use his Taser, correct?

18      A.   Yes, I did.

19           MR. PLOFCHAN:  Court's indulgence, Your

20  Honor.

21  BY MR. PLOFCHAN:

22      Q.   Now, you recall being deposed again under oath on

23  November 10th, 2011, correct?

24      A.   Correct.

25      Q.   All right.  Now, you were asked -- in that case,

1    you were asked --

2                    MR. FRANCUZENKO:  What page, counsel?

3                    MR. PLOFCHAN:  It's on pages 227 and 228.

4    BY MR. PLOFCHAN:

5       Q.   I'd like you to read 227, lines 3 through 22 and

6    228, lines 1 through 3.

7       A.   What were the pages, the first one?

8       Q.   Three through 22, 3 through 22 on 227.

9       A.   Three through 22.

10           "Question:  Who was the first person you became

11   aware was present?

12           "Answer:  Deputy Sayre.

13           Question:  Tell me how you became aware Deputy

14   Sayre was there?

15           "Answer:  As we were struggling on the front

16   foyer, I watched Deputy Sayre come from around Ferguson's

17   right-hand side.

18           "Question:  Let me see that, please.

19           "Answer:  Come around from the side.

20           "Question:  You didn't see Sayre come in?

21           "Answer:  No, I didn't.

22           "Question:  Okay.  But, when you're struggling,

23   you saw him there already?

24           "Answer:  Correct.

25           "Question:  And then he comes from around the

1   side?

2          "Answer:  Correct.

3          "Question:  Goes pass the stairs?

4          "Answer:  I don't know if he passed the stairs or

5   not.  He came behind."

6          And you want it to continue on the next page?

7   Q.   Lines 1 through 3.

8   A.   One through 3?

9          "He came behind in and before anybody starting

10  tussling with anybody.

11         "Answer:  Tussling as we came through the door.

12  Q.   No, lines 1 through 3 on 228, the next page.

13  A.   228, 1 through 3, I'm sorry.

14         So, the -- "Question:  Okay, I'm with you.  What

15  happened then?

16         "Answer:  At that point he pulled out his Taser

17  and tased Mr. Mial."

18  Q.   Thank you.

19         Marshal, may I have that back?

20         Now, you were asked to provide the details of what

21  happened with that encounter on November 10, 2011, and

22  you never state what happened next.  You never state, I

23  asked Sayre to use the Taser.  I asked him to do that,

24  correct?  You didn't state that, did you?

25  A.   He didn't ask me if I said anything to Deputy

1    Sayre.

2       Q.  He asked you what happened next.  Wouldn't you

3    think an answer would be, well, I asked something -- I

4    said to Deputy Sayre -- if it happened actually -- I said

5    to Deputy Sayre, use your Taser and then he used the

6    Taser.

7            Wouldn't that have been a natural response if

8    that's what actually happened?

9       A.  He asked what happened.  I said he was tased.  He

10   didn't ask if I said anything to Deputy Sayre.

11      Q.  Isn't saying something to Deputy Sayre actually

12   something that happens?

13      A.  It did happen, yes.  I told him to tase him.

14      Q.  So -- well, wait a minute.  If it is something

15   that happens, and you were asked what happened, why

16   didn't you say it?

17      A.  Because that's not every single event that

18   occurred on that day in the deposition.  If he had asked

19   my -- that question, I would have been more than happy to

20   tell him, yes, I asked Deputy Sayre to tase him.

21      Q.  Isn't it a fact that you believe Sayre has greater

22   liability for unilaterally using the Taser if you didn't

23   ask him?

24            MR. FRANCUZENKO:  Objection.

25            THE COURT:  Sustained.

1   BY MR. PLOFCHAN:

2       Q.   Now, isn't it also a fact after you tased

3   Mr. Mial, he collapsed to the ground or after Mr. Sayre

4   tased Mr. Mial, Mr. Mial collapsed to the ground?

5       A.   Correct.

6       Q.   And he had his hands above his head, correct?

7       A.   Not at that time.

8       Q.   He was just lying on the ground?

9       A.   Right.

10      Q.   And then he later put his hands above his head?

11      A.   Yes.

12      Q.   And you got over him and told him if he didn't

13  move his hands, you were going to tase him again?

14      A.   I asked him at first, please release his hands.

15  When he didn't, I did state if you do not release your

16  hands, you could be tased again, yes.

17      Q.   Did you say you could be or you were going to tase

18  him?

19      A.   You were going to.

20      Q.   Well, so you said, I'm going to tase you if you

21  don't move your hands?

22      A.   You will be tased again.

23          MR. PLOFCHAN:  Court's indulgence.

24  BY MR. PLOFCHAN:

25      Q.   And when you told him he was going to be tased, he

1    moved, correct?

2       A.   Correct.

3       Q.   Now, is it within your authority to threaten

4    tasing to someone who is not violent at the time or

5    potentially violent?

6              MR. FRANCUZENKO:  I'm going to object, Your

7    Honor.

8              THE COURT:  Sustained.  You want to ask

9    questions about this case, you can.  But hypothetical

10   questions --

11             MR. PLOFCHAN:  I thought in this case he was

12   not -- I'll rephrase it, Your Honor.  Thank you.

13      Q.   You had no authority to threaten or use a Taser on

14   Mr. Mial because he was not acting in any -- in a violent

15   or dangerous way on the ground, correct?

16             MR. FRANCUZENKO:  Your Honor, again, I

17   object.

18             THE COURT:  What's the objection?

19             MR. FRANCUZENKO:  There's no -- there's no

20   evidence that Mr. Mial was tased a second time.

21             MR. PLOFCHAN:  Your Honor, may I respond?

22             THE COURT:  Yes, yes.

23             MR. FRANCUZENKO:  I object on relevance.

24             MR. PLOFCHAN:  An assault in Virginia is the

25   threatened use of a force in which one has a reasonable

1   expectation that one would exercise it against them and

2   that they have a reasonable fear of that exercise.

3           MR. FRANCUZENKO:  And, Your Honor, there's no

4   state claim for assault in this case.

5           MR. PLOFCHAN:  The issue is --

6           THE COURT:  Hold on.  Hold on.

7           MR. PLOFCHAN:  I'm sorry.

8           THE COURT:  Objection's overruled.

9           MR. PLOFCHAN:  Thank you.

10  BY MR. PLOFCHAN:

11      Q.  Would you agree that you had no authority to

12  threaten Mr. Mial with a second tasing because he was not

13  acting in a violent way?

14      A.  Based on the fight that we -- the struggle that we

15  had just had with him, I stated that so he would leave --

16  so he would release his hands so we could place him in

17  handcuffs without further struggle from him.

18      Q.  That's not my question, ma'am.  My question is,

19  would you agree that you had no authority to threaten him

20  with a Taser because he was not violent at that time?

21      A.  I disagree with that.

22      Q.  I'm going to ask you to take a look at what -- I'm

23  identifying as General Order 506.

24          MR. FRANCUZENKO:  Your Honor, I'm going to

25  object, again.  And if this is a Taser policy, this goes

1    well beyond the scope of what this case is about.  Again,

2    at this --

3              THE COURT:  I'm sorry.  This document is

4    called a what?  506.

5              MR. PLOFCHAN:  506 General Order.

6              THE COURT:  What exhibit number is it?

7              MR. PLOFCHAN:  It's number 36.

8              THE COURT:  Just one second.  Let me look at

9    it.

10             What page?

11             MR. PLOFCHAN:  May I have the document,

12   Marshal?

13             Page 6, Your Honor.

14             THE COURT:  All right.  What's your

15   objection, again?

16             MR. FRANCUZENKO:  Your Honor, I understand if

17   they want to use this in the context of Deputy Sayre

18   using the Taser.  Now he's asking about whether she could

19   make a statement about using a Taser, when it was not

20   even used.

21             So, I'm not sure what the relevance is to

22   this case.

23             THE COURT:  I want to make sure that I heard

24   something correctly.  Let me ask you to come to sidebar

25   for just a second.

1          MR. PLOFCHAN:  Yes, sir.

2          (Thereupon, the following side-bar was had:)

3          THE COURT:  My question is, did she testify

4     that she directed Sayre to tase the plaintiff in the

5     first instance?  Is that what she testified to?

6          MR. FRANCUZENKO:  In the first instance, yes.

7     We're talking about a different time period now.

8          THE COURT:  I understand.  Now he's talking

9     about apparently, the officer just testified she made a

10    statement to the plaintiff that if he did not release his

11    hands, that you will be tased again.

12          She said she didn't.  She said, you would be

13    tased again.  It's ambiguous to me whether she would do

14    it or someone else would do it.

15          It seems to me under those circumstances

16    where she is the person who said she's controlling the

17    Taser, she would be subjected to the policy.

18          This policy deals with the use of a Taser and

19    when it's supposed to be used.  This points out the

20    reason why the General Orders are in.

21          If they were not in, then the jury would have

22    to make up their own mind what a police is supposed to do

23    or not do out in the street.

24          Here there's a trained officer on the stand.

25    We have policies.  And I'm assuming that if asked, she's

1   going to say, she has training about when or when not to

2   use the Taser, trained when or when not to use the

3   weapons.  That's why it's relevant from the Fourth

4   Amendment.

5           So my ruling is the objection is overruled.

6   He can use whatever he wants from this policy.

7           MR. FRANCUZENKO:  But, Your Honor, I

8   understand the Court's ruling with respect to the Taser

9   being deployed by Brian Sayre, but there's no evidence or

10  allegation that a Taser was ever used again.  And we're

11  talking about after the fact.  I mean --

12          THE COURT:  Maybe you didn't hear what I just

13  said.  If the witness says she -- she's taken the stand.

14  And now she told Sayre to fire the Taser.  That's the

15  same as if she did it.

16          MR. FRANCUZENKO:  And I -- I hear you on that

17  point.  But the question -- the questions now are did you

18  have the authority to threaten the use of Taser later on

19  when they're trying to get him handcuffed.  That's what

20  we're talking about.  So, that's a different question.

21          I understand what the Court is saying, but

22  we're talking three steps later now, where he's trying to

23  cross-examine her about using the Taser.  You didn't have

24  the authority to even threaten the Taser when you were

25  trying to get him handcuffed.  And that's inappropriate

1    for him to use the Orders for that purpose.  That's the

2    problem I have.

3                  I agree with the -- I understand what you're

4    saying.

5                  THE COURT:  I'm glad that you further

6    explained to me your objection.  I still think that under

7    the circumstances where the question here has to do with

8    what took place inside the house, how it started, how

9    long did it last, what were the circumstances from her

10   point of view about what she thought was a threat to her

11   or the other officers, his actions all bear on her

12   judgment about using -- telling someone to use the Taser

13   or threatening to use the Taser.  I shouldn't say

14   threatening.  She told him if you don't -- if you don't

15   do what I tell you do, you will be tased.

16                  I can't make a judgment about that, so what

17   I'm going to do is this.  I'm going to let him question

18   about the policy.  I explained why the objection is

19   overruled.

20                  MR. FRANCUZENKO:  And, I'm not going to

21   object to every question, but I just want a continuing --

22                  THE COURT:  Let's put it on the record now

23   and hopefully it will meet your requirement.

24                  I previously considered a motion in limine to

25   include General Orders from Loudoun County Police.  I had

 1  a hearing outside the hearing of the jury in advance of

 2  trial where I ruled the General Orders were admissible

 3  for reasons I stated then and I reiterated them.

 4          Defense counsel is not required to object

 5  every time a General Order is offered because I already

 6  made a ruling against him.  As I understand the rules of

 7  law, that is sufficient to preserve his objection for

 8  purposes of appeal.

 9          MR. FRANCUZENKO:  And can I just say

10  something for the record, because the Court made very

11  clear the reason that it made its ruling yesterday

12  during -- after I made a motion for a mistrial.

13          THE COURT:  But that was after I already made

14  a ruling the first time.  I don't have to repeat

15  everything I said every single time I rule.

16          MR. FRANCUZENKO:  I don't think we both have

17  to repeat ourself, but my point is, the Court had in its

18  mind how the Orders were used.  My position is now that

19  the Orders have been used, they have been used

20  inappropriately.  They have not been used for the purpose

21  which the Court has articulated both before the trial and

22  during this trial.  And, that has severely prejudiced the

23  defense in this case.  It's not the fact that you

24  admitted them or are permitting them to be used.  It's

25  the way that they're being used.

1          THE COURT:  Well, again, for probably the

2   fifth time now, let me reiterate.  There is a case

3   involving *Graham versus Conner* about the Fourth Amendment

4   use of excessive force.  Among the facts the jury is to

5   consider is objective reasonableness of the officer's

6   conduct.

7          One of the things based on objective

8   reasonableness is what they knew or did not know, what

9   they were supposed to do in the use of force.  One

10  element of that is the county procedures and General

11  Orders to police officers in which they are trained as

12  well as their own general knowledge of the Fourth

13  Amendment.

14          This is not a case where the jury can just go

15  back and make up their own mind about the Fourth

16  Amendment.  They have to look at the facts.  They have to

17  look at the rules of law and the instructions.  And my

18  instructions will address what I just said about use of

19  General Orders.  They're not the standard of care.

20  They're only one element of fact they are to consider in

21  the reasonable -- objective reasonableness of the

22  officer's conduct.

23          Thank you.

24          (THEREUPON, side-bar conference was

25  concluded.)

```
 1              THE COURT:  You may proceed.

 2              MR. PLOFCHAN:  Thank you, Your Honor.

 3   BY MR. PLOFCHAN:

 4     Q.  Now, Deputy, can you identify this as the Use of

 5   Force General Order Loudoun County Sheriff's Office?

 6     A.  That's correct.

 7     Q.  Okay.

 8              MR. PLOFCHAN:  And, I'm sorry, Marshal, may

 9   have it back now.  Thank you.

10        Now, Your Honor, I'd like to move this in as our

11   next exhibit and this is exhibit --

12              THE COURT:  Thirty-six is received.

13              MR. FRANCUZENKO:  Objection.

14              THE COURT:  For reasons previously stated,

15   counsel is not required to object any more on this issue.

16   I've already ruled several times now.  They're admitted.

17              MR. PLOFCHAN:  Thank you, Your Honor.

18   BY MR. PLOFCHAN:

19     Q.  Now, Deputy Forsch, you received training on the

20   use of a Taser, correct?

21     A.  Correct.

22     Q.  Okay.  And you've received refresher training on

23   the use of a Taser, correct?

24     A.  Correct.

25     Q.  And there are very specific limited situations
```

1   when one can use a Taser, correct?

2       A.  Correct.

3       Q.  And, the -- in terms of -- you also understand

4   that as part of your Fourth Amendment training, that

5   there's a limitation on the amount of force that one can

6   use in a particular situation, correct?

7       A.  Correct.

8       Q.  All right.  And, that within the context of the

9   Fourth Amendment, one cannot use excessive force,

10  correct?

11      A.  Correct.

12      Q.  And, one of the factors that one has to consider

13  is the likelihood of harm to an officer at the time the

14  force is used, correct?

15      A.  Correct.

16      Q.  And, one of the other factors is whether there is

17  even a crime being committed, correct?

18      A.  Correct.

19      Q.  Okay.  And, in terms of the deployment -- in terms

20  of the first use of the Taser by -- when you requested

21  it, according to your testimony, you requested it be

22  used.  Are you aware of any authority that says that you

23  can cause the altercation and use that as a justification

24  to use the Taser?

25      A.  No.

1        Q.   Okay.  Now --

2                  MR. PLOFCHAN:   Court's indulgence, Your

3    Honor.

4    BY MR. PLOFCHAN:

5        Q.   Would you agree that Section B as identified here

6    talks about five recognized times when you could use a

7    Taser, correct?

8        A.   Correct.

9        Q.   All right.   And, would you agree that they

10   don't -- the first one doesn't apply because there was

11   not a mental detention or emergency custody order,

12   correct?

13       A.   Correct.

14       Q.   And the second one doesn't apply because there is

15   nobody armed with weapons or other firearms, correct?

16       A.   Correct.

17       Q.   And, the third one doesn't apply because there was

18   no preplanned warrant service where the subject was

19   believed to be potentially violent, correct?

20       A.   Correct.

21       Q.   And, the fourth one doesn't apply because you

22   didn't have a violent person under the influence of drugs

23   or alcohol, correct?

24       A.   I didn't know if there was drugs or alcohol

25   involved at the time.

1    Q.   You didn't know.  So, are you allowed to use a
2    Taser when you don't know if the elements are met?
3    A.   It doesn't stated that I -- it states if the
4    person could be under -- persons under the influence of
5    drugs or alcohol.  I do not know that for a fact.
6    Q.   Well, let me ask you.  Do you know if I've had
7    drugs or alcohol today?
8    A.   I don't.
9    Q.   If -- is it your position that you, under this
10   guideline, would be authorized to use a Taser if you
11   thought I threatened you?
12   A.   You are also not being violent.
13   Q.   Well, let's say I'm coming at you threatening you,
14   would you be authorized to use a Taser on me, because --
15   but without knowing whether I was under the influence of
16   drugs or alcohol?
17   A.   There's other circumstances.
18   Q.   Oh.  So, would you agree that the language, "under
19   the influence of drugs or alcohol" is therefore a reason?
20        MR. FRANCUZENKO:  Your Honor, I'm going to
21   object.  This -- again, this has nothing to do with this
22   case.
23        THE COURT:  If --
24        MR. FRANCUZENKO:  He's taking parts of these
25   orders out of context.

1          THE COURT:  You'll be given a chance,

2   Mr. Francuzenko, to reexamine the witness.

3          MR. FRANCUZENKO:  Relevance, Your Honor.

4          THE COURT:  All right.  Objection is

5   overruled on relevance.

6          If you would focus on this case as opposed to

7   hypotheticals.

8          MR. PLOFCHAN:  Yes, sir.

9   BY MR. PLOFCHAN:

10    Q.  You had no evidence at that time that Mr. Mial

11  was, not potentially, but was under the influence of

12  drugs or alcohol, correct?

13    A.  No evidence, no.

14    Q.  Okay.  And, Mr. Mial was not threatening to injure

15  himself or commit suicide in your presence, was he?

16    A.  Correct.

17    Q.  Okay.  Now, it also says a Taser may be used to

18  control a violent or potentially violent subject when you

19  believe the following conditions exist.  Deadly force

20  does not appear to be immediately necessary.

21        Was there any need for deadly force?

22    A.  No.

23    Q.  Okay.  And, attempts to gain control of a subject

24  through the use of verbal commands or physical compliance

25  have been or will likely be ineffective in the situation,

1    or there is reasonable expectation that it will be unsafe

2    for deputies to approach within the contact range of a

3    person, correct?

4        A.   Correct.

5        Q.   Now, I might ask you on the first -- right at the

6    first time you asked Sayre -- based on -- you told him

7    use the Taser, okay.  Was there -- there was no attempt

8    to gain control of him through the use of verbal

9    commands, correct?

10       A.   Verbal commands, yes.

11       Q.   What were the verbal commands?

12       A.   Deputy Ferguson was giving him verbal commands.

13       Q.   What were the verbal commands?

14       A.   To stop resisting.

15       Q.   Okay.  And yet you just told me that if it was a

16   legal entry, he had the right to resist?

17       A.   Right.

18       Q.   And one doesn't have to listen to an illegal

19   command, correct?

20       A.   Correct.

21       Q.   Now, let me ask you.  I want to be very clear.

22   From the moment you came in the door to the moment you

23   asked Sayre to tase him, how much time passed?

24       A.   Less than 30 seconds.

25       Q.   Less than 30 seconds.  Now, is it your position

1  that you -- you run into him, you grabbed him, he grabs

2  around you.  You're swinging and trying to -- on him and

3  is he supposed to hear these verbal commands?

4      A.  I can't speak to what he heard or didn't hear.

5      Q.  Okay.  And, was there even time for him to react?

6      A.  I can't speak to if he heard them and reacted.  He

7  did not react to them.

8      Q.  Was there -- so if -- are you able -- is it your

9  position then you can say, I've got my Taser, stop

10  resisting, boom?

11      A.  No, sir.

12      Q.  So you would have to give somebody time or

13  situation in which to react, correct?

14      A.  It would all be a totality of --

15      Q.  Okay.  Did you ever relax your grip around Mial?

16      A.  I never had a grip around him.

17      Q.  You were not -- where were your hands?

18      A.  I couldn't tell you where my hands were.

19      Q.  So, you were just -- you were just standing there.

20  You don't know where your hands were, and he got his

21  hands around you and you're standing there like that or

22  were you actually trying to get him to the ground is what

23  you told us, right?

24      A.  I was trying to sweep his feet, yes.

25      Q.  Okay.  Did you ever stop trying to sweep his feet

1    and gave him a command that he could react to?

2       A.   I did.

3       Q.   Really.  How long did you stop?

4       A.   I stopped and all his weight started to come on

5    me.

6       Q.   You -- but you never gave him a command, correct?

7       A.   I did not, no.

8       Q.   Okay.  And when you stopped, how long did you wait

9    before you said tase him?

10      A.   Couple seconds.

11      Q.   So, you actually ordered the tasing because his

12   weight was falling on you, not because he was being

13   violent, correct?

14      A.   No, I ordered the tasing because he was being

15   violent.  I was being tossed around and I was worried for

16   my safety.

17      Q.   Is it your position that you can cause the

18   situation of potential violence and then use a Taser

19   because you caused it and you don't feel you're in

20   control after causing it?

21      A.   We had a reason to enter the residence.

22      Q.   Ma'am, you can answer my question, please.

23           MR. FRANCUZENKO:  Your Honor --

24   BY MR. PLOFCHAN:

25      Q.   Is it your position that you can cause the violent

1    situation and then you get to use a Taser because you

2    can't control it?

3            MR. FRANCUZENKO:  I object to form, Your

4    Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  In my opinion, we didn't cause

7    the violent situation.

8    BY MR. PLOFCHAN:

9        Q.  I didn't ask that, ma'am.

10       A.  You're asking me if --

11       Q.  Is it your position that under your understanding

12   of your rules you can cause a violent situation and then

13   use a Taser because you can't control it?  Is that your

14   position?

15           MR. FRANCUZENKO:  Objection, hypothetical,

16   Your Honor.

17           THE COURT:  Sustained.

18   BY MR. PLOFCHAN:

19       Q.  In this context, Mr. Mial did nothing to cause any

20   interaction with you, correct?

21       A.  I'm not understanding what you mean by

22   interaction.

23       Q.  He didn't -- he didn't move toward you.  He didn't

24   initially lay a hand on you.  Everything was done in

25   reaction to your actions, correct?

1     A.   As we came through the door, he started to throw

2  elbows at us.  We made contact with him.

3     Q.   Now, this is -- I'm going to be clear.  This is a

4  different version of what you just testified to and what

5  you testified under oath in November.  You said that when

6  you came in the door, you ran smack into him.  Now,

7  you're saying that as you came in, he was throwing

8  elbows.  What was it?  Was it what you said back in

9  November, 2011, and what you said in April of 2010, or is

10  it something new now?

11     A.   He was throwing elbows as we came through the

12  door.

13     Q.   I -- how was there time for that to happen when

14  you said that as soon as you ran -- you came into the

15  door, you ran smack into him?

16     A.   Because as we ran him, he was throwing elbows.

17     Q.   Was he backing up?

18     A.   I don't know.

19     Q.   So, you come into the house, he's backing up, no

20  fist, but his elbows are going like this?

21     A.   His elbows were coming towards us.

22     Q.   Like this?

23     A.   Off to the side, elbowing.

24     Q.   He's going like this, get away from me?

25     A.   Towards us, not away from us.

J. Forsch - Direct                                              66

1    Q.   But he's going get away from me?

2    A.   That's backwards.  He was moving them towards

3    because --

4    Q.   So he's saying get away from me, moving towards

5    you?

6    A.   He's moving his elbows towards us.

7    Q.   To keep you out of his house?

8    A.   I can't speak to what his intention was.

9    Q.   Now, let me ask you this, again.  What did you --

10   how long do you have to wait before you use a Taser?

11   A.   There's no set time.

12   Q.   So, you could have used it in 3 seconds?

13   A.   There's no set time.

14   Q.   Okay.  How many people have to be involved?

15   A.   There's no set number of people.

16   Q.   Why didn't you ask Sayre to help before you used

17   the Taser?

18   A.   Because when I saw him, he had his Taser out.  We

19   were struggling and I asked him to tase him.

20   Q.   So his Taser was already out of the holster, ready

21   for use?

22   A.   I believe he had it in his hand, yes.

23   Q.   Ready for use, just looking for an opportunity,

24   without you asking; is that correct?

25   A.   I did ask him to use.

 1            MR. FRANCUZENKO:  Objection, cause to

 2   speculate.

 3            THE COURT:  Sustained.

 4   BY MR. PLOFCHAN:

 5       Q.  So, you have nothing to -- because you didn't ask

 6   him to help you physically, you don't have any basis to

 7   say that physical compliant would have been ineffective,

 8   correct?

 9       A.  We were asking for Mr. Mial's physical compliance

10   which he was not doing.

11       Q.  Doesn't physical compliance in this order mean

12   that you couldn't subdue him physically without the use

13   of a Taser?

14       A.  Also asked to gain -- attempt to gain control

15   through verbal commands which he was not following

16   either.

17       Q.  And so, one, you used verbal commands and then in

18   this case, physical compliance means you physically would

19   grab him, not in that case, correct.  That's what it

20   means, physical compliance, you would physically grab

21   him?

22       A.  It would be physical compliance that we were

23   dealing with.

24       Q.  And you didn't -- where does it say that?

25            Okay, ma'am, I withdraw that question.

1          So then, Sayre tases him and he's on the ground.

2    He was immobilized, right?

3       A.  He was laying there, yes.

4       Q.  Okay.  And, then how close were you when he was

5    lying there?

6       A.  Down right besides him.

7       Q.  Within a foot?

8       A.  Yes.

9       Q.  Okay.  And at that point in time, you told him

10   that he had to -- he better cooperate or you were going

11   to tase him again?

12      A.  That was not the first thing I had said to him.

13      Q.  Okay.  You said put your arms behind your back?

14      A.  That's not the first thing, either.

15      Q.  What did you said?

16      A.  Roll over on his stomach.

17      Q.  You told him to roll over on his stomach, and did

18   he do that?

19      A.  Not at first, no.

20      Q.  Okay.  What efforts did you make to see whether he

21   could even comply after you just shot him with 30,000

22   volts of electricity?

23      A.  I asked him to roll over on his stomach and then

24   we assisted him with that.

25      Q.  I didn't ask that question.  I asked you what

1   efforts did you take that he could even comply with

2   the -- the request to roll over after you had just shot

3   him with 30,000 volts of electricity?

4       A.   I didn't ask him anything besides to roll over to

5   his stomach.  I don't understand what you're --

6       Q.   And you then told me, but he didn't do it right

7   away.  Did you treat that as noncompliance?

8       A.   He was not complying, yes.

9       Q.   So, what steps, if you're thinking that's

10  noncompliance, what steps did you take to see if he could

11  even comply after you shot him with 30,000 volts of

12  electricity?

13      A.   I didn't ask him if he understood what I was

14  asking of him.

15      Q.   So, if he is immobilized because that's what a

16  Taser is supposed to do, right?  Let me rephrase it.  A

17  Taser is supposed to immobilize someone, correct?

18      A.   Yes.

19      Q.   And you asked -- asked to have him tased, and he

20  was shot with a Taser and 30,000 volts of electricity and

21  he is immobilized and you stand over him and say, move

22  over to your stomach, but he's immobilized.  You just

23  said he's noncompliant because he's not moving?

24      A.   The Taser was no longer cycling.  So the Taser was

25  no longer causing him to be immobilized.

1           Did I ask him if he was?  No.  I asked him to roll

2    over to his stomach.

3       Q.   You said it was no longer cycling.  Did you make

4    any effort to determine whether he was functional,

5    whether the Taser was still cycling or not?

6       A.   When it was done, I did not.

7       Q.   So you -- then -- because you were mad at him,

8    weren't you?

9       A.   I was not.

10      Q.   You were calm?

11      A.   I was.

12      Q.   And, you didn't raise your voice to him at all?

13      A.   I did not.

14      Q.   Okay.  And you said -- but, you said move over on

15   your stomach without checking to see if he was even

16   functional and then determined just now, as you told us,

17   that he was not noncompliant because he didn't

18   immediately move over, right?

19      A.   Right.

20      Q.   Okay.  And, at that point in time, none of the

21   first five factors here are applicable, correct?

22      A.   The first five under B, no.

23      Q.   Okay.  And at that point in time in this case, you

24   already had control of him because you've already used a

25   Taser, correct?

1     A.   I don't have control of him, no.

2     Q.   He's immobilized on the ground.  Are you -- how

3   are you saying you don't have control over him?

4     A.   I just fought with him for over 30 seconds.  I

5   don't have control of his hands.

6     Q.   Now, it's over 30 seconds.  I thought it was that

7   the whole incident took less than 30 seconds.

8     A.   Right.

9     Q.   So, it wasn't over 40 seconds, correct?

10    A.   The incident was --

11    Q.   And then you just told us that you fought with

12  him.  When I asked you what you were doing before, you

13  said you didn't even know what your hands were doing, but

14  he was flaying at you and you were fighting.  Were you

15  fighting him?

16    A.   I was not striking him.

17    Q.   So, what do you mean when you said you just fought

18  with him?

19    A.   I'm sorry.  I meant struggle with him.

20    Q.   Well, actually don't you mean that you fought with

21  him and your were fighting with him and you were

22  resisting his efforts to move you out of the house?

23    A.   He was resisting, yes.

24    Q.   And you were trying to take him down?

25    A.   Correct.

1    Q.   And you were fighting with him, correct?

2    A.   Struggling, fighting.

3    Q.   Your adrenalin was high?

4    A.   It was.

5    Q.   Okay.  So, in this case, he's on the ground.  You

6    just tased him.  What about his position at this point,

7    is there any reasonable expectation it will be unsafe for

8    you to approach within the contact range of the person?

9    A.   I was already down on the ground with him.

10   Q.   So, it wasn't unsafe for you to get that close,

11   correct?

12   A.   I was trying to --

13   Q.   Answer my question, yes or no.

14   A.   I didn't know.

15   Q.   You were already in that space, correct?

16   A.   Correct.

17   Q.   So, you must have presumed that it was safe to be

18   in that space, correct?

19   A.   Correct.

20   Q.   All right.  So, in this case, there was no

21   expectation that it would be unsafe for you to approach

22   within the contact range of the person, correct?

23   A.   Okay, correct.

24   Q.   All right.  And, you already had physical

25   compliance with him and there was no evidence that it

1   would be continued to be ineffective in that case,

2   correct?

3       A.   I did not have physical compliance of him.

4       Q.   You didn't even know if he could comply, correct?

5       A.   He rolled to his stomach.  He immediately put his

6   hands over his head and interlocked his fingers.

7       Q.   Okay.  So did you tell him not to do that?

8       A.   Well, if he was unable to respond, he wouldn't

9   have been --

10      Q.   You just told us 2 minutes ago that he rolled over

11  to his stomach with the assistance of you and the other

12  officers.

13      A.   Correct.

14      Q.   So, he can't even roll over to his stomach by

15  himself.  You help him move over to his stomach and he

16  puts his hands above his head and locks his fingers,

17  correct?

18      A.   Correct.

19      Q.   And then you say I want your hands behind your

20  back, right?

21      A.   I attempted to take his hand, yes.

22      Q.   And he's not responding at this point.  You

23  don't -- but you don't inquire as to whether he is --

24  because you already had to give him assistance to roll

25  over.  You don't know if he can move his hands freely at

1  this point in time?

2      A.   I don't.

3      Q.   He doesn't say anything, does he, at this point?

4      A.   He did not.

5      Q.   He's not moving.  He's not saying.  He's doing

6  this, right?  He's just standing there with his hands

7  locked, right?  Lying on the ground, on his belly, right?

8      A.   With his fingers interlocked, yes.

9      Q.   Okay.  What threats of physical violence or harm

10  was there to you that would justify you under the Fourth

11  Amendment and under your policies to tell him that if he

12  doesn't give you your hands, you're going to shoot him

13  again with the Taser?

14      A.   I was trying to gain control --

15      Q.   I don't care what you're trying to do.  I'm asking

16  what authority you had or what physical threat there was

17  that would have justified you telling him that if you

18  don't do it again, you're going to use a Taser on him?

19      A.   The physical threat I was just in a struggle with

20  him, and I'm trying to get him to comply --

21      Q.   When do you --

22      A.   He's actively interlocking his fingers and not

23  complying with my verbal command.

24      Q.   So you're mad that he didn't immediately move his

25  hand but you just admitted he poses no physical threat to

1   you at this point in time?

2       A.   The Taser was cycling.  He was no physical threat.

3            THE COURT:  Excuse me, excuse me.  Take the

4   morning recess now for 15 minutes.

5            MR. PLOFCHAN:  Yes, sir.

6            (Court recessed at 11:30 a.m. and reconvened

7   at 11:46 a.m.)

8            THE COURT:  You can bring our jury out,

9   Mr. Toliver.  Thank you.

10           You may be seated.

11           All right, counsel, you may proceed.

12           MR. PLOFCHAN:  Thank you, Your Honor.

13  BY MR. PLOFCHAN:

14      Q.   Ms. Forsch, I just want to clarify very

15  specifically.  When you threatened Mr. Mial with a second

16  tasing, he had made no violent move toward you, correct?

17      A.   A violent move, no.

18      Q.   Okay.  And he had not made any violent move toward

19  anyone, correct?

20      A.   Correct.

21      Q.   Okay.  When all this was going on from the time

22  you said, everything was less than 30 seconds; is that

23  correct?

24      A.   Approximately, yes.

25      Q.   How much time from the time that you hit him with

1   the Taser the first time until you threatened him with

2   the second time, 10 seconds?

3       A.   Maybe, I couldn't be specific.

4       Q.   Okay.  And, where were the children at this time?

5       A.   I couldn't tell you that.

6       Q.   Were they screaming?

7       A.   I couldn't tell you that.

8       Q.   Okay.

9            I'm going to ask the Marshal if you would show the

10  Deputy page 234 and just read lines 1 through 11, please.

11           Would you read that out loud, ma'am.

12      A.   Yes.  "Question:  Who was the first such

13  resident" -- excuse me, "to show up?"

14           "Answer:  The children.

15           "Question:  At what point in the story did they

16  show up?

17           "Answer:  I can't tell you a specific time.

18           "Question:  When did you first see them?

19           "Answer:  After Mr. Mial had been tased and laying

20  on the ground.

21           "Question:  Did either of them say anything or

22  shout anything to -- any --

23           "Question:  Did either of them say anything or

24  shout anything or cry anything?

25           "Answer:  They were screaming."

1    Q.   Now, that was what you testified to in November --

2    on November 10th, 2011, correct?

3    A.   Correct.

4    Q.   Okay.  And any reason to doubt the fact that they

5    were screaming upon your reading of that?

6    A.   Correct.

7    Q.   Is there a reason to doubt that?

8    A.   No.

9    Q.   Okay.  Mrs. Mial ever show up?

10   A.   A female did.

11   Q.   Okay, was she screaming as well?

12   A.   I don't know if screaming.

13   Q.   What do you know?

14   A.   She was making noises.  I don't know whether she

15   was saying words or making noises.  I don't recall that.

16   Q.   Let me ask you to now look at page 242.  And, I'd

17   like you to read -- actually, if you just read to

18   yourself lines 17 through 22 and see if that refreshes

19   your recollection.

20        Does that refresh your recollection?

21   A.   Yes.

22   Q.   Okay.  I'm going to ask again, was Mrs. Mial

23   screaming?

24   A.   Yes, it says she was screaming.  I can't recall

25   what she was saying.

1    Q.  So, after this event when there was -- was a calm

2    household.  You go in.  You tase somebody, and all the

3    people in the house are screaming; is that correct?

4          MR. FRANCUZENKO:  Objection to the form, Your

5    Honor, hypothetical.

6          MR. PLOFCHAN:  I'm asking in this house.

7    It's not a hypothetical.

8          THE COURT:  Overruled.

9          THE WITNESS:  Correct.

10   BY MR. PLOFCHAN:

11   Q.  Okay.  Now, isn't it -- Marshal, may I have that?

12   Thank you.

13         Now, isn't it also true that it wouldn't have

14   mattered if Mr. Mial had come to the door and been polite

15   as Mr. Manners or Ms. Manners or Mary Poppins, he would

16   have said, officer, I -- you were going into that house.

17   It didn't matter what his tenor was; is that correct?

18   A.  That's not correct.

19   Q.  So, the tenor did matter?

20   A.  What I had stated is if he had brought the people

21   to the front door, then we would not have had to enter

22   the residence.

23   Q.  You also said he was -- he had been loud, correct?

24   A.  Correct.

25   Q.  So, if he had not been loud, he had just calmly

1  said, I'm sorry, I'm not going to do this, you still

2  would have gone in, correct?

3     A.   Right.

4     Q.   So, his being loud had nothing to do with whether

5  or not you were going in, correct?

6     A.   Correct.

7     Q.   And, whether he was in an argument with you or not

8  had nothing to do with whether you were going in,

9  correct?

10    A.   Correct.

11    Q.   Okay.  Now, isn't it a fact that you knew you had

12 violated Mr. Mial's Fourth Amendment rights and really

13 didn't have any basis to seize, arrest him, or tase him?

14    A.   I disagree.

15    Q.   And isn't it a fact that you knew that and as a

16 consequence, you and the other officers decided to charge

17 him with criminal charges so that it would deflect away

18 from your actions?

19    A.   That's incorrect.

20    Q.   And, isn't it a fact that you gave a sworn

21 complaint to the magistrate about what allegedly occurred

22 that day?

23    A.   Correct.

24    Q.   Let me ask you to take a look at this exhibit.

25         MR. PLOFCHAN:  I'm sorry.  Can

1    Mr. Francuzenko see that first?

2           MR. FRANCUZENKO:  He's saying he is going to

3    use it to refresh her recollection, but is there a

4    question pending?

5           MR. PLOFCHAN:  I agree.  I'm out of order.

6    I'll do that first.  Thank you.  I withdraw the previous

7    question.

8    BY MR. PLOFCHAN:

9    Q.  Now, Deputy, isn't it a fact when you went to

10   swear testimony in front of the magistrate, you never

11   told the magistrate that there was a call and that

12   somebody had reported having put the knife away?

13   A.  I don't remember what was in my affidavit that I

14   filled out for the magistrate.

15   Q.  Okay.

16          MR. FRANCUZENKO:  The basis for my objection,

17   Your Honor, is relevance.  There is no false arrest claim

18   in this case.

19          MR. PLOFCHAN:  There's --

20          THE COURT:  Is that a statement about -- that

21   was signed by her?

22          MR. FRANCUZENKO:  Yes.

23          THE COURT:  All right, objection overruled.

24   BY MR. PLOFCHAN:

25   Q.  Would you agree that you don't make any statement

1    with respect to -- that the knife had been put away?

2        A.   I have -- can I take a moment and finish?

3        Q.   Oh, I'm sorry, certainly.  Let me know when you're

4    finished reading it.

5        A.   Yes, sir.  What was your question?

6        Q.   My question was, isn't it a fact that you never

7    told the magistrate in your signed complaint that there

8    had been -- that the call ended with someone saying that

9    the knife had been taken away?

10       A.   Correct.

11       Q.   And, you never informed the magistrate that the

12   dispatcher had called back and confirmed that the

13   complainant said that the situation was under control?

14       A.   Correct.

15       Q.   Okay.  And, that you never told the magistrate

16   that you and Ferguson and Holloway and others had made

17   the determination to go into the property despite never

18   seeking a warrant?

19       A.   Correct.

20       Q.   And, you never told the magistrate that there was

21   an emergency?

22       A.   I believe saying that somebody was armed with a

23   knife would be an emergency.

24       Q.   Now, you told the magistrate that somebody was

25   armed with a knife.  Is that what you told the

1    magistrate?

2       A.   That's what's written on the sheet.

3       Q.   Okay.  You had no information at that time when

4    you went up and made entry into the house that anyone was

5    armed with a knife, did you?

6       A.   No factual information.

7       Q.   Okay.  So, you lied under oath to the magistrate,

8    didn't you?

9       A.   No, sir.

10      Q.   Okay.  And then you also told -- that you never

11   told the magistrate that you requested to enter the

12   house, correct?

13      A.   Correct.

14      Q.   And, you -- because you didn't request to enter

15   the house is your position, correct?

16      A.   Correct.

17      Q.   Okay.  And then you then tested -- or told the

18   magistrate that Mr. Mial attempted to shut the door and

19   the door was forced open, correct?

20      A.   Correct.

21      Q.   Okay.  And that he attempted to shut the door on

22   you and Deputy Ferguson, correct?

23      A.   Correct.

24      Q.   That never happened either, did it?  He didn't

25   attempt to shut the door on you.  He just attempted to

1    shut the door, correct?

2        A.   Shut the door while we were standing there.  He

3    shut the door on us.

4        Q.   Well, you were 3 feet away, so it wasn't like he

5    was pushing you with the door on you, right?

6        A.   The door was shutting.

7        Q.   I didn't ask that.  Was the door being pushed on

8    you?

9        A.   When we were coming through the residence, yes.

10       Q.   But, when Mr. Mial started to close the door,

11   according to you, were you anywhere -- you said before

12   you were 3 feet away and weren't touching the door,

13   correct?

14       A.   Correct.

15       Q.   And so the door wasn't being pushed on you at that

16   point, correct?

17       A.   Physically, no.

18       Q.   You didn't tell that to the magistrate, did you?

19       A.   Correct.

20       Q.   You didn't tell the magistrate that you weren't

21   aware of any crime that had been admitted, did you?

22       A.   At that time prior to, no.

23       Q.   Okay.

24       A.   After that.

25       Q.   And, you didn't tell the magistrate that you had

1  no knowledge of who was in the house, did you?

2     A.  No.

3     Q.  And, you didn't tell the magistrate that you

4  didn't know if anyone -- that there was no crime being

5  committed and you had no facts to support that any crime

6  had not been committed, correct?

7     A.  Correct.

8     Q.  And you didn't -- and then, you told the

9  magistrate that the subject shoved Deputy Ferguson and

10  yourself, correct?

11     A.  Correct.

12     Q.  That's a lie, isn't it?

13     A.  No.

14     Q.  Your testimony today and your testimony in April

15  and November was that you came through and ran smack into

16  him?

17     A.  Correct.

18     Q.  You didn't testify that he shoved you first?

19     A.  He was shoving us backwards.

20     Q.  That's not what it says.  You wrote under a sworn

21  testimony to the magistrate "the subject shoved Deputy

22  Ferguson and myself.  He then grabbed us and began to

23  become assaultive".

24         Isn't that what you wrote?

25     A.  Correct.

1    Q.   Those facts that you told a magistrate in order to

2    get him charged with a felony and two misdemeanor didn't

3    happen, did they?

4    A.   They did happen.

5    Q.   You --

6    A.   A summary of the events.  That's not every event

7    that occurred.

8    Q.   You did not testify that he shoved you and you

9    didn't testify that he grabbed you and began to be

10   assaultive, correct?

11   A.   That's a summary of the events.  It's not

12   everything that happened.

13   Q.   You knew that it -- you knew that you had not

14   recognized Mr. Mial's rights under the Fourth Amendment

15   by your actions, correct?

16   A.   I disagree.

17   Q.   You also knew that if you brought charges against

18   Mr. Mial that the fact that you didn't recognize his

19   Fourth Amendment rights would be -- that the whole issue

20   would be compounded, correct?

21   A.   You would have to break that down.  That's --

22   Q.   You knew that by charging him that he was going to

23   have to deal with that before he could deal with the fact

24   that you violated his Fourth Amendment rights?

25   A.   I knew that he would have to deal with the fact

1    and go to court based on the charges, yes.

2       Q.    And you knew that the magistrate, based on the way

3    you wrote this, would likely issue criminal charges, two

4    misdemeanor and a felony against Mr. Mial for you

5    entering his house, correct?

6       A.    Correct.

7       Q.    And, yet you -- and then you deliberately omitted

8    any references in this written report to anything that

9    suggested that you were not able to go into that house.

10   Correct?

11      A.    No, that's incorrect.

12      Q.    Well, what was your justification for not telling

13   the magistrate that the knife was no longer with

14   anybody -- in anyone's possession?

15      A.    The application for a warrant is a summary of all

16   events that occur.  I can't write every single event that

17   occurs.

18      Q.    Can you tell me your justification as to why said

19   someone was armed with a knife when you knew that was a

20   material falsehood?

21      A.    Again, it is a summary of all the information.  It

22   is not -- every single fact is not placed in the warrant.

23      Q.    But, lies cannot be placed in the warrant, can

24   they?

25      A.    No.

1    Q.   And, it was a material falsehood, a lie, that you

2    had any knowledge that anyone at the time was armed with

3    a knife, correct?

4    A.   It states I responded to a call saying that

5    somebody was armed with a knife.  That is why I

6    originally responded to the call.

7    Q.   Isn't it also a factual misstatement that -- or

8    omission that the subject shoved you and himself and then

9    grabbed you when you ran into him?

10   A.   I disagree.  We --

11   Q.   How did you choose -- why did you choose to say it

12   that way instead of the way you chose today?  Wasn't it

13   so that you would be successful in getting a warrant and

14   that Mr. Mial would have to deal with that and not deal

15   with the fact that you illegally entered his house?

16   A.   No, that's incorrect.

17   Q.   Can you tell me the justification for you not

18   telling the magistrate that you had no facts that there

19   was anyone in the house other than the children and that

20   there were no facts that anyone was armed, dangerous, or

21   that any crime had occurred?

22   A.   It's a summary of the events.

23   Q.   So -- but, in that summary when you know the

24   purpose is to charge someone, you get to select those

25   things you want the magistrate to know and those things

1  you don't want the magistrate to know because you're

2  writing the summary, right?

3      A.   When you write the affidavit for it --

4      Q.   Yes or no, ma'am.

5      A.   I'm trying to answer your question, sir.

6      Q.   All right.

7      A.   When you write the summary for the affidavit, you

8  do include the details for the -- the crimes that you are

9  charging, yes.

10     Q.   Okay.  And, you understand that the magistrate is

11 supposed to be a neutral and detached judicial officer

12 because sometimes you write a complaint and he says

13 you're wrong, there's no complaint, correct?

14     A.   Correct.

15     Q.   And, you didn't give him any of the facts that he

16 could use to say that there was no complaint, correct?

17     A.   I gave him the facts on that.  I did not -- it's a

18 summary of the event.

19     Q.   You didn't give him any of the facts that occurred

20 that would have shown Mr. Mial wasn't involved in a

21 crime, correct?

22     A.   Correct.

23     Q.   Ultimately, the Circuit Court of Loudoun County

24 dismissed all these charges because they found that you

25 entered the house --

1          MR. FRANCUZENKO:  Your Honor, I'm going to

2     object.  I -- what -- the outcome of the charges are is

3     not relevant to this case.  He's also going to make a

4     comment about a court ruling which there is a pending

5     objection on, and I think it's inappropriate for that to

6     be introduced.

7          THE COURT:  All right.  I'll sustain the

8     objection now.  We'll take that matter up during the

9     luncheon recess.

10          MR. PLOFCHAN:  Yes, sir, thank you.

11          Your Honor, subject to that matter, that's

12     all the questions I have for Ms. Forsch.

13          THE COURT:  All right.

14          MR. FRANCUZENKO:  Counsel was going to give

15     me that one transcript, I believe.

16                    CROSS-EXAMINATION

17     BY MR. FRANCUZENKO:

18     Q.  Deputy Forsch, let's just start with a couple of

19     things that Mr. Plofchan was asking you about.  When you

20     go before a magistrate, that's not a full-blown trial, is

21     it?

22     A.  No, sir.

23     Q.  You're not there giving every single detail of

24     events of the evening, are you?

25     A.  Correct.

1     Q.  You're expressing the facts which support the

2   basis for a warrant that you're attempting to obtain,

3   correct?

4     A.  Correct.

5     Q.  And, in fact, the affidavit isn't the only thing

6   that the magistrate considers, is it?

7     A.  Correct.

8     Q.  Does the magistrate ask you questions?

9         MR. PLOFCHAN:  I'm going to object, Your

10   Honor, to the extent that generally may occur.  We're

11   objecting it's not specifically in this case.

12         THE COURT:  Sustained.  You can ask questions

13   about this case.

14   BY MR. FRANCUZENKO:

15     Q.  In this case, besides the affidavit, did you also

16   have an interchange with the magistrate on what happened?

17     A.  I did, yes.

18     Q.  Okay.  And, in fact, wasn't he -- at one point

19   even Mr. Mial present during the exchange with the

20   magistrate?

21     A.  Yes.

22     Q.  And, at one point, did the magistrate -- well,

23   strike that.  At one point, was Mr. Mial removed from the

24   magistrate's office because of his behavior?

25         MR. PLOFCHAN:  Your Honor, I'm going to

1   object to this line of questioning.  The issue is what is

2   the -- the issue before the jury is the actions of the

3   deputy and the reasonableness of those actions, not what

4   Mr. Mial did or the magistrate did.  The purpose of that

5   was only discussed, what she -- and how she recorded what

6   she had done.

7             THE COURT:  I understand the objection as it

8   relates to what Mr. Mial did.  The only question here is

9   what interchange she had with the magistrate and what she

10  put in the affidavit.

11            Go ahead from there.

12  BY MR. FRANCUZENKO:

13    Q.  But beyond the affidavit, you did have a

14  conversation with the magistrate as it relates to what

15  happened that evening?

16    A.  Correct.

17    Q.  Okay.  Now, let's talk about arresting Mr. Mial.

18  When you went into the home at that point, was it your

19  intent to arrest Mr. Mial?

20    A.  No, sir.

21    Q.  Okay.  The crime he was charged with were as a

22  result of his actions after you were in the home,

23  correct?

24    A.  Correct.

25    Q.  So, in terms of the whole issue about getting a

1    warrant, you weren't going to get any kind of warrant for

2    his arrest, because at that point, you weren't going to

3    charge him with any crimes?

4        A.   Correct.

5        Q.   And if you had pushed in that door and there was

6    no additional contact with him after that, would you

7    have had a basis to charge him with assault on a law

8    enforcement officer?

9             MR. PLOFCHAN:  Your Honor, I going to object.

10   I understand it's cross-examination, but she was an

11   adverse party in this case, and I -- and Mr. --

12            THE COURT:  The objection is leading?

13            MR. PLOFCHAN:  Yes, sir.

14            THE COURT:  Objection sustained.

15            MR. FRANCUZENKO:  Your Honor, just for the

16   record, I think I'm entitle to do that.  Regardless of

17   whether she's an adverse witness or not, I think

18   cross-examination permits me to do that.

19            THE COURT:  I ruled to the contrary.  You

20   cannot lead this witness.  Go ahead.

21            MR. FRANCUZENKO:  Thank you, Your Honor.

22   BY MR. FRANCUZENKO:

23       Q.   The -- if Mr. Mial did not resist and did not

24   struggle, would you have arrested him?

25            MR. FRANCUZENKO:  Objection, speculation,

1    Your Honor.

2            THE COURT:  Sustained.

3    BY MR. FRANCUZENKO:

4       Q.  Did Mr. Mial resist and struggle after you came in

5    the house?

6       A.  Yes.

7       Q.  Okay.  Was that the basis for your seeking the

8    arrest warrant?

9       A.  Yes, it was.

10      Q.  And, did you, while you were in the house, did you

11   have control of Mr. Mial at any time?

12      A.  No, I did not.

13      Q.  And I'm talking about prior to the Taser.

14      A.  Correct.

15      Q.  And, were you in fear of your safety at that --

16   during that period?

17      A.  I was, yes.

18      Q.  Okay.  And the question was asked you about

19   authority to -- to use force on somebody even if you

20   initiate the force.  If somebody escalates the force, are

21   you entitled to respond?  Do you have legal authority for

22   that?

23           MR. PLOFCHAN:  Objection, hypothetical.

24   Calls for -- I'm not going to say legal conclusion, but

25   it's a hypothetical and either not related to this case.

```
1            THE COURT:  If you would focus on this case.
2   Objection sustained.
3   BY MR. FRANCUZENKO:
4      Q.  In this case, you testified earlier that when you
5   became in through the door that there was some contact
6   with Mr. Mial, correct?
7      A.  Correct.
8      Q.  All right.  At that point, was there additional
9   contact in terms of him grabbing you?
10           MR. PLOFCHAN:  Objection, again leading, Your
11  Honor.  Suggests the answer.
12           THE COURT:  The question's leading.
13  Objection sustained.
14  BY MR. FRANCUZENKO:
15     Q.  What happened after the initial contact?
16     A.  Mr. Mial grabbed a hold of me.
17     Q.  Did you view that as an escalation of the force?
18           MR. PLOFCHAN:  Objection again.  Leading,
19  Your Honor.
20           MR. FRANCUZENKO:  That's a --
21           THE COURT:  Questions that begin "did you"
22  suggest the answer.  Objection is sustained.
23  BY MR. FRANCUZENKO:
24     Q.  What was your view of that -- of him taking that
25  action?
```

1    A.   That he was escalating the situation more.

2    Q.   And, did you respond to that?

3    A.   Yes, I did.

4    Q.   And, did the other deputies in your -- in your

5    observation respond to that?

6    A.   Yes, they did.

7    Q.   And, were you able to see what everybody else was

8    doing at that time?

9    A.   Not every moment, no.

10   Q.   Were you able to hear Deputy Ferguson?

11   A.   Yes, I was.

12   Q.   And, what -- what was Deputy Ferguson saying?

13   A.   He kept saying "stop resisting, stop resisting".

14   Q.   Were those verbal commands followed by Mr. Mial

15   before the Taser was deployed?

16   A.   No, sir.  They were not.

17        MR. PLOFCHAN:  Objection to the form of the

18   question as to whether they were legal commands.

19        MR. FRANCUZENKO:  Your Honor --

20        THE COURT:  Overruled, overruled.

21   BY MR. FRANCUZENKO:

22   Q.   I'm sorry.  Can you answer the question.

23   A.   No, sir, they were not.

24   Q.   Okay.  And at any point before the Taser was

25   deployed, did you have control of Mr. Mial or the

1  situation?

2      A.  No, I did not.

3      Q.  What happened after the Taser was deployed?

4      A.  It worked as it was supposed to do, and Mr. Mial

5  laid on the ground.

6          MR. PLOFCHAN:  She could say what she

7  observed, not what she expected to happen.

8          THE COURT:  Objection is overruled.

9          MR. FRANCUZENKO:  Go ahead.  You can finish

10  your question -- I'm sorry, finish your answer.

11          THE WITNESS:  The Taser worked as it was

12  supposed to do and Mr. Mial ended up on the ground.

13  BY MR. FRANCUZENKO:

14      Q.  Okay.  And, at that point, were you able to --

15  well, strike that.

16          At any point, did you strike Mr. Mial?

17      A.  No, sir.

18      Q.  And now, I'm talking about not just the struggle,

19  the 30-second struggle, but any time afterwards?

20      A.  No, sir.

21      Q.  At any point did you observe anybody strike

22  Mr. Mial?

23      A.  No, sir.

24      Q.  Did you observe anybody kick Mr. Mial?

25      A.  No, sir.

1    Q.   Did you observe anybody knee Mr. Mial?

2    A.   Yes, sir.

3         MR. PLOFCHAN:  Objection, Your Honor, to the

4    form of question.  He can ask what she observed, not go

5    through a litany of potential hypotheticals.

6         THE COURT:  I understand why you want to

7    cross-examine this witness.  But, questions that suggest

8    the answer are leading.  And as I just said to you a

9    moment ago, questions that begin "did you" are leading.

10   Objection sustained.

11   BY MR. FRANCUZENKO:

12   Q.   Other than handcuffing Mr. Mial after he was

13   tased, did you use any additional force on Mr. Mial?

14   A.   No, sir.

15   Q.   Let's go back to this transcript that Mr. Plofchan

16   was questioning you about.  You remember him asking you

17   questions about the cad reports?

18   A.   Yes.

19   Q.   And he was asking you questions about -- page 16.

20   Mr. Plofchan was asking you specific questions about

21   whether you had reviewed the cad reports after -- I'm

22   sorry, before you got to the Mial's home, correct?

23   A.   Correct.

24   Q.   And, that whole line of questioning was that --

25   dealt with whether or not you had reviewed those cad

1    reports before you got to the home, correct?

2        A.   Correct.

3        Q.   Can you please read from the beginning of page 16

4    the lines that Mr. Plofchan did not have you read.

5                THE COURT:  What line numbers are those?

6                MR. FRANCUZENKO:  Number one, starting with

7    number one on page 16.

8                THE COURT:  All right.

9                THE WITNESS:  Number one on 16.

10               "Answer:  We received the --

11               "Question:  Today, have you reviewed anything

12   before your testimony?

13               "Answer:  Yes.

14               "Question:  You said you reviewed your

15   report, correct?

16               "Answer:  Yes, I did.

17               "Question:  Did you review any officer --

18   other officers' reports?

19               "Answer:  No, I did not.

20               "Question:  Do you know what a cad printout

21   is?

22               "Answer:  I know what they are yes.

23               "Question:  Did you review that?

24               "Answer:  I do not have that, no.

25               "Question:  Okay.  Do you remember what came

1    over as the cad computer --"

2      Q.   That's enough.  The whole premise of those lines

3    of questioning is what you reviewed that day, correct?

4      A.   Correct.

5      Q.   Okay.  At any point in that hearing or in any

6    deposition have you ever testified that you reviewed cad

7    reports prior to getting to the Mial home?

8           MR. PLOFCHAN:  I'm going to object to the

9    form of the question, Your Honor.  The statement in

10   impeachment evidence speaks for itself.  And this would

11   be a -- I think it's an improper question asking if she'd

12   ever done that.

13          If there is a specific sentence where he

14   wants to address it, he can, but not to ever say it when

15   the statement actually speaks for itself and he says

16   something to the contrary.

17          THE COURT:  Objection overruled.

18          MR. FRANCUZENKO:  You can answer the

19   question.

20          THE WITNESS:  I'm sorry.  Can you repeat it

21   one more time.

22   BY MR. FRANCUZENKO:

23     Q.   Have you ever stated in any deposition or hearing

24   or trans -- any transcript that you're aware of that you

25   had reviewed the cad notes prior to arriving at the Mial

1    home on February 14th, 2010?

2        A.   No, sir.

3        Q.   And, it doesn't say that in that transcript, does

4    it?

5             MR. PLOFCHAN:  Objection, Your Honor.  The

6    document would speak for itself.

7             THE COURT:  Objection overruled.

8    BY MR. FRANCUZENKO:

9        Q.   It doesn't say it in that transcript, does it?

10            MR. PLOFCHAN:  Objection, leading.

11            THE COURT:  You stand what you're objecting

12   in this courtroom.

13            MR. PLOFCHAN:  I'm sorry, I apologize.  I

14   object as leading.

15            THE COURT:  Objection overruled.

16            THE WITNESS:  No, it does not.

17   BY MR. FRANCUZENKO:

18       Q.   Now, Deputy Forsch, how old are you?

19       A.   Currently or back then?

20       Q.   Currently.

21       A.   Thirty-six.

22       Q.   So, what does that make your age at the time of

23   the incident?

24       A.   Thirty-one.

25       Q.   And, when did you start working for the Loudoun

1   County Sheriff's Office?

2       A.   In 2007.

3       Q.   And, what year did you start patrol?

4       A.   2008.

5       Q.   And, how long were you actually on patrol?

6       A.   About 2 years.

7       Q.   Okay.  And, what was your next position after

8   patrol?

9            MR. PLOFCHAN:  Objection, relevance, Your

10  Honor.

11           THE COURT:  Is there -- can you set a

12  timeframe for us, Mr. Francuzenko, a timeframe.

13           MR. FRANCUZENKO:  A timeframe for --

14           THE COURT:  That's related to this case.

15  This case occurred in 2010.  If you want to go to 2010,

16  go ahead.

17  BY MR. FRANCUZENKO:

18      Q.   Let's narrow it down a little bit.  In 2008 you

19  started on patrol, correct?

20      A.   Correct.

21      Q.   Okay.  And then, you remained on patrol until

22  about when?

23      A.   Probably 2012.

24      Q.   Okay.  So, a total of 4 years?

25      A.   I'm sorry, yes.

1    Q.  All right.  And, you had been on patrol

2    approximately 2 years, is that correct, at the time of

3    this incident, correct?

4    A.  Correct.

5    Q.  Now, yesterday you were asked a lot of

6    hypotheticals and abstracts about the orders and so

7    forth.  What I'd like to do today is focus on actually

8    what happened that day.

9        And my question is were you assigned -- were you

10   on duty that day, February 14th, 2010?

11   A.  Yes, I was.

12   Q.  And, you were on duty?  You were in full uniform?

13   A.  Correct.

14   Q.  And can you explain to the jury what your

15   responsibility was that evening.

16   A.  I was assigned to patrol.  And the way that it

17   works is everyone is assigned to a specific sector within

18   the substation that you work.

19   Q.  Okay.  And, which sector was your assignment that

20   day?

21   A.  Mine was 350, it's the middle of Ashburn.

22   Q.  And does that include where the Mial residence

23   was?

24   A.  Yes, it did.

25   Q.  And, did there come a time when you received a

1   call regarding the Mial residence?

2       A.   Yes, there was.

3       Q.   And, can you tell the jury how that works and what

4   actually happened as far as your response to that call?

5       A.   When a call is placed for service, if it is in

6   your sector, then you --

7               MR. PLOFCHAN:   I'm going to object to the

8   general state, Your Honor.   She can say what she did with

9   regard to this case.   What might be a general practice is

10  not subject -- is not an issue for this matter.

11              THE COURT:   That's what he just asked about,

12  the Mial residence.   Objection overruled.

13              THE WITNESS:   When you are assigned to a

14  sector, that's your sector and if you're available for a

15  call, you're automatically sent that call as the

16  primarily deputy.

17  BY MR. FRANCUZENKO:

18      Q.   And did that happen here in the Mial case?

19      A.   Yes, it did.

20      Q.   Was there anybody called for backup to assist you?

21      A.   Yes, there was.

22      Q.   And who was that?

23      A.   It was Deputy Ferguson.

24      Q.   And, do you know what sector he was assigned to

25  that particular day?

1       A.   That I do not.

2       Q.   Now, at that point, going to the Mial home, what

3  information were you relying on?

4       A.   Dispatch was giving us information.

5       Q.   And, did that include the address?

6       A.   Yes, it did.

7       Q.   And did that include a summary of the call?

8       A.   Yes, it did.

9       Q.   At any time did you have an opportunity to hear

10 the actual calls, the 911 calls before going to the home?

11      A.   No, I did not.

12      Q.   All right.  And generally speaking, do you get an

13 opportunity for that to happen?

14      A.   No, we do not.

15      Q.   Now, Mr. Plofchan asked you a lot of questions

16 yesterday about facts.  What's your definition of facts?

17      A.   My fact is something I know firsthand that I've

18 been able to verify.

19      Q.   Okay.  So, when you were answering his questions

20 about facts, that was the context of what your responses

21 were, correct?

22      A.   Correct.

23      Q.   And, at the time that you initially arrived at the

24 Mial home, is there anything that you knew firsthand or

25 with any certainty?

1    A.   No, sir.

2    Q.   Okay.  At that point, the only information you had

3  was the dispatch?

4    A.   Correct.

5    Q.   Now, if you had known for a fact that there was

6  either a crime committed or someone injured or someone

7  about to injure, would you have gone through the steps of

8  just knocking on the door and having the original

9  conversation with Mr. Mial?

10           MR. PLOFCHAN:  Objection, hypothetical, Your

11  Honor.

12           THE COURT:  Sustained.

13           MR. FRANCUZENKO:  Your Honor, can we

14  approach?

15           THE COURT:  Sure.

16           (Thereupon, the following side-bar conference

17  was had.)

18           MR. FRANCUZENKO:  Your Honor, the Court even

19  acknowledged I'll have an opportunity to rehabilitate

20  this witness on various issues.  There were various

21  hypotheticals and abstract questions that were being

22  asked during the course of yesterday's question -- direct

23  examination.

24           Not one -- I think I'm entitled to use

25  leading questions to help rehabilitate this witness

1    because that's exactly what I'm trying to do at this

2    point.

3              Number two, the whole issue about did you

4    have a -- did you know for sure, or did you have a -- did

5    you know for a fact that someone was injured in the house

6    was a question that was asked on direct and now I'm

7    trying to rehabilitate and address that particular area

8    of questioning.

9              So, I mean, you can't have it both ways in my

10   view.

11             MR. PLOFCHAN:  Your Honor, in response, the

12   charges before -- with regard to this are violation of

13   Fourth Amendment and excessive force.  The subject's

14   intent or the subject's subjective belief of the officer

15   are not relevant, what an objective reasonable officer

16   knows.

17             The only thing that we have that is relevant

18   for the jury to decide is not what she normally does, not

19   what her stand would be.  What did she do that day and

20   what facts did she possess to rely on when she did.  That

21   standard is not oh, I intended to be helpful and so

22   forth.  If she violated the Fourth Amendment, then she

23   violated the Fourth Amendment.

24             Contrary to what Mr. Francuzenko says is, you

25   know, what does she normally do, or I think the question

1    is phrased in this case, what would you -- what was the

2    exact phrasing of the question that you had asked?  It

3    was along the lines of what do you normally do?  If you

4    have in the past, have you been able to do this?

5              That's not only irrelevant, but it's

6    designed, in cross-examination, to confuse the jury

7    because the issue is what did she know and when did she

8    do what she did based on what she knew at that time.

9    And, that's what the -- the only issue for the jury to

10   consider.

11             THE COURT:  I'm going to overrule the

12   objection because she just testified to the facts I think

13   that she knows, that she saw, or that were verifiable.

14   The issue here is what facts she had before she entered

15   the residence.

16             If you want to question her about those

17   facts, you can.  If you want to question her about what's

18   in her mind when she acted on the absence of facts, you

19   can.

20             MR. FRANCUZENKO:  Thank you.

21             MR. PLOFCHAN:  Your Honor, before we go, may

22   I -- sorry.

23             Your Honor, I had another question with

24   regard to just the -- in terms of -- it appears to me

25   that her definition of a fact is something that she has

1  verified is not a legal definition.  I -- I know that I

2  did not object when -- or move to strike that answer in

3  terms of that.

4        I didn't -- I would like to ask the Court if

5  it would instruct the jury that this is only her

6  definition of the fact and not what a fact is.

7              THE COURT:  Absolutely not.

8              MR. PLOFCHAN:  I understand.

9              THE COURT:  That jury is going to decide what

10  they think she said.  Absolutely not.

11              (THEREUPON, side-bar conference was

12  concluded.)

13              THE COURT:  You may proceed.

14              MR. FRANCUZENKO:  Thank you, Your Honor.

15  BY MR. FRANCUZENKO:

16  Q.  Going back to my line of questioning regarding

17  facts, and again, this is a follow up on what Mr.

18  Plofchan asked you yesterday.

19        Did you know for a fact at the time when you

20  arrived at that home and you had your first interaction

21  with Mr. Mial, that someone had -- that a crime had been

22  committed in the home?

23  A.  I did not have a fact.

24  Q.  Okay.  Did you know for a fact that someone was

25  intending to harm themselves or harm someone else at that

1  home?

2     A.   No, I didn't.

3     Q.   And did you know for a fact someone was actually

4  injured in that home?

5     A.   No, I didn't.

6     Q.   Let's talk about what did happen then in terms of

7  what you did and Mr. Mial's response.

8          You were there to investigate based on the

9  original call?

10            MR. PLOFCHAN:   Objection, to the question,

11  Your Honor.   Object to the form.

12  BY MR. FRANCUZENKO:

13     Q.   Why were you at the Mial home?

14     A.   To investigate the original call placed for

15  service.

16     Q.   And had you ever been to the Mial home before?

17     A.   No, I had not.

18     Q.   Have you ever met Mr. Mial before?

19     A.   No, I had not.

20     Q.   Did you know who Mrs. Mial was?

21     A.   No, I did not.

22     Q.   Did you have any knowledge of what her race is

23  before you got to the home?

24     A.   No, huh-un.

25     Q.   Now, what happened when you got to the door?   What

1    happened when you first encountered Mr. Mial?

2       A.   I knocked on the front door.  Quickly, the front

3    door opened, and a gentleman standing in the doorway

4    stated that he had told us that he no longer needed our

5    assistance.  He had canceled the call.

6       Q.   Okay.  I don't want to lead you.  Please tell the

7    jury as much detail and as you can, as to what happened

8    during that first encounter.

9       A.   Okay.  After he had told me that he had canceled

10   the call, I informed him -- I said I have to check the

11   welfare -- I'm sorry.  I am required to come and

12   investigate what had happened.  Who had the knife?

13         He became immediately upset at me.  He began to

14   yell and state that it was none of my business.  I asked

15   who was at the residence.  He stated again it was none of

16   my business.  He wasn't going to talk to me.  He had

17   placed the call.  He had canceled the call already.  He

18   did not need me whatsoever.

19         I again tried to tell him I just need to make sure

20   everyone at the residence is okay.  Is anyone else here?

21   He started to scream that he has called the Sheriff's

22   Office before when his house was toilet papered, when it

23   was egged, and when his builder was harassing him and the

24   Sheriff's Office would not conduct any investigation when

25   he had called for service.

1          At that time, I had seen in the background two

2     children come down the stairs, and disappear around the

3     corner, away from the front door.

4          I again asked him could he have everyone in the

5     residence come to the door.  He continued to scream over

6     what I was saying.

7     Q.   Okay.  At some point, did Deputy Ferguson arrive?

8     A.   He did, yes.

9     Q.   And did he join you at the door?

10    A.   He did, yes.

11    Q.   Did you hear Deputy Ferguson say anything?

12    A.   Deputy Ferguson didn't speak.

13    Q.   And we're talking about the first encounter now?

14    A.   Correct.

15    Q.   Is there anything else that you can recall as to

16    what happened at the first encounter?

17    A.   Mr. Mial -- I'm sorry.  Mr. Mial, he was so upset.

18    He was visibly shaking as I was trying to speak with him

19    and he was just going on a tyrant about calls that he had

20    placed before and we had not helped him.

21    Q.   Did Mr. Mial answer any of your questions?

22    A.   No, he did not.

23    Q.   Did he even identify what his name was?

24    A.   No, he did not.

25    Q.   Did he ever give you any information about what

1    happened with that knife?

2       A.   No, he did not.

3       Q.   Did you ask him?

4       A.   I did.

5       Q.   How did the -- and, can you tell the jury -- put

6    it in context for the jury, how long this exchange

7    transpired?

8       A.   Approximately 2 to 3 minutes.

9       Q.   How did it end?

10      A.   He ended up shutting the door.

11      Q.   And, at the conclusion of this exchange, did you

12   have more questions and answers at that --

13              MR. PLOFCHAN:  Objection, Your Honor, to the

14   form of the question and as well as leading in this

15   regard.  It suggests the answer.

16              THE COURT:  Use of "did you" suggest the

17   answer.  If you can ask a non-leading question.

18   Objection sustained.

19              MR. FRANCUZENKO:  Thank you, Your Honor.

20   BY MR. FRANCUZENKO:

21      Q.   Can you describe to the jury what if any concerns

22   you had at that point when Mr. Mial closed the door.

23      A.   I was concerned.  I was concerned with his

24   behavior because he was extremely upset and irate.  I was

25   concerned that he wouldn't tell me who he was.  I

1    couldn't verify that he actually lived at the house.  I

2    didn't know his name.  I didn't know who he was.  I did

3    not know if anyone else was in the residence besides the

4    two children that I had seen.  I didn't know if anyone

5    had used the knife.  And I didn't know if the person was

6    no longer armed with a knife, how that person was

7    disarmed.

8         Q.   And, how would you describe his behavior during

9    that exchange?

10        A.   Completely irate.

11        Q.   Now, are all of these circumstances that you

12   factored into your decision ultimately to make the entry?

13        A.   Yes.

14             MR. PLOFCHAN:  Objection, leading.

15             THE COURT:  Sustained.

16   BY MR. FRANCUZENKO:

17        Q.   What did you do next?

18        A.   Once the door shut, Deputy Ferguson and I walked

19   down the end of the driveway and he called Sergeant

20   Holloway.

21        Q.   How did he call?  Was it over the radio or some

22   other method?

23        A.   Deputy Ferguson had a department-issued cellphone.

24   So he called her on his cellphone.

25        Q.   And why did he call her, if you know?

1     A.   Because I didn't have a department cellphone.

2     Q.   But what was the purpose for you all to call her?

3     A.   To call her to let her know what had happened at

4  the door and see what she would like us to do at this

5  point.

6     Q.   Okay.  You did not -- well, strike that.

7          At some point, did Deputy Holloway arrive?

8     A.   Yes, she did.

9     Q.   And, what if anything did you all tell Deputy

10 Holloway?

11    A.   We had told her what had happened at the front

12 door.  I can't remember exactly what words we had told

13 her.  We had given her just -- and she had stated that

14 we're going to go back up to the door, that we needed to

15 make contact.

16              MR. PLOFCHAN:  Objection, hearsay.

17              THE COURT:  Sustained.

18 BY MR. FRANCUZENKO:

19    Q.   Let's stick with the substance of what you all

20 told her.  Did you -- again, tell the jury what you told

21 Deputy Holloway.

22    A.   I can't remember word for word what was said.  I

23 explained how he would not answer any questions as to who

24 had the knife, who he was, who was in the residence.  And

25 I could not verify any information.

1    Q.   Okay.  What -- what actions did you all take next?

2    A.   We went back up to the front door.

3    Q.   And who is we?

4    A.   It was Sergeant Holloway, myself, and Deputy

5    Ferguson.

6    Q.   And what happened next?

7    A.   Sergeant Holloway knocked on the door.  There is

8    two windows on the sides of the doors that we were

9    looking through.  She was knocking on the door and there

10   was no response.

11       I saw a shadow from somewhere in the back of the

12   residence, but I could not tell who that was.  And then

13   at that point, Deputy Ferguson stated that he saw a male

14   subject sitting in the office on the telephone.

15   Q.   Okay.  Let me -- let's break this down.  Was

16   Deputy Holloway -- I'm sorry -- Sergeant Holloway with

17   you at the front door the entire time that you were up

18   there the second time?

19   A.   No, she was not.

20   Q.   Okay.  Where did she go?

21   A.   She ended up going off the front porch and

22   standing on the side in the driveway.

23   Q.   And, did you observe her do anything?

24   A.   She was on her cellphone.

25   Q.   Did you hear the substance of that conversation?

1    A.   I did not.

2    Q.   Okay.  What did you all do next, you and Deputy

3    Ferguson?

4    A.   We continued to knock on the front door and look

5    through the windows.

6    Q.   And, how long did you all do that?

7    A.   Say approximately 10 minutes.

8    Q.   What happened next?

9    A.   We saw the gentleman in the office.  He got out --

10   came out the office, came out of the office and came and

11   answered the front door.

12   Q.   Okay.  Before he actually came to the door, did

13   you observe him on the phone?

14   A.   Yes, we did.

15            MR. PLOFCHAN:  Objection, leading.

16            THE COURT:  Sustained.

17   BY MR. FRANCUZENKO:

18   Q.   What observations -- before he came to the door,

19   what did you observe him doing besides just sitting in

20   the study?

21   A.   He was sitting in the office on the telephone.

22   Q.   And, was he on the telephone the entire time that

23   you were knocking on the door?

24   A.   I couldn't tell you that.  Once Deputy Ferguson

25   pointed him out in the window, I could then see him on

1    the phone.  I don't know prior to that.

2       Q.   Okay.  So, in terms of the length that he was on

3    the phone, you don't know?  You can't tell us?

4             MR. PLOFCHAN:  Asked and answered, Your

5    Honor.

6             THE COURT:  Overruled.

7             THE WITNESS:  I could not tell you, no.

8    BY MR. FRANCUZENKO:

9       Q.   So, what happened after the 10 minutes of

10   knocking?

11      A.   He opened the front door again and Deputy Ferguson

12   attempted to speak with him.

13      Q.   You recall the substance of what he said?

14      A.   Not word for word.  Deputy Ferguson was basically

15   stating that we had to check on everyone inside the

16   residence.

17      Q.   Anything else that you recall?

18      A.   Mr. Mial became extremely irate again and told us

19   to get off his property.  He no longer needed us, that he

20   didn't want to talk to us.

21      Q.   Did he make any indication to you, one, that he

22   would let you into the house at that point?

23      A.   No, sir.

24      Q.   Did he make any indication to you, two, that he

25   would bring everybody in the house up to the door?

1    A.  No, sir.

2    Q.  Did he make any indication to you at all at that

3  point that he was going to be responsive to your

4  inquiries?

5    A.  No, sir.

6    Q.  What happens next?

7    A.  At that point, standing at the front door, I

8  observed the door start to shut.

9    Q.  And what did you do?

10   A.  I pushed towards the door preventing it from

11  shutting.  It continued to shut, and I pushed harder on

12  the door and went through the front.

13   Q.  And you understand that once you did that, you did

14  not have a warrant at that time, correct?

15   A.  Correct.

16   Q.  Can you tell the jury why you did that at that

17  time?

18   A.  I did that at the time because --

19         MR. PLOFCHAN:  Your Honor, I object.  Her

20  subjective intent is not relevant for the jury's

21  consideration.

22         THE COURT:  Objection overruled.

23  BY MR. FRANCUZENKO:

24   Q.  Please.

25   A.  The reason I did that at the time, again, I have

1    no idea who had the knife.  I don't know how they were

2    disarmed or even if they were disarmed.  I have no idea

3    if somebody was injured either from the knife and/or

4    being disarmed with the knife.  I have no idea who is in

5    the residence.

6         I have a gentleman that's extremely irate with me

7    for just knocking on his front door.  While I was

8    speaking with him, he was changing the subject to prior

9    calls that he had placed with the Sheriff's Office.  He

10   did not want to answer any questions regarding why I was

11   there.  He wouldn't tell me who had the knife.  He

12   wouldn't tell me who he was.  I didn't know if he was a

13   homeowner.  I had no idea what was going on.

14   Q.   Okay.  So, what, at the end of the -- well, based

15   on the factors that you just testified with -- or

16   testified about, did you believe that you had reasonable

17   suspicion at that point?

18            MR. PLOFCHAN:  Your Honor, I object.  Now at

19   this point, her belief is -- the issue of whether it was

20   reasonable is for the jury to decide.  Her subjective

21   belief is irrelevant.

22            THE COURT:  Objection overruled.

23            THE WITNESS:  I do, yes.

24   BY MR. FRANCUZENKO:

25   Q.   Okay.  Did you feel like you had a choice --

1          THE COURT:  Questions that begin "did you"

2    are leading.

3          MR. FRANCUZENKO:  I'm sorry.

4          THE COURT:  Questions that begin "did you"

5    are leading.

6    BY MR. FRANCUZENKO:

7      Q.  Were there other options that you felt were either

8    reasonable or available to you at that time?

9      A.  I did not feel there was any other options.

10     Q.  And what was your concern if you didn't exercise

11   the option that you actually did that day?

12         MR. PLOFCHAN:  Again, Your Honor, object.

13   Her motivation is not relevant.  It's the legality of her

14   actions that the jury has to decide.

15         THE COURT:  Your response?

16         MR. FRANCUZENKO:  Your Honor, if the

17   plaintiff is not going to be arguing malice in this case,

18   which he's indicating that he will, I think her

19   intentions and her motives are -- come into play.

20         THE COURT:  Objection overruled.

21         THE WITNESS:  I'm sorry.  Would you repeat

22   it.

23   BY MR. FRANCUZENKO:

24     Q.  What was your concern if you didn't exercise the

25   option that you did that day of going into the house?

1    A.   My concern was somebody was lying there hurt.  My

2    concern was possibly his family was being held hostage.

3    I had no idea.  I was concerned for everybody's safety

4    that was in that house.

5    Q.   Did any of your actions or decisions that day --

6    were they influenced by any racial motivation?

7    A.   No, sir.

8    Q.   There was some testimony earlier about you asking

9    Mr. -- Deputy Sayre at the time to deploy his Taser,

10   correct?

11   A.   Correct.

12   Q.   Why did you do that?

13   A.   Because as we were struggling, I was unable to

14   control Mr. Mial.  He was not listening to verbal

15   commands.

16       At one point like I said, I tried to lift my one

17   leg to sweep his feet out from underneath him, and I felt

18   all of his body weight coming on top of me.  And I felt

19   that I was going to be injured if he had fallen on me.

20   And I felt that we would not be able to control the

21   situation.  It was already out of hand.

22   Q.   Were you in fear of your safety when you made that

23   statement or request for him to deploy the Taser?

24   A.   Yes, I was.

25   Q.   Let's talk about what happened after Mr. Mial was

1    in custody.  What is the protocol to deal with somebody

2    after they've been tased?

3         A.   We are required to call for fire rescue for a

4    medical check out.

5         Q.   Did you do that?

6         A.   Yes, we did.

7         Q.   And, can you tell the jury what happened during

8    that exchange?

9              MR. PLOFCHAN:  Object beyond the scope of

10   direct, Your Honor.

11             THE COURT:  Sustained.

12             MR. FRANCUZENKO:  Well, Your Honor, he's

13   complaining about being tased.

14             THE COURT:  I understand.  This is the

15   plaintiff's case.  If you want to call her in your case,

16   you have the right to do that.

17             MR. FRANCUZENKO:  Very good.

18   BY MR. FRANCUZENKO:

19        Q.   Let me ask it a different way then.

20             Was Mr. Mial cooperative when dealing with the

21   EMTs?

22             MR. PLOFCHAN:  Objection to the form of the

23   question as to what the definition of cooperative is.

24   She can say -- I have a second objection, that it's

25   beyond the -- dealing with EMTs is beyond the scope of

 1   direct examination.

 2              THE COURT:  It is.  Objection sustained.

 3   BY MR. FRANCUZENKO:

 4       Q.   Now, at -- after Mr. Mial was in custody, were you

 5   able to get any additional information about what

 6   happened that evening?

 7       A.   No, I was not.

 8       Q.   Did he still refuse to give his name?

 9       A.   Yes, he did.

10       Q.   Did he provide you with any details about what

11   went on in the home after he was in custody?

12       A.   No, he did not.

13              MR. FRANCUZENKO:  Your Honor, I have no

14   further questions at this time.  I do reserve the right

15   to recall Deputy Forsch.

16                     REDIRECT EXAMINATION

17   BY MR. PLOFCHAN:

18       Q.   Deputy, do you contend that your intent overrides

19   your obligation under the Fourth Amendment?

20       A.   I'm not understanding what you're asking.

21       Q.   Well, do you -- do you believe that because you

22   wanted to see if everybody was safe, to use your words,

23   that that desire overrode your obligations to Mr. Mial

24   under the Fourth Amendment?

25              MR. FRANCUZENKO:  Your Honor, I'm going to

1   object.

2              THE COURT:  Sustained.  I'll give you a

3   chance to argue the case at the end, Mr. Plofchan.

4              MR. PLOFCHAN:  Thank you.

5   BY MR. PLOFCHAN:

6      Q.  Now, you also indicated a fear of safety when you

7   asked Sayre to use the Taser, correct?

8      A.  Correct.

9      Q.  Is it your position that even if you caused the

10  altercation, that your use of the Taser is justified?

11             MR. FRANCUZENKO:  Your Honor, this has been

12  asked and answered multiple times on direct.

13             THE COURT:  Sustained.

14             MR. PLOFCHAN:  If I may respond -- you've

15  ruled.  That's fine.

16             THE COURT:  I just ruled.  Next question.

17             Remember this is just a response to what he

18  asked on his cross-examination.

19             MR. PLOFCHAN:  That's -- yes, sir.  All

20  right.

21  BY MR. PLOFCHAN:

22     Q.  Now, you indicated you never struck Mr. Mial.

23  What do you mean by that?

24     A.  I never physically struck him.

25     Q.  So, are you saying that you didn't physically have

1    contact with him?

2       A.   I had physical contact.

3       Q.   Okay.  So what do you mean by striking him?

4       A.   Striking him, to me, would qualify as punching,

5    kicking, to that effect.

6       Q.   I thought you were lifting your leg so as to sweep

7    his leg.  Would that not be striking him or attempting to

8    strike him?

9       A.   You asked if I had contact.  I did not -- I didn't

10   have contact at that point.  I didn't strike him.  I

11   attempted to.  I did not.

12      Q.   So you did attempt to strike him?

13      A.   Correct.

14      Q.   Okay.  And would you grabbing him or holding on to

15   him constitute striking in your mind?

16      A.   As I said to you, I don't know where my hands

17   were.  I don't know if I was holding on to him.

18      Q.   My question is, would that constitute striking him

19   if you were holding on to him?

20      A.   If I was holding on to him, no.

21      Q.   Okay.  All right.  Now, in terms of -- Court's

22   indulgence, Your Honor.

23           Now, you specifically read the first five lines of

24   page 16 on this transcript.  Nowhere in those five lines

25   does it say that you -- you did or did not read the cad

1    reports, correct?

2         A.   I'm sorry.  Are you talking about --

3         Q.   Mr. Francuzenko had you read the first five lines

4    of page 16 of the transcript from April 22, 2010,

5    correct?  Nowhere in those five lines did it -- did it

6    determine whether or not you read the cad reports before

7    you appeared at Mr. Mial's house, correct?

8         A.   Correct.

9         Q.   But you did indicate that you -- on page 17,

10   before you had indicated that you knew both that -- both

11   of the elements identified in the cad report by the time

12   you got to the residence, correct?

13        A.   Correct.

14        Q.   Okay.  So, there was no question that you were

15   aware that the notes to the call said disregard, I got

16   the knife away and that they had hung up?

17        A.   I was aware that he had called stating that

18   somebody had a knife and that it was -- the person no

19   longer had it.  What the note said, I didn't know.

20   Dispatcher relayed those two pieces of information to me.

21        Q.   Would you agree that you -- in April, 2010, you

22   never mentioned any distinction between reading the cad

23   report and dispatch, what was told to you by dispatch?

24        A.   You asked if I had known those two things, yes.

25   There was -- they did not ask me if I read it prior to

1    arrival.

2        Q.  Ma'am, I'm asking would you -- if you can listen

3    to my question.

4            Would you agree in April, 2010, you did -- when

5    they were talking about the cad report, you did not

6    distinguish in your answer that you didn't know it from

7    the cad report but you knew it from dispatch?  You did

8    not say that, correct?

9        A.  Correct.

10       Q.  Okay.  Now, you also indicate that you said that a

11   fact is something that you'd verify.  Correct?

12       A.  Correct.

13       Q.  Okay.  So, you had no facts whatsoever at any time

14   because you didn't verify anything at any time, correct?

15       A.  In regards to the call, yes.

16       Q.  Okay.  So, whether someone even had a knife that

17   was dropped was not a fact that you knew, correct?

18       A.  Correct.

19       Q.  And, you didn't want to act on anything unless it

20   was a fact, correct?

21       A.  That's incorrect.

22       Q.  So, you don't think you need to have facts in

23   order to act?

24       A.  Depends on the circumstances.  If I'm able to

25   gather those facts or not able to gather those facts.

1    Q.  So, if you're not able to verify anything, what is

2    your position that on that day you were not able to

3    verify anything?  What was your authority to take further

4    action?

5    A.  My authority was based on somebody could be in the

6    house that's injured.

7    Q.  Now, what is your -- what is your process when you

8    decide to accept some non-facts and disregard other

9    non-facts?

10   A.  I took everything that we had known at the time

11   into consideration.

12   Q.  So you took into consideration that the man said

13   never mind on the very first call.  They've given it up.

14   I don't need you.  And you took into consideration again

15   when they called 5 minutes later to confirm the situation

16   is under control.  I don't need you.  And you took into

17   consideration when you got to the house, Mr. Mial said, I

18   canceled the call.  I don't need you.  You took all that

19   into consideration?

20   A.  Along with other factors, yes.

21   Q.  Okay.  Well -- and so, how -- can you explain to

22   me how a statement that says someone had a knife and they

23   gave it up creates a situation for you where you have the

24   right to -- or that you are justified in overriding all

25   the other evidence that there's no emergency so that you

1   could take action?

2      A.   It was based on his behavior, based on he wouldn't

3   tell me who he was, if he even lived there.  He would not

4   answer anything to help me try to verify what he had

5   said.

6      Q.   Now you already told me that someone doesn't have

7   to answer your questions.

8      A.   Right.

9      Q.   All right.  You also told me earlier today that

10  his behavior had nothing to do with your decision to go

11  into the house, correct?  So, why are you now saying that

12  oh, your decision to go in the house was based on his

13  behavior?

14     A.   You asked if his behavior was the only reason.  It

15  was not the only reason, that it was taken into

16  consideration.

17     Q.   No, I didn't, ma'am.  I asked you --

18          THE COURT:  Excuse me.  Some of this sounds

19  like it repetitive testimony that happened yesterday.

20  It's also beyond the scope of his cross-examination.

21          MR. PLOFCHAN:  Yes, sir.  All right.

22  BY MR. PLOFCHAN:

23     Q.   Now, I want to be -- earlier, Mr. Francuzenko

24  asked you about whether you asked about a knife and you

25  said yes, correct?

1    A.  Yes.

2    Q.  Can you explain how when Mr. Francuzenko asks you

3    about a question, you can say yes about the topic.  But

4    when I ask you yesterday about questions as to what you

5    asked, you said you couldn't remember the exact

6    questions?

7            MR. FRANCUZENKO:  Your Honor, I'm going to

8    object.  That's argumentative.

9            THE COURT:  It is argumentative.  I'll give

10   you a chance to argue the case at the end.

11           Do you have any more questions you want to

12   ask --

13           MR. PLOFCHAN:  I do.

14           THE COURT:  -- about the things

15   Mr. Francuzenko covered on cross?

16           MR. PLOFCHAN:  That's what I thought I was

17   doing.  I didn't do it artfully.

18           THE COURT:  You don't need to repeat things.

19   We've heard it once.

20   BY MR. PLOFCHAN:

21   Q.  You said you had concerns.  Were any of those

22   concerns based on a violation of a law?

23   A.  That I didn't know.

24   Q.  Okay.  And -- now, Mr. Francuzenko also asked you

25   if you had a suspicion and did -- and he used -- he

1    actually used the phrase reasonable suspicion as to

2    whether there was something there.

3          The question I have is what is the difference

4    between reasonable suspicion and probable cause?

5                MR. FRANCUZENKO:  I'm going to object, Your

6    Honor.  I mean, again, this is -- this is not a legal

7    quiz.

8                THE COURT:  All right.

9                MR. PLOFCHAN:  Your Honor, if I could

10   respond.  The Fourth Amendment says that one has to go

11   under a warrant based on probable cause.

12                And when we talked --

13                THE COURT:  Mr. Plofchan, I'm going to

14   instruct the jury on the law.

15                MR. PLOFCHAN:  Yes, sir.

16                THE COURT:  And, I'm very familiar with the

17   Fourth Amendment.  I think you are, too.

18                If you have a question for this witness, now

19   would be your chance to ask that question.

20                I sustained the objection to that question

21   which calls for a legal conclusion.

22   BY MR. PLOFCHAN:

23     Q.  Does your finding of -- or your belief of a

24   reasonable suspicion or some suspicion of anything going

25   on justify overriding the Fourth Amendment?

1    A.   In circumstances, yes.

2    Q.   Are there any limits on your suspicions --

3            THE COURT:  Excuse me.  Come to sidebar.

4    Come to sidebar.

5            (Thereupon, the following side-bar conference

6    was had.)

7            THE COURT:  I'm very sensitive about not

8    telling a lawyer or interfering with how a lawyer

9    presents the case.  But, all of this now we've heard all

10   day yesterday, and now it's almost 1 o'clock and you're

11   just rethreading old grounds.

12           You're asking her legal conclusions what she

13   thinks she has the right to do about the Fourth

14   Amendment.  I just told you I'm going to instruct the

15   jury on the Fourth Amendment.  So I don't need her to

16   answer legal questions about whether she has the right to

17   use legal suspicion to override the warrant requirement.

18           All you're doing now is confusing the jury

19   about what reasonable suspicion is.  It's unnecessary.

20   Stop, okay.

21           MR. PLOFCHAN:  I apologize, it wasn't --

22           THE COURT:  You don't need to apologize.

23   You're doing your job, and I'm doing mine now.  I'm just

24   trying to stop what's taking place here.  It's

25   unnecessary.

1                MR. PLOFCHAN:  Yes, sir.

2                (Thereupon, side-bar conference was

3      concluded.)

4                MR. PLOFCHAN:  May I proceed, Your Honor?

5                THE COURT:  Yes.

6      BY MR. PLOFCHAN:

7        Q.  Were there any facts known to you that would

8      suggest a hostage situation as you indicated with

9      Mr. Francuzenko's question?

10       A.  No, sir.

11       Q.  Okay.

12               MR. PLOFCHAN:  Those are the questions I

13     have, Your Honor.

14               (Testimony concluded at 12:56 p.m.)

15               (Testimony heard at 2:10 p.m.)

16               MR. PLOFCHAN:  Your Honor, I call

17     Mr. Ferguson.  Mr. Ferguson.

18               THEREUPON, NATHAN FERGUSON, having been duly

19     sworn, testified as follows:

20               THE WITNESS:  I do.

21               MR. PLOFCHAN:  May I proceed, Your Honor?

22               THE COURT:  You may proceed.

23                    DIRECT EXAMINATION

24     BY MR. PLOFCHAN:

25       Q.  Sir, can you state your name for the judge and the

1    jury, please.

2        A.   Nathan Ferguson.

3        Q.   And how are you currently employed?

4        A.   I'm a detective with the Loudoun County Sheriff's

5    Office.

6        Q.   And how long have you been so employed?

7        A.   Since 2005, it was -- October was my hire date.

8        Q.   Okay.  And, and what was your capacity -- in what

9    capacity were you serving on February 14th, 2010?

10       A.   As a patrol deputy.

11       Q.   Okay.  And, have you gone to an academy?

12       A.   Yes, sir.

13       Q.   And which academy?

14       A.   The Northern Virginia Police Academy.

15       Q.   And when did you go there or graduate from there?

16       A.   That would have been in the summer of 2006.

17       Q.   Okay.  And, did you receive training in the Fourth

18   Amendment there?

19       A.   Yes, sir.

20       Q.   And, did you receive training in the General

21   Orders of the Sheriff's Office there?

22       A.   Yes, sir.

23       Q.   Okay.  And, what kind of training did you receive?

24       A.   Is that specifically for academy and/or --

25       Q.   Yes, I was talking about at the academy.  What

1   kind of training did you receive with regard to the

2   Fourth Amendment?

3       A.   There's a large amount of legal coursework that's

4   covered in the police academy.

5       Q.   Okay.

6            MR. FRANCUZENKO:  Can you move forward a

7   little bit, sir.  Okay.

8   BY MR. PLOFCHAN:

9       Q.   Do you recall how many classes or how many hours

10  you spent on the Fourth Amendment?

11      A.   I couldn't say how many hours.

12      Q.   Okay.  And -- but, you know the topic that was

13  covered?

14      A.   Yes, sir.

15      Q.   Okay.  And, how many -- what kind of training did

16  you have with the Sheriff's Office outside the academy?

17      A.   There's additional field training post academy

18  where, as a new deputy on patrol, we ride with training

19  officers for the original -- for the first three and a

20  half months or so on patrol.

21      Q.   And did you ever -- were you ever tested either

22  orally or in writing with regard to the Fourth Amendment?

23      A.   There is numerous General Orders which we cover

24  one by one with our field training officers and then

25  there was our initials as being covered with the FTO

1   after it's completed.

2       Q.   Okay.  Now, did you see on the screen when I had

3   presented it to Ms. Forsch, did you see the General

4   Orders that were identified on the use of force, domestic

5   and arrest procedures?

6       A.   Yes, sir.

7       Q.   Did you recognize those as the General Orders

8   that -- for the Loudoun County Sheriff's Office?

9       A.   Yes, sir.

10      Q.   Okay.  And, you're familiar with those?

11      A.   Yes, sir.

12      Q.   Okay.  And, I want -- with respect to your

13  opinion, are you in a -- are you, as an officer, allowed

14  to ignore a requirement in a General Order?

15      A.   No, sir.

16      Q.   Okay.  And, you appeared as a backup officer on

17  February 14th, 2010; is that correct?

18      A.   Yes, sir.

19      Q.   Okay.  And, when you arrived at the scene, what

20  specifically did you know?

21      A.   The verbals that dispatch had given over the radio

22  stated that they had received a call that the individual

23  needed help taking a knife away from somebody.

24      Q.   Okay.  And what else did you know?

25      A.   Before I arrived on the scene, dispatch also had

1  verbalized over the radio that the caller had stated the

2  person had put the knife down and he was not requesting

3  our assistance.

4      Q.   I'm going to ask you a question.  Was that verbal

5  informed -- the first verbal, did it actually tell you

6  that they had called, said someone -- they wanted help,

7  but they had put the knife down?  Was that in the first

8  call or was there a second announcement over the radio?

9      A.   I was not aware at the time of the order of events

10 or the number of calls.  I do know for certain that I had

11 all of that information before I arrived on the scene.

12     Q.   Okay.  And, did you also have information that you

13 would be -- that the person was a male who had called?

14     A.   I don't recall if gender of the complainant was

15 given over the radio.  I don't know if it was something I

16 inferred or when I saw a male at the door when I arrived

17 on the scene.

18     Q.   Okay.

19          Court's indulgence, Your Honor.

20          So, I want to just to be clear on that.  Would you

21 agree that when you arrived on the scene, before you

22 arrived on the scene, there was an initial dispatch

23 saying that the man called 911 saying he needed help

24 getting a knife, but before you arrived on the scene you

25 were also told that he had put the knife down?

1    A.   In substance when you say he had put the knife

2    down, I don't believe a gender was ever assigned to who

3    was holding the knife.

4    Q.   Okay.  Now, do you also agree that you were able

5    to look at the cad notes when you arrived at the scene?

6    A.   I do not recall looking at the cad notes.

7    Q.   Okay.  I'm going to ask you to take -- page 34.

8    I'm going to have you just take a look at lines 15

9    through 21 on page 34 of this document.  See if that

10   refreshes your recollection.

11       Have you -- does that refresh your recollection as

12   to whether you had been informed that there was a male?

13   A.   Okay, as far as the gender male?

14   Q.   Yes.

15   A.   Okay, yes, sir.

16   Q.   Okay.  Thank you.

17       Thank you, Marshal.

18       So, I want to be clear that when you arrived at

19   the scene that you knew that there had been a call

20   originally from a male who asked for assistance and then

21   said never mind, the knife was placed down, and that then

22   there had been a follow-up call and the male responded

23   that the situation was under control and that the

24   assistance was not needed; is that correct?

25   A.   Yes, sir.  That's my understanding.

1    Q.   Okay.  All right.  So when you arrived, you were

2    backup.  And where -- when you arrived, who else was

3    there?

4    A.   Deputy Sherin.

5    Q.   Okay.

6    A.   Deputy Forsch.

7    Q.   And where was she when you arrived?

8    A.   She was up near the front door interacting with

9    Mr. Mial.

10   Q.   The door was already open?

11   A.   Yes, sir.

12   Q.   Okay.  And was the door only opened a little bit?

13   Was it opened so you could see his entire body?  How was

14   it opened?

15   A.   I don't recall exactly how far open it was, but I

16   believe it was fairly wide.

17   Q.   Okay.  And, you don't know -- do you know --

18   recall what the conversation was when you got there?

19   A.   Word for word, no.

20   Q.   Okay.  Do you recall substantively what the call

21   was -- or the conversation was when you got there?

22   A.   Yes, I do know that.  Deputy Forsch -- Deputy

23   Sherin at the time was attempting to explain to Mr. Mial

24   that she needed to check the welfare of the persons

25   inside the house.  Mr. Mial was interrupting and

1    overriding her.  He seemed very angry and was yelling.

2        Q.  Now, when you say that she needed to, did you --

3    was that in comport with your understanding of either

4    needing to or was that wanted to?

5        A.  I would not say that she was using the word need.

6    Again, I don't mean to quote as far as verbatim what she

7    said.  Substantively, she was explaining that is what she

8    wished to do.

9        Q.  She wished to do.  Did you ever hear her ask to go

10   into the house?

11       A.  No, I do not recall.

12       Q.  Did you ever hear her ask him to bring anyone to

13   the front door?

14       A.  I do not recall that either.

15       Q.  Okay.  How long were you there?

16       A.  It was a short amount of time, not more than a

17   couple minutes after my arrival.

18       Q.  Okay.  And, while you were there, did you see

19   anyone else in the house?

20       A.  At one point, I did see a young girl who I

21   estimated to be approximately 7 years old.

22       Q.  Okay.  And, where was she?

23       A.  Further into the house.  It looked like a living

24   room area with a sofa.

25       Q.  Did you notice anything about her that -- other

1   than she was a young girl?

2   A.   No, nothing else stood out to me.

3   Q.   She didn't appear to be upset?

4   A.   No, sir.

5   Q.   Okay.  And, did you ever see anyone else?

6   A.   No, sir.

7   Q.   Okay.  Now, you just told me that you thought that

8   there was some yelling, correct?

9   A.   Yes, sir.

10  Q.   What does that mean?

11  A.   My description of yelling?

12  Q.   Uh-huh.

13  A.   Mr. Mial had a very raised voice and was

14  projecting that in an angry manner.

15  Q.   So he was speaking loudly, with a tone?

16  A.   I would say that's beyond speaking loudly.

17  Q.   He wasn't screaming at anybody, was he?

18  A.   It would be more akin to screaming than speaking

19  loudly.

20  Q.   Do you recall being deposed on November 11, 2011?

21  A.   Yes, I'm not a hundred percent on the exact date,

22  but that sounds about right.

23  Q.   Okay.  I'm going to ask you to take a look and see

24  if this might refresh your recollection to the extent

25  that there was -- the nature or so fourth of yelling.

1    I'm going to ask you to look at pages 51 through 53.

2        A.   Okay, sir.

3        Q.   You don't mention at any time there that he was

4    yelling, do you?

5        A.   No, sir.  I did not use that word there.

6        Q.   And, would that refresh your recollection that he

7    wasn't yelling at the time?

8        A.   No, sir.  I would just say that wasn't a word I

9    used on those pages.

10       Q.   All right.  And I'm also going to ask you to look

11   at the -- did you write a complaint in this case, not a

12   complaint, a report in this case?

13       A.   Yes, sir.

14       Q.   Okay.  I'm going to ask you just to take a look at

15   the first paragraph of -- see if you can identify this

16   document as the report you wrote in this case.  You don't

17   mention the word yelling in that first paragraph about

18   this first encounter, do you?

19       A.   I did not use the word yelling.

20       Q.   You said that he was loud and upset; is that

21   correct?

22       A.   Yes, sir.

23            MR. FRANCUZENKO:  Objection.  That's not what

24   it says.  If he's going to --

25            THE COURT:  I'll give you a chance to show

 1   that document to the witness in your examination.

 2            MR. FRANCUZENKO:  I'm just asking him to read

 3   it accurately.

 4            THE COURT:  Well, this is cross-examination

 5   of an adverse party.  He's allowed to do that.

 6   BY MR. PLOFCHAN:

 7     Q.  But you do in your report mention yelling when you

 8   entered the house, correct?

 9     A.  I believe again I'd have to refer back to the

10   report for a point where I used that word, but --

11     Q.  The second paragraph.

12     A.  Yes, sir.  I see where yelling is used in the

13   second paragraph.

14     Q.  So you distinguished being very loud and upset

15   from yelling in your own report, correct?

16     A.  I would say the second encounter where I used the

17   word yelling would indicate that the -- his demeanor was

18   more amped up or louder than previously.

19     Q.  Okay.  But, it's different than just being very

20   loud and upset?

21     A.  Yes, to an extent.

22     Q.  Okay.  Thank you.

23            MR. PLOFCHAN:  Marshal, may I have that back?

24   Thank you.

25   BY MR. PLOFCHAN:

1    Q.  So, after -- how long did this encounter the first

2    time last?

3    A.  Since my arrival, I would say not more than a

4    couple minutes.

5    Q.  Okay.  And, how did it end?

6    A.  It ended with Mr. Mial closing the door.

7    Q.  Okay.  And, was there anything unusual in how he

8    closed the door?

9    A.  To the best of my recollection, it was hard, but

10   nothing that stood out any more than that.

11   Q.  Okay.  So, there was no slamming of the door,

12   correct?

13   A.  Again, I don't know that I would use the word slam

14   at that point.

15   Q.  Okay.  All right.  And then after he closed the

16   door, what did you do?

17   A.  I stepped out to the end of the driveway and

18   placed a phone call to my sergeant.

19   Q.  Did you -- were you teasing Ms. Forsch or saying

20   something to her about being quiet on the way down the

21   driveway?

22   A.  I would not describe that as teasing.  I don't

23   recall our exact conversation as we stepped out before

24   the phone call was placed.

25   Q.  What was the gist of it?

1      A.    Again, the best of my recollection is what I heard

2   from the other deputy.

3      Q.    Which was what?

4      A.    Something to the effect of about never seeing her

5   that quiet.

6      Q.    Okay.  Why did you tell her that?

7      A.    It would be an observation I had made given the

8   circumstances.

9      Q.    Okay.  So, at this point in time, what facts did

10  you possess with regard to any of the activities at this

11  residence?

12     A.    I knew we had a dispatch call to the address in

13  question and the statements that were given to us per

14  dispatch was that the caller needed help with an

15  individual who had a knife and then additionally that

16  that caller had updated that the knife was -- our

17  assistance was no longer needed.  It had been put down.

18     Q.    Okay.  And, so then what you had been told

19  factually was that there was no need for your help; is

20  that correct?

21     A.    That was the information that was passed on to us.

22     Q.    Okay.  And then, that was confirmed by your

23  observations at the front door, correct?

24     A.    No, I would say if anything my observations at the

25  front door raised more questions or concern.

1      Q.   Did you see Mr. -- did -- Mr. Mial, he was there

2   at the front door?

3      A.   Yes, yes, sir.

4      Q.   He wasn't in distress, was he?  He didn't have any

5   wounds or blood or anything?

6      A.   None that I saw, no, sir.

7      Q.   And what was he wearing?

8      A.   I don't recall the clothes he was wearing.

9      Q.   Was he in socks or shoes?

10      A.   I don't recall.

11      Q.   Okay.  The child was not in distress, correct?

12      A.   Correct, not that I could tell.

13      Q.   You didn't hear any noise in the background,

14   correct?

15      A.   Correct.

16      Q.   Okay.  So, what about all that is inconsistent

17   with their not being an emergency?

18      A.   My understanding at that point or the inference I

19   was making was that Mr. Mial was the one who had called

20   911 for his demeanor and behavior to be projecting his

21   anger towards us, bringing up completely unrelated

22   situations for why he may be angry with the Sheriff's

23   Office in the past did not seem like a logical response

24   from someone who was acting in a reasonable manner.

25      Q.   Now, isn't his -- didn't he say his frustration

1    was that when he had called in the past for other things,

2    you didn't show up?  No one from the Sheriff's Office

3    showed up, but that when he called on this and then

4    called back and said he didn't need help, someone showed

5    up and he was frustrated with the response of the

6    Sheriff's Office because they show up when he doesn't

7    need help, but showed up when he didn't.  Is that the

8    gist of what he was saying to you?

9        A.   Yes, I would say that is the gist.

10       Q.   Okay.  What about that suggests any emergency?

11       A.   I wouldn't say that his -- if my interaction were

12   based on no 911 call involving a knife and a request to

13   help disarm a person initially, his behavior would not

14   necessarily stand out to me on top of the original

15   information we had.

16       Q.   So, then what about a 911 call that says before

17   they hang up, never mind, they've given it up, and then

18   it's confirmed 5 minutes later by your dispatch operator?

19   What about that factual scenario causes you to have a

20   heightened sense of inquiry just on the first part that

21   somebody originally said that somebody held a knife?

22       A.   I would not describe the update as a fact when

23   that would be something we would be looking to ascertain

24   and confirm.

25       Q.   Well, why would you not describe the update as a

1    fact but accept the initial phone call as a fact?

2        A.   Again, I wouldn't necessarily use the word facts.

3    It's a description of an unknown situation for which we

4    were responding to.

5        Q.   And why would you accept only the first half of

6    the first call and not the second half of the first call

7    as a fact or something that is of credible nature to take

8    into account?

9        A.   I take everything as a whole.  So I'll take into

10   context the second call, but I did not have the leeway to

11   choose, to disregard responding to the office at that

12   point.

13       Q.   You didn't have the leeway to discard what?

14       A.   At that point, I could not just choose to turn

15   around and go the other way after dispatch updated on the

16   second portion.

17       Q.   Why could you not?

18       A.   Per our training, and for dispatch to call, we

19   respond to the scene and ascertain what's going on.

20       Q.   You responded to the scene.  And did you ever

21   contact dispatch and say I spoke with the man who made

22   the call, and he said everything's okay, and I'm leaving?

23       A.   No, because that is not what happened.

24       Q.   Well, didn't he say everything was okay?

25       A.   I never heard those words come out of his mouth.

1    Q.   Did he ever say that there wasn't anything okay?

2    A.   He, to the best of my recollection, he did not

3    specifically address what had transpired with the knife

4    at any point during my interaction with him.

5    Q.   Did you ask him?

6    A.   The initial encounter at the door about where

7    Deputy Forsch was attempting to speak with him.

8    Q.   So, did you ask him anything?

9    A.   No, sir.

10   Q.   So, if she didn't ask the questions, why didn't

11   you ask the questions?

12   A.   Because she was attempting to cover that ground.

13   So my initial encounter with him, I was standing there to

14   Deputy Forsch's right side.

15   Q.   How do you know she was attempting to cover that

16   ground if when you just told me when you came up,

17   Mr. Mial was talking about how the sheriffs didn't

18   respond?

19   A.   When I first came up again as far as what words

20   were said by Mr. Mial or Deputy Forsch at which point, I

21   cannot verbatim give that back-and-forth.  There were

22   numerous words spoken by Deputy Forsch as well as

23   Mr. Mial during that period of time.

24   Q.   Now, in your report that you wrote of the

25   incident, you didn't mention anything with regard to that

1  first encounter about Ms. Forsch specifically asking any

2  questions about anyone, correct?

3      A.  I don't believe I specifically noted any specific

4  questions.

5      Q.  Okay.  All right.  So then you called your

6  sergeant and that's Sergeant Holloway; is that correct?

7      A.  Yes, sir.

8      Q.  All right.  And, she specifically told you

9  that you were to make recontact and that she made it

10 clear that you needed to check the welfare of other

11 people involved, and that if he was to open the door, you

12 were not allowed to allow the door to shut again; is that

13 correct?

14     A.  Yes, sir.

15     Q.  Okay.  Now, you have been trained in the

16 requirements of the Fourth Amendment, correct?

17     A.  Yes, sir.

18     Q.  Okay.  And, you are familiar with the General

19 Orders, correct?

20     A.  Yes, sir.

21     Q.  All right.  And, to your knowledge, nobody refused

22 you entry at any time, correct?

23     A.  With reference to the first paragraph of my report

24 where before Mr. Mial does close the door, he

25 specifically says, you may not come in.  You may not --

1    again, I'm paraphrasing here as far as the wording.  You

2    may not talk to the other people inside and you may

3    leave.

4        Q.  Did you ever ask to come in?

5        A.  Again, I did not speak with Mr. Mial, so, no, sir,

6    I did not ask.

7        Q.  And to your knowledge, and according to what you

8    heard Deputy Forsch say, she didn't ask to come in.  Is

9    that correct?

10       A.  Correct, I did not hear those words.

11       Q.  So, nobody had refused you entry at that point in

12   time because you didn't ask to come in, correct?

13       A.  There was no refusal based on a request --

14       Q.  Okay.

15       A.  -- that I knew of.

16       Q.  And at that point in time, you did not have any

17   facts that there was an ongoing emergency, correct?

18       A.  There was unconfirmed information that had come

19   in, so there were circumstances which led me to believe

20   there may be an emergency.

21       Q.  You did not have -- you did not have any

22   observations from your own eyes that there was anyone in

23   distress in that house, correct?

24       A.  I would be hesitant to characterize observations

25   because I would classify my observation of Mr. Mial, what

1    I would have deemed at that point irrational behavior on

2    top of the 911 call.

3        Q.   The fact that he was upset in -- did that indicate

4    to you he was in distress or in need of medical?

5        A.   No, sir.  I did not observe any need of medical

6    assistance.

7        Q.   Did that give you any indication that he was

8    harmed?

9        A.   No, sir.

10       Q.   Did it give you any indication that he needed any

11   assistance?

12       A.   I would not be able to specify what if any

13   assistance he was requiring at that moment.

14       Q.   Okay.  And you agree that under the General Orders

15   to help you understand your obligations under the Fourth

16   Amendment, the General Order on domestic refers to

17   complainants, victims, and disputants; is that correct?

18       A.   Yes, sir.

19       Q.   Okay.  And you had already established that he was

20   the complainant, correct?

21       A.   That was my understanding at that point, although

22   it had not been confirmed.

23       Q.   And there was no alleged victim because nobody had

24   been threatened, correct?

25       A.   My inference from the fact that someone had called

911 about someone in their house with a knife would lead
me to believe that someone was in fear for their or
someone else's safety based off of that.

Q.  And wouldn't that lead you to believe that the
victim and the complainant were the same person?

A.  Quite possibly.  But again, identities had not
been confirmed.

Q.  And the victim and the complainant told you he
didn't need any help, correct?

A.  Referring to Mr. Mial, yes, that was what he
passed on.

Q.  And so you had no knowledge of any disputant,
correct, anyone who disputed his story?

A.  We had not spoken with anyone else in the house,
so, no, sir.

Q.  So the only facts you had were confirmed by
Mr. Mial when you came to the door, correct?

A.  I would not say any facts were confirmed.  If
anything, questions were raised.

Q.  What is -- let me withdraw that question, Your
Honor.

So you -- the door closed.  You did not
exercise -- you did not make a determination there was an
emergency that would justify you going into the house at
that point in time, correct?

1       A.  At that point, yes, I did not make any move to

2   stop the door from being closed.

3       Q.  And you did not make any determination that there

4   was any emergency, correct?

5       A.  It was an involving -- ongoing situation.  I had

6   not -- you would be correct in saying I had not reached

7   that conclusion at that point.

8       Q.  Okay.  And then -- so then you go down and you

9   meet with the sergeant and she tells you are not allowed

10  to allow the door to be shut again.  Correct?

11      A.  To that effect.  I don't know if it was verbatim.

12      Q.  So, when you go back, the only difference in the

13  knowledge base that you have from when you left the house

14  was that you went back and now you had a directive from

15  the sergeant that you're not allowed to let the door

16  closed, correct?

17      A.  Yes, sir.

18      Q.  Did the sergeant -- what words did the sergeant

19  say as to why you weren't allow to let the door close?

20      A.  That we needed to check the welfare of the persons

21  inside.

22      Q.  The sergeant didn't rely on anything on the Fourth

23  Amendment, did it -- did the sergeant?

24              MR. FRANCUZENKO:  Your Honor, objection.

25  That calls for speculation.

```
 1              THE COURT:  Are you asking --

 2              MR. PLOFCHAN:  Let me rephrase that question,

 3  Your Honor.

 4  BY MR. PLOFCHAN:

 5    Q.  The sergeant didn't convey to you any reasoning

 6  based on the Fourth Amendment or an exception to the

 7  Fourth Amendment, did she?

 8              MR. FRANCUZENKO:  I'm going to object, Your

 9  Honor, at this point.  I mean, the hearsay has already

10  been going on, but --

11              THE COURT:  Hearsay.

12              MR. FRANCUZENKO:  -- if he wants to ask the

13  sergeant that, he can ask the sergeant.

14              THE COURT:  Objection sustained.

15  BY MR. PLOFCHAN:

16    Q.  You didn't convey any information to the sergeant

17  with regard to a Fourth Amendment right to go into the

18  house, did you?

19    A.  I don't recall if we spoke about exigent

20  circumstances at that point.

21    Q.  Okay.  And you didn't contact the magistrate, did

22  you?

23    A.  No, sir.

24    Q.  And -- Court's indulgence.

25         You have seen the language of the Fourth
```

1    Amendment, correct?

2        A.   Yes, sir.

3        Q.   Okay.  And, you agree that a search warrant would

4    have to be based upon probable cause, correct?

5        A.   Yes, sir.

6        Q.   And, probable cause, because you said you've

7    already seen your General Orders, is define in your

8    general order on arrest, correct?

9        A.   Yes, sir.

10       Q.   And would you agree that at the time you left at

11   the first time, you did not have probable cause to seek a

12   search warrant?

13       A.   I had not reached that conclusion, and honestly, I

14   don't recall ever having a probable cause discussion at

15   that point.

16       Q.   So, in -- and to be clear on that in terms of your

17   General Orders and their definition of probable cause,

18   you had no facts or circumstances to suggest that a

19   criminal offense had been committed or was being

20   committed, correct?

21       A.   I would say that was one of the unknown elements.

22       Q.   At the time you left, you did not have a

23   reasonable basis to conclude that an offense was being

24   committed or had been committed, correct?

25       A.   No, I would say that's incorrect.

1    Q.  Okay.  What offense did you say -- did you believe

2    that you had a reasonable basis to say had been

3    committed?

4    A.  The first few words where it says facts and

5    circumstances.  And I would go back to the initial 911

6    call where an individual at that point, and for it to be

7    Mr. Mial, had called 911 based on someone having a knife.

8    Whether that knife was intended to be used on the holder

9    of the knife or someone else, that created the fear of

10   apprehension in Mr. Mial or whoever the caller was at

11   that point, at that point that we believed it to be

12   Mr. Mial which would very possibly be a criminal

13   situation.

14   Q.  I'm not asking what would possibly.  I asked you

15   what offense do you believe that you may have had

16   probable cause for.

17   A.  I would not be able to articulate a specific

18   offense since I did not know all the facts at that point.

19   Q.  Doesn't the requirement of a warrant for a search

20   warrant require that you be able to articulate probable

21   cause for a specific offense?

22   A.  Yes, sir, for a search warrant.

23   Q.  And, you also had no indication that Mr. Mial had

24   committed any offense, correct?

25   A.  I did not have any confirmed facts as far as what

1  offense had been committed.

2      Q.  Or if any offense had been committed, correct?

3      A.  Correct, sir.  There was a lot of unknowns.

4      Q.  And you certainly had information at that point in

5  time because you were looking at them, that Mr. Mial was

6  not in the process of committing an offense, correct?

7      A.  Correct.

8      Q.  And, it didn't look like the child you saw was in

9  the process of committing an offense, correct?

10     A.  Correct.

11     Q.  So, under the first prong of the Fourth Amendment,

12 because you did not have probable cause to seek a

13 warrant, you couldn't -- you were not saying you could

14 enter that house pursuant to that component of the Fourth

15 Amendment, correct?

16     A.  Are you referring to the entry of the house based

17 on the probable cause needed for the search warrant?

18     Q.  Yes.

19     A.  Correct, that was not my intent to enter based on

20 that.

21     Q.  Okay.  Then, so when you turned around -- now, you

22 did not tell anything to Sergeant Holloway or ask her any

23 questions about your authority to go in under the Fourth

24 Amendment, correct?

25     A.  Again, I do not recall the specific Fourth

1    Amendment discussion.

2       Q.   And you didn't have any Fourth Amendment

3    discussion regard -- with then Deputy Sherin, correct?

4       A.   Not that I recall with her, either.

5       Q.   As a matter of fact, you didn't have any

6    discussion with anybody on the Fourth Amendment, did you?

7       A.   I would classify my lack of memory of the Fourth

8    Amendment discussion with anyone to include anyone on

9    scene, whether it was Deputy Forsch or Sergeant Holloway.

10      Q.   Okay.  But you agreed that you were going to

11   comply with what Sergeant Holloway told you, even though

12   you knew or should have known that you had to make a

13   Fourth Amendment evaluation, correct?

14      A.   Correct, I --

15      Q.   Okay.  And so, you were -- you had determined that

16   you were going to seek to get into the house and if he

17   opened the door, you were not going to let it closed

18   without going in, though you had not done a Fourth

19   Amendment evaluation at that time, correct?

20      A.   I would say incorrect.  Just because there was a

21   lack of a discussion about the Fourth Amendment in

22   regards to that incident with my co-workers, I would say

23   that's still the overriding rule and law that would be in

24   the back of my mind.

25      Q.   What would be back -- in back of your mind, but

1    you agreed to go back to the house at the direction of

2    Deputy Holloway, Sergeant Holloway, and you did not have

3    any more information when you agreed to do that than you

4    did when you left the house the first time, correct?

5        A.    Again, I don't believe there was an agreement that

6    was reached.  Our intent on going back up to the house

7    was to make contact, if anything, to reason with Mr.

8    Mial, not necessarily to force entry.

9        Q.    Do you recall being asked in your deposition

10   whether you had a plan in the event he would not be

11   compliant?

12       A.    I would need to see that to refresh my memory.

13       Q.    Okay.  I'm going to take you to page 64, and

14   Marshal, if you would ask -- lines 17 through the end of

15   the page and then there's just two words on the next

16   page.  This is page 64.

17       A.    Sorry, which lines on page 64?

18       Q.    Seventeen.  If you read that out loud, sir, I'm

19   sorry.

20       A.    Line 17, "Question:  Did you have a plan in the

21   event he would be -- or not be compliant?

22            "Answer:  Our understanding was based on the

23   circumstances and based on our supervisor's statement,

24   the door, again, this is assuming the door opened again,

25   we would not allow it to be shut again."

1    Q.   Okay.  Thank you.  So, you had no additional facts

2    from the house -- thank you, Marshal -- that would

3    indicate any emergency.  But because the sergeant told

4    you to do that, that was your intent, correct?

5    A.   Along with the circumstances.

6    Q.   But those were the same circumstances you knew

7    about when you came down from the house, correct?

8    A.   Yes, sir.

9    Q.   Okay.  So, nothing had changed with regard to the

10   information that didn't justify going in when you came

11   down from the house except that your sergeant told you to

12   do it, correct?

13   A.   And along with the passage of time.

14   Q.   Now, what did the -- what happened in the passage

15   of time that would have caused you any greater concern?

16   A.   Nothing that I was aware of.

17   Q.   Okay.  So then the passage of time has nothing to

18   do with anything, right?  It doesn't create or lessen or

19   doesn't enhance or lessen any justification, correct?

20   A.   No, it would add nothing, I guess, to the unknown

21   possibilities inside the house.

22   Q.   So, is it your position that you can then start to

23   speculate on what ifs and that creates a justification to

24   go into a house?

25   A.   No, sir.

1     Q.   Okay.  Let's talk about time if we can.  Would you

2   agree that the call came in approximately at 5:04 p.m.?

3               MR. FRANCUZENKO:  Before this exhibit is

4   published to the jury, first of all, it's not admitted

5   into evidence.

6               Secondly, it's a demonstrative.  So, I would

7   object to -- if he wants to ask questions, that's fine.

8   If he lays a proper foundation, but this certainly is not

9   an exhibit at this point.

10              MR. PLOFCHAN:  Your Honor, in response, I

11  believe that the Court previously ruled on our ability to

12  use a timeline as a demonstrative exhibit in the case.

13              THE COURT:  I let you use it for opening

14  statement.

15              MR. PLOFCHAN:  I didn't realize it was

16  limited.

17              THE COURT:  Are you planning to use it for

18  this witness?

19              MR. PLOFCHAN:  I was, Your Honor, yes.

20              THE COURT:  You can show it to the witness,

21  and the witness can describe his view of whether or not

22  it's accurate or not.  Go ahead.

23  BY MR. PLOFCHAN:

24    Q.   You agree that there was a call that came in

25  approximately 5:04?

1           MR. FRANCUZENKO:  Your Honor, again it's

2    published to the jury.  I don't think it's appropriate.

3    It's coming up on the screen.

4           THE COURT:  Not yet.  You can show it to the

5    witness.

6           MR. PLOFCHAN:  Marshal, may I show this?

7    Thank you.

8    BY MR. PLOFCHAN:

9      Q.  Now, would you agree that a call came in

10   approximately 5:04 and by 5:10 or so, you and Ms. Forsch

11   were at the property?

12     A.  Based on this timeline, as far as my personal

13   memory, I would rely on the computer records at the

14   Sheriff's Office.

15     Q.  Okay.  So, do you not have the personal memory at

16   this point in time?

17     A.  As far as specific times, no, sir, I do not.

18          MR. PLOFCHAN:  Court's indulgence.

19          Marshal, may I?

20   BY MR. PLOFCHAN:

21     Q.  Deputy Ferguson, could you review those and see if

22   that --

23          MR. FRANCUZENKO:  Hold on a second, is that

24   an exhibit or --

25          THE COURT:  To refresh recollection, there's

1    no limitation; is that right?

2            MR. FRANCUZENKO:  I understand.

3            THE COURT:  You want to see it?  You should

4    be able to see it.  Let him see it.

5            MR. FRANCUZENKO:  I'll just asking for it to

6    be identified.  I'm not objecting.

7            THE COURT:  All right.

8    BY MR. PLOFCHAN:

9       Q.  Mr. Ferguson, would you look at that and see if

10   that refreshes your recollection as to when the call

11   began?

12      A.  Yes, sir.  It shows 17:04 or 17:03 hours as the

13   first timestamp I'm seeing on there.

14      Q.  And that's 5:03 in the evening; is that correct?

15      A.  Yes, sir.

16      Q.  And does that document refresh your recollection

17   as to when you arrived at the house?

18      A.  That would be consistent with the time of early

19   evening that I had in my head, yes, sir.

20      Q.  Which is what time?

21      A.  Consistent with the time on here, 17:03 hours.

22      Q.  So you arrived at the house at 17:03 or that's

23   when the call came?

24      A.  The time the call came in.

25      Q.  So what time did you arrive at the house?

1    A.  It would have been a matter of minutes later.

2    Q.  Can you be more specific?

3    A.  I'm looking in the notes to see if it shows the

4    exact time I marked on scene.  I don't know if that's

5    included in these notes.

6         I would say based on your timeline with showing

7    Deputy Sherin arriving on the scene at 5:12, it was at

8    some point shortly after Deputy Sherin.

9    Q.  Okay.  And would you agree that approximately 5:15

10   or so you were at -- between 5 -- 5:10 and 5:15, you were

11   at the door with Mr. Mial and Deputy Sherin?

12   A.  Yes, sir, at some point in that timeframe.

13   Q.  Okay.  And you were there for just a couple

14   minutes.  So you had left from between 5:15 and 5:20; is

15   that correct?

16   A.  That is correct, yes, sir.

17   Q.  And how long were you down at the bottom of the

18   driveway?

19   A.  Maybe a few minutes making the phone calls.

20   Q.  Okay.  Well, do you know when you went back up?

21   A.  Again, it was a short span of time.  I'd say

22   between the phone call and Deputy -- Sergeant Holloway

23   arriving on the scene.

24   Q.  If you left at 5:15 to 5:20, were you down at the

25   bottom at the driveway until 5:35, 5:40?

1    A.   No, I would say 15, 20 minutes sounds like a

2    longer time span than I recollect.

3    Q.   In that time span there, did you hear any noise

4    coming from the house?

5    A.   No, sir.

6    Q.   Did you see any movement coming from the house?

7    A.   No, sir.

8    Q.   Did you get any reports of any other calls coming

9    from the house?

10   A.   No, sir.

11   Q.   Did you have any -- did you talk to any neighbors

12   about any activity at the house?

13   A.   I did not personally, no, sir.

14   Q.   Did you ask anyone else to talk to any neighbors

15   about any activity at the house?

16   A.   I did not ask anyone else, no, sir.

17   Q.   Were you aware of anybody else being asked to talk

18   to any neighbors?

19   A.   It was my understanding that Sergeant Holloway was

20   allocating other deputies to make contact with neighbors.

21   Q.   So you, at the time you went back, you had had no

22   other information whatsoever about anything being

23   escalated at the house, anything happening at the house,

24   any neighbor -- you had no additional information other

25   than Sergeant Holloway saying you're not to -- that says

1    you're not to let the door closed if it opens?

2        A.    Yes, sir.

3        Q.    Okay.  So then you go back up to the house at that

4    time, correct?

5        A.    Yes, sir.

6        Q.    And, who went with you?

7        A.    Deputy Forsch and Sergeant Holloway.

8        Q.    Okay.  And, did you knock on the door?

9        A.    I believe Sergeant Holloway knocked initially when

10   she stepped up with us and then I would continue knocking

11   at points after that.

12       Q.    Okay.  And did you knock for a while?

13       A.    Yes, there was a span of numerous minutes where we

14   were attempting contact.

15       Q.    Does it frustrate you when somebody doesn't open

16   the door when you knock?

17       A.    Ideally, they would open the door.

18       Q.    I didn't ask that.  I didn't ask what they ideally

19   do.  I asked did it frustrate you when Mr. Mial didn't

20   open the door?

21       A.    I would not describe myself as being frustrated.

22       Q.    Were you upset?

23       A.    No, sir.

24       Q.    So, there was no emotion on your part about him

25   not opening the door?

1    A.   That's just a matter of a call.  That's work to

2    me.  I try to be objective.

3    Q.   And there was nothing illegal about him not

4    answering the door, correct?

5    A.   No, sir, not that I would describe.

6    Q.   Did Ms. Forsch say anything like I can't believe

7    he's not opening the door or was she pounding louder or

8    you pounding louder?

9    A.   Not that I recollect, no, sir.

10   Q.   So nobody had any issue with him exercising his

11   right not to open the door, correct?

12   A.   No, sir, I wouldn't describe it that way.

13   Q.   Okay.  So people did have an issue with him

14   exercising his right not to open the door?

15   A.   Well, personally for me, obviously, I wanted him

16   to come to the door so we could talk with him.  I would

17   be hesitant to describe other people's feelings about the

18   efforts.

19   Q.   So, you had an issue with him not coming to the

20   door and exercising his right not to come to the door?

21   A.   Again, no, sir, I would not say I had an issue or

22   personal frustration.

23   Q.   Okay.  So, you understood then he didn't have to

24   come to the door?

25   A.   Yes, sir.

1    Q.   And he was exercising his rights not to come to

2    the door?

3              MR. FRANCUZENKO:  Objection as to what he was

4    doing and why he was doing it, Your Honor.  It calls for

5    a --

6              THE COURT:  Sustained, sustained.

7              MR. PLOFCHAN:  Let me see if I can rephrase.

8    BY MR. PLOFCHAN:

9    Q.   Based on your understanding of the Fourth

10   Amendment -- well actually, let me rephrase this way.

11   Was your understanding in the context of the Fourth

12   Amendment of his understanding to come to the door?

13             MR. FRANCUZENKO:  I'm going to object as it

14   calls for a legal conclusion.

15             MR. PLOFCHAN:  Your Honor, I think this goes

16   to his training and understanding of how he's supposed to

17   observe someone's right under the Fourth Amendment.

18             THE COURT:  I'll sustained the objection to

19   the question that was just asked.

20             MR. PLOFCHAN:  Okay.

21   Q.   Do you agree that he had no legal obligation to

22   come to the door?

23   A.   Yes, sir, at that point.

24   Q.   Okay.  And, do you agree that under the Fourth

25   Amendment, you did not have a warrant so there was no

1  authority under the -- a warrant -- under the search

2  warrant component to go into the house, correct?

3      A.   Correct.

4      Q.   And, if there were any authority, it would have to

5  come from an exception to the warrant requirement under

6  the Fourth Amendment, correct?

7      A.   Yes, sir.

8      Q.   Okay.  And, the exceptions to the Fourth Amendment

9  are, would you agree, limited and strictly construed

10  against you as an officer in your very limited authority,

11  correct?

12     A.   Yes, sir.

13     Q.   Okay.  And, you agree that you have in the General

14  Orders, been given some guidance to comply with making --

15  that you're required to comply with, to insure that you

16  respect people's Fourth Amendment rights, correct?

17     A.   Yes, sir.

18     Q.   And, in those -- Court's indulgence, Your Honor.

19          And in that order, they have identified four

20  factors that you're supposed to consider in terms of

21  whether or not you're going to forcibly enter someone's

22  home without a warrant, correct?

23     A.   I don't recall the four specifically off the top

24  of my head, but that sounds in line.

25          MR. FRANCUZENKO:  Your Honor, just for the

1   record, I won't do it again.  I'm just going to object to

2   this line of questioning.

3   BY MR. PLOFCHAN:

4       Q.  Now, Mr. Ferguson, you agree that at the time you

5   went up the second time, there was no sense of urgency,

6   correct?

7       A.  No, sir.  I would not describe it as no sense of

8   urgency.

9       Q.  Why would there have been urgency based on what

10  you knew?

11      A.  There was still an evolving situation based on the

12  original call for a subject with a knife and then in our

13  initial encounter, have a very angry man.

14      Q.  When -- what made -- what made this case an

15  evolving situation other than you and the other deputies

16  not going away?

17      A.  I describe it as an evolving situation since it

18  had not been concluded after the initial contact.  And

19  then subsequently the second contact although our

20  questions were not answered, his behavior and his

21  demeanor raised the prospect of why he was behaving that

22  way given the nature of the original call.

23      Q.  You said it hadn't been concluded.  What aspect of

24  this situation made it not be concluded other than you

25  and the other deputies deciding not to conclude it and

1  going back up to his house?

2     A.  Because I believe we would have been negligent in

3  our duties had we just walked away after the initial

4  encounter.

5     Q.  Now, you wouldn't have been negligent in your

6  duties if you had applied for a search warrant and had a

7  magistrate decide whether or not you could go in,

8  correct?

9     A.  That may have been another possible option.

10    Q.  And, you didn't even know the procedures to apply

11  for a search warrant, did you?

12    A.  That's incorrect.  I had obtained numerous search

13  warrants.  However, I had not obtained an emergency

14  search warrant at that point.

15    Q.  So then you didn't know the procedures on how to

16  obtain an emergency search warrant, correct?

17    A.  Correct, I was not familiar with that.

18    Q.  Did you ever ask Sergeant Holloway how do we

19  obtain an emergency search warrant?

20    A.  No, sir.

21    Q.  Do you have any information that would challenge

22  Mr. Roger's testimony that if you had called another

23  officer they could have typed an affidavit and walked

24  down the hall and gotten a decision within 10 minutes?

25    A.  No, sir.  I would defer to Mr. Rogers on his

1    experience with that.

2        Q.  So, if you had a concern sometime around 5:15 and

3    nobody went back into the house until after 5:45 where --

4    because Deputy Forsch indicates that they went in and

5    then shortly after the Taser was at 5:49 and that's when

6    that was, you would have at least a half hour to get a

7    decision from a magistrate on whether you had enough

8    information to go into the house.  And yet, you didn't do

9    that, correct?

10             MR. FRANCUZENKO:  Your Honor, I'm going to

11   object to the form of that question.  There was about

12   five or six questions in there and a whole argument of

13   facts.  I object to the form.

14             THE COURT:  Compound question.  Objection

15   sustained.

16   BY MR. PLOFCHAN:

17       Q.  Okay.  You agree that there was at least a half

18   hour between the time you left the house and the time you

19   went back up the second time, correct?

20       A.  If that's what the time stamps indicate.

21             MR. FRANCUZENKO:  And I'm going to object to

22   leading at this point, too.  This is direct examination.

23             MR. PLOFCHAN:  Your Honor, I think -- I'm

24   sorry.  This is an adverse witness.  He's a party --

25   adverse party in this case.

1          MR. FRANCUZENKO:  But, you know, in order to

2    lead -- get to that leading question, you have to -- you

3    have to ask some preliminary questions.  I don't think

4    there's a basis for him to lead at this point.

5          THE COURT:  All right.  Objection note.

6    Objection overruled.

7    BY MR. PLOFCHAN:

8      Q.  So, you agree that you had at least a half hour of

9    time based on the -- when the Taser was deployed, when

10   you went into the house and when you acknowledged when

11   you would have left the first time?

12     A.  My personal estimation of the time span was

13   shorter than that.  However, I would defer to if there is

14   a specific times noted in the cad notes, I would defer to

15   that.

16     Q.  And if one had taken the time to apply to a

17   magistrate and fill out an affidavit, there was nothing

18   that said that you had to walk back up to the house at

19   the moment you did, correct?

20          MR. FRANCUZENKO:  Objection, hypothetical.

21          MR. PLOFCHAN:  It's not a hypothetical.  I'm

22   asking if he had any circumstances -- he said had to go

23   back up at the moment he did.

24          THE COURT:  Objection sustained.

25   BY MR. PLOFCHAN:

1    Q.   You were not aware of any facts that required you

2    to go back up to the house at the moment you did,

3    correct?

4    A.   No, sir.  And just if I can understand when you're

5    saying facts, you're referring to the situation, the

6    unknown situation in the house?

7    Q.   That's right.  You were not aware of any changed

8    circumstance that -- that said that you had to go back up

9    to the house at the moment you did, as opposed to waiting

10   five, or ten more minutes, correct?

11   A.   Correct.

12   Q.   So, there was nothing that prevented you from

13   attempting to get a search warrant or get a magistrate to

14   decide on whether there was enough to get a search

15   warrant except your lack of knowledge on how to do it,

16   correct?

17   A.   In my position that evening as a backup unit to

18   Deputy Forsch, it would not have been my position to

19   leave and go to the magistrate.  I would say that would

20   be a choice or an option for the sergeant to allocate

21   what manpower is available.

22   Q.   Now, you agree that Mr. Rogers indicated no one

23   would have had to leave.  They would just have to call a

24   sheriff at the ADC and relay it by phone and that person

25   could have typed it up, correct?

1          MR. FRANCUZENKO:  Objection, Your Honor.

2          THE COURT:  What's the objection?

3          MR. FRANCUZENKO:  Relevance.  Is he asking

4    now to confirm what Mr. Rogers' testimony was?

5          MR. PLOFCHAN:  No, I'm not asking that.

6          MR. FRANCUZENKO:  I believe he is.

7          I don't even think that was the accurate

8    description of the testimony that they could have

9    somebody else do it or call somebody.  I don't agree with

10   the characterization of the testimony, but -- I object to

11   the relevance and to the form.

12         MR. PLOFCHAN:  Your Honor, I don't know how

13   to respond.  I'm not sure other than relevance -- I know

14   the objection now is relevance and form.  I think it's

15   highly relevant in terms of the context of having the

16   officer explain not only his understanding of the Fourth

17   Amendment but why he didn't follow based on his

18   understanding of the Fourth Amendment, and the context I

19   think was properly phrased.

20         THE COURT:  I'm going to sustain the

21   objection.  You can ask him about what he did or did not

22   do, but what he did not do from the standpoint of

23   hypotheticals, the objection will be sustained.

24         MR. PLOFCHAN:  Understood.

25   BY MR. PLOFCHAN:

1    Q.   Now, there was nothing that prevented you or was

2    there anything that prevented you from calling someone at

3    the ADC and asking for them to help get a search warrant?

4    A.   Although I did have a phone with me, yes, I did

5    not have -- I couldn't recollect if there was anyone I

6    know up at ADC.  And again, my dispatch priority was to

7    be a backup to officer -- for Deputy Sherin or Deputy

8    Forsch.

9    Q.   Now, was there anything that prevented you from

10   asking Deputy Forsch to call to the ADC and have someone

11   seek a search warrant from the magistrate?

12   A.   No, sir.

13   Q.   Was there anything that prevented you from asking

14   Sergeant Holloway to call up to the ADC and ask an

15   officer to present an affidavit for a search warrant?

16   A.   No, sir.  But again, I was not familiar with that

17   emergency search warrant procedure.

18   Q.   Do you believe that you are charged with knowing

19   the procedures to get an emergency search warrant if

20   you're going to be protecting people's Fourth Amendment

21   rights?

22   A.   I have studied, reviewed, and familiar with my

23   General Orders.  I would not say or describe myself as

24   knowing every intricate element involved in law

25   enforcement.

 1      Q.   I didn't ask you if you knew that.  I asked if you

 2    believe you are charged with knowing that, that you

 3    should know that.

 4      A.   If at some point I am able to perform or learn

 5    that scenario, yes, sir.

 6      Q.   But, you didn't make any mention of the Fourth

 7    Amendment to any other officer, including Sergeant

 8    Holloway, correct?

 9            MR. FRANCUZENKO:  Objection, asked and

10    answered.

11            MR. PLOFCHAN:  I'll withdraw that.

12            THE COURT:  Sustained.

13    BY MR. PLOFCHAN:

14      Q.   Now, when you got up to the house and you're

15    knocking at the door, actually, I wanted to -- I'm sorry.

16    I want to rephrase that.

17            So, I want to be clear that you just told me that

18    there was nothing that stopped you or nothing -- no

19    information that you had that would not have allowed you

20    to wait five, or ten more minutes, correct?

21      A.   As a rule our procedure, no, but --

22      Q.   Okay.  And, therefore, there's no real urgency

23    involved if you could have waited five or ten more

24    minutes, correct?

25      A.   That would be where I would say it would be a

1    mischaracterization, although it was not a rule that we

2    had to step up at that moment.  There was a sense of

3    urgency based on the information that we had.

4        Q.  Explain to me or -- actually, explain to the jury,

5    please, what information, what specific information

6    created this sense of urgency.

7        A.  It was --

8        Q.  Let me rephrase it.  What specific information you

9    had that created this sense of urgency?

10       A.  The original phone call stating that the caller

11   needed assistance taking a knife away from someone.  And

12   then Mr. Mial's demeanor and interaction with us when we

13   first arrived on scene.  His anger and being irate

14   towards us seemed unreasonable, given the fact that at

15   that point, and for it to be him as the caller, had

16   called us for help with someone with a knife.

17       Q.  Why is it that every time I ask you about the

18   original phone call, you only mention the first part and

19   not the second part that says that never mind, they've

20   dropped it?

21       A.  Because the first part is the reference to someone

22   holding the knife and that would be the element that

23   would place someone in fear to call 911 to begin with.

24       Q.  And yet, would you agree that the element never

25   mind, they've dropped it, would be the element that

1   reduces or eliminates that fear, and yet you don't

2   consider that at all.  Can you explain that?

3       A.  It's not that we don't consider that, but we do

4   not know all the current status of the situation inside

5   the house at that point as far as --

6       Q.  I'm trying to understand this.  Several times I've

7   asked you what specific information you had and you

8   mentioned they made the call.  But you've ignored the

9   fact that they told you everything was okay.

10              MR. FRANCUZENKO:  Your Honor --

11              MR. PLOFCHAN:  Can you explain why?

12              MR. FRANCUZENKO:  I'm going to object.  This

13  line of questioning has now been gone through, not just

14  the specific question, but this line of questioning has

15  been gone through multiple times.

16              MR. PLOFCHAN:  I --

17              THE COURT:  Sustained.

18  BY MR. PLOFCHAN:

19      Q.  Now, in terms of -- there was nobody left to guard

20  the site, correct?

21      A.  Are you referring to the proximity to the house?

22      Q.  No, I'm referring to the possibility of danger to

23  others, including deputies left to guard the site.

24          When you were down at the driveway, there was

25  nobody at the -- up at the door guarding the site,

1    correct?

2       A.  I would say the fact that myself and Deputy Forsch

3    at that point were right there at the face of the

4    driveway, we were on site, in effect.

5       Q.  I didn't ask that.  There's nobody up at the door

6    guarding the house, correct?

7       A.  I don't see how standing on the porch outside the

8    door qualifies as guarding versus the driveway area.

9       Q.  Okay.  So, there's no one left guarding the site,

10   correct?

11      A.  I don't really understand the -- your question at

12   that point.

13      Q.  I'm reading from your General Order.  The General

14   Order says that in order to make a warrantless entry, you

15   have to consider the possibility of danger to others,

16   including deputies left to guard the site if you went and

17   got a warrant.

18         There is nobody left to guard the site if you left

19   and got a warrant, right?  There's no danger to any

20   deputy, correct?

21      A.  That would have had to be something -- if it had

22   gone a search warrant route, that would be covered as far

23   as someone staying on scene.

24      Q.  It has to be covered in order to effect a

25   warrantless entry, correct?  Isn't that right?  You must

1    have this and you have to consider the following on a

2    warrantless entry.

3         Are you saying you didn't consider that?

4    A.   I'm sorry.  Can you point out which segment you're

5    referencing.

6    Q.   Sure.  "Deputy shall evaluate the following

7    elements when considering a warrantless entry" and then

8    it's number B, the possibility of danger of others,

9    including deputies left to guard the site.

10        You didn't consider that, right?  Yet you were

11   going to make a warrantless entry.

12   A.   Sir, we were on site.  In the context of the

13   exigent circumstance exception to the Fourth Amendment to

14   make entry, we would not need someone to guard the site

15   as we were on the site ourselves.

16   Q.   And there was no danger to you at that point to

17   the bottom of the driveway, was there?

18   A.   No, not that I would classify, no, sir.

19   Q.   Okay.  So then at least with regard to the

20   possibility of danger to others, including you, that is

21   not a basis for a warrantless entry at that point when

22   you're down at the bottom of the driveway, right?

23   A.   It's -- I would say the first segment of that the

24   possibility of danger to others would cover the people

25   inside the house.  That was the concern for danger.

1    Q.   What was different about this house than any other

2    house that has knives in it?

3    A.   We had received a 911 call from this house.  From

4    what we were dispatched to that address for what we

5    understood to be Mr. Mial calling 911 asking for

6    assistance with someone with a knife inside his house.

7    Q.   And then him calling you back and saying, there's

8    no -- I don't need you.

9              MR. FRANCUZENKO:  Objection, again, rehashing

10   the same grounds.  You can -- he's doing it now in a

11   different context, but it's the same ground, the same

12   facts are the facts.

13             MR. PLOFCHAN:  Your Honor, I think it's very

14   important in the context to -- it's not rehashing the

15   same facts just because the officer keep giving the same

16   answer to different questions.  That's the difficulty

17   here.  When we're assessing the Fourth Amendment

18   urgency --

19             THE COURT:  Excuse me.

20             MR. PLOFCHAN:  I'm sorry, Your Honor.

21             THE COURT:  I've allowed you great leeway to

22   ask questions.  If you have new questions to cover, that

23   you have not covered, now would be the time to do that.

24             MR. PLOFCHAN:  Okay.

25             THE COURT:  I do think you've asked a lot of

1    questions along this same line.  So they are being

2    repetitive now.  So the objection is sustained.

3             MR. PLOFCHAN:  Thank you, Your Honor.

4    BY MR. PLOFCHAN:

5    Q.   Now, when you got to the house, did you engage in

6    conversation with Mr. Mial?

7    A.   Yes, sir.

8    Q.   And, what did you engage in?

9    A.   I attempted to explain to him that we needed to

10   insure that everyone inside the house was okay.

11   Q.   But, you're never asked to go in, did you?

12   A.   I did not get the chance to.

13   Q.   Well, you actually engaged in quite a bit of

14   conversation with him, didn't you?

15   A.   No, sir.  My attempts to talk with him were

16   overridden by him yelling at me.

17   Q.   Didn't you first offer him to speak with your

18   sergeant?

19   A.   My very initial statement, yes, sir.

20   Q.   Okay.  And he declined, correct?

21   A.   I believe he replied it does not matter.

22   Q.   Okay.  And, you didn't ask to go in at that point,

23   did you?

24   A.   No, sir.

25   Q.   Okay.  And then, didn't you ask to explain that

1    you didn't feel you could just go away?

2        A.   I believe as far as the context of we need to make

3    sure everyone is -- inside the house is okay.  We can't

4    just walk away was the context of that statement, yes,

5    sir.

6        Q.   And then he began to talk to you again about his

7    displeasure with the Sheriff's Office, correct?

8        A.   He began to yell at me about the anger towards the

9    Sheriff's Office.

10       Q.   You never at that point interrupted and said, I

11   need to come into the house, correct?

12       A.   As I recall, I attempted to reiterate to him our

13   need to speak with the people and insure their safety

14   inside the house to which he continued yelling at me.

15       Q.   Okay.  Did you -- do you agree that you did not

16   ask him to allow you into the house?

17       A.   Yes, sir, that is correct.

18       Q.   Okay.  And, you also agree that you did not ask

19   him to bring anyone to the door?

20       A.   Yes, sir.  That is correct as well.

21       Q.   Okay.  All right.  And you did not recall Deputy

22   Forsch asking him to bring anyone to the door either, do

23   you?

24       A.   I did not specifically recall her using those

25   words.

1    Q.  Now, you then said that he made a movement; is

2    that correct?

3    A.  Yes, sir, as far as the movement towards

4    apparently closing the door.

5    Q.  Well, what was the movement?

6    A.  If -- after the second encounter, I was standing

7    on the hinge side of the door.  It's an inward opening

8    front door.  He had the door slightly open.  So I could

9    see his face, but as I remember most of his body was

10   obscured behind the door.  I would describe it as the

11   door being opened a sliver, as he was guarding or being

12   guarded in his interaction with us.

13   Q.  You mean he was guarding his house from you

14   entering illegally?

15   A.  No, sir.

16       MR. FRANCUZENKO:  Argument, Your Honor.

17       THE COURT:  I'll give you a chance to argue

18   at the incident, Mr. Plofchan.

19   BY MR. PLOFCHAN:

20   Q.  Did he say anything to you to say that he was

21   going to close the door?

22   A.  No, sir.

23   Q.  Okay.  How much did the door allegedly move?

24   A.  Again, my focus was on his face as he pulled back

25   from where we had been interacting.

1    Q.  So, he's standing with his hands on the door like

2   this and he pulls back, but the door doesn't move?

3    A.  No, sir.  Again, my focus was on his face.  I

4   can't speak to the positioning of his hands.

5    Q.  What about the door?

6    A.  The door was open a sliver.

7    Q.  A sliver.  Was it open where you could see his

8   whole face or at least 8 inches?

9    A.  Yes, sir.  That would be correct.

10    Q.  Okay.  And he moved back, but the door didn't

11   move, did it?

12    A.  Again, my focus was on him, not -- I can't say

13   that I recollect the door movement as far as how much it

14   moved or what.

15    Q.  So then, there was nothing from your observations

16   that there was any attempt to close the door on you,

17   correct?

18    A.  The movement of his body seemed that he was

19   pulling back from the door.  Again, I cannot specify as

20   to the movement of the door, the exact amount of --

21    Q.  If someone wanted to open the door and say finally

22   come in, you'd have to pull back or move back from the

23   door to have that open, right?

24    A.  If the door was to be opened, yes.

25    Q.  So, then there's nothing about his behavior that

1  suggests that he was closing the door or opening the door

2  or doing anything to the door at all, correct?

3       A.  I would say his interaction with me when he was

4  yelling at me, moving up to his movement of his face away

5  from the open area of the door was not indicative that he

6  was going to be opening it and inviting us inside.

7       Q.  But you didn't give him an opportunity because you

8  guys bum rushed the door right then, right?

9       A.  Shortly after that point.

10      Q.  Not shortly, immediately, right?  Sherin put her

11  shoulders down and put in to push and you pushed right

12  behind her, correct?

13      A.  I don't know as far as her shoulder or hands, but,

14  yes, my hands were to the door.

15      Q.  You didn't -- there wasn't even a split second

16  for reaction on your part.  You seized an opportunity to

17  get into his house, correct?

18      A.  Well, we only had a split second of time to react.

19      Q.  So, you seized that opportunity at that point in

20  time, correct?

21      A.  Yes, sir.

22      Q.  And, you knew you didn't have a warrant, correct?

23      A.  Yes, sir.

24      Q.  And, you had no knowledge -- no change in facts of

25  the status of anyone in that house at that time when you

1    went in, correct?

2        A.   The second encounter with Mr. Mial were, again,

3    per my report, where I describe him in the second

4    encounter is yelling versus raised voice in the first

5    one.  That is the only direct interaction with anyone in

6    the house, but I would say yes, that would be a change

7    in -- or further interaction with a person from inside

8    the house which would raise concern and question marks

9    for what is going on inside the house.

10       Q.   So, it's your statement that because he's irate

11   with you, that gives you a reason to believe something

12   might have happened to his children?

13       A.   No, sir.  I'm not placing any specific statements

14   on his children.

15       Q.   So, because he's irate with you, you just want to

16   check it all out and go in, right?

17       A.   No, sir, the original call to 911 about a person

18   with a knife in the house was --

19       Q.   Was made by him, correct?

20       A.   That is what --

21       Q.   He said he doesn't need you, correct?

22       A.   That is what he inferred, yes.

23       Q.   Well, he said it directly, didn't he?  He said I

24   don't need you.  If the case is settled, it's all

25   resolved.  I don't need you.  I canceled the call.  Isn't

1   that what he told you all?

2       A.   I would not say word for word that was his

3   demeanor nor statements to us.

4       Q.   So, there's no -- you have nothing about anyone

5   else in the house other than you want to check it out,

6   correct?

7       A.   I had no direct information on other people inside

8   the house at that point.

9       Q.   Okay.  And, you did not give him any orders, did

10  you?

11      A.   At what point are you referring to?

12      Q.   At that point in time.

13      A.   No, sir.  I did not give him any orders.

14      Q.   And I want to be very clear.  You cannot say that

15  you specifically saw the door swinging shut, correct?

16      A.   Correct, as far as the amount of movement of the

17  door, I cannot specify.

18      Q.   And you never told him he was at the risk of being

19  arrested, correct?

20      A.   Correct.

21      Q.   And you never told him he was at risk of violating

22  the law in prohibiting sheriffs from attending their

23  duties, did you?

24      A.   No, sir.

25      Q.   Okay.  Deputy Forsch didn't say anything along

1    those lines, did she?

2        A.   No specifics that I recall.

3        Q.   Okay.  And then you go in and did you run smack

4    into him?

5        A.   No, sir.  I would not characterize the encounter

6    as that.

7        Q.   Well, that's what Deputy Forsch said.  Is she

8    wrong?

9        A.   I won't speak for Deputy Forsch's

10   characterization.  I would say once I crossed the plane

11   into the house, Mr. Mial immediately grabbed me with his

12   left arm.

13       Q.   So, he's at the door and he kind of tries to bear

14   hug you back out the door.  Is that right?

15       A.   In effect, yes.

16       Q.   And you had -- you and Forsch on him, correct?

17   And another deputy get involved, too?

18       A.   At some point, Deputy Altom came in the door.

19       Q.   And how long do you think this whole transaction

20   took place?

21       A.   I would estimate around 30 seconds.

22       Q.   Is it less than 30 seconds?

23       A.   I would say roughly around 30, give or take.  I

24   couldn't say exactly.

25       Q.   Could it have been 10 or 15?

1    A.   Again, to the best of my recollection, 30 seconds

2    is what I would attribute to it.

3    Q.   All right.

4         MR. PLOFCHAN:   Court's indulgence.

5    BY MR. PLOFCHAN:

6    Q.   Did you ever hear anybody yell for a Taser?

7    A.   No, sir.  I do not recall that.

8    Q.   Were you -- you weren't in danger at that point,

9    were you?

10   A.   Yes, sir.  I would characterize myself and Deputy

11   Forsch in a physical struggle with Mr. Mial placed us

12   both in danger of physical injury.

13   Q.   Now, what liability do you have for creating that?

14        MR. FRANCUZENKO:   Objection --

15        MR. PLOFCHAN:   Let me rephrase that question

16   in terms of liability.

17   BY MR. PLOFCHAN:

18   Q.   You said you were justified in going in.  Aren't

19   you also then responsible for creating that -- the issues

20   of the contact with Mr. Mial?

21   A.   Sir, I do believe we were justified entering upon

22   exigent circumstances.

23   Q.   Can you rely -- are you relying on any standard

24   law or constitutional amendment or provision that would

25   support your belief?

1          MR. FRANCUZENKO:  Objection so far as he's

2   calling for a legal opinion.

3          THE COURT:  Sustained.

4   BY MR. PLOFCHAN:

5     Q.   What is the basis for your belief other than you

6   wanted to get into the house to check it out?

7     A.   Based on my training, I would say that a

8   reasonable person placed in my shoes and my co-workers'

9   shoes on the scene of that incident, based on the

10  totality of the circumstances, would be right to have

11  cause for concern about what had transpired or may be

12  transpiring within the house at that time.

13    Q.   Okay.  So I have two questions based on that

14  answer.  Wouldn't a reasonable person have said, hey,

15  let's try to get a warrant?

16    A.   Again, sir, there may have been different

17  directions the incident could have gone, but I believe we

18  were reasonable in the path that we took.

19    Q.   And then it was based on your concerns you said,

20  but would you agree that it wasn't based on any facts

21  indicating an ongoing crime or other physical emergency,

22  correct?

23    A.   I would use the term circumstances, totality of

24  the circumstances rather than facts since there were

25  unknown elements.

1    Q.   Actually, let me rephrase it.  I'll save that for

2    argument.

3         Court's indulgence.

4         Actually, he got tased; is that correct?

5    A.   Yes, sir.

6    Q.   Did you have anything to do with writing a

7    complaint or charging him?

8    A.   No, sir.

9    Q.   Did you ever threaten to tase him when he was on

10   the ground?

11   A.   No, sir.

12   Q.   Did you hear Deputy Forsch threaten to tase him

13   when he was on the ground?

14   A.   No, sir.

15   Q.   Did you hear anybody do anything at that point?

16   A.   There were a lot of voices and commotion going on.

17   Q.   Where did you go afterwards?

18   A.   Initially I was in the house until he was placed

19   in handcuffs and then I cleared the scene shortly after

20   that.

21   Q.   Now, I want to be clear.  Would you agree that at

22   no time did Mr. Mial directly vent any anger toward

23   anyone living in the home or say that he had been in an

24   argument with anyone?

25        MR. FRANCUZENKO:  Objection, compound

1    question.

2                THE COURT:  It is.  One question at a time,

3    Mr. Plofchan.

4    BY MR. PLOFCHAN:

5        Q.  Do you agree that Mr. Mial did not directly vent

6    any anger toward anyone living in the home?

7        A.  Yes, sir.

8        Q.  And, do you agree that he did not say that he had

9    been in an argument with anyone?

10       A.  Yes, sir.

11       Q.  And that his frustration or anger appeared to be

12   solely directed at deputies and the Sheriff's Office?

13       A.  Yes, sir.

14       Q.  Okay.  Also, at all times, you understood that

15   Mr. Mial was the person who placed the 911 calls?

16       A.  It was not confirmed.  That is what I inferred

17   during the situation.

18       Q.  You recall being asked for admissions in this

19   case?

20       A.  Yes, sir.

21       Q.  Okay.

22               MR. PLOFCHAN:  I'm going to ask Mr. Marshal,

23   would you show him admission 11.

24       Q.  Can you read the request for admission 11 and your

25   answer to the question at the first -- 11?

1    A.    Eleven, "Deputy Ferguson understood that Mr. Mial

2    was the person who had placed the 911 call".

3    Q.    And what's the answer?

4    A.    "Response, defendant admits request number 11

5    based on plaintiff's statements."

6    Q.    Okay.

7           MR. PLOFCHAN:   Thank you, Marshal.

8    Q.    Would you also agree that while you were outside

9    or in Mr. Mial's home, you saw two children in the house

10   and nothing about the children looked or suggested the

11   need for law enforcement activity of any site -- of any

12   sort on the premises?

13   A.    From the outside of the house, I recall seeing the

14   young girl who was approximately 7 years old.  That is

15   the only child that I remember seeing inside from the

16   outside of the house.

17          MR. PLOFCHAN:   Marshal, could I ask your

18   assistance again.

19   Q.    Would you read, please, request number 19 and the

20   response to 19.

21          Could you read that out loud, please.

22   A.    "Defendant -- defendant admits that he did not

23   make a statement to plaintiff warning him that he was

24   breaking the law --"

25   Q.    Nineteen.

1    A.   Nineteen.  "While Deputy Sherin and Ferguson were

2   outside of or in Mr. Mial's home, they saw two children

3   in the house.  Nothing about how the children looked

4   suggested the need for law enforcement activity of any

5   sort on the premises.  Response defendant admits request

6   number 19."

7         I would just note that that said outside of or in.

8   So at the point when we're inside the house, I did see

9   the second child.

10   Q.   You did see a second child and it didn't need any

11  law enforcement intervention, correct?

12   A.   That is correct, sir.

13   Q.   Okay.

14   A.   I believe your original question you had asked

15  while we were outside of the house.

16         MR. PLOFCHAN:  Which I believe I read it, but

17  that's all right.

18         Court's indulgence.

19         THE COURT:  Counsel, we're going to take the

20  afternoon recess now for 15 minutes.

21         MR. PLOFCHAN:  Yes, sir.

22         (Court recessed at 3:36 p.m. and reconvened

23         at 3:58 p.m.)

24         THE COURT:  You can bring our jury out.

25  Thank you.

1                You may be seated.

2                All right, counsel, you may proceed.

3                MR. PLOFCHAN:  Thank you, Your Honor.

4    BY MR. PLOFCHAN:

5        Q.  Mr. Ferguson, I want to be clear.  At no time when

6    you entered the house did Mr. Mial ever throw any

7    punches?

8        A.  That is correct.

9        Q.  And, while you were struggling for about

10   30 seconds, he was then tased and immobilized, correct?

11       A.  Yes, sir.

12       Q.  And, was there any problem in getting him placed

13   in the hand -- in the handcuffs?

14       A.  I remember he was initially tensed, and then he

15   complied and was placed in the handcuffs.

16       Q.  So, he didn't resist arrest or try to fight it or

17   anything like that?

18       A.  No, sir.  I do not specifically recall any

19   resisting of arrest.

20       Q.  So, there's no basis for anyone to have threatened

21   him with being tased again, correct?

22       A.  Again, I -- my focus wasn't 100 percent on

23   Mr. Mial.  There was a lot of other stuff going on, so I

24   don't want to speculate.

25       Q.  Based on your observations, was there any basis

1    for threatening him with being tased again?

2              MR. FRANCUZENKO:  Your Honor, object and

3    asked and answered.

4              THE COURT:  Sustained.

5    BY MR. PLOFCHAN:

6      Q.  Did you see anything other than him being

7    compliant?

8      A.  I know that his arms were initially tensed.

9      Q.  Okay.

10             MR. PLOFCHAN:  Those are the questions I

11   have.

12             MR. FRANCUZENKO:  Court's indulgence, Your

13   Honor.

14             THE COURT:  All right.

15             MR. FRANCUZENKO:  I'll try not to recover

16   ground.

17                      CROSS-EXAMINATION

18   BY MR. FRANCUZENKO:

19     Q.  You were asked earlier, Deputy Ferguson, about

20   testimony that you gave in your deposition about whether

21   you used the word yelling; is that correct?

22     A.  Yes, sir.

23     Q.  All right.

24             MR. FRANCUZENKO:  Mr. Plofchan, I'm going to

25   be referring to page 52 of his deposition.

1          Mr. Toliver, lines 2 and 3.

2      Q.  Can you read for the jury what you said on lines 2

3  and 3 of page 352.

4      A.  "Mr. Mial appeared to be very upset.  Deputy

5  Sherin was attempting to speak to him."

6      Q.  Thank you.  You didn't use the actual words

7  yelling, correct?

8      A.  Correct, not in that portion, no.

9      Q.  All right.  And, were you ever asked specifically

10  in your deposition "was he yelling at that time"?

11          MR. PLOFCHAN:  Objection, the deposition

12  would speak for itself.  Past evidence would be the

13  deposition.

14          THE COURT:  Sustained.

15          MR. FRANCUZENKO:  All right.

16  BY MR. FRANCUZENKO:

17      Q.  Remind me, Deputy Ferguson, when did you start

18  with the Sheriff's Office?

19      A.  I was hired in October of 2005.

20      Q.  And, when did you start working a patrol?

21      A.  After police academy, that would have been the

22  summer, I believe, July of 2006.

23      Q.  And, were your duty as a patrolman up from that

24  time up until the time of this incident?

25      A.  Yes, sir.

1    Q.  And, so how long were you actually in patrol then

2    up until this time?

3    A.  Oh, approximately four and a half years, a little

4    bit more.

5    Q.  And how long have you -- did you ultimately serve

6    in the patrol unit?

7    A.  In early 2012 I was promoted to detective.

8    Q.  And where do you currently serve?

9            MR. PLOFCHAN:  Objection, relevance.

10           MR. FRANCUZENKO:  Your Honor, it is relevant.

11           THE COURT:  All right.  You say it's

12   relevant.  Objection overruled.

13           THE WITNESS:  I'm currently assigned as a

14   detective in the narcotics unit.

15   BY MR. FRANCUZENKO:

16   Q.  And, are you in a specific -- are you an

17   undercover or are you plain clothes?

18   A.  I was --

19   Q.  Are you a uniform or undercover?

20   A.  Undercover.

21           MR. PLOFCHAN:  Your Honor, at this point, I

22   move to strike the previous testimony.  It hasn't been

23   able to link up any relevance to this issue.

24           MR. FRANCUZENKO:  Your Honor, at -- at --

25           THE COURT:  I want to save time.  The

1    objection is overruled.  Go ahead.

2              MR. FRANCUZENKO:  Okay.

3    BY MR. FRANCUZENKO:

4      Q.  Can you explain to the jury why your appearance is

5    today with your hair and your beard?

6      A.  In my position, it would -- primarily look to

7    blend into various crowds.  So I would never be wearing a

8    uniform for -- ever since I've been narcotics, facial

9    hair and hair on top is held to a different standard than

10   say patrol where it's short cut hair and clean shaven on

11   the face.

12     Q.  So, if you were still in patrol in a uniform

13   position, you would not have the current hair or the

14   current beard, correct?

15     A.  Correct.

16     Q.  How old are you, Deputy Ferguson?

17     A.  Thirty-one.

18     Q.  And, how old were you at the time of this incident

19   in 2010?

20     A.  I believe 26.

21     Q.  And, Sergeant Holloway was your direct supervisor

22   at that time?

23     A.  Yes, sir.

24     Q.  And, what was the reasons or reason that you

25   called her that evening after you left the Mial home

1  initially?

2    A.  To update her on the circumstances of the call we

3  were on.

4    Q.  And, did she give you instructions at that time?

5    A.  She advised that she would be responding --

6          MR. PLOFCHAN:  Objection, hearsay.

7          THE COURT:  What she said would be hearsay.

8          MR. FRANCUZENKO:  Very good, Your Honor.

9  BY MR. FRANCUZENKO:

10   Q.  Based on your telephone call, what if anything did

11  Sergeant Holloway do?

12   A.  She responded to the scene.

13   Q.  And once she got to the scene, what was her role

14  in the scene?

15          MR. PLOFCHAN:  Objection.  This goes beyond

16  the scope of direct.  We didn't ask questions about what

17  Sergeant Holloway did.

18          MR. FRANCUZENKO:  It's not true.

19          THE COURT:  Objection overruled.

20  BY MR. FRANCUZENKO:

21   Q.  Go ahead.

22   A.  She was the supervising deputy on the scene.

23   Q.  And, at that point, did you take instructions and

24  orders from her?

25   A.  Yes, sir.

1   Q.   Is that the same order that Mr. Plofchan has been

2   referring to throughout your questioning?

3   A.   Yes, sir.

4   Q.   Can you read for us what it says in paragraph two?

5   A.   Just to the right of number two there at the

6   bottom?

7   Q.   Yes.

8   A.   Number two, "Finally, deputies are reminded that

9   if they have -- that they have a lawful right to

10  investigate any situation that they might reasonably

11  believe to be an emergency."

12  Q.   And, was that your understanding of the orders

13  that day?

14  A.   Yes, sir.

15          THE COURT:  Can I have the number for that

16  document?  What document number was that?

17          MR. FRANCUZENKO:  It's plaintiff's document.

18  It's a portion of Exhibit 36, I believe.

19          THE COURT:  All right.  Thank you.

20          MR. PLOFCHAN:  Yes, Your Honor, it would be

21  36.

22          THE COURT:  All right.  You can go on.

23          MR. FRANCUZENKO:  Your Honor, if I may just

24  have a minute or two, because --

25          THE COURT:  Yeah, sure.

1        MR. FRANCUZENKO:  I don't want to rehash.

2        THE COURT:  Take your time.

3        MR. FRANCUZENKO:  And if I can not have to

4   recall this witness, then I'm not going to recall him.

5        THE COURT:  Okay.

6        MR. FRANCUZENKO:  I appreciate the Court's

7   indulgence.

8   BY MR. FRANCUZENKO:

9    Q.   Deputy Ferguson, when you initially responded to

10  the Mial home, you were called as backup, correct?

11   A.   Yes, sir.

12   Q.   And, Deputy Sherin was already at the scene?

13   A.   Yes, sir.

14   Q.   Do you know as we sit here today how long she was

15  at the front door before you got there?

16   A.   I don't have a specific amount of time.  I know it

17  was a short amount of time before I arrived.

18   Q.   Did you hear then -- did you hear everything that

19  she said to Mr. Mial?

20   A.   No, sir.

21   Q.   Did you hear everything that Mr. Mial said to her?

22   A.   No, sir.

23   Q.   And, can you describe for the jury, please, what

24  your role was at this scene.

25   A.   As a backup deputy, my role would be to assist the

1    primary deputy in handling of that call however the

2    situation may unfold.

3        Q.   And, who was the primary?

4        A.   Deputy Forsch.

5        Q.   And, what -- in terms of the questioning, things

6    of that nature, who would take the lead on that?

7        A.   Generally, the primary deputy who is dispatched or

8    in some circumstances, it may be the first on scene,

9    depending on the nature of the call.

10       Q.   Okay.  And, is that what happened when you

11   initially arrived at the scene?

12       A.   Yes, sir.

13       Q.   So, at any point during the initial interaction

14   between Mr. Mial, yourself, and Deputy Forsch, did you --

15   did you make any statements at that time?

16       A.   No, sir.

17       Q.   Did you make any request at that time?

18       A.   No, sir.

19       Q.   And what were you doing at that time?

20       A.   I was standing on the porch in close proximity to

21   the door to the right of Deputy Sherin as she interacted

22   with Mr. Mial.

23       Q.   And, you were serving in a backup role at that

24   time?

25       A.   Yes, sir.

1     Q.   Now, the initial call, there's been a lot of

2   discussion about the initial call of the knife and then

3   someone saying that they no longer needed assistance.

4   That's been your testimony, correct?

5     A.   Yes, sir.

6     Q.   Is that type of a call a common occurrence in your

7   experience as a sheriff's deputy?

8     A.   No, sir, I would not say so.

9     Q.   How would you characterize that type of call?

10    A.   Rare or abnormal.

11    Q.   And, what if anything does that -- how does that

12  play into your decision-making process when you're

13  addressing the situation?

14          MR. PLOFCHAN:  Objection, leading, Your

15  Honor.

16          THE COURT:  Overruled.

17          THE WITNESS:  I would say the circumstance

18  that we would not normally encounter since it is a rare

19  occurrence or incident where something like that happen.

20  And then in particular, it's unknown circumstances with

21  the original perceived threat of someone with a knife

22  raises the degree of urgency.

23  BY MR. FRANCUZENKO:

24    Q.   And, what about after the initial encounter with

25  Mr. Mial, what were some of the circumstances that you

1   observed that played into your decision-making process?

2       A.   Mr. Mial's very angry demeanor and his statements

3   and interaction towards Deputy Sherin and myself being on

4   the porch near her seemed like a very abnormal reaction,

5   especially given the fact that we had responded based on

6   a 911 emergency call.

7       Q.   And, let's talk about the time period between when

8   you go back up to the door the second time and then when

9   Mr. Mial actually opens the door.

10       Can you describe for the jury specifically what

11   was going on during that time period?

12       A.   Initially, after stepping away from the front door

13   in the first encounter, that's when I made the phone call

14   to my sergeant.

15       Q.   No, no, no.  I don't want to rehash all that.  I'm

16   talking specifically when you go back up to the door --

17       A.   Okay.

18       Q.   -- the second time and until he opens the door,

19   that time.  First of all, how long was that?  How long

20   were you at the door the second time before he opened the

21   door?

22       A.   I would say approximately 10 minutes before the

23   door was opened.

24       Q.   I would like you to explain to the jury what was

25   going on during that time period.

1      A.   From my understanding phone calls were being

2    attempted into the house.

3                MR. PLOFCHAN:   Objection, Your Honor,

4    foundation.

5                THE COURT:   Just focus on what you saw.

6    Objection sustained.

7                THE WITNESS:   Myself and Deputy Sherin

8    remained at the front door and continued to knock.  Also,

9    I was looking through one panel of windows to the right

10   of the front door and Deputy Sherin was looking through

11   windows to the left to see what we could see inside the

12   house.  And during that time I could see Mr. Mial seated

13   in what appeared to be an office-type room to the left of

14   the front door.  He also appeared to be conversing with

15   someone on the phone.

16   BY MR. FRANCUZENKO:

17     Q.   What else were -- what if anything were you all

18   doing at the front door?

19     A.   We also knocked numerous times throughout that

20   10 minutes attempting to get a response, for someone to

21   come to the front door.

22     Q.   Well, let's be clear on this.  Was it a continuous

23   knock or did you take breaks or how did it happen?

24     A.   I would say it would be fairly continuous,

25   although I would not say it was a 100 percent knock,

1  knock, knock for 10 minutes straight.

2      Q.  Was it loud enough for Mr. Mial to know that you

3  were there?

4          MR. PLOFCHAN:  Objection, Your Honor.  I

5  don't know how we can speculate as to what somebody else

6  could hear.

7          THE COURT:  Sustain.

8  BY MR. FRANCUZENKO:

9      Q.  Did Mr. Mial at any point before you -- before he

10  came to the door acknowledge that you were there?

11         MR. PLOFCHAN:  Objection, leading, Your

12  Honor.

13         THE COURT:  Questions that begin "did you"

14  are leading.  Sustained.

15         MR. FRANCUZENKO:  Just a moment, Your Honor.

16  BY MR. FRANCUZENKO:

17     Q.  Was there any acknowledgment on the part of

18  Mr. Mial that you and Deputy Sherin were back at the

19  front door?

20     A.  No, sir.

21     Q.  How would you characterize that behavior?

22         MR. PLOFCHAN:  I'm going to object as to

23  foundation because there's no foundation that Mr. Mial

24  was aware that they were knocking at the time.

25         THE COURT:  Well, that's not a proper

1    objection, but I sustain the objection.

2    BY MR. FRANCUZENKO:

3        Q.   Did that factor into your evaluation of the

4    situation?

5        A.   Yes, because I had a clear line of sight to

6    Mr. Mial and his behavior and what appearing to me to be

7    the fact that he was attempting to blatantly ignore me

8    regardless of the fact that I was in a clear line of

9    sight to him through the glass as well as knocking on the

10   front door.

11       Q.   And, I'll save Mr. Plofchan the question.  He has

12   the right to ignore you, correct?

13       A.   Yes, sir.

14       Q.   But that's what he did that day, correct?

15            MR. PLOFCHAN:  Objection.

16            MR. FRANCUZENKO:  Withdrawn, withdrawn.

17   BY MR. FRANCUZENKO:

18       Q.   Let's talk just briefly about the struggle with

19   Mr. Mial.  Can you describe for the jury how Mr. Mial had

20   contact with you after you entered the house.

21       A.   His left arm was initially hooked around the upper

22   part of my shoulders and my neck area.  I eventually put

23   my arm over his arm and at that point he was hooked

24   underneath around my rib cage and torso area.

25       Q.   Did you say anything to him during the struggle?

1    A.   I repeatedly told him to stop resisting.

2    Q.   At any point, did he comply with those orders?

3    A.   No.

4    Q.   At any point, did you have Mr. Mial under control?

5    A.   No, sir.

6    Q.   At what point did -- at any point was the

7    situation under control?

8    A.   No, sir.

9    Q.   What -- at some point, the situation stopped, the

10   struggle stopped, correct?

11   A.   Yes, sir.

12   Q.   What caused the situation to stop?

13   A.   After Mr. Mial was tased.

14   Q.   And, were you able to get Mr. Mial under control

15   at that point?

16   A.   Yes.

17   Q.   Were you involved in any of the things that

18   happened afterwards, meaning taking him to the detention

19   center or any of that?

20   A.   No, sir.

21        MR. FRANCUZENKO:  Your Honor, that's all the

22   questions, just reserve the right to recall if necessary

23   during the defendant's case.

24        THE COURT:  All right.

25             REDIRECT EXAMINATION

1  BY MR. PLOFCHAN:

2      Q.  Mr. Ferguson, do you see Mr. Francuzenko brought

3  you up to paragraph two, correct?

4      A.  Yes, sir.

5      Q.  Would you agree that paragraph two doesn't say you

6  have the right to -- to make a warrantless entry to

7  investigate, correct?

8      A.  Correct, it does not specifically address

9  warrantless entry.

10     Q.  To investigate, correct?  Okay.

11         Are you required to obey Sergeant Holloway's order

12  if it's illegal?

13     A.  No, sir.

14     Q.  Okay.  You indicated that this was a rare

15  experience.  If you -- have you ever had any specific

16  training for this rare experience?

17     A.  Yes, I would say search and seizure related

18  training as well as General Orders which do address

19  exigent circumstances would apply in this situation.

20     Q.  If you don't encounter this on a regular basis,

21  why wouldn't you think it important to get a reading from

22  a magistrate on what you should do before you take

23  action?

24     A.  I took the action that given the totality of the

25  circumstances I deemed it was appropriate during that

1    incident.

2        Q.   You indicated that you thought Mr. Mial's conduct

3    was abnormal, but you had never meet him before, correct?

4        A.   That is correct.

5        Q.   So you don't know if it was normal for him or not,

6    correct?

7        A.   That is correct.

8        Q.   Okay.  Were you aware or are you aware of

9    whether -- whether or not Mr. Mial has a right to resist

10   an illegal entrance into his home?

11            MR. FRANCUZENKO:  Your Honor, I'm going to

12   object.  Calls for legal conclusion.

13            MR. PLOFCHAN:  Your Honor, I'm asking his

14   understanding of Mr. Mial's rights in response to his

15   actions.

16            THE COURT:  Objection sustained.

17            MR. PLOFCHAN:  Those are the questions I

18   have, Your Honor.

19            THE COURT:  You can step down, sir.

20            THE WITNESS:  Thank you.

21            (Thereupon, the witness withdrew from the

22   stand.)

23            (Testimony concluded at 4:20 p.m.)

24

25

CERTIFICATE OF REPORTER

1

2

3       I, Renecia Wilson, an official court

4  reporter for the United State District Court of Virginia,

5  Alexandria Division, do hereby certify that I reported by

6  machine shorthand, in my official capacity, the

7  proceedings had upon the testimony in the case of Marcus

8  Mial vs. Stephen O. Simpson, et al.

9       I further certify that I was authorized and

10  did report by stenotype the proceedings and evidence in

11  said testimony, and that the foregoing pages, numbered 1

12  to 214, inclusive, constitute the official transcript of

13  said proceedings as taken from my shorthand notes.

14       IN WITNESS WHEREOF, I have hereto subscribed

15  my name this  6th  day of  August  , 2015.

16

17                            /s/
                    _____
                    Renecia Wilson, RMR, CRR
18                  Official Court Reporter

19

20

21

22

23

24

25